## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| KALSHIEX LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MARK FURCOLO, in his official capacity as | ) |
| Director of the Division of State Lottery; | ) Civil Action No. _____ |
| PETER F. NERONHA, in his official | ) |
| capacity as Rhode Island Attorney General; | ) |
| CHRISTINA TOBIASZ, in her official | ) |
| capacity as Gaming and Athletics | ) |
| Administrator, Department of Business | ) |
| Regulation, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## COMPLAINT

## INTRODUCTION

1.  This action challenges the State of Rhode Island's intrusion into the federal government's exclusive authority to regulate derivatives trading on exchanges overseen by the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 2(a)(1)(A). Plaintiff KalshiEX LLC ("Kalshi" or "Plaintiff") believes Rhode Island will imminently bring an enforcement action against Kalshi with the intent to prevent Kalshi from offering event contracts for trading on its federally regulated exchange.

2.  Kalshi is a federally designated derivatives exchange, subject to the CFTC's exclusive jurisdiction. It offers consumers the chance to trade in many types of event contracts. These contracts are subject to exclusive federal oversight, and—critically—they are *lawful* under federal law, and state gambling laws that seek to regulate them are preempted. In April, the Third Circuit found as much, and just two weeks ago a district court in the Ninth Circuit used the same reasoning in issuing a preliminary injunction barring state officials from enforcing Arizona anti-gambling laws against exchanges like Kalshi. *See KalshiEX LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026); *KalshiEX LLC v. Johnson*, --- F. Supp. 3d ----, 2026 WL 1223373 (D. Ariz. May 5, 2026).

3.  But Rhode Island has taken a different view, and its intent to bring an enforcement action against Kalshi is clear. On May 20, 2026, Kalshi's representatives met with the Attorney General of Rhode Island and members of the Attorney General's staff. During this meeting, the Attorney General and staff asked a number of pointed questions and made clear that Defendants believe that Kalshi's federally regulated offerings do not comply with Rhode Island gaming laws. When Kalshi sought assurances that the Rhode Island Attorney General did not intend to bring an enforcement action against Kalshi, the Attorney General made clear that Kalshi would not receive any advanced notice before the state filed an enforcement action against the company. In short, the Rhode Island Attorney General refused to provide any assurances that the

state would refrain from enforcement. This information makes clear that Rhode Island views Kalshi's event contracts as illegal under its state laws and intends to act imminently against Kalshi's federally regulated business.

4.    This confirmed what Defendants have stated publicly: Defendant Mark Furcolo, in his official capacity as Director of the Division of State Lottery, told the press that the Rhode Island Lottery Commission has an open investigation into prediction markets like Kalshi which he emphasized is "very active."[1]

5.    Further, Defendant Peter F. Neronha, in his official capacity as Rhode Island's Attorney General and on behalf of the State of Rhode Island, has also signed amicus briefs in the United States Court of Appeals for the Third, Fourth, and Ninth Circuits on June 17, 2025, December 17, 2025, January 30, 2026, and March 10, 2026, claiming that Kalshi is violating comparable state laws by offering sports event contracts. *See generally* Amicus Brief, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. June 17, 2025), Dkt. No. 29 ("June Amicus"); Amicus Brief, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Dec. 17, 2025), Dkt. No. 41-1 ("December Amicus"); Amicus Brief, *KalshiEX LLC v. Assad*, No. 25-7516 (9th Cir. Jan. 30, 2026), Dkt. No.-48.1 ("January Amicus"); Amicus Brief, *N. Am. Derivatives Exchange v. Nevada*, Nos. 25-7187, 25-7516, 25-7813 (9th Cir. Mar. 10, 2026), Dkt. No. 111.1 ("March Amicus"). These briefs argue that states, not the CFTC, have the sole power to regulate Kalshi's sports event contracts and that such contracts constitute illegal sports gambling under the signatory states' laws. And although the briefs are focused particularly on Kalshi's sports event contracts, the positions advanced by the amicus could apply to ***all*** of Kalshi's contracts. *See* Amicus Brief of CFTC at

---

[1] Patrick Anderson, *Why RI is Investigating Popular Kalshi, Polymarket Prediction Markets,* Providence J. (Mar. 27, 2026), https://www.providencejournal.com/story/news/politics/state/2026/03/27/ri-joins-list-of-states-investigating-kalshi-polymarket-prediction-markets/89338021007/.

2-3, 17-18, 28-19, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ("CFTC Amicus Br.") (explaining that arguments advanced by states in attempting to regulate sports event contracts apply beyond sports events, and this conduct improperly usurps the CFTC's exclusive authority while causing "market fragmentation [that] erode[s] the nationally uniform framework Congress established to reduce risk, promote transparency, and safeguard market integrity within the financial system.").

6.    Most recently, Defendant Neronha, again on behalf of the State of Rhode Island, signed a letter to CFTC Chairman Michael Selig demanding that the CFTC "acknowledge it lacks any jurisdiction over" sports events contracts, and concede regulatory authority to the states. Comment Letter from 41 Att'y Gens. to Commodity Futures Trading Comm'n (Apr. 30, 2026), https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=115653&SearchText=. Indeed, in that letter, the Defendant unequivocally stated his belief that "the CFTC lacks exclusive jurisdiction" over sports events contracts and that the CFTC should eschew its own Congressionally granted powers in favor of state regulations. *Id.*

7.    Rhode Island law contemplates criminal and civil sanctions for unlawful gaming transactions, R.I. Gen. Laws §§ 11-19-1, 11-19-14, 11-19-18, 11-19-39(d), 42-61.2-1, 42-61.2-3.3, 42-61.2-13, 42-61.2-16—which Defendants posit Kalshi's sports event contracts are.  These penalties are severe, and include felony charges and fines up to $1,000 per day. *See, e.g.*, R.I. Gen. Laws §§ 11-19-1, 42-61.2-13.  The threat of enforcement is heightened by the fact that Defendants have refused to provide Kalshi with assurances of non-enforcement, despite Kalshi's endeavors to initiate dialogue to assuage any of the State's concerns.

8.    As such, Kalshi faces an immediate threat that Defendants will attempt to enforce Rhode Island's preempted state laws against it.

