**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| KALSHIEX LLC, <br><br>     Plaintiff, <br><br> v. <br><br> MARK FURCOLO, in his official capacity as Director of the Division of State Lottery; PETER F. NERONHA, in his official capacity as Rhode Island Attorney General; CHRISTINA TOBIASZ, in her official capacity as Gaming and Athletics Administrator, Department of Business Regulation, <br><br>     Defendants. <br><br> **<span style="color:red">REQUEST FOR EMERGENCY/EXPEDITED RELIEF – TEMPORARY RESTRAINING ORDER</span>** | C.A. No. 1:26-cv-00327-MSM-PAS |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF A**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

BACKGROUND ......................................................................................................... 4

    A.    The Exclusive Federal Scheme for Regulating Derivatives on DCMs................. 4

    B.    Kalshi's Federal Registration as a CFTC-Regulated Designated Contract Market. .................................................................................................................. 8

    C.    The Rhode Island Gaming Regulatory Scheme. ..................................................... 9

    D.    Rhode Island's Correspondence .............................................................................. 9

ARGUMENT ............................................................................................................. 10

    A.    Kalshi Is Likely to Succeed Because Rhode Island's Efforts to Regulate Kalshi's Event Contracts Are Preempted by the CEA and Its Regulations......... 10

        1.    Kalshi's Event Contracts Are Swaps Subject to the CEA's Exclusive Jurisdiction. ............................................................................. 11

        2.    Rhode Island's Gaming and Gambling Laws Are Expressly and Impliedly Field Preempted as Applied to Kalshi's Event Contracts. ...... 13

        3.    Rhode Island Laws Are Conflict-Preempted as Applied to Kalshi. ........ 20

    B.    Kalshi Will Suffer Irreparable Harm Without a Temporary Restraining Order and a Preliminary Injunction. .................................................................... 23

    C.    The Balance of the Equities and Public Interest Favor a Temporary Restraining Order and a Preliminary Injunction. ................................................. 26

CONCLUSION ......................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
    977 F.2d 1147 (7th Cir. 1992) ...............................................................................8, 20, 21

*Acosta v. Pablo Restrepo*,
    470 F. Supp. 3d 161 (D.R.I. 2020)...........................................................................26

*Atl. Beach Casino, Inc. v. Morenzoni*,
749 F. Supp. 38 (D.R.I. 1990)...................................................................................26

*Arizona v. United States*,
    567 U.S. 387 (2012).........................................................................................3, 23, 26

*Associated Builders & Contractors v. Mich. Dep't of Lab. & Econ. Growth*,
    543 F.3d 275 (6th Cir. 2008) ....................................................................................26

*Barancik v. Invs. Funding Corp. of N.Y.*,
    489 F.2d 933 (7th Cir. 1973) ....................................................................................27

*Blue Lake Rancheria v. Kalshi Inc.*,
    No. 25-cv-06162, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) .....................19, 20

*BNSF Ry. Co. v. Hiett*,
    22 F.4th 1190 (10th Cir. 2022) .................................................................................14

*Botsford v. Blue Cross & Blue Shield of Mont., Inc.*,
    314 F.3d 390 (9th Cir. 2002) ....................................................................................21

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
    511 F.3d 535 (6th Cir. 2007) ....................................................................................25

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000)...................................................................................10, 13, 20, 23

*Does 1-6 v. Mills*,16 F.4th 20 (1st Cir. 2021) ..............................................................26

*Entergy, Ark., Inc. v. Nebraska*,
    210 F.3d 887 (8th Cir. 2000) ....................................................................................24

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
    458 U.S. 141 (1982)...................................................................................................10

*Freightliner Corp. v. Myrick*,
    514 U.S. 280 (1995)...................................................................................................14

*FTC v. Ken Roberts Co.*,
  276 F.3d 583 (D.C. Cir. 2001) ..............................................................................................15

*Garrett v. City of Escondido*,
  465 F. Supp. 2d 1043 (S.D. Cal. 2006) ................................................................................25

*Greenless v. Almond*,
  277 F.3d 601 (1st Cir. 2002) ................................................................................................24

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) ..................................................................................................10, 12, 20

*Hughes v. Talen Energy Mktg., LLC*,
  578 U.S. 150 (2016) ..............................................................................................................13

*Hughes v. Talen Energy Mktg., LLC*,
  578 U.S. 150 (2016) ..............................................................................................................13

*Hyde Park Partners, L.P. v. Connolly*,
  839 F.2d 837 (1st Cir. 1988) ................................................................................................27

*Ingersoll-Rand Co. v. McClendon*,
  498 U.S. 133 (1990) ..............................................................................................................20

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987) ..............................................................................................................15

*Int'l Trading, Ltd. v. Bell*,
  556 S.W.2d 420 (Ark. 1977) ................................................................................................14

*K-Mart Corp. v. Oriental Plaza, Inc.*,
  875 F.2d 907 (1st Cir. 1989) ................................................................................................24

*KalshiEX LLC v. CFTC*,
  No. 23-3257, 2024 WL 4164694 (D.D.C. Sep. 12, 2024) ..............................................3, 6, 7

*KalshiEX LLC v. CFTC*,
  No. 24-5205, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) ...................................................2

*KalshiEX LLC v. Flaherty*,
  172 F.4th 220 (3d Cir. 2026) .......................................................................................... *passim*

*KalshiEX LLC v. Flaherty*,
  No. 25-cv-02152, 2025 WL 1218313 (D.N.J. Apr. 28, 2025) ..............................2, 16, 23, 25

*KalshiEX LLC v. Johnson*,
  --- F. Supp. 3d ---, 2026 WL 1223373 (D. Ariz. May 5, 2026) ...................................... *passim*

iv

*KalshiEX LLC v. Orgel*,
No. 3:26-cv-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026)............................... *passim*

*Kucherenko v. Chelsea Housing Auth.*,
2023 WL 12098666 (D. Mass. Aug. 28, 2023) .......................................................................27

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986)...............................................................................................................17

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980)..............................................................................................1, 14

*Leone v. Town of New Shoreham*,
534 A.2d 871, 873-74 (R.I. 1987).........................................................................................25

*McGee v. Gerstenberg & Co.*,
No. 84-c-9778, 1986 WL 4183 (N.D. Ill. Mar. 25, 1986) ......................................................18

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982)...........................................................................................................2, 17

*Mississippi v. Louisiana*,
506 U.S. 73 (1992)..................................................................................................................13

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .........................................................................................................22, 23

*Nat'l City Lines, Inc. v. LLC Corp.*,
687 F.2d 1122 (8th Cir. 1982) ...............................................................................................27

*New York v. Trump*,
764 F.Supp.3d 46 (2025) ........................................................................................................11

*Nken v. Holder*,
556 U.S. 418 (2009).................................................................................................................25

*Omnipoint Commc'ns, Inc. v. City of Huntington Beach*,
738 F.3d 192 (9th Cir. 2013) ..................................................................................................13

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983).................................................................................................................12

*Paine, Webber, Jackson & Curtis, Inc. v. Conaway*,
515 F. Supp. 202 (N.D. Ala. 1981).........................................................................................18

*Philip Morris Inc. v. Harshbarger*,
946 F. Supp. 1067 (D. Mass. 1996) ........................................................................................27

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
  579 U.S. 115 (2016)......................................................................................................13

*Rice v. Bd. of Trade of Chi.*,
  331 U.S. 247 (1947)......................................................................................................15

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
  102 F.3d 12 (1st Cir. 1996).........................................................................................24

*United States v. New York*,
  708 F.2d 92 (2d Cir. 1983)..........................................................................................23

*Upserve, Inc. v. Hoffman*, No. 1:19-CV-00593-MSM-LDA, 2020 WL 2042979
  *7(D.R.I. Apr. 28, 2020)..............................................................................................10