9.    Rhode Island's stated intent to prohibit Kalshi from operating intrudes upon the federal framework that Congress established for regulating the trading of derivatives on federally designated exchanges.  The State's efforts to regulate Kalshi are preempted under principles of express preemption, field preemption, and conflict preemption.  This Court should therefore issue temporary, preliminary and permanent injunctions, as well as grant declaratory relief.

10.  Commodity futures regulation has long been under the exclusive purview of the federal government.  In 1936, Congress passed the Commodity Exchange Act ("CEA"), which enacted a federal regulatory framework for derivatives.  In 1974, Congress established a federal agency called the CFTC to oversee it.

11.  The text, purposes, and statutory history of the CEA leave no question that Congress sought to preempt state regulation of derivatives on exchanges overseen by the CFTC, known as "designated contract markets" or "DCMs."  The text of the statute gives the CFTC "exclusive jurisdiction" over trading on federally regulated exchanges.  7 U.S.C. § 2(a)(1)(A).  During the drafting of the 1974 amendments to the CEA, Congress deleted a provision that would have granted states concurrent jurisdiction over futures trading.  *See* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and Talmadge).  One of Congress's avowed goals in creating the CFTC was to avoid the "chaos" that would result from subjecting exchanges to a patchwork of 50 different—and potentially conflicting—state laws.  *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113,* 93d Cong. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark).  As the conference report to the 1974 amendments explained, they were designed to "preempt the field insofar as futures regulation is concerned."  H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).

And the statute gives the CFTC comprehensive authority over regulated exchanges, including the authority to approve or reject certain categories of event contracts as against the public interest.

12.  For that reason, courts have easily found that the CEA preempts state laws in similar contexts.  *See, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 n.7 (7th Cir. 1995); *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 563–64 (6th Cir. 1998).  The CFTC itself agrees.  It informed the U.S. Court of Appeals for the D.C. Circuit that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM" like Kalshi. Brief for Appellant at *27, *KalshiEX LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024) (No. 24-5205), 2024 WL 4512583 (emphasis added).[2]

13. In *Flaherty*, the U.S. Court of Appeals for the Third Circuit affirmed the District of New Jersey's grant of a preliminary injunction to prevent similar state overreach.  In ruling for Kalshi, the Third Circuit emphasized that because "Congress gave the CFTC exclusive jurisdiction over trades on DCMs, [and] provided for continued state regulation of trades conducted off DCMs," it was "reasonable for the District Court to conclude that Kalshi was likely to succeed in showing that the [CEA] preempts [state] law" from "reaching into Kalshi's CFTC-licensed DCM[.]" *Flaherty*, 172 F.4th at 231; *but see KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025), *appeal pending*, Case No. 25-1892 (4th Cir.); *KalshiEX, LLC v. Hendrick*, 2025 WL 3286282 (D. Nev. Nov. 24, 2025), *appeal pending*, Case No. 25-7516 (9th Cir.); *KalshiEX LLC v. Schuler*, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026), *appeal pending*, Case No. 26-3196 (6th Cir.).

---

[2] Commentators have likewise concluded with no difficulty that the CEA "resulted in the preemption of all other would-be regulators at every level of government."  Philip F. Johnson, The Commodity Futures Trading Commission Act: Preemption as Public Policy, 29 Vand. L. Rev. 1, 2 (1976).  And commentators have specifically recognized that "the CEA preempts state bucket-shop laws and other anti-gambling legislation."  Kevin T. Van Wart, Preemption and the Commodity Exchange Act, 58 Chi.-Kent L. Rev. 657, 721 (1982).

14. The Third Circuit also found that Kalshi faced irreparable harm because "absent injunctive relief, Kalshi would suffer economic and reputational harm, including loss of business and goodwill." *Flaherty*, 172 F.4th at 231; *see also KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at \*7 (D.N.J. Apr. 28, 2025) (describing the circumstances as a "Hobson's choice" for Kalshi where "leaving it subject to state enforcement or obligating it to shift its business practices [are] consequences that are not cleanly undone").

15. The CFTC has consistently affirmed its exclusive role in regulating derivatives markets like Kalshi, and the CFTC has committed to defending that authority against improper attacks from state regulators. CFTC Amicus Br. at 1 ("Congress vested the CFTC with exclusive jurisdiction to protect that national interest by overseeing the regulation of futures, options, and swaps traded on federally regulated exchanges…[t]he *CFTC's jurisdiction supersedes State as well as Federal agencies* because commodity derivatives markets require nationally uniform rules governing the listing, trading, clearing, settlement, surveillance, and enforcement of financial instruments traded in these markets to prevent the type of fragmented oversight" that would result from state enforcement (citation modified) (emphasis added)). Recently, the CFTC and the Department of Justice initiated litigation against six states—Arizona, Connecticut, Illinois, New York, Wisconsin, and Minnesota—to prevent them from applying state gambling laws to event contracts traded on CFTC-regulated DCMs (as Defendants seek to do here), leaving no doubt as to the CFTC's view that the trading of Kalshi's event contracts is subject to its exclusive jurisdiction. *See generally United States v. Arizona*, 2:26-cv-02246 (D. Ariz. Apr. 2, 2026), Dkt. No. 1 ("Ariz. Compl."); *United States v. Connecticut*, 3:26-cv-00498 (D. Conn. Apr. 2, 2026), Dkt. No. 1 ("Conn. Compl."); *United States v. Illinois*, 1:26-cv-03659 (N.D. Ill. Apr. 2, 2026), Dkt. No. 1 ("Ill. Compl."); *United States v. New York*, No. 1:26-cv-3404 (S.D.N.Y. Apr. 24, 2026), Dkt.

No. 1 ("NY Compl."); *United States v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026), Dkt. No. 1 ("Wis. Compl."); *United States v. Minnesota*, 0:26-cv-2661 (D. Minn. May 19, 2026), Dkt. No. 1 ("Minn. Compl.").