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) .....................................................................................23

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)............................................................................................................9

*Xiong v. Minn. State High Sch. League*,
  917 F.3d 994 (8th Cir. 2019) .......................................................................................25

*Ex parte Young*,
  209 U.S. 123 (1908)......................................................................................................23

**Statutes**

7 U.S.C. § 1a..........................................................................................................5, 10, 11

7 U.S.C. § 2.................................................................................................................. *passim*

7 U.S.C. § 5......................................................................................................................22

7 U.S.C. § 6....................................................................................................................4, 17

7 U.S.C. § 7.............................................................................................................4, 17, 21

7 U.S.C. § 7a-2............................................................................................................. *passim*

7 U.S.C. § 9a....................................................................................................................17

7 U.S.C. § 12c...................................................................................................................17

7 U.S.C. § 13a-2................................................................................................................18

7 U.S.C. § 16.....................................................................................................................19

31 U.S.C. § 5362 ....................................................................................................................19

R.I. Gen. Laws § 11-19-1 .......................................................................................................8

R.I. Gen. Laws § 11-19-14 .....................................................................................................8

R.I. Gen. Laws § 11-19-18 ..................................................................................................821

R.I. Gen. Laws § 11-19-39 ...............................................................................................21, 24

R.I. Gen. Laws § 42-61.2-1 ....................................................................................................8

R.I. Gen. Laws § 42-61.2-3.3 .................................................................................................8

R.I. Gen. Laws § 42-61.2-13 ..................................................................................................8

R.I. Gen. Laws § 42-61.2-16 ..................................................................................................8

## Other Authorities

17 C.F.R. pt. 16 ....................................................................................................................17

17 C.F.R. § 1.31 ...................................................................................................................17

17 C.F.R. § 38.3 .....................................................................................................................4

17 C.F.R. § 38.5 .....................................................................................................................8

17 C.F.R. § 38.100 ................................................................................................................17

17 C.F.R. § 38.151 ................................................................................................................21

17 C.F.R. § 38.450 ................................................................................................................17

17 C.F.R. § 38.950 ................................................................................................................17

17 C.F.R. § 38.1101 ..............................................................................................................17

17 C.F.R. § 40.2 ..........................................................................................................5, 17, 18

17 C.F.R. § 40.11 ............................................................................................................6, 18

120 Cong. Rec. S30464 (daily ed. Sep. 9, 1974) ................................................................15

*Associated*, Oxford English Dictionary (2d ed. 1991) .......................................................10

*Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong., 2d Sess. (1974) ................................................................................................................4, 14

Concept Release,
  73 Fed. Reg. 25,669 (May 7, 2008) .......................................................................12

Fed. R. Civ. P. 65 ....................................................................................................1, 9

Frank N. Fisanich, Prediction Markets Advisory, CFTC LTR No. 26-08
  (Mar. 12, 2026) ........................................................................................................7

Further Definition of "Swap,"
  77 Fed. Reg. 48,208 (Aug. 13, 2012).....................................................................11

H.R. Rep. No. 93-975 (1974).................................................................................14, 17

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.)........................................................1, 4, 14

H.R. Rep. No. 97-565, pt. 1 (1982)...........................................................................19

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent
  L. Rev. 657 (1982) ...................................................................................................2

Philip F. Johnson, The Commodity Futures Trading Commission Act: Preemption
  as Public Policy, 29 Vand. L. Rev. 1 (1976), https://perma.cc/DW9Y-V7G3 ........10

Prediction Markets,
  91 Fed. Reg. 12,516 (proposed Mar. 16, 2026) ..................................................7, 17

*Review of Commodity Exchange Act and Discussion of Possible Changes:
  Hearings Before the H. Comm. on Agric.*, 93d Cong., 1st Sess. (1973)...................4

S. Rep. No. 93-1131 (1974) ...............................................................................4, 14, 15

**INTRODUCTION**

KalshiEX LLC ("Plaintiff" or "Kalshi") moves the Court under Rule 65 of the Federal Rules of Civil Procedure for a temporary restraining order and a preliminary injunction prohibiting Defendants Mark Furcolo, in his official capacity as Director of the Division of State Lottery; Peter F. Neronha, in his official capacity as Rhode Island Attorney General; and Christina Tobiasz, in her official capacity as Gaming and Athletics Administrator, Department of Business Regulation (together, "Defendants"); and Defendants' officers, agents, servants, employees, and all persons in active concert or participation with them who received actual notice of the preliminary injunction, from enforcing R.I. Gen. Laws §§ 11-19-1, 11-19-14, 11-19-18, 11-19-39(d), 42-61.2-1, 42-61.2-3.3, 42-61.2-13, 42-61.2-16, and any other Rhode Island law to regulate transactions traded or executed on Kalshi's designated contract market ("DCM").

Kalshi seeks to prevent Defendants from enforcing preempted state law in an attempt to prohibit trading on Kalshi's federally regulated DCM, though Kalshi's contracts are authorized by federal law and Congress preempted state law by granting the CFTC "exclusive jurisdiction" to regulate trading on DCMs. 7 U.S.C. § 2(a)(1)(A). The threat is immediate: mere hours after Kalshi filed this Action, and alerted Defendants to it, the Attorney General filed a complaint in the Superior Court for Providence County seeking a permanent injunction barring Kalshi's offerings in Rhode Island.[1] The Attorney General's Enforcement Action against Kalshi will cause irreparable harm necessitating immediate preliminary relief.

---

[1] The Attorney General's Office has not served Kalshi with this complaint, but the complaint was filed in the Superior Court for Providence County on May 21, 2026 at 4:07 p.m., four hours after Kalshi filed its Complaint in this action and more than three hours after Kalshi provided the state with notice of its intent to seek the relief in this motion. *See Rhode Island v. KalshiEX LLC*, C.A. No. PC-2026-02753 (Sup. Ct. May 21, 2026); Press Release, Peter F. Neronha, Attorney General of Rhode Island, Attorney General Neronha Sues Kalshi and Polymarket for Unlawfully Conducting Sports Gambling in Rhode Island

Every marker of congressional intent confirms preemption of state regulation of trading on DCMs like Kalshi.  The CEA's text grants the CFTC "exclusive jurisdiction" and thereby "supersede[s]" state law.  7 U.S.C. § 2(a)(1)(A).  Congress sought to "preempt the field."  H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).  Courts have held for 50 years that "the CEA preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982).  The CFTC recognizes that "due to federal preemption, event contracts never violate state law when they are traded on a DCM."  Br. for Appellant at *27, *KalshiEX LLC v. CFTC*, No. 24-5205, (D.C. Cir. Oct. 16, 2024), 2024 WL 4512583 ("CFTC D.C. Cir. Br.").

Last month, the Third Circuit affirmed a preliminary injunction barring New Jersey officials from enforcing laws similar to those invoked by Rhode Island, finding that because "Congress gave the CFTC exclusive jurisdiction over trades on DCMs, [and] provided for continued state regulation of trades conducted off DCMs," it was "reasonable for the District Court to conclude that Kalshi was likely to succeed in showing that the [CEA] preempts [state] law from reaching into Kalshi's CFTC-licensed DCM." *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 231 (3d Cir. 2026).  And earlier this month, a federal district court granted a preliminary injunction to the CFTC preventing Arizona state regulators from proceeding with any criminal or civil actions to enforce their preempted state gaming laws against DCMs. *KalshiEX LLC v. Johnson*, --- F. Supp. 3d ----, No. 2:26-cv-01715-PHX-MTL, 2026 WL 1223373 (D. Ariz. May 5, 2026).  Additional lower courts have likewise granted preliminary injunctions to Kalshi against the sort of state enforcement contemplated here. *See KalshiEX LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL

(May 21, 2026 4:40 PM), https://riag.ri.gov/press-releases/attorney-general-neronha-sues-kalshi-and-polymarket-unlawfully-conducting-sports; Declaration of Andrew L. Porter, Ex. 2.