16. Indeed, just two weeks ago, a federal court in the District of Arizona granted the CFTC's motion for a preliminary injunction barring Arizona state gaming regulators from enforcing laws materially similar to those that Rhode Island seeks to enforce against Kalshi here. *Johnson*, 2026 WL 1223373, at *9. In doing so, the court found that "event contracts traded on DCMs are swaps within the meaning of 7 U.S.C. § 1a(47)(A)." *Id.* at *5. The court also found that "both field and conflict preemption independently bar[red] [state] enforcement against Kalshi," as the CEA's "comprehensive framework is so pervasive that it forecloses parallel state regulation of DCM trading" and a state's "enforcement stands as an obstacle to Congress's full purposes and objectives in the CEA." *Id.* at *5-7.

17. The rulings in *Flaherty* and *Johnson* reflect a growing recognition by federal courts that Kalshi's contracts are legal under federal law and subject to the exclusive jurisdiction of the CFTC. In February, a federal court in the Middle District of Tennessee granted Kalshi a preliminary injunction barring officials in that state from taking action against Kalshi's exchange, based on a finding that Kalshi's contracts—specifically Kalshi's sports event contracts—are swaps subject to the CFTC's exclusive jurisdiction. *KalshiEX v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026) ("The court finds that Kalshi is likely to succeed on the merits because sports event contracts are 'swaps' and conflict preemption applies.").

18. The Tennessee court was also persuaded that Kalshi would suffer irreparable harm because its constitutional rights were threatened and because "[a]bsent an injunction, Kalshi could either continue its operations in Tennessee and face potential civil and criminal liability" or attempt

to comply and risk its position as a national exchange. *Id.* at \*10. The court further noted that Kalshi would be irreparably injured from the "substantial expenses and reputational harm" it would incur from attempting to comply with Tennessee's unconstitutional demands. *Id.* at \*11.

19. An enforcement action by Rhode Island designed to prohibit Kalshi from offering contracts that federal law permits would intrude on the comprehensive federal scheme for regulating designated exchanges. Kalshi is a federally designated and approved derivatives exchange, subject to the CFTC's exclusive jurisdiction. Kalshi offers consumers the chance to trade many types of event contracts, all of which are subject to extensive oversight by the CFTC and are *lawful* under federal law. The CFTC has the authority to initiate the review of, and under certain circumstances, prohibit the trading of, contracts listed on Kalshi's federally regulated exchange. As discussed, the CFTC has made clear that it views Kalshi's offerings as legal and within its purview.

20. Even though Kalshi's contracts are subject to the CFTC's exclusive jurisdiction, Defendants have made clear that they (mistakenly) believe that Kalshi's contracts are instead subject to—and unlawful under— Rhode Island gambling law. The State prohibits any person from "directly or indirectly, set[ting] up, put[ting] forth, carry[ing] on, [or] promot[ing] . . . any lottery, chance, game, or device of any nature . . . for the purpose of exposing, setting for sale or disposing of any money, houses, lands, merchandise, or articles of value . . . except as authorized [by sports wagering license] in this chapter and in title 41 and chapters 61 and 61.2 of title 42." R.I. Gen. Laws § 11-19-1. Accordingly, the State would characterize ***all*** of Kalshi's event contracts as 'illegal gambling' within the meaning of R.I. Gen. Laws § 11-19-1.

21. Defendants' actions, including their acknowledgement that an "investigation" into prediction markets is "very active," refusal to provide Kalshi with advance notice before filing an

enforcement action, signaled intent to act against Kalshi, comments to the CFTC, and joining of amicus briefs, leave little doubt that Defendants intend to bring an enforcement action against Kalshi unless Kalshi stops offering contracts entirely—which, again, are offered for trade on its federally regulated exchange without objection from the CFTC—in Rhode Island.  In doing so, Defendants seek to subject Kalshi to the patchwork of state regulation that Congress created the CFTC to prevent, and Defendants would interfere with the CFTC's exclusive authority to regulate derivatives trading on the exchanges it oversees.

22.  Defendants' threatened actions are preempted under the Supremacy Clause of the U.S. Constitution—both because Congress has expressly and impliedly occupied the field of regulating trading on CFTC-approved exchanges, and because Defendants' acts would squarely conflict with federal law.  Kalshi is entitled to declaratory and injunctive relief to prevent Rhode Island authorities from enforcing their preempted state laws against Kalshi.

23.  Accordingly, Defendants' threatened actions would result in irreparable harm, not just to Kalshi, but to its customers and commercial counterparties.  Shutting down Kalshi's ability to offer event contracts in Rhode Island would threaten Kalshi's viability and require devising complex technological solutions.  It would also impair Kalshi's existing contracts with consumers and business partners, subject Kalshi's users to uncertainty and loss, undermine confidence in the integrity of Kalshi's platform, threaten its prospective business relationships, and jeopardize Kalshi's status as a CFTC-approved exchange.  For these reasons, Kalshi intends to imminently seek an emergency temporary restraining order and preliminary injunction to avoid the immediate and irreparable harm that would result from Defendants' unlawful acts.

## JURISDICTION AND VENUE

24. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution. The federal question presented is whether Rhode Island gambling laws are preempted by the CEA, 7 U.S.C. §§ 1 *et seq.*, as applied to Kalshi's event contracts.

25. The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials. "[T]he Eleventh Amendment does not bar claims for prospective injunctive relief against state officials in their official capacity." *Negron-Almeda v. Santiago*, 579 F.3d 45, 52 (1st Cir. 2009).

26. Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). Defendants perform their duties in and thus reside in this District. A substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

27. Plaintiff Kalshi is a financial services company with its principal place of business in New York. Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts. Its exchange market is federally regulated by the CFTC pursuant to the CEA, 7 U.S.C. §§ 1 *et seq.*

28. Defendant Mark Furcolo is sued in his official capacity as Director of the Division of State Lottery pursuant to R.I. Gen. Law § 42-61.2-3.3 which authorizes the defendant to promulgate rules and regulations relating to "sports wagering and associated devises, equipment, and accessories," and R.I. Gen. Law § 42-61.2-13 which enables the Defendant to enforce the laws and impose administrative penalties at his discretion.

29. Defendant Peter F. Neronha is sued in his official capacity as Rhode Island Attorney General, in which capacity he is authorized to bring enforcement actions against Kalshi for alleged violations of R.I. Gen. Law § 11-19-1.