474869, at *7 (M.D. Tenn. Feb. 19, 2026) ("Kalshi is likely to succeed on the merits because sports event contracts are 'swaps' and conflict preemption applies"); *KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025). These decisions adhere to a longstanding consensus that "the CEA preempts state bucket-shop laws and other anti-gambling legislation." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 721 (1982).

Kalshi has no option but to seek immediate preliminary relief to avoid imminent irreparable harms. On May 20, 2026, Kalshi's representatives met with the Rhode Island Attorney General and members of the Attorney General's staff. The Attorney General made clear that Kalshi would not receive any advance notice before the state filed an enforcement action against the company.

Kalshi filed its Complaint in this Action at 12:03 p.m. on May 21, 2026 and promptly provided notice of the Action, and Kalshi's intent to seek a temporary restraining order and preliminary injunction, to Defendants at 12:55 p.m. Porter Decl., Ex. 2 Kalshi asked whether Defendants would agree to forego enforcement pending a decision on the preliminary injunction motion, in which case Kalshi would not need to burden the Court with a temporary restraining order request. *Id.* Defendants did not respond to that email, *id.*, instead electing to ignore the first-filed nature of this case and file a separate case against Kalshi in Rhode Island state court, which was signed by one of the Special Assistant Attorneys General who received the email from Kalshi's counsel earlier in the day.[2]

Kalshi is likely to prevail on the merits because federal law preempts the application of Rhode Island law against Kalshi. The balance of harms and public interest likewise favor Kalshi.

---

[2] *See Rhode Island v. KalshiEX LLC*, C.A. No. PC-2026-02753 (Sup. Ct. May 21, 2026)

3

Kalshi therefore respectfully requests that this Court issue a temporary restraining order and a preliminary injunction against Defendants enjoining them from pursuing any state action, including the one filed late yesterday after this Action was filed, against Kalshi and its affiliates concerning trading on Kalshi's DCM.

## BACKGROUND

### A.    The Exclusive Federal Scheme for Regulating Derivatives on DCMs.

Derivative contracts are financial tools that traders use to mitigate risk. *See KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *1-2 (D.D.C. Sep. 12, 2024). Event contracts are a type of derivative—they identify a future event with several possible outcomes, a payment schedule, and an expiration date. *Id.* at *2. The event contracts at issue here are traded on an exchange, so their prices are determined by market forces. Kalshi does not set the price of any contract, and unlike a sportsbook there is no "house" that stacks the odds in its favor. Declaration of Xavier Sottile ("Sottile Decl.") ¶¶ 33-34. The price of an event contract fluctuates from creation to expiration in accordance with the changing likelihood of the event's occurrence. *Id.* ¶ 44. During the contract period, individuals can buy and sell the contract at changing prices; users may trade contracts to hedge risk. Compl. ¶¶ 32-33. The ultimate value is determined at expiration. *See KalshiEX*, 2024 WL 4164694, at *2.

Congress passed the CEA in 1936 to regulate derivatives exchanges, but initially chose not to preempt state regulation. In 1974, Congress amended the CEA to empower the CFTC to oversee and regulate exchanges and to grant the CFTC "exclusive jurisdiction" to regulate trading on the exchanges it oversees. 7 U.S.C. § 2(a)(1)(A). These amendments were designed to "[b]ring[] all futures trading under federal regulation." *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong. 848 (1974) ("Senate Hearings"). Congress recognized that federal regulation would only

4

be workable if it "prevent[ed] any possible conflicts over jurisdiction." *Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agric.*, 93d Cong. 128 (1973). Subjecting exchanges to "different State laws would just lead to total chaos." Senate Hearings at 685 (statement of Sen. Clark).

Congress deliberately reinforced the CFTC's exclusive jurisdiction. After House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The language ensured that "where the jurisdiction of the [CFTC] is applicable, it supersedes State as well as Federal agencies." *Id.* at 23. The Senate also "struck" the existing CEA provision that preserved states' authority to regulate derivatives transactions. H.R. Rep. No. 93-1383, at 35. As the conference report explained, the amendments were designed to "preempt the field insofar as futures regulation is concerned." *Id.*

The CFTC's regulatory framework is extensive, comprehensive, and exclusive. To obtain approval from the CFTC, an exchange must first apply for and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 6(a), 7(a); 17 C.F.R. § 38.3(a). The exchange's application must detail its capacity to comply with all CFTC rules and regulations through written submissions and exhibits. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the exchange's designation. *Id.* § 38.3(a)(1).

Once the CFTC designates an entity as a contract market—known as a "DCM"—the CFTC has "exclusive jurisdiction" over derivatives traded on the market, including "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to event contracts. *See id.* §§ 1a(47)(A)(ii), (iv), (vi). The CFTC also regulates derivatives on "excluded commodit[ies]" like

interest rates, other financial instruments, economic indices, risk metrics, and—as particularly relevant here—events, which the CEA defines as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences.  *Id.* § 1a(19)(iv); *see id.* § 1a(9).

DCMs are subject to the CFTC's extensive regulatory framework as set out in the CEA and CFTC regulations.  These provisions establish a comprehensive scheme for regulating DCMs.  *See Flaherty*, 172 F.4th at 228-229.  The CEA prescribes a specific method by which the CFTC may approve new contracts on DCMs.  A DCM that abides by the CEA requirements may list contracts on its exchange without pre-approval from the CFTC by self-certifying that the contracts comply with CFTC requirements.  7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a).  The contracts are effective on the first day after the Commission receives the certification unless the CFTC initiates a review.  *See* 17 C.F.R. § 40.2(c).  The CFTC "shall approve a new contract" unless it finds the contract would violate the CEA or CFTC regulations.  7 U.S.C. § 7a-2(c)(5)(B).  If a DCM offers a contract in violation of the CEA or CFTC regulations, the CFTC has an array of enforcement mechanisms, including revocation of licensing, civil penalties, and criminal enforcement.

In 2010, Congress amended the CEA to add a "Special [R]ule" specifically addressing event contracts, which are "agreements, contracts, transactions, or swaps in excluded commodities."  7 U.S.C. § 7a-2(c)(5)(C)(i).  The Special Rule authorizes the CFTC to review and prohibit specific types of event contracts that it determines to be "contrary to the public interest."  *Id.*  The CEA specifically authorizes the CFTC to reject event contracts if the Commission deems them to be "contrary to the public interest" and if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest."  *Id.*;

6

*see also* 17 C.F.R. § 40.11(c) (public interest review under Special Rule).  The decision to prohibit an event contract that falls within any of these categories is subject to the CFTC's evaluation of the "public interest."  *See KalshiEX*, 2024 WL 4164694, at *3 ("[T]he CFTC may determine that an agreement, contract, or transaction is contrary to the public interest only if it involves" one of the enumerated categories).  The Special Rule further provides that no contract "determined by the Commission to be contrary to the public interest . . . may be listed or made available for clearing or trading on or through a registered entity."  7 U.S.C. § 7a-2(c)(5)(C)(ii).