30. Defendant Christina Tobiasz is sued in her official capacity as Gaming and Athletics Administrator, Department of Business Regulation pursuant to R.I. Gen. Law § 42-61.2-3.3 which establishes her responsibility for licensing of sports books.

31. Together, Defendants would be responsible for enforcing any demand for Kalshi to comply with Rhode Island state law that is preempted by federal law.

## FACTUAL ALLEGATIONS

### A. An Event Contract—Like Other Derivatives—Is a Recognized Financial Tool to Mitigate Risk.

32. Derivatives contracts are financial tools used to mitigate risk. Event contracts are a quintessential example of a derivatives contract—they are a type of option. This form of derivatives contract identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position. For example, a derivatives contract might center around whether a magnitude 8 earthquake will take place in California before January 1, 2027. A purchaser may trade on either the "yes" or the "no" position on the contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

33. Event contracts are traded on an exchange. Traders exchange positions with other traders in the marketplace. Importantly, event contracts do not reflect a "bet" against the "house." Because traders do not take a position against the exchange itself, traders' ability to hedge risk requires counterparties willing to assume risk in the hope of seeing a return. *See Merrill Lynch,*

*Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place."). Kalshi's exchange links traders seeking to hedge or seeking returns based on the uncertainty associated with financially significant events.

34. The value of an event contract is determined by market forces. An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence. During that period, individuals can buy and sell the contract at its fluctuating prices. The ultimate value of an event contract is determined at its expiration date. If the underlying event occurs, the holder of the "yes" position is entitled to its full value. But if the underlying event does not occur, the holder of the "no" position gets the payment.

35. Traders price event contracts by reference to available information at any given time. If new information comes to light, portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase. The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur. Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year. The 30% figure can be informed by data points the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

36. Event contracts are a valuable means to hedge against event-driven volatility. Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure to real-world events in an uncertain market. There is no other widely available financial instrument with this unique capability to capture the risks of an event

with potential economic consequences, which is a benefit not only to those that wish to hedge risk or seek return, but also to market observers and other economic actors.

37. To give just some of many examples, this past February, researchers at the Federal Reserve published a paper for which the "results suggest that Kalshi markets provide a high-frequency, continuously updated, distributionally rich benchmark that is valuable to both researchers and policymakers."[3]  Findings in that paper included that "Kalshi markets are well-behaved and broadly consistent with those from more established financial instruments," and that "in several episodes, they allocate probability mass in ways that may reflect the range of plausible macroeconomic outcomes better than traditional financial derivative or survey-based forecasts."[4]  Further, Kalshi's "median and mode have a perfect forecast record on the day before the [Fed Open Market Committee] meeting, which represents a statistically significant improvement over the fed funds futures forecast,"[5] and, for headline consumer price index forecasts, "Kalshi provides a statistically significant improvement over the Bloomberg consensus forecast."[6]  And, "Kalshi provides real-time, distributional forecasts for macroeconomic variables such as GDP, core CPI, and unemployment—markets for which options data have historically been unavailable."[7]

38.  As another example, Kalshi announced a partnership with Tradeweb, a leading global operator of electronic marketplaces for rates, credit, equities, and money markets, which facilitates more than $2.6 trillion in notional value of instruments traded per day.[8]  The partnership is

---

[3] Anthony M. Diercks, Jared Dean Katz & Jonathan H. Wright, *Kalshi and the Rise of Macro Markets*, Finance and Economics Discussion Series Paper 2026-010, Board of Governors of the Federal Reserve System, at 1 (Feb. 18, 2026), https://www.federalreserve.gov/econres/feds/kalshi-and-the-rise-of-macro-markets.htm.

[4] *Id.* at 2-3.

[5] *Id.* at 3.

[6] *Id.*

[7] *Id.*

[8] Tradeweb and Kalshi Announce Strategic Partnership to Expand Institutional Access to Prediction Markets, Tradeweb (Feb. 19, 2026), https://www.tradeweb.com/newsroom/media-center/news-releases/tradeweb-and-kalshi-announce-strategic-partnership-to-expand-institutional-access-to-prediction-markets/.

designed to expand institutional access to data from Kalshi's market and to facilitate trading by those same institutional investors on Kalshi's platform.[9]

39.  And late last year, the real estate investment firm Arrived announced its plans to utilize Kalshi's event contracts to hedge the risk of a government shutdown impacting its business.[10]

40.  Though Defendants have attacked prediction markets broadly, some states have focused in particular on Kalshi's sports event contracts.  But these too are swaps that fall under the CFTC's exclusive jurisdiction.  That is because, as both courts and the CFTC have recognized, sporting events can have significant economic consequences for a broad ecosystem of stakeholders.  *Orgel*, 2026 WL 474869, at *7–8; *Flaherty*, 2025 WL 1218313, at *6; CFTC Amicus Br. at 19-20.  Advertisers, sponsors, television networks, local communities, sportsbooks, and others all stand to gain or lose substantial sums depending on the outcomes of sports events.  Sports event contracts thus offer these entities opportunities to hedge their exposure.  And that is happening in the market right now.

41.  Take, for example, Game Point Capital, a sports-focused insurance firm that works with college athletic departments, pro teams, and sponsors to insure risk related to performance bonuses, coach salary buyouts, postseason and ticket revenue, and other areas of economic

---

[9] *See* Katherine Doherty and Sridhar Natarajan, *Wall Street Bond-Trading Hub Tradeweb Strikes Deal with Kalshi*, Bloomberg (Feb. 19, 2026), https://www.bloomberg.com/news/articles/2026-02-19/bond-trading-hub-tradeweb-strikes-prediction-markets-deal-with-kalshi.