The CFTC has unequivocally expressed its belief that event contracts fall within its exclusive jurisdiction and are properly traded on DCMs.  The CFTC's actions in multiple forums, including its own initiation of litigation against state authorities, directly demonstrate this position. *See generally* Compl.*, United States v. Arizona*, 2:26-cv-02246 (D. Ariz. Apr. 2, 2026), Dkt. No. 1; Compl., *United States v. Connecticut*, 3:26-cv-00498 (D. Conn. Apr. 2, 2026), Dkt. No. 1; Compl., *United States v. Illinois*, 1:26-cv-03659 (N.D. Ill. Apr. 2, 2026), Dkt. No. 1; Compl., *United States v. State of New York*, 1:26-cv-03404 (S.D.N.Y. Apr. 24, 2026), Dkt. No. 1; Compl., *United States v. State of Wisconsin*, 2:26-cv-00749 (E.D. Wis. Apr. 28, 2026), Dkt. No. 1; CFTC Amicus Br., *N. Am. Derivatives Exch., Inc. v. Nevada,* No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ("CFTC Amicus Br."); CFTC Amicus Br., *Commonwealth v. KalshiEX LLC*, No. SJC-13906 (Mass. Apr. 24, 2026), Dkt. No. 38.  Earlier this year, the CFTC additionally made pronouncements where it purported to regulate prediction markets, including by publishing guidance supporting lawful innovation in prediction markets, and by publishing an Advanced Notice of Proposed Rulemaking, seeking public comment on a range of issues in this space.  Frank N. Fisanich, Prediction Markets Advisory, CFTC LTR No. 26-08 (Mar. 12, 2026); Prediction

Markets, 91 Fed. Reg. 12,516 (proposed Mar. 16, 2026).  As these developments demonstrate, the CFTC is actively exercising its regulatory authority over the markets at issue in this proceeding.

**B.      Kalshi's Federal Registration as a CFTC-Regulated Designated Contract Market.**

In 2020, the CFTC certified Kalshi as a DCM, affirming that its platform complies with the CEA's regulatory requirements.  *KalshiEX*, 2024 WL 4164694, at *4.  Because Kalshi is a DCM, its event contracts are subject to the CFTC's "exclusive jurisdiction."  7 U.S.C. § 2(a)(1)(A). Federal law requires Kalshi to comply with a host of federal requirements designed to ensure market integrity.  An exchange's status as a DCM "imposes upon it a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances."  *Am. Agric. Movement*, *Inc. v. Bd. of Trade of Chi.,* 977 F.2d 1147, 1150-51 (7th Cir. 1992).

Kalshi offers event contracts related to commodities, economics, finance, health, cryptocurrencies, and popular culture.  Compl. ¶ 59.  For example, Kalshi's platform currently allows users to trade on the prices of physical commodities such as oil and gold, on whether India will meet its 2030 climate goals, and on whether the market share for electric vehicles will exceed 50% in 2030.  *Id.*; *Oil Prices (WTI) today?*, KALSHI, https://kalshi.com/markets/kxwti/wti-oil-on-day/kxwti-26may11 (last visited May 11, 2026); *Gold price on Friday at 5:00 PM EDT?*, KALSHI, https://kalshi.com/markets/kxgoldw/gold-weekly-price-/kxgoldw-26may1517 (last visited May 11, 2026).  Kalshi also offers contracts related to sporting events, the first of which it self-certified in January 2025.  *See Orgel*, 2026 WL 474869, at *5.  Shortly thereafter, the CFTC requested that Kalshi submit a demonstration of compliance with the CEA for those contracts, pursuant to 17 C.F.R. § 38.5(b).  Compl. ¶ 61; Sottile Decl. ¶ 7.   Kalshi responded with lengthy memoranda

8

detailing its listings' compliance with applicable rules and regulations.  Compl. ¶ 61; Sottile Decl. ¶¶ 7.  The CFTC took no further action, and has since allowed thousands of Kalshi's sports event contracts to be listed, traded, and closed.  Compl. ¶ 60; Sottile Decl. ¶ 9.  These contracts are lawful and fall under the CFTC's exclusive jurisdiction.  Compl. ¶¶ 2, 19.

## C.    The Rhode Island Gaming Regulatory Scheme.

Rhode Island regulates gaming and gambling through its civil and criminal code.  *See* R.I. Gen. Laws §§ 11-19-1, 11-19-14, 11-19-18, 11-19-39, 42-61.2-1, 42-61.2-3.3, 42-61.2-13, 42-61.2-16.  The State prohibits any person from "directly or indirectly, set[ting] up, put[ting] forth, carry[ing] on, [or] promot[ing] . . . any lottery, chance, game, or device of any nature . . . for the purpose of exposing, setting for sale or disposing of any money, houses, lands, merchandise, or articles of value . . . except as authorized [by sports wagering license] in this chapter and in title 41 and chapters 61 and 61.2 of title 42."  R.I. Gen. Laws § 11-19-1. Violations of Rhode Island's anti-gambling laws may result in criminal prosecution, including misdemeanors and, in certain circumstances, felony exposure, R.I. Gen. Laws §§ 11-19-1, 11-19-14, 11-19-18, 11-19-39, as well as administrative penalties, R.I. Gen. Law § 42-61.2-13.  These penalties are severe, including felony charges and fines up to $1,000 per day.  *See, e.g.*, R.I. Gen. Laws §§ 11-19-1, 42-61.2-13.

## D.    Rhode Island's Correspondence

Rhode Island has taken a different view from the federal government and has responded to this Action by bringing the Enforcement Action against Kalshi. On May 20, 2026, Kalshi met with representatives from the Rhode Island Attorney General's office.  During this meeting, the Rhode Island Attorney General refused to provide any assurances that the state would refrain from enforcement and instead signaled an intent to act unilaterally, and imminently, against Kalshi's federally regulated business.

9

Kalshi thus filed its Complaint in this Action at 12:03 p.m. on May 21, 2026 and promptly provided notice of the Action, and Kalshi's intent to seek a temporary restraining order and preliminary injunction, to Defendants.  Porter Decl., Ex. 2.  Kalshi asked whether Defendants would agree to forego enforcement pending a decision on the preliminary injunction motion, in which case Kalshi would not need to burden the Court with a temporary restraining order request.  Defendants did not respond to that email.  *Id.*  Instead, with full knowledge of Kalshi's first-filed federal lawsuit, Defendants chose to file their own lawsuit against Kalshi in Rhode Island state court without prior notice to Kalshi.  The complaint in the state court Enforcement Action was signed by one of the Special Assistant Attorneys General that received notice of Kalshi's federal Action earlier that day.  *Id.*  Kalshi has been left with no choice but to seek emergency relief.

## ARGUMENT

To obtain a temporary restraining order and a preliminary injunction, the moving party must demonstrate: (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest.  *See* Fed. R. Civ. P. 65; *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *New York v. Trump*, 764 F.Supp.3d 46 (2025); *see also Upserve, Inc. v. Hoffman*, No. 1:19-CV-00593-MSM-LDA, 2020 WL 2042979, at *7 (D.R.I. Apr. 28, 2020).  For the same reasons district courts in Arizona, Tennessee, and New Jersey granted preliminary injunctions regarding state regulation of transactions on DCMs—and the Third Circuit upheld the latter—Kalshi satisfies each element.

**A.**  **Kalshi Is Likely to Succeed Because Rhode Island's Efforts to Regulate Kalshi's Event Contracts Are Preempted by the CEA and Its Regulations.**

"A fundamental principle of the Constitution is that Congress has the power to preempt state law."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  Federal law can preempt state law expressly or impliedly.  One manner of preemption is field preemption, which

10

occurs where Congress manifests an intent to exclusively occupy an entire field of regulation. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Federal law also preempts state law where compliance with both is impossible or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," known as conflict preemption. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). It is well-settled that the CEA and its implementing regulations have "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, The Commodity Futures Trading Commission Act: Preemption as Public Policy, 29 Vand. L. Rev. 1, 2 (1976). Rhode Island's laws are no exception.