[10]  *See* Ryan Frazier, LINKEDIN, https://www.linkedin.com/posts/activity-7386091007588749312-rhxN/ [https://perma.cc/CQN6-JK3M]; *see also* Michael J. de la Merced, *Kalshi, a Prediction Market, Raises $1 Billion in a New Round*, N.Y. TIMES (Dec. 2, 2025), https://www.nytimes.com/2025/12/02/business/dealbook/kalshi-prediction-market-billion.html [https://perma.cc/VUY8-HCDT].

exposure.[11]  Game Point Capital uses Kalshi to hedge, and it intends to do so for $30 million in risk annually.[12]

42.  Other market participants have recognized the hedging utility of sports event contracts as well.  In an April 2026 submission to the CFTC on event contracts and prediction markets, Susquehanna International Group explained that media companies and advertisers use sports-related event contracts to hedge risks tied to viewership, game outcomes, point spreads, and totals, and that businesses are already using these markets to hedge real economic risks.[13]  Similarly, Underdog Sports, a fantasy sports company, uses Kalshi as a tool to "hedge against volatility" on its own platform.[14]  And others can as well:  sponsors of a particular team or athlete can use event contracts to hedge against the risk that the team or athlete underperforms.  Hotel operators can hedge against the revenue earned from a local team making a playoff run, and TV networks can hedge against the risk that star players who draw viewers may not play in certain games.

43.  Event contracts are also a valuable means of communicating information to the public because contract prices reflect prevailing market opinions and conditions. Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions.  This is not

---

[11] Game Point Capital, *Services*, https://www.gamepointcapital.com/services; *see also* Paul Steinbach, *UConn Insured Basketball Coach Bonuses and Saved Nearly $3M*, Athletic Bus. (Apr. 23, 2024), https://www.athleticbusiness.com/operations/budgeting/article/15669200/uconn-insured-basketball-coach-bonuses-and-saved-nearly-3m (Game Point Capital wrote insurance contract that saved university nearly $3 million in bonus payments to coaches related to NCAA tournament performance.).

[12] Andrew Ross Sorkin et al., *New Epstein Details Rattle Washington, Hollywood and Beyond*, N.Y. Times (Feb. 10, 2026), https://www.nytimes.com/2026/02/10/business/dealbook/epstein-lutnick-wasserman-starmer.html.1.

[13] *See* Comment Letter from Caitlin Starbuck, Global Head of Compliance, Susquehanna International Group, LLP to Commodity Futures Trading Comm'n (Apr. 30, 2026), https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=115523.

[14] *See* Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 20, 2025), https://www.ingame.com/underdog-kalshi-pm-risk-management/.

theoretical. Kalshi has announced partnerships with CNN, Fox News, and CNBC, which make use of its market data in their reporting.[15]

44. Kalshi has launched a platform, Kalshi Research, to share market data with academics and promote research derived from the same.[16] Data generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event. *See* 7 U.S.C. § 5(a) (derivatives contracts, including event contracts, "are affected with a national public interest by providing" both a means for hedging risk and "disseminating pricing information through trading in liquid, fair and financially secure trading facilities").

**B. Congress Delegated the Power to Regulate Event Contracts That Are Offered by a Regulated Exchange to the CFTC.**

45. Futures contracts have long been regulated by the federal government. In 1936, Congress passed the CEA, which provides for federal regulation of all commodities and futures trading activities and requires that all futures and commodity options are traded on organized, regulated exchanges.

46. In 1974, Congress established the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA. Proponents of the 1974 Act were concerned that the "states . . . might step in to regulate the futures markets themselves," thus subjecting futures exchanges to "conflicting regulatory demands." *Am. Agric. Movement*, 977 F.2d at 1156. One

---

[15] *See* James Faris, *Prediction giant Kalshi strikes a new media partnership with CNBC, days after its CNN deal*, Business Insider (Dec. 4, 2025), https://www.businessinsider.com/kalshi-cnbc-deal-cnn-data-integration-partnership-2025-12; R.T. Watson, *Kalshi inks exclusive CNBC deal as prediction markets surge into mainstream media*, The Block (Dec. 4, 2025), https://www.theblock.co/post/381415/kalshi-exclusive-cnbc-deal-prediction-markets-surge-mainstream-media; *FOX to Integrate Kalshi Forecasts Across FOX News Media and FOX One Platforms*, FOX (Apr. 7, 2026), https://www.foxcorporation.com/news/business/2026/fox-to-integrate-kalshi-forecasts-across-fox-news-media-and-fox-one-platforms/.

[16] *See Kalshi launches new research arm*, Kalshi News, (Dec. 22, 2025) https://news.kalshi.com/p/kalshi-launches-research-arm-prediction-markets.

Senator remarked that "different State laws would just lead to total chaos." Senate Hearings at 685 (statement of Sen. Clark). As a solution, the House Committee on Agriculture put "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 76, 82 (1974). The Senate reaffirmed the CFTC's exclusive power by deleting a provision of the CEA that would have preserved the states' authority over futures trading. *See* 120 Cong. Rec. 30,464 (1974) (statements of Sens. Curtis and Talmadge).

47. The public can only trade derivatives on a board of trade that the CFTC has designated as a contract market, or DCM. 7 U.S.C. §§ 2(e), 6(a)(1), 7(a); 17 C.F.R. § 38.3(a). An entity must first submit an application to the CFTC detailing how the entity complies with the Core Principles of the CEA. 17 C.F.R. § 38.3(a)(2). Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor, and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. *Id.* §§ 38.100, 38.150, 38.200, 38.250, 38.300. Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA. *Id.* § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission. *Id.* § 38.3(a)(1).

48. Once the CFTC designates an entity as a contract market, the CEA gives the CFTC "exclusive jurisdiction" over the derivatives traded on the market. Those derivatives include "accounts, agreements (including any transaction which is of the character of, or is commonly

known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to "event" contracts. *See id.* § 1a(47)(A)(ii), (iv), (vi).

49. Once the CEA designates a board of trade as a DCM, the market is subject to an extensive framework for CFTC oversight. Part 38 of Title 17, Chapter 1 of the Code of Federal Regulations comprehensively regulates DCMs, ensuring that these markets continue to comply with the CEA. Exchanges must meet detailed requirements to maintain their designations as DCMs. *See* 17 C.F.R. pt. 38. Among other things, DCMs must abide by recordkeeping requirements that specify the form, manner, and duration of retention. *Id.* §§ 38.950, 1.31. DCMs must meet reporting obligations like furnishing daily reports of market data on futures and swaps to the CFTC. *Id.* § 38.450, pt. 16. Part 38 also imposes specific liquidity standards, disciplinary procedures, dispute resolution mechanisms, board of directors requirements, auditing demands, and more.