1.     <u>Kalshi's Event Contracts Are Swaps Subject to the CEA's Exclusive Jurisdiction.</u>

As a threshold matter, Kalshi's event contracts are swaps under the plain language of the CEA. Kalshi's contracts "provide[]" for payment based on the "occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). "Associated" commonly means "connect[ed]." *See Associated*, Oxford English Dictionary (2d ed. 1991). A swap thus requires an event connected to a potential financial, economic, or commercial consequence. Congress's choice of "potential" is broad. *Flaherty*, 172 F.4th at 227-228; *Orgel*, 2026 WL 474869, at *8.

All of Kalshi's contracts fit comfortably within this definition.[3] Kalshi's contracts are also futures or options in "excluded commodit[ies]." Excluded commodities include intangibles such

---

[3] This includes contracts related to sporting events, which have consequences—often significant ones—for a broad ecosystem of stakeholders, including team sponsors, advertisers, television networks, franchises, local communities, and more. *See Flaherty*, 172 F.4th at 227-228. They also have direct economic consequences for state-regulated sportsbooks, which face substantial financial risks associated with sports events (if their customers win, they lose, providing a natural hedging need). Some sportsbooks have turned to Kalshi's contracts to hedge their financial risks.

11

as commercial benchmarks. *See* 7 U.S.C. § 1a(19). Congress also expressly defined "excluded commodity" to include "occurrence[s]" that are "associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(iv). An "occurrence"-based futures contract or option results in a payment based on a specified occurrence or extent of an occurrence—for example, the occurrence or severity of a hurricane. Kalshi's event contracts likewise pay out based on financially significant occurrences and thus are "of the character of" futures and options, as understood by derivatives markets. *See id.* § 1a(36) (defining "option").

Several textual features constrain the definition of "swap" to prevent any parade of horribles. *First*, an event giving rise to a swap transaction must have potential financial, economic, or commercial consequences independent of the transaction itself. 7 U.S.C. § 1a(47)(A)(ii). *Second*, for an event to qualify as a commodity, it must be "beyond the control of the parties." *Id*. § 1a(19)(iv)(I). *Third*, Congress followed its definition with express "[e]xclusions" for certain securities, notes, and foreign currency transactions. *Id*. §§ 1a(47)(B)(iii)–(vii). *Fourth*, the CFTC and SEC have authority to "further define" swaps and have excluded "customary consumer and commercial agreements" not traded "on an organized market." Further Definition of "Swap," 77 Fed. Reg. 48,208, 48,209, 48,246-47 (Aug. 13, 2012). Kalshi's contracts comfortably fall within these constraints.

The Special Rule confirms that Congress considered "event contracts" to be subject to CFTC jurisdiction, regardless of whether they are understood as swaps or futures. 7 U.S.C. § 7a-2(c)(5)(C)(i). That provision gives the CFTC jurisdiction to review specified types of "agreements, contracts, transactions, or swaps in excluded commodities." *Id.* The CFTC itself has repeatedly confirmed that it understands Kalshi's contracts to fall within that provision. In 2008, before the CFTC's jurisdiction encompassed swaps, it recognized that event contracts, which

12

may be based on "varied" eventualities such as "the results of political elections, or the outcome of particular entertainment events," could be structured as "futures" or "options."  Concept Release, 73 Fed. Reg. 25,669, 25,669-71 (May 7, 2008).

2.    <u>Rhode Island's Gaming and Gambling Laws Are Expressly and Impliedly Field Preempted as Applied to Kalshi's Event Contracts.</u>

Field preemption can be either express or implied.  *See Crosby*, 530 U.S. at 372 n.6. Congress's intent to occupy a field can be apparent in the statutory text and history.  *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-13 (1983). Courts can also infer field preemption from a scheme of "federal statutory directives" that "provide a full set of standards" designed to function "as a 'harmonious whole.'"  *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting *Hines*, 312 U.S. at 72).  "Where Congress occupies an entire field," "even complementary state regulation is impermissible."  *Id.*  Congress has preempted the field of regulating trading on DCMs, both expressly in the text of the CEA and implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation. Every marker of congressional intent confirms that Congress has preempted the field.  *See Johnson*, 2026 WL 1223373, at *7 (holding that "the CEA preempts the regulation of trading in swaps on CFTC-registered DCMs"); *Flaherty*, 172 F.4th at 228 (agreeing that "at the very least field preemption applies" (citation omitted)).

*Statutory Text*: The text of the 1974 amendments to the CEA could hardly be clearer. Congress established the CFTC and granted it "exclusive jurisdiction" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A).  Kalshi's event contracts are traded on a contract market designated by the CFTC, and the CFTC therefore has "exclusive jurisdiction" to regulate these contracts.  *Id.*

13

The "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to other entities. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992). The Supreme Court has repeatedly instructed that state law is preempted where a federal agency's jurisdiction is "exclusive." *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016). Courts have found that statutes containing similar language preempt parallel state law regulation. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995); *BNSF Ry. Co. v. Hiett*, 22 F.4th 1190, 1194 (10th Cir. 2022). Where a statute "contains an express pre-emption clause, [courts] do not invoke any presumption against pre-emption." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (citation modified). The presumption against preemption applies only outside the express preemption context—it has no application where, as here, Congress has spoken directly by granting the CFTC "exclusive jurisdiction."

Other features of Section 2(a)'s text confirm its preemptive effect. The statute contains a savings clause providing it does not "supersede" state regulatory authority, but the clause applies "[e]xcept as hereinabove provided" by the exclusive jurisdiction grant. 7 U.S.C. § 2(a)(1)(A). That proviso enables a "logical inference" of preemption as to matters within the CFTC's exclusive jurisdiction. *Omnipoint Commc'ns, Inc. v. City of Huntington Beach*, 738 F.3d 192, 194-196 (9th Cir. 2013). Because the savings clause clarifies that state law is not "supersede[d]" as to off-DCM transactions, it confirms that state law is superseded as to on-DCM transactions. Congress added the proviso specifically to ensure that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 6; *see also Johnson*, 2026 WL 1223373, at *6 ("A savings clause underscores the CFTC's preemptive effect.").

*Statutory Purpose*: Congress in the 1974 Act sought to prevent exchanges from being subjected to fragmented regulatory demands that could differ from one jurisdiction to the next.

14

One "aim" of the 1974 Act was to "avoid unnecessary, overlapping and duplicative regulation." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001) (citation modified).  As one sponsor explained, "different State laws would just lead to total chaos."  Senate Hearings at 685 (statement of Sen. Clark).

Congress thus placed "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 76 (1974).  The Conference Report confirmed Congress's intent to preempt the field:  "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned."  H.R. Rep. No. 93-1383 at 35.

Courts agree that Congress intended to preclude states from exercising parallel authority over commodity futures trading in exchanges designated by the CFTC.  Writing for the Second Circuit, for example, Judge Friendly explained that the CEA "preempts the application of state law" regarding trading on federal exchanges.  *Leist*, 638 F.2d at 322; *see also Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (Ark. 1977) (exclusive jurisdiction clause "is a clear indication that Congress intended no regulation in this field except under the authority of the act").  Defendants' effort to regulate Kalshi's contracts cannot be reconciled with that clear congressional purpose.

*Drafting History*:  The drafting history of the 1974 Act eliminates all doubt as to Congress's intent to preempt state laws like those Defendants would seek to enforce against Kalshi.  To "assure that Federal preemption is complete," the Senate deleted the provision the Supreme Court had previously interpreted to preserve the states' authority over futures trading.  120 Cong. Rec. S30464 (daily ed. Sep. 9, 1974) (statement of Sen. Curtis); *see also Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947).  After House drafters introduced a state-law savings clause, the Senate

15

added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31. The language ensured that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." *Id.* at 6. These changes "wholly and unequivocally eliminated each of the bases" the Supreme Court had relied on "to hold that the CEA did not preempt state regulation." Van Wart, *supra*, at 692-93. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) (citation omitted). The Senate's decision to omit provisions allowing concurrent state jurisdiction over trading on DCMs is further proof of Congress's intent to preempt parallel state regulation.