50. The CEA allows DCMs to list contracts on its exchange without pre-approval from the CFTC. To do so, a DCM self-certifies that a given contract complies with the CEA and CFTC regulations by filing a "written certification" with the CFTC at the time of listing. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The CFTC may initiate review of any contract under its purview. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c). The CFTC also may require a DCM to submit a "written demonstration" that it is "in compliance" with one or more Core Principles at any time. 17 C.F.R. § 38.5(b).

51. Alternatively, exchanges have the option of submitting contracts to the CFTC for approval prior to listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c). The CFTC

"shall approve a new contract" unless the CFTC finds that it would violate the CEA. 7 U.S.C. § 7a-2(c)(5)(B). Substantially all contracts listed by DCMs for trading are self-certified by the listing DCMs; it is extremely rare for a DCM to seek CFTC approval of individual contracts.

52. The CEA's enforcement process rounds out the comprehensive federal framework that regulates futures derivatives sold on DCMs. The CEA gives the CFTC discretion as to how to police and enforce violations of the CEA for DCMs. The CFTC includes an Enforcement Division, which may initiate investigations and, with the approval of a majority of the CFTC, pursue enforcement actions in federal court or administrative proceedings. If the Division concludes that there has been a violation of the CEA, it may recommend to the Commission that it seek a wide range of enforcement measures, including (1) civil monetary penalties, (2) restitution, (3) disgorgement, (4) suspension, denial, revocation, or restriction of registration and trading privileges, and (5) injunctions or cease-and-desist orders. *See* CFTC Division of Enforcement, Enforcement Manual (May 20, 2020), https://www.cftc.gov/media/1966, at § 3.3. If the Division suspects that an entity has engaged in criminal violations, the Division may also refer the matter to the Department of Justice or the appropriate state authority for prosecution. *Id.*

53. The CFTC regulates derivatives that reference physical commodities like "wheat, cotton, rice, corn, oats." 7 U.S.C. § 1a(9). The CFTC also regulates derivatives on "excluded commodit[ies]" like interest rates, other financial instruments, economic indices, risk metrics, and—as particularly relevant here—events, which the CEA defines as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *Id.* § 1a(19)(iv).

54. In 2010, Congress amended the CEA to add "swaps" to the CFTC's exclusive jurisdiction and to define event contracts as a type of swap. *See id.* § 1a(47)(A)(ii), (iv), (vi); *see*

*KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *2-3 (D.D.C. Sept. 12, 2024). "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i).

55. The CFTC has also recognized that "event contracts," including contracts on "the outcome of particular entertainment events," "can be designed to exhibit the attributes of either options or futures contracts." *Concept Release*, 73 Fed. Reg. 25,669, 25,669–70 (May 7, 2008). An "occurrence"-based futures contract or option results in a payment based on a specified occurrence or extent of an occurrence—for example, the occurrence or severity of a hurricane. Where event contracts pay out based on financially significant occurrences, they are "of the character of" futures and options, as understood by derivatives markets. *See* 7 U.S.C. § 1a(36) (defining "option").

56. Also, in 2010, Congress amended the CEA to add a "Special Rule" governing event contracts. Congress provided that the CFTC "may"—but need not—conclude that event contracts are "contrary to the public interest" if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.* § 7a-2(c)(5)(C).

## C. After an Extensive Regulatory Process, the CFTC Registered Kalshi as a Contract Market That Operates Under Federal Law.

57. Kalshi is a CFTC-regulated exchange and prediction market where users can trade on the outcome of real-world events. In 2020, the CFTC designated Kalshi as a contract market, affirming that its platform complied with the CEA. Since then, Kalshi has been fully regulated as a financial exchange under federal law, alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

58. Kalshi specializes in event contracts, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

59. Kalshi offers many kinds of event contracts related to an array of substantive areas like physical commodities, economics, finance, climate, technology, health, crypto, popular culture, and sports. For example, Kalshi's platform currently allows users to trade on the price of West Texas Intermediate oil at the end of the year, level of US GDP growth in Q2 2026, the closing price of the S&P 500 at the end of 2026, whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030. Kalshi also offers contracts on the outcomes of Supreme Court decisions, congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

60. Prior to making a contract available for trade on its platform, Kalshi self-certifies to the CFTC, pursuant to section 7a-2(c)(1) of the CEA, that the offering complies with the CEA and CFTC regulations. Those certifications contain extensive information, including confidential appendices not available to the public, for the CFTC's review.

61. The CFTC also has the ability to require Kalshi to submit a "Demonstration of Compliance," which is "a written demonstration, containing supporting data, information and documents" that a DCM is required to file upon request from the CFTC to explain how the DCM "is in compliance with one or more core principles as specified in the request." 17 C.F.R. § 38.5(b). The CFTC did just that with respect to Kalshi's first sports event contracts, and Kalshi responded with lengthy memoranda detailing the listing's compliance with applicable rules and regulations, and the CFTC's jurisdiction over sports event contracts traded on DCMs.

62. The CFTC took no further action and has since allowed thousands of Kalshi's sports event contracts to be listed, traded, and closed, with no hint that the agency views these contracts as falling outside of its jurisdiction. Had the CFTC deemed Kalshi's sports event contracts (or any other of its contracts) impermissible, it would have had the responsibility to "object[]" to the contracts. 7 U.S.C. § 7a-2(c)(3)(B)(ii). But it did not. Unless and until the CFTC takes action on a self-certified Kalshi contract—and they all have been self-certified—the contracts are authorized under federal law. *Id.* § 7a-2(c)(5).

**D. Rhode Island has Threatened Kalshi with State Criminal and Civil Action with Regard to Its Event Contracts.**

63. In early May 2026, the Attorney General confirmed to counsel for Kalshi that his staff was investigating Kalshi and likely to recommend a lawsuit. On May 20, 2026, Kalshi met with representatives from the Rhode Island Attorney General's office. During this meeting, the Attorney General and his staff asked pointed questions and expressed concerns about Kalshi's federal regulated offerings. When Kalshi sought assurances that the Rhode Island Attorney General did not intend to bring an enforcement action against Kalshi, the Attorney General made clear that Kalshi would not receive any advanced notice before the state filed an enforcement action against it. This information makes clear that Rhode Island views Kalshi's event contracts as illegal under its state laws and intends to act imminently against Kalshi's federally regulated business.