*The CFTC's Position*: The CFTC has made abundantly clear it views prediction markets as subject to its exclusive jurisdiction. In 2024, the CFTC informed the D.C. Circuit that "due to federal preemption, event contracts never violate state law when they are traded on a DCM." CFTC D.C. Cir. Br. at *27. Earlier this year, the CFTC stated that "commodity derivatives markets require nationally uniform rules . . . to prevent the type of fragmented oversight" that would result from state enforcement. CFTC Amicus Br. at 1 (noting, at 19, that event contracts, including sports-event contracts, fall "comfortably within" the CEA and under its regulatory authority).

To defend that exclusive jurisdiction the CFTC and the U.S. Department of Justice have recently initiated litigation against six states—Arizona, Connecticut, Illinois, New York, Wisconsin, and Minnesota—to prevent them from applying state gambling laws to event contracts traded on CFTC-regulated DCMs (as Defendants seek to do here). *See generally United States v. Arizona,* 2:26-cv-02246 (D. Ariz. Apr. 2, 2026), Dkt. No. 1 ("Ariz. Compl.*")*; *United States v. Connecticut,* 3:26-cv-00498 (D. Conn. Apr. 2, 2026), Dkt. No. 1 ("Conn. Compl."); *United States*

16

*v. Illinois*, 1:26-cv-03659 (N.D. Ill. Apr. 2, 2026), Dkt. No. 1 ("Ill. Compl."); *United States v. New York, No.* 1:26-cv-3404 (S.D.N.Y. Apr. 24, 2026), Dkt. No. 1 ("NY Compl."); *United States v. Wisconsin,* No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026), Dkt. No. 1 ("Wis. Compl."); *United States v. Minnesota,* 0:26-cv-2661 (D. Minn. May 19, 2026), Dkt. No. 1 ("Minn. Compl.").  Earlier this month, a federal court in the District of Arizona granted the CFTC's motion for a preliminary injunction barring Arizona state gaming regulators from enforcing laws materially similar to those Rhode Island seeks to enforce here.  *Johnson*, 2026 WL 1223373, at *9.  The CFTC has similarly moved for preliminary injunctions on the same grounds against New York and Wisconsin state regulators, the motions for which are pending.  *See* Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction, *United States v. State of New York*, 1:26-cv-3404 (S.D.N.Y. May 1, 2026), Dkt. 35; Plaintiffs' Motion for Preliminary Injunction and Memorandum of Law in Support, *United States v. State of Wisconsin*, 1:26-cv-00749 (E.D. Wis. May 1, 2026), Dkt. 6.

Even courts that have questioned whether certain event contracts are swaps under the CEA have nonetheless agreed with the conclusion that the CEA's grant of exclusive jurisdiction "triggers field preemption of state enforcement of gambling laws against event contracts traded on DCMs," and have accordingly endorsed the CFTC's exclusive jurisdiction.  *See Johnson*, 2026 WL 1223373, at *6 (citing *Flaherty*, 172 F.4th at 228-229); *Flaherty*, 2025 WL 1218313, at *5.

The CFTC's March 12, 2026 Advance Notice of Proposed Rulemaking Related to Prediction Markets further reinforces the agency's position that it holds exclusive jurisdiction over prediction markets and demonstrates the agency's willingness to act with such authority.  *See* 91 Fed. Reg. at 12,517 n.5 (noting that Section 2(a)(1)(A) "expressly extends the CFTC's 'exclusive jurisdiction' to encompass 'transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to [CEA section 5,

17

7 U.S.C. 7] …'" (citation omitted)); *see also* Fisanich, *supra*, at 3 (providing DCMs with guidance on their responsibilities when listing event contracts that may carry risk of manipulation).

*Comprehensive Regulatory Scheme*:  The comprehensive nature of the regulatory scheme Congress created for DCMs further evidences that Congress intended to foreclose concurrent state jurisdiction.  *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368-369 (1986).  As the Supreme Court has found, the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex."  *Merrill Lynch*, 456 U.S. at 356 (quoting H.R. Rep. No. 93-975, at 1).  An exchange may only offer derivatives after undergoing an extensive review process and receiving the CFTC's designation as a DCM.  7 U.S.C. §§ 2(e), 6(a), 7(a); 17 C.F.R. § 38.100.  Once an exchange is designated as a DCM, the CFTC enjoys "exclusive jurisdiction" over the derivatives traded on the market.  7 U.S.C. § 2(a)(1)(A).  DCMs are subject to an extensive framework of CFTC oversight, involving recordkeeping requirements, 17 C.F.R. §§ 38.950, 1.31, reporting obligations, *id.* §§ 38.450, pt. 16, liquidity standards, *id.* § 38.1101(a)(2), and penalties, 7 U.S.C. §§ 9a, 12c.  Congress elected to allow DCMs to list contracts by self-certifying that they comply with the CEA's requirements.  7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(2).  Congress then gave the CFTC back-end authority to conduct a review of a contract if it believes the contract may run afoul of any statute or regulation.  *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c).  Violations can result in civil and criminal penalties, which the CFTC may pursue at its discretion.

Of particular relevance here, the Special Rule specifically authorizes the CFTC to bar certain event contracts deemed "contrary to the public interest" and "involv[ing]" certain categories of activities.  7 U.S.C. § 7a-2(c)(5)(C)(i); *see* generally 17 C.F.R. § 40.11.  The Special Rule is not mandatory—the CFTC "may" prohibit a contract involving a listed activity or may determine that such a contract would not be contrary to the public interest.  7 U.S.C. § 7a-

18

2(c)(5)(C)(i).  Congress thus left the decision to one federal authority—not 50 separate states and the District of Columbia.  *See Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-06162, 2025 WL 3141202, at \*7 (N.D. Cal. Nov. 10, 2025) (because the CFTC has "exclusive jurisdiction," "the only enforcement mechanism belongs to the [CFTC]"); CFTC Amicus Br. at 21 (the CEA's "exclusive jurisdiction" provision "preempts application of state gambling laws to event contracts trading on DCMs.").

Congress granted an enforcement role to states—but that role expressly excludes the right to enforce state laws against DCMs.  The CEA authorizes state officials to bring suit regarding CEA violations, but a proviso limits that authorization to actions against parties "other than a [designated] contract market."  7 U.S.C. § 13a-2(1).  The CEA also allows states to enforce "antifraud" laws, but not antigambling laws.  *Id.* § 13a-2(7); *see e.g.*, *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 207 (N.D. Ala. 1981) ("this specific allowance of antifraud proceedings must be deemed to preclude antigambling proceedings."); *McGee v. Gerstenberg & Co.*, No. 84-c-9778, 1986 WL 4183, at \*2 (N.D. Ill. Mar. 25, 1986) ("Although the CEA establishes the [CFTC] as the exclusive regulatory agency, it does not preclude the states from enforcing their own general antifraud statutes.").  Congress further made clear that the CEA does not "supersede or preempt" the application of state law to entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so.  7 U.S.C. § 16(e)(1)(C).  In other words, Congress granted the CFTC exclusive power to regulate contracts traded on the exchanges it oversees but permitted federal and state agencies to police "those who offer fraudulent off-exchange investments" and other "transactions outside those preserved exclusively for the jurisdiction of the CFTC."  H.R. Rep. No. 97-565, pt. 1, at 44 (1982).  The CEA does not call into

19

question the state's authority to regulate casinos or entities that are not DCMs. But the CEA's comprehensive scheme for regulating DCMs evinces Congress's intent to preempt the field.