64. Moreover, Rhode Island gaming officials have openly challenged the validity of "prediction markets," like Kalshi, and stated that an investigation into these platforms is "ongoing" and "very active."[17]

65. Rhode Island officials have also signed amicus briefs in the United States Court of Appeals for the Third Circuit on June 17, 2025, the Fourth Circuit on December 22, 2025, and in the Ninth Circuit on January 30, 2026, and March 10, 2026, claiming that Kalshi is violating comparable state laws by offering sports event contracts. *See generally* June Amicus; December Amicus; January Amicus; March Amicus. In the June 2025 amicus brief, Defendant Neronha, on behalf of the state, assumed "absent preemption" that Kalshi's sports event contracts would constitute illegal sports gambling under Rhode Island's laws. *See* June Amicus at 3. In the December 2025 amicus brief, Rhode Island similarly argued that Kalshi's event contracts constituted "sports betting" that is subject to Rhode Island's anti-gambling laws. *See* December Amicus at 6. In the January 2026 amicus brief, Rhode Island again argued that Kalshi's event contracts are "sports betting" and thus prohibited under the laws of Rhode Island and other states. *See* January Amicus at 6. In the March 2026 amicus brief, Rhode Island further argued that Kalshi's event contracts are "sports betting" subject to Rhode Island's anti-gambling laws. *See, e.g.*, March Amicus at 28-29. And although those cases were focused particularly on Kalshi's sports event contracts, the positions advanced by the amicus briefs could apply to all of Kalshi's contracts.

66. Additionally, Defendant Neronha signed a letter to CFTC Chairman Michael Selig that criticized the CFTC's exercise of exclusive jurisdiction over sports event contracts. Comment

---

[17] Patrick Anderson*, Why RI is Investigating Popular Kalshi, Polymarket Prediction Markets*, Providence J. (Mar. 27, 2026), https://www.providencejournal.com/story/news/politics/state/2026/03/27/ri-joins-list-of-states-investigating-kalshi-polymarket-prediction-markets/89338021007/.

Letter from 41 Att'y Gens. to Commodity Futures Trading Comm'n (Apr. 30, 2026), https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=115653&SearchText=. In that letter, the Defendant plainly stated that he believes "the CFTC lacks exclusive jurisdiction" over sports events contracts and that the CFTC should reject its own authority in favor of letting states regulate sports events contracts. *Id.*

67. Rhode Island's public positions in the amicus briefs, as well as its letter to the CFTC and its refusal during the May 20, 2026 meeting with Kalshi to provide assurances—or even advance warning—that it would not bring an enforcement action, have led Kalshi to believe that an enforcement action in Rhode Island is imminent.

68. Rhode Island state laws contemplate criminal penalties for unlawful gambling activity. Violations of Rhode Island's anti-gambling laws may result in criminal prosecution, including misdemeanors and, in certain circumstances, felony exposure, R.I. Gen. Laws §§ 11-19-1, 11-19-14, 11-19-18, 11-19-39, as well as administrative penalties, R.I. Gen. Laws § 42-61.2-13. Defendants' actions make abundantly clear their belief that Kalshi's event contracts fall within that category.

69. The CFTC has, in an exercise of its exclusive jurisdiction, permitted Kalshi to offer event contracts for trade on its exchange, including its sports event contracts, which the CFTC views as falling "comfortably within" the CEA and under its own regulatory authority. CFTC Amicus Br. at 19. Nevertheless, Kalshi now understands that Defendants intend to take action against Kalshi.

**E. Defendants Have Not Provided Assurances of Non-Enforcement.**

70. Kalshi has made good-faith efforts to engage Rhode Island in dialogue. Kalshi's outside counsel spoke with representatives from the State on May 20, 2026, during which they refused to provide Kalshi with any assurance that they would not bring legal action against it.

71. Kalshi therefore has no option but to seek judicial relief. The discussion with the Attorney General's office made clear that Defendants believe Kalshi's offering of event contracts in Rhode Island violates Rhode Island law, and that Kalshi may be immediately subjected to action by the State. Absent any assurances of non-enforcement, Kalshi (and its users) face a threat of irreparable harm, leaving Kalshi with no choice but to protect its commercial interests and those of its users and bring this suit.

72. Immediately following the filing of this complaint, Kalshi intends to inform Defendants of its filing, and Kalshi's intent to seek preliminary injunctive relief. Kalshi will also inform Defendants that, unless Defendants assure Kalshi they will not begin an enforcement proceeding while Kalshi's motion for a preliminary injunction is pending, Kalshi will additionally seek a temporary restraining order barring such an action.[18]

**REQUISITES FOR RELIEF**

73. As a result of Defendants' threatened conduct described above, there is a strong likelihood that Defendants will take action, including, but not limited to, seeking to enforce preempted state law in violation of the Supremacy Clause of the U.S. Constitution, which will subject Kalshi and its customers to irreparable harm.

---

[18] Kalshi sought the same relief in Tennessee after the Tennessee attorney general failed to provide any assurance that they would defer enforcement until the court reached a decision on Kalshi's motion for preliminary injunction, and the Tennessee court granted the temporary restraining order. *Orgel*, 2026 WL 474869, at *1–2.

74. An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties. Defendants' conduct alleged herein, including threats to Kalshi, has already resulted in, and will continue to result in, irreparable injury to Kalshi, including but not limited to economic hardship, lost business opportunities, and impairment of existing contractual relationships.

75. Kalshi has no plain, speedy, or adequate remedy at law to address the wrongs described herein. Kalshi therefore seeks declaratory and injunctive relief restraining Defendants from enforcing Rhode Island law that interferes with the operation and function of Kalshi's DCM described herein.