Other federal laws reinforce this intent. The Unlawful Internet Gaming Enforcement Act of 2006 ("UIGEA") generally prohibits use of the internet to transmit wagers between states "where such bet or wager is unlawful," 31 U.S.C. § 5362(10)(A), but provides that the term "bet or wager" "does not include" transactions conducted on "a registered entity . . . under the Commodity Exchange Act," *id.* § 5362(1)(E)(ii). UIGEA underscores Congress's understanding that, under the CEA, state gambling laws do not reach trading on DCMs. *See Blue Lake Rancheria*, 2025 WL 3141202, at *6 (Kalshi's "internet contracts are not bets or wagers under the UIGEA and therefore do not constitute 'unlawful internet gambling' even if the contracts are received, placed or transmitted from persons" where gambling is unlawful under local law).

### 3. Rhode Island Laws Are Conflict-Preempted as Applied to Kalshi.

As multiple federal courts recently held regarding similar state laws, *see Johnson*, 2026 WL 1223373, at *7-8; *Flaherty*, 172 F.4th at 229-231; *Orgel*, 2026 WL 474869, at *9-10, Rhode Island gambling laws are conflict-preempted as applied to Kalshi. It would be "impossible" for Kalshi "to comply with both state and federal law," and Rhode Island's laws stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA. *Crosby*, 530 U.S. at 372-73 (citation modified). Subjecting Kalshi's event contracts to Rhode Island law would conflict with the CEA in at least three respects.

*First*, Congress passed the 1974 Amendments to bring futures markets "under a uniform set of regulations." *Am. Agric.*, 977 F.2d at 1156. "[A] contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Id.* The Seventh Circuit held that "[w]hen application of state law would

20

directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (citation omitted).

Courts commonly find conflict preemption where a statute provides for a uniform federal scheme. The Supreme Court has found state law to conflict with federal law where permitting state regulation was "at odds with the goal of uniformity that Congress sought to implement." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990); *see Botsford v. Blue Cross & Blue Shield of Mont., Inc.*, 314 F.3d 390, 393-95 (9th Cir. 2002) (finding conflict preemption where "[t]he application of different state standards would disrupt the nationally uniform administration" provided by federal statute).

Subjecting Kalshi to Rhode Island's gaming and gambling laws would conflict with Congress's goal of a uniform federal scheme. Piecemeal state-by-state regulation is precisely what Congress sought to avoid, and the conflict is made even clearer when considering the possibility that 49 other states might also attempt to subject Kalshi to their own state laws (as several have). That state-by-state regulation would erect "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67. As a federal court recently held in granting Kalshi a preliminary injunction, "state law likely stands as an obstacle to . . . the CEA's primary objective: uniform regulation of the derivatives market," because it "would directly affect trading on Kalshi by limiting who can trade with whom." *Orgel*, 2026 WL 474869, at *10.

*Second*, compliance with Rhode Island law would be impossible. Complying would require Kalshi to limit access to its exchange based on a user's geographic location. *See* R.I. Gen. Laws § 42-61.2-16(a) (noting that online sports wagering "shall only occur within the state of Rhode Island" and that a hosting facility "shall only accept online wagers from players who have been

21

affirmatively located as being physically present in the state of Rhode Island at the time of their wager"). The requirement to exclude users based solely on their location in one state would be impossible for a nationwide exchange like Kalshi, which is required by federal law to "provide its members, persons with trading privileges, and independent software vendors with impartial access to its markets and services." 17 C.F.R. § 38.151(b); CFTC Amicus Br. at 26-27 (noting that "a DCM is required by federal law to provide 'impartial access' to all eligible participants nationwide," and that a DCM "cannot fulfill its federal mandate" if it imposes geographical restrictions). Complying with Rhode Island law would additionally place further requirements on Kalshi that are inconsistent with its operation as a nationwide, independent DCM, such as mandating that all hardware, software, and other technology or equipment used to conduct online sports wagering be located "in a restricted area on the hosting facility's premises" within Rhode Island. *See* R.I. Gen. Laws § 42-61.2-16(c). Compliance could also require Kalshi to cease offering event contracts entirely in Rhode Island or face criminal charges, which could conflict with the federal law governing DCMs and would thus imperil Kalshi's CFTC approval.

But the problem extends beyond these matters.  Applying state gaming laws on a state-by-state basis would force a single federally licensed exchange to operate multiple, separate liquidity pools with different prices for the same contracts—one for Nevada, another for Rhode Island, another for Maryland, and so on.  Such fragmentation is susceptible to manipulation and raises serious market surveillance challenges, both of which implicate core DCM principles.  *See* 7 U.S.C. § 7(d)(3) (contracts must not be "readily susceptible to manipulation"); *id*. § 7(d)(4) (DCMs must "[p]revent[]…market disruption").  This fragmentation would fundamentally undercut the central purpose of the CEA, as reflected in 7 U.S.C. § 5, which is to provide a nationwide market for price discovery and to deter and prevent price manipulation.  If Rhode Island could subject

22

Kalshi to state laws, 49 other states could do the same, resulting in the patchwork that Congress recognized would make operating a DCM impossible.  As CFTC counsel recently warned: "[W]e would have 50 state regulations that all have different interpretations of what a swap is or is not," and "the CFTC is not equipped, nor are our regulated entities, nor the market participants, to go and comply and try and figure out how those state regulations fit with the CEA."  Declaration of Andrew L. Porter, Ex. 1 at 12:18-13:7.

*Third*, a state law stands as an "obstacle" where it hampers "the careful balance struck by Congress."  *Arizona*, 567 U.S. at 406.  Where Congress "entrust[s]" the federal government with "discretion" over violations of federal law, a state regime that allows for state prosecutions of the same actions is "preempted by federal law."  *Id.* at 407-10.  Otherwise, a state could bring charges "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies."  *Id.* at 402.  Congress authorized the CFTC to review contracts involving "gaming" and bar them if "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i).  The CFTC declined to initiate such review.  Compl. ¶¶ 19, 60-62.  Allowing states to impose their own judgments would nullify the CFTC's exclusive right to engage in public-interest review.  *See Crosby*, 530 U.S. at 380.

**B.**     **Kalshi Will Suffer Irreparable Harm Without a Temporary Restraining Order and a Preliminary Injunction.**

Defendants' actions present Kalshi with a "Hobson's choice" giving rise to irreparable harm—either "continually violate [state] law and expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings."  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  As the Third Circuit recently held, Kalshi suffers irreparable harm in several respects.  *See Johnson*, 2026 WL 1223373, at *8-9; *Flaherty*, 172 F.4th at 231-232; *Orgel*, 2026 WL 474869, at *10-11; *Flaherty*, 2025 WL 1218313, at *6-7.

23

*First*, if Kalshi chooses not to comply with preempted Rhode Island law, Kalshi and its officers face the harms associated with criminal or civil enforcement, including the Enforcement Action filed by Defendant Neronha.    When brought under a preempted state statute, that is "irreparable injury."  *Morales*, 504 U.S. at 382; *see Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

*Second*, compliance with preempted Rhode Island law would subject Kalshi to extensive unrecoverable harms.  Kalshi has nearly 21,000 users in Rhode Island with hundreds of thousands of dollars in open contracts.  Sottile Decl. ¶ 31.  Compliance would require Kalshi to forgo this business, with no prospect of recouping losses.  Moreover, forcing Kalshi to cease operating in Rhode Island would subject Kalshi to extraordinary technological challenges and costs.  Kalshi has no current obligation to geolocate its users on a real-time, state-by-state basis.  *Id.* ¶ 26. Attempting to implement geolocation capabilities would take months and cost tens of millions of dollars annually.  *Id.* ¶¶ 29-30.  And because the Eleventh Amendment permits only injunctive relief and declaratory relief against state officials enforcing unconstitutional state law, *see Ex parte Young*, 209 U.S. 123, 155–56 (1908); *Greenless v. Almond,* 277 F.3d 601, 607 (1st Cir. 2002), Kalshi would have no clear way of seeking damages if it ultimately prevailed, creating further irreparable harm.  *See Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000) (holding irreparable harm established where an action to recover damages would be barred by sovereign immunity); *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (per curiam) (holding irreparable harm established where an action to recover damages would be barred by the Eleventh Amendment).