## COUNT I

### (Supremacy Clause—Preemption by Commodity Exchange Act)

76. Plaintiff incorporates all prior paragraphs by reference.

77. The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

78. The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

79. Congress explicitly gave the CFTC "exclusive jurisdiction" to regulate futures trading on approved exchanges. 7 U.S.C. § 2(a)(1)(A). Without a unified approach to futures regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos." Senate Hearings at 685 (statement of Sen. Clark). Having analyzed the text, purpose, and history

of the CEA, courts nationwide have agreed that Congress intended to preempt state law in futures trading on CFTC-regulated exchanges. *See, e.g.*, *Am. Agric. Movement*, 977 F.2d at 1156; *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

80.  In threatening to enforce R.I. Gen. Laws §§ 11-19-1, 11-19-14, 11-19-18, 11-19-39(d), 42-61.2-1, 42-61.2-3.3, 42-61.2-13, and/or 42-61.2-16 against Kalshi, Defendants are impermissibly intruding on the CFTC's exclusive authority to regulate futures trading on CFTC-regulated exchanges.  Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same putative subject matter.  Because federal law occupies the entire field of regulating trading on designated contract markets, Defendants' threatened actions are both expressly and impliedly field-preempted under the Supremacy Clause.

81. In addition, Defendants' threatened actions conflict with federal law and policy.  Defendants seek to ban event contracts that federal law and the CFTC have authorized (and to subject the website on which such contracts are offered to abatement), which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges.  Congress passed the 1974 Amendments to the CEA to bring futures markets regulation "under a uniform set of regulations." *Am. Agric. Movement, Inc.*, 977 F.2d at 1156.  "As Congress recognized in enacting the 1974 Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Id.*  The Seventh Circuit thus explained that "[w]hen application of state law would directly affect trading on or the

operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (internal citation omitted). The conflict is even clearer when considering that 49 other states and the District of Columbia might equally attempt to subject Kalshi to their own state laws, producing the patchwork of state-by-state regulation Congress sought to prevent. Moreover, complying with Defendants' implicit demand to immediately cease offering event contracts in Rhode Island or face criminal charges could conflict with the federal law governing DCMs, and would thus imperil Kalshi's CFTC approval. And because federal law requires Kalshi to offer impartial access to its exchange, compliance with Rhode Island law would jeopardize Kalshi's compliance with the federal obligations to which it is subject. For that reason, the threatened actions are conflict-preempted under the Supremacy Clause.

82. Additionally, a state law stands as an "obstacle" to a federal regulatory scheme if Congress chooses a specific enforcement method to achieve federal goals and a state law adopts a different method of enforcement that hampers the "accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also Me. Forest Products Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022). Where state law "purports to forbid" conduct that "federal law authorizes," and the "structure and purpose of the [federal] program argue persuasively against the existence of such a veto power," the state law is conflict preempted. *Cormier*, 51 F.4th at 10-11. Under federal law, once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts for trading by self-certifying that these contracts comported with federal law. The CFTC had the authority to review that self-certification on the ground that these contracts were "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i), but chose not to do so. The CFTC's Enforcement Division has authority

to investigate and initiate enforcement actions seeking an array of penalties in federal court or administrative proceedings, but, again, it chose not to do so. Congress thus gave the CFTC a variety of tools for enforcing federal law against federally designated contract markets and entrusted the CFTC with discretion to pursue the penalties it deems most appropriate. Subjecting federally regulated exchanges to state laws like Rhode Island's would "rudely interfere[e] with the careful balance struck by Congress." *Cormier*, 51 F.4th at 10 (citation modified).

83. Furthermore, Defendants' demands conflict with the CFTC Core Principles on which Kalshi's designation as a CFTC-approved market depends. The CFTC's Core Principle 2 requires Kalshi to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services." 17 C.F.R. §§ 38.150, 38.151(b) (emphasis added). Cutting off Rhode Island residents from Kalshi's platform—including residents with ongoing investments—would be in considerable tension with that principle. In addition, Core Principle 4 requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of price distortions and *market disruptions*." *Id.* § 38.255 (emphasis added). Abruptly closing Kalshi's event contracts to anyone located in Rhode Island could constitute exactly the sort of market disruption the CFTC has directed Kalshi to prevent. Depending on the CFTC's interpretation of its Core Principles, it could well be "impossible" for Kalshi to simultaneously "comply with both state and federal law"—the paradigmatic case for preemption. *EEOC v. Massachusetts*, 987 F.2d 64, 68, 70 (1st Cir. 1993) (citation omitted).

84. Defendants may not enforce Rhode Island's gambling laws against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1.    Enter a judgment declaring that R.I. Gen. Laws §§ 11-19-1, 11-19-14, 11-19-18, 11-19-39(d), 42-61.2-1, 42-61.2-3.3, 42-61.2-13, 42-61.2-16, and any other Rhode Island law that attempts to regulate transactions traded or executed on Plaintiff's exchange violates the Supremacy Clause of the United States Constitution as applied to Plaintiff and its affiliates, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2.    Enter temporary, preliminary and permanent injunctions prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing R.I. Gen. Laws §§ 11-19-1, 11-19-14, 11-19-18, 11-19-39(d), 42-61.2-1, 42-61.2-3.3, 42-61.2-13, 42-61.2-16, and any other Rhode Island law to regulate transactions traded or executed on Plaintiff's exchange;

3.    Any other relief within this Court's discretion that it deems just and proper.

### Notice of Constitutional Question

Pursuant to Federal Rule of Civil Procedure 5.1, a Notice of Constitutional Question will be served in accordance with the Rule upon Rhode Island Attorney General Peter F. Neronha contemporaneously with service of process upon the named Defendants.

Dated:  May 21, 2026

Plaintiffs

KALSHIEX LLC,

By their Attorneys

*/s/ Ryan M. Gainor*
Ryan M. Gainor (#9353)
Mackenzie C. McBurney (#10098)
Hinckley, Allen & Snyder LLP
100 Westminster Street, Suite 1400
Providence, RI  02903-2319
T:  (401) 274-2000
F:  (401) 277-9600
rgainor@hinckleyallen.com
mmcburney@hinckleyallen.com

and

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
Colleen Roh Sinzdak (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
Matthew J. Laroche (*pro hac vice* forthcoming)
Nicole D. Valente (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff KalshiEX LLC*