*Third*, a temporary restraining order and a preliminary injunction is needed to protect not only Kalshi and its affiliates, but also its users.  Immediately shuttering access to contracts for

24

Rhode Island users could require Kalshi to terminate contracts and liquidate users' positions, or to pause trading pending the outcome of litigation. Sottile Decl. ¶¶ 42-48. Either scenario would harm users not just in Rhode Island but nationwide, because cutting off users in one state would substantially distort markets and contract prices for users in other states. People located within Rhode Island are inevitably transacting with persons located in other states, meaning the harms from an enforcement action would be suffered nationwide—including in states where federal courts have preliminarily enjoined enforcement of state laws against Kalshi. *Id.* ¶ 46. Such "impair[ment of] existing contractual obligations" constitutes irreparable harm. *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1051-52 (S.D. Cal. 2006) (citation modified); *see Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) ("[L]ikely interference with customer relationships" resulting from breach of contract constitutes irreparable harm).

*Fourth*, Kalshi will face irreparable reputational harm if no injunction is granted. Prosecution undermines its reputation as a lawfully licensed DCM, and facing an enforcement action would undermine users' confidence and make them fear their positions are at risk. Sottile Decl. ¶¶ 58-62. This loss of "goodwill" could not easily be regained even if Kalshi ultimately prevails and constitutes a distinct irreparable harm. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 20 (1st Cir. 1996); *Leone v. Town of New Shoreham*, 534 A.2d 871, 873-74 (R.I. 1987) (enjoining town from interfering with Block Island moped business where inability to conduct business during the summer season "would have meant loss of good will to the business . . . for which there is no adequate legal remedy"); *see also K-Mart Corp. v. Oriental Plaza, Inc.,* 875 F.2d 907, 915 (1st Cir. 1989). Moreover, abruptly terminating Kalshi's event-based contracts in Rhode Island would risk violating CFTC Core Principles to which Kalshi is subject. *See* CFTC

Amicus Br. at 26-27 (noting a DCM "cannot fulfill its federal mandate" if it complies with state-by-state regulation).  A temporary restraining order and preliminary injunction is needed to prevent Kalshi from suffering irreparable harm during the pendency of this litigation.

### C.    The Balance of the Equities and Public Interest Favor a Temporary Restraining Order and a Preliminary Injunction.

The balance of equities and public interest[4] weigh in favor of a temporary restraining order and a preliminary injunction because "[i]t is always in the public interest to prevent the violation of a party's constitutional rights."  *Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) (citation omitted); *see also Acosta v. Pablo Restrepo*, 470 F. Supp. 3d 161, 168 (D.R.I. 2020); *Atl. Beach Casino, Inc. v. Morenzoni*, 749 F. Supp. 38, 42 (D.R.I. 1990) (harm from threatened governmental action based on unconstitutional ordinance outweighed harm to government).  The Third Circuit, in addition to Arizona, Tennessee, and New Jersey courts, agreed. *Johnson*, 2026 WL 1223373, at *9; *Orgel*, 2026 WL 474869, at *11; *Flaherty*, 2025 WL 1218313, at *7; *Flaherty*, 172 F.4th at 231-32.  "[A] state has no legitimate interest in enforcing a preempted law." *Johnson*, 2026 WL 1223373, at *9; *see also Arizona*, 567 U.S. at 401.

Beyond that, the failure to issue an injunction would "reach beyond the parties involved directly in the suit and impact the public's right[s]." *Associated Builders & Contractors v. Mich. Dep't of Lab. & Econ. Growth*, 543 F.3d 275, 278 (6th Cir. 2008) (citation omitted); *see also Acosta*, 470 F. Supp. 3d at 168.  Ceasing operations in Rhode Island would harm Kalshi's users and impose intractable technological difficulties. Sottile Decl. ¶¶ 17-62.  Abrupt cessation would make it difficult to inform users in Rhode Island of their rights and obligations regarding ongoing

---

[4] The third and fourth factors for a preliminary injunction—harm to the opposing party and the public interest  "merge when the [g]overnment is the opposing party." *Does 1-6 v. Mills,* 16 F.4th 20, 37 (1st Cir. 2021); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009).

event contracts and cut off their access to positions on Kalshi's exchange. *Id.* ¶¶ 42-48. The harms would be suffered by counterparties nationwide, including in Arizona, Tennessee, and New Jersey, where similar enforcement actions have been enjoined. *Id.* ¶ 46. Because Rhode Island's laws are preempted as applied to Kalshi, the balance of the equities and public interest firmly favor preliminary relief.[5]

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should issue a temporary restraining order and a preliminary injunction against Defendants enjoining them from pursuing any state action, including the one filed late yesterday after this Action was filed, against Kalshi and its affiliates concerning trading on Kalshi's DCM.

---

[5] The requested relief does not run afoul of the Anti-Injunction Act, 28 U.S.C. § 2283, for the simple reason that Kalshi filed its request for injunctive relief before the Attorney General filed its state court action. *Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 842 n.6 (1st Cir. 1988) ("The Anti–Injunction Act . . . does not, in any event, bar injunctive relief that would run against a state court . . . when the federal court's injunctive power is *invoked* (i.e., requested) by the plaintiff before the state court action is commenced." (emphasis in original)); *see Kucherenko v. Chelsea Housing Auth.*, 2023 WL 12098666, *3 (D. Mass. Aug. 28, 2023) ("In this circuit, the question is whether injunctive relief was 'requested' before the state court proceedings commenced." (citing *Hyde Park*, 839 F.2d at 842 n.6)); *Philip Morris Inc. v. Harshbarger*, 946 F. Supp. 1067, 1074 (D. Mass. 1996) ("The Act does not apply here for the simple reason that the plaintiffs filed their suit first. Where the plaintiff invokes the federal court's injunctive power before the state court action has commenced, the Act does not bar the federal court from granting relief." (citing *Hyde Park*, 839 F.2d at 842 n.6)); *Barancik v. Invs. Funding Corp. of N.Y.*, 489 F.2d 933, 934 (7th Cir. 1973) (Stevens, J.) (same); *Nat'l City Lines, Inc. v. LLC Corp.*, 687 F.2d 1122, 1127–28 (8th Cir. 1982) (same). Kalshi also expects that the state court action will be removed to this Court in short order, further making the Anti-Injunction Act inapplicable here.

DATED: May 22, 2026

Respectfully submitted,
**HINCKLEY, ALLEN & SNYDER LLP**

By: /s/ Ryan M. Gainor
Ryan M. Gainor (#9353)
Mackenzie C. McBurney (#10098)

100 Westminster Street, Suite 1400
Providence, RI  02903-2319
Telephone: (401) 274-2000
Facsimile: (401) 277-9600
rgainor@hinckleyallen.com
mmcburney@hinckleyallen.com

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
Colleen Roh Sinzdak (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
Matthew J. Laroche (*pro hac vice* forthcoming)
Nicole D. Valente (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff KalshiEX LLC*

28

**CERTIFICATE OF SERVICE**

  I hereby certify that the foregoing document was filed through the ECF system on May 22, 2026 and will be sent electronically to the registered participants identified on the Notice of Electronic Filing.


               *Ryan M. Gainor*
               Ryan M. Gainor