# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

KALSHIEX LLC,

                           Plaintiff,

and

UNITED STATES OF AMERICA
and COMMODITY FUTURES TRADING
COMMISSION

                           Proposed
                           Plaintiff-
                           Intervenors

                      v.

MARK FURCOLO, in his official capacity as
Director of the Division of State Lottery;
PETER F. NERONHA, in his official capacity
as Rhode Island Attorney General;
CHRISTINA TOBIASZ, in her official capacity
as Gaming and Athletics Administrators,
Department of Business Regulation,

                           Defendants.

Case No. 1:26-cv-00327

---

**MEMORANDUM OF LAW IN SUPPORT OF PROPOSED
PLAINTIFF-INTERVENORS' MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................................1

BACKGROUND ..........................................................................................................................2

I.     The CEA provides the regulatory framework for commodity derivatives markets in the United States, including event-contract markets...........................................................2

II.    Congress has steadily expanded the Commission's jurisdiction and contracted state jurisdiction over derivatives trading.......................................................................4

III.   Event contracts have long traded subject to Commission oversight.....................................6

IV.    Rhode Island unlawfully attempts to apply state gambling laws to CFTC-regulated derivatives markets ...........................................................................................................8

LEGAL STANDARD.....................................................................................................................8

ARGUMENT.................................................................................................................................9

I.     The federal intervenors have standing ..............................................................................9

II.    The federal intervenors are likely to succeed on the merits.................................................11

       A.    Event contracts are "swaps" under the CEA...............................................................12

       B.    Rhode Island gambling law is preempted as applied to swap transactions on DCMs.................................................................................................................................14

             1.    The CEA expressly preempts state regulation of commodity derivatives transactions.......................................................................................................15

             2.    The CEA occupies the field of regulating trading on a DCM ...........................17

             3.    Rhode Island's enforcement effort conflicts with the CEA and Commission Rules ...........................................................................................19

III.   The remaining factors favor granting preliminary relief .....................................................21

CONCLUSION............................................................................................................................22

## TABLE OF AUTHORITIES

<u>Cases</u>

*Alabama Power Co. v. Costle*,
  636 F.2d 323 (D.C. Cir. 1979).......................................................................................13

*American Agriculture Movement, Inc. v. Board of Trade of Chicago*,
  977 F.2d 1147 (7th Cir. 1992).......................................................................................20

*Arizona v. United States*,
  567 U.S. 387 (2012)................................................................................10, 14, 18, 19

*Atlantic Richfield Co. v. Christian*,
  590 U.S. 1 (2020)..........................................................................................................17

*Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*,
  622 F.3d 36 (1st Cir. 2010)...........................................................................................21

*Chamber of Com. of U.S. v. Whiting*,
  563 U.S. 582 (2011).......................................................................................................15

*Churchill Downs Technology Initiatives Co. v. Michigan Gaming Control Board,*
  162 F.4th 631 (6th Cir. 2025) .......................................................................................22

*Commodity Futures Trading Commission v. Spagnuolo*,
  No. 1:26-cv-4419 (S.D.N.Y.)...........................................................................................7

*Commodity Futures Trading Commission v. Van Dyke*,
  No. 1:26-cv-3369 (S.D.N.Y.) ..........................................................................................7

*Cunningham v. National Bank of Augusta,*
  71 Ga. 400 (1883) ...........................................................................................................4

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  622 F.2d 216 (6th Cir. 1980) ........................................................................................15

*Dickson v. Uhlmann Grain Co.*,
  288 U.S. 188 (1933).........................................................................................................4

*Does 1-6 v. Mills*,
  16 F.4th 20 (1st Cir. 2021).............................................................................................22

*Effex Capital, LLC v. National Futures Ass'n*,
  933 F.3d 882 (7th Cir. 2019).....................................................................................15, 19

*FEC v. National Conservative Political Action Committee*,
  470 U.S. 480 (1985).......................................................................................................10

*FTC v. Ken Roberts Co.,*
  276 F.3d 583 (D.C. Cir. 2001).........................................................................................5

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016)......................................................................................................................14

*Institutional Shareholder Servs., Inc. v. SEC*,
142 F.4th 757 (D.C. Cir. 2025).......................................................................................................9

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) ............................................................................... *passim*

*KalshiEX LLC v. Johnson*,
2026 WL 1223373 (D. Ariz. May 5, 2026)........................................................... *passim*

*KalshiEX LLC v. Martin*,
793 F. Supp. 3d 667 (D. Md. 2025) .............................................................................................16

*KalshiEX v. Orgel*,
2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) ...............................................................2, 13, 22

*Kansas v. Garcia*,
589 U.S. 191 (2020).......................................................................................................................18

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980)............................................................................................................3

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020).........................................................................................................................9

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992).........................................................................................................................9

*Maine Forest Prods. Council v. Cormier*,
51 F.4th 1 (1st Cir. 2022)................................................................................................................8

*Merrill Lynch Int'l v. XL Cap. Assur. Inc.*,
564 F. Supp. 2d 298 (S.D.N.Y. 2008)..........................................................................................18

*Merrill Lynch, Pierce, Ferner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982)................................................................................................1, 4, 11, 15, 18

*Mohr v. Miesen*,
49 N.W. 862 (Minn. 1891)..............................................................................................................4

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992).......................................................................................................................21

*Murphy v. National Collegiate Athletic Association*,
584 U.S. 453 (2018)................................................................................................................17, 18

*Rhode Island v. KalshiEX LLC*,
No. PC-2026-02753 (R.I. Super. Ct.) .............................................................................................8

*Rhode Island v. KalshiEX LLC*,
No. 1:26-cv-00333 (D.R.I.)...................................................................................................1, 8, 22

*Rice v. Board of Trade of Chicago,*
  331 U.S. 247 (1947)..................................................................................................5

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
  102 F.3d 12 (1st Cir. 1996)......................................................................................21

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016)..................................................................................................9

*Stuber v. Hill,*
  170 F. Supp. 2d 1146 (D. Kan. 2001).....................................................................18

*Texas Midstream Gas Servs., LLC v. City of Grand Prairie,*
  608 F.3d 200 (5th Cir. 2010) ...................................................................................21

*Thrifty Oil Co. v. Bank of Am. National Tr. & Sav. Ass'n,*
  322 F.3d 1039 (9th Cir. 2003) .................................................................................17

*Tirrell v. Edelblut,*
  747 F. Supp. 3d 310 (D.N.H. 2024)........................................................................22

*Town of Chester v. Laroe Estates, Inc.,*
  581 U.S. 433 (2017)..................................................................................................9

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025)..................................................................................................9

*United States v. Alabama,*
  691 F.3d 1269 (11th Cir. 2012) ....................................................................13, 21, 22

*United States v. California,*
  173 F.4th 1060 (9th Cir. 2026) ...............................................................................21

*United States v. Florida,*
  172 F.4th 1201 (11th Cir. 2026) ...............................................................................9

*United States v. Iowa,*
  126 F.4th 1334 (8th Cir. 2025),
  *vacated as moot* 2005 WL 1140834 (8th Cir. Apr. 15, 2025) ..........................10, 11

*United States v. Missouri,*
  114 F.4th 980 (8th Cir. 2024) ..............................................................................10, 11

*United States v. Phillips,*
  155 F.4th 102 (2d Cir. 2025) ...................................................................................12

*United States v. South Carolina,*
  720 F.3d 518 (4th Cir. 2013) ...................................................................................11

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens,*
  529 U.S. 765 (2000)................................................................................................10

*Winter v. Natural Resources Defense Council, Inc.,*
  555 U.S. 7 (2008)......................................................................................................8

iv

*Wyandotte Transp. Co. v. United States*,
  389 U.S. 191 (1967)..............................................................................................................10

Statutes

7 U.S.C. § 1a(19), CEA § 1a)(19)....................................................................................12

7 U.S.C. § 1a(47)(A), CEA § 1a(47)(A)..............................................................5, 12, 13

7 U.S.C. § 2(a)(1), CEA § 2(a)(1)............................................................... *passim*

7 U.S.C. § 2(c), CEA § 2(c)..............................................................................................16

7 U.S.C. § 2(f), CEA § 2(f)...............................................................................................16

7 U.S.C. § 5, CEA § 3.........................................................................................................3

7 U.S.C. § 6(c), CEA § 4(c)..............................................................................................16

7 U.S.C. § 7, CEA § 5.....................................................................................................3, 18

7 U.S.C. § 7a-2(c)(1), CEA § 5c(c)(1)...........................................................................18

7 U.S.C. § 7a-2(c)(5)(C), CEA § 5c(c)(5)(C) .......................................................6, 14, 19

7 U.S.C. § 13a-2(1), CEA § 6d(1)....................................................................................16

7 U.S.C. § 13a-2(7), CEA § 6d(7)....................................................................................16

7 U.S.C. § 16(e), CEA § 12(e)....................................................................................16, 17

7 U.S.C. § 16(h), CEA § 12(h) .........................................................................................17

7 U.S.C. § 27–27f .................................................................................................................16

Commodity Futures Trading Commission Act of 1974,
  Pub. L. No. 93-463, 88 Stat. 1389 (1974)......................................................................5

Dodd-Frank Wall Street Reform and Consumer Protection Act,
  Pub. L. No. 111-203, 124 Stat. 1376 (2010).................................................................5

Regulations

17 C.F.R. § 38.150(a)...........................................................................................................3

17 C.F.R. § 38.151(b).........................................................................................................20

17 C.F.R. § 38.200 ...............................................................................................................3

17 C.F.R. § 38.250 ...............................................................................................................4

17 C.F.R. § 40.11(c)(2) ......................................................................................................19

17 C.F.R. § 50.75 ....................................................................................................................17

Concept Release on the Appropriate Regulatory Treatment of Event Contracts,
  73 Fed. Reg. 25,669 (May 7, 2008) ...................................................................................6, 14

Prediction Markets,
  91 Fed. Reg. 12,516 (proposed Mar. 16, 2026) ......................................................................7

Legislative Materials

120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974)....................................................................5, 19

Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry
  on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen.
  Clark) ...................................................................................................................................20

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.),
  *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897 ...................................................................5, 18

S. Rep. No. 93-1131 (1974) ......................................................................................................5

Other Authorities

Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets
  For Its Own Risk Management*, InGame (Oct. 22, 2025), https://www.ingame.com/underdog
  kalshi-pm-risk-management/ ................................................................................................14

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*,
  58 Chicago-Kent L. Rev. 657, 670 (1982).  ..............................................................................4

CFTC, Contracts & Products,
  https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm ......................................6

CFTC Designated Contact Market Products,
  https;//www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts?
  Organization=CM ..................................................................................................................7

CFTC, Futures Glossary: A Guide to the Language of the Futures Industry,
  https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/
  CFTCGlossary/index.htm ..................................................................................................3, 12

CFTC Staff Letter No. 93-66 (June 18, 1993),
  https://www.cftc.gov/sites/default/files/idc/groups/
  public/@lrlettergeneral/documents/letter/93-66.pdf..................................................................6

CFTC, Release Number 9199-26,
  *CFTC and MLB Sign Groundbreaking MOU* (Mar. 19, 2026),
  https://www.cftc.gov/PressRoom/PressReleases/9199-26.........................................................7

CFTC, Release Number 9235-26,
  *CFTC and National Hockey League Sign MOU Related to Integrity
  in Professional Hockey* (May 21, 2026),
  https://www.cftc.gov/PressRoom/PressReleases/9235-26. .........................................................7

**PRELIMINARY STATEMENT**

Proposed Intervenor-Plaintiffs the United States of America ("USA") and the Commodity Futures Trading Commission ("Commission" or "CFTC"), a federal executive agency, seek a preliminary injunction from this Court to halt Defendants' ongoing attempts to assert jurisdiction over federally regulated commodity derivatives markets. Under the Commodity Exchange Act ("CEA"), the event contracts that Rhode Island seeks to prohibit are "swaps," and the "prediction markets" on which these event contracts trade are CFTC-regulated Designated Contract Markets ("DCMs"). The CEA expressly confers "exclusive jurisdiction" upon the Commission to regulate "transactions involving swaps" that are traded on DCMs, 7 U.S.C. § 2(a)(1)(A), and more broadly, the Act provides a "comprehensive regulatory structure [for] oversee[ing] the volatile and esoteric futures trading complex" that is administered—and administered only—by the Commission, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). State law that purports to regulate or prohibit transactions involving swaps is therefore preempted.

Rhode Island seeks to invade the Commission's jurisdiction over federally regulated markets by enforcing its state gambling laws against CFTC-approved DCMs. Last week, state officials met with a DCM and threatened to enforce state gambling laws against CEA-governed event contracts without any prior notice. Dkt. No. 1 ¶ 3. The next day, Rhode Island sued two DCMs in state court, seeking to bar them from offering sports-related event contracts in the State. *See Rhode Island v. KalshiEX, LLC, et al.*, No. 1:26-cv-00333 (D.R.I.), Dkt. No. 1 (removing the case to federal court).

This Court should follow the lead of other federal courts—including the Third Circuit—that have enjoined States from enforcing their gambling laws against sports event contracts listed on CFTC-regulated DCMs. *See KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 224 (3d Cir. 2026)

1

(upholding preliminary injunction prohibiting New Jersey from "enforcing state law against Kalshi's sports-related event contracts"); *KalshiEX LLC v. Johnson*, __ F. Supp. 3d __, 2026 WL 1223373, at *3 (D. Ariz. May 5, 2026) (same as to Arizona); *Kalshiex LLC v. Orgel*, No. 3:26-cv-34, 2026 WL 474869, at *12 (M.D. Tenn. Feb. 19, 2026) (same as to Tennessee). The CEA expressly gives the CFTC—and only the CFTC—jurisdiction to regulate derivatives trading on DCMs. 7 U.S.C. § 2(a)(1)(A). Allowing States to intrude on that jurisdiction would not only contravene the plain text of the CEA; it would subject CFTC-regulated markets to a patchwork of 50 different regulatory frameworks—precisely what Congress sought to avoid in creating the CFTC. And while Rhode Island has thus far only targeted sports event contracts, its position lacks any limiting principle—the State, by its logic, could regulate event contracts that have long been traded uncontroversially on CFTC-regulated DCMs, like contracts on the weather or agricultural production.

Because the CEA preempts the application of state gambling laws to transactions on CFTC-regulated markets, this Court should halt Rhode Island's enforcement of its preempted laws against DCMs by entering a preliminary injunction.

## BACKGROUND

### I.   The CEA provides the regulatory framework for commodity derivatives markets in the United States, including event-contract markets

The CEA provides a comprehensive framework that governs transactions in United States commodity derivatives markets. The CFTC is the federal executive agency that administers the CEA, enforces its provisions in federal courts, and regulates derivatives markets. A "derivative" is a financial instrument, such as a future, option, or swap, for which the price is directly dependent upon—that is, "derived from"—the value or occurrence of something else, such as an agricultural

2

or financial commodity or, as relevant here, an event.[1]

In enacting the CEA, Congress specifically identified "a national public interest" in flourishing derivatives markets, as they provide "a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5. For instance, derivatives markets allow actors with limited risk tolerance to "hedge" their risks.[2] Like securities markets, the commodities derivatives markets also include "speculators" who trade to profit from price movements. Speculators are important because they help ensure that hedgers can find counterparties with whom to trade, thereby fostering price discovery and liquidity in the markets. *See generally Leist v. Simplot*, 638 F.2d 283, 287–88 (2d Cir. 1980) (describing roles of hedgers and speculators).

Many derivatives must be traded on a DCM—that is, an exchange or national board of trade that operates under the regulatory oversight of the Commission. *See* 7 U.S.C. § 7. The Commission designates an exchange as a DCM through a formal application process in which an applicant must demonstrate its ability to comply with detailed statutory and regulatory requirements called "core principles." *Id.* § 7(d). These core principles require DCMs to, among other things, establish and enforce compliance with market rules, 17 C.F.R. § 38.150(a); list only contracts that are not readily susceptible to manipulation, *id.* § 38.200; and have the capacity to

---

[1] CFTC, Futures Glossary: A Guide to the Language of the Futures Industry, Derivative, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm.

[2] For instance, airlines that need to buy jet fuel in the foreseeable future might manage the risk that the price will increase by entering into a derivative contract, *e.g.* a futures contract, to hedge against that risk. It would take a "long" position, *i.e.*, a futures contract that will increase in value if the price of the airline's fuel increases. On the other hand, a fuel supplier might manage the risk that the price of oil will decline by taking a "short" position, *i.e.*, a futures contract that will increase in value if the price of fuel goes down.

3

prevent manipulation or price distortions, *id.* § 38.250. Today, 25 exchanges in the United States have active designations from the Commission to operate as a DCM.

## II.    Congress has steadily expanded the Commission's jurisdiction and contracted state jurisdiction over derivatives trading

Rhode Island's attempt to regulate derivatives trading as gambling is nothing new. Before Congress entered the field of futures regulation, States often failed to distinguish between futures trading and illegal "gambling" or "wagering." *See, e.g.*, *Cunningham v. National Bank of Augusta*, 71 Ga. 400, 403 (1883) (describing futures contracts for cotton as "speculation on chances, a wagering and betting between the parties"); *Mohr v. Miesen*, 49 N.W. 862, 862 (Minn. 1891) (describing "betting upon the price of wheat, [as] against public policy, and not only void, but deserving of the severest censure"). Congress, by contrast, "has recognized the potential hazards as well as the benefits of futures trading," and it accordingly "has authorized the regulation of commodity futures exchanges for over [100] years," beginning with the Future Trading Act of 1921 and Grain Futures Act of 1922. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 360 (1982). Those early federal forays into futures regulation, however, failed to preempt state law. *See Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933) (holding that federal law "did not supersede any applicable provisions of [] Missouri law making gambling in grain futures illegal").

The CEA, enacted in 1936, broadened the federal government's regulatory authority over futures trading and prompted a "[g]radual state retreat from . . . the entire field of commodities futures regulation." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chicago-Kent L. Rev. 657, 670 (1982). But the Supreme Court again held that States could regulate aspects of commodities trading, explaining that a savings clause in Section 4c of the CEA

4

"serves the function of preventing supersedure and preserving state control in [] areas where state and federal law overlap." *Rice v. Board of Trade of Chicago*, 331 U.S. 247, 255 (1947).

The key turning point came in 1974, when Congress created the Commission and gave it "exclusive jurisdiction" over futures trading. Pub. L. No. 93-463, § 201(b), 88 Stat. 1389, 1395 (codified at 7 U.S.C. § 2(a)(1)(A)). "The aim of this provision" was to "'avoid unnecessary, overlapping and duplicative regulation.'" *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001). The 1974 Act also removed the savings clause in Section 4c "[i]n order to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974). Leading proponents of the Act repeatedly indicated that futures regulation would be subject solely to Commission oversight, not state law. *See, e.g.*, H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Report) (explaining that the "exclusive grant of jurisdiction to the Commission" would "preempt the field insofar as futures regulation is concerned," and that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern"); S. Rep. No. 93-1131, at 6 (1974) (stating that the Commission's "jurisdiction, where applicable, supersedes State as well as Federal agencies").

Congress has further expanded the preemptive reach of the CEA over the subsequent decades—particularly with respect to "swaps." A "swap" is a type of derivative that encompasses "any agreement, contract, or transaction . . . that provides for any . . . payment[ ] or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). In the 2010 Dodd-Frank Act, Congress extended the Commission's "exclusive jurisdiction" to encompass "accounts, agreements . . . , and transactions involving swaps." Pub. L. No. 111-203, § 722(a)(1)(D), 124 Stat. 1376, 1672 (2010) (codified at 7 U.S.C.

5

§ 2(a)(1)(A)). It also added a "Special Rule" granting the Commission authority to prohibit certain swaps called "event contracts" that, in the Commission's view, are contrary to the public interest. *Id.* § 745(a), 124 Stat. at 1736–37 (codified at 7 U.S.C. § 7a-2(c)(5)(C)).

### III.    Event contracts have long traded subject to Commission oversight

At issue in this case are "event contracts," which are "derivative contract[s] whose payoff is based on a specified event, occurrence, or value."[3] While event contracts have become more popular with the American public in recent years, these contracts are not novel innovations. "Since 1992, Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts with payout terms based on" events "as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events." 73 Fed. Reg. 25,669, 25,671 (May 7, 2008). In 1993, the Commission issued a no-action letter to Iowa Electronic Markets, allowing the facility to list event contracts tied to U.S. and Canadian elections.[4] And by 2005, event contracts encompassed "the accomplishment of certain scientific advances, world population levels, the adoption of particular pieces of legislation," and even "the length of celebrity marriages." 73 Fed. Reg. at 25,670. Today, event contracts are listed on numerous CFTC-registered DCMs, whether they be relatively new markets like KalshiEX ("Kalshi") and QCX ("Polymarket"), or longstanding ones like North American Derivatives Exchange ("Nadex") and CME Group. To date, at least eight DCMs have collectively self-certified more than 3,000 event based contracts with the CFTC, many of which are tied to events such as cryptocurrency price levels, GDP releases, benchmark interest-rate decisions, election outcomes,

---

[3]    CFTC, Contracts & Products, https://www.cftc.gov/IndustryOversight/ ContractsProducts/index.htm.

[4]    CFTC Staff Letter No. 93-66 (June 18, 1993), https://www.cftc.gov/sites/default// files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf.

temperature forecasts, electricity usage, and the price movements of precious metals.[5] In recent years, DCMs have increasingly offered event contracts based on sports. While the underlying event may be comparatively novel, the structure of these contracts parallels the contracts that have traded for decades under the Commission's oversight.

The Commission exercises its exclusive jurisdiction over these DCMs by requiring them to complete a registration process with the Commission before trading, monitoring their activity and the event contracts they self-certify, and pursuing enforcement actions as appropriate. The Commission is also taking additional steps to ensure market integrity around the trading of event contracts. The Commission has signed Memoranda of Understanding with Major League Baseball and the National Hockey League, which establishes a framework for the leagues to exchange information with the Commission in order to respond swiftly to incidents and anticipate emerging trends.[6] The Commission issued an Advance Notice of Proposed Rulemaking seeking comment on potential rulemaking around prediction markets. *See* 91 Fed. Reg. 12,516 (proposed Mar. 16, 2026). And the Commission has filed enforcement actions against persons who engage in insider trading on prediction markets. *See CFTC v. Van Dyke*, No. 1:26-cv-3369 (S.D.N.Y.) (enforcement action against U.S. servicemember who used sensitive nonpublic information to trade event contracts related to the ouster of Venezuelan President Nicolás Maduro); *CFTC v. Spagnuolo*, No. 1:26-cv-4419 (S.D.N.Y.) (enforcement action against Google employee who used nonpublic information to trade event contracts related to Google's Year in Search list).

---

[5] *See* CFTC Designated Contact Market Products, https;//www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts?Organization=CM.

[6] CFTC, Release Number 9199-26, *CFTC and MLB Sign Groundbreaking MOU* (Mar. 19, 2026), https://www.cftc.gov/PressRoom/PressReleases/9199-26; CFTC, Release Number 9235-26 (May 21, 2026), https://www.cftc.gov/PressRoom/PressReleases/9235-26.

IV.    **Rhode Island unlawfully attempts to apply state gambling laws to CFTC-regulated derivatives markets**

On May 20, 2026, the Attorney General of Rhode Island met with representatives of Kalshi. Dkt. No. 1 ¶ 3. The Attorney General's office indicated that it considered Kalshi to be in violation of state gambling laws and refused to offer advance notice of any enforcement action. *Id.* The next day, and hours after Kalshi filed this action, Rhode Island made good on its threat by filing a civil enforcement suit against DCMs Kalshi and Polymarket. *See* Petition for Declaratory Judgment, *Rhode Island v. KalshiEX LLC, et al.*, No. PC-2026-02753 (R.I. Super. Ct. May 21, 2026), *removed to federal court Rhode Island v. KalshiEX LLC*, No. 1:26-cv-333, Dkt. 1 (D.R.I. May 22, 2026). Rhode Island alleges that Kalshi and Polymarket are engaged in illegal and unlicensed "casino gaming" and "online sports wagering" under state law. *KalshiEX*, No. 1:26-cv-333, Dkt. No. 1.1 (D.R.I. May 22, 2026), ¶¶ 113–15. The State thus seeks to "[p]ermanently enjoin [Kalshi and Polymarket] from offering sports-related 'event contracts' on 'prediction markets' within the State of Rhode Island." *Id.* ¶ 117. Kalshi moved for a preliminary injunction, Dkt. No. 5, and the United States and the Commission promptly moved to intervene to defend the Commission's exclusive jurisdiction over federally regulated exchanges and the products they offer, Dkt. No. 19.

**LEGAL STANDARD**

A party seeking a preliminary injunction must establish that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The likelihood-of-success prong is "the 'sine qua non' for preliminary injunctive relief." *Maine Forest Products Council v. Cormier*, 51 F.4th 1, 5 (1st Cir. 2022).

8

## ARGUMENT

This Court should enter a preliminary injunction because Rhode Island's gambling laws are preempted as applied to swaps listed on CFTC-regulated DCMs, and the State's aggressive enforcement efforts cause irreparable harm to the federal intervenors and contravene the public interest.

### I.    The federal intervenors have standing

As an initial matter, the federal intervenors have standing to seek a preliminary injunction.[7] Article III requires plaintiffs to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish an injury in fact, plaintiffs must demonstrate "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

The federal intervenors are suffering at least three injuries because of Rhode Island's actions. *First*, as the Supreme Court has stated, "[i]t is beyond doubt" that a complaint "asserts an injury to the United States" if it alleges an "injury to [U.S.] sovereignty arising from violation of

---

[7] "[A]n intervenor of right must have Article III standing in order to pursue relief that is *different* from that which is sought by a party with standing." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 440 (2017) (emphasis added). But it need not establish Article III standing where it seeks the same relief as the plaintiff. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020) (holding that the lower court "erred by inquiring into the [intervenors'] independent Article III standing" because "both the [original plaintiff] and the [intervenors] asked the court" for the same relief); *Institutional Shareholder Servs., Inc. v. SEC*, 142 F.4th 757, 764 n.3 (D.C. Cir. 2025) (same). Because the federal intervenors seek a preliminary injunction that prohibits enforcement of Rhode Island state law as to swaps on *all* DCMs, they seek broader relief than Kalshi. *See United States v. Florida*, 172 F.4th 1201, 1222 (11th Cir. 2026) ("[W]hen the United States asserts its sovereign interest to remedy a state's violation of federal law, and proves state-wide violations, complete relief may be statewide." (citing *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025))).

9

its laws." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); *see also United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024) ("The United States has a legally protected interest in enforcing federal law."); 13B Federal Practice & Procedure Jurisdiction, § 3531.11 (3d ed., Apr. 2026 update) ("Standing to pursue the general interests of the public is easily recognized when federal officials responsible for enforcing specific statutory schemes bring suit under the aegis of the statute."). For example, in a case involving a federal statute that the FEC had "exclusive jurisdiction" to enforce, the Supreme Court held that there was "no[] doubt" that the FEC had Article III standing to defend the statute's constitutionality, given that the "relief the FEC requests would aid its enforcement efforts." *FEC v. National Conservative Political Action Committee*, 470 U.S. 480, 484–85 (1985). Likewise here, the CFTC has the "exclusive jurisdiction" to regulate DCMs, 7 U.S.C. § 2(a)(1)(A), and can bring civil suits to enforce its authority, 7 U.S.C. § 13a-1(a). Article III does not preclude the federal government from defending that jurisdiction in court.

*Second*, and relatedly, "[t]he United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see also Missouri*, 114 F.4th at 985 ("Interference with the federal government's interest in enforcing federal law is sufficient to establish that [a state law's] implementation injure[s] the United States."); *KalshiEX LLC v. Johnson*, __ F. Supp. 3d __, 2026 WL 1223373, at *3 (D. Ariz. May 5, 2026) ("The federal government 'may sue to protect its interests' . . . , and that authority extends to suits seeking to enjoin the enforcement of preempted state law." (quoting *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967))). Indeed, the United States regularly brings preemption lawsuits to invalidate state laws that are contrary to federal law. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 394 (2012); *United States v. Iowa*,

10

126 F.4th 1334, 1341 (8th Cir. 2025), *vacated as moot* 2025 WL 1140834 (8th Cir. Apr. 15, 2025); *Missouri*, 114 F.4th at 983; *United States v. South Carolina*, 720 F.3d 518, 528 (4th Cir. 2013).

Here, Rhode Island's attempt to regulate DCMs directly "impairs" the United States's "legally protected interest in enforcing federal law." *Missouri*, 114 F.4th at 984. Congress subjected these transactions to the Commission's "exclusive jurisdiction," 7 U.S.C. § 2(a)(1)(A), and more broadly, it empowered the Commission to administer the CEA's "comprehensive regulatory structure" for derivatives transactions. *Curran*, 456 U.S. at 356. If Rhode Island can enforce its gambling laws against CFTC-approved DCMs, the blow to the Commission's sovereign interest as exclusive regulator would be substantial.

*Third*, the Commission has already experienced injuries associated with States' attempts to ban event contracts. DCMs have sought guidance from the Commission's staff as to appropriate steps to take under the CEA and Commission regulations if ordered to cease operations in particular States. The Commission has devoted resources to determining the necessary compliance requirements, which have diverted Commission resources away from its core function of supervising DCMs and other markets. *See* Ex. A, Declaration of Joshua Beale ¶ 7. These diversions will only be amplified by Rhode Island's enforcement efforts.

For any one of these reasons, "[t]he CFTC [] has standing to seek to enjoin [Rhode Island's] enforcement of its gambling laws against event contracts traded on DCMs." *Johnson*, 2026 WL 1223373, at *3.

### II.   The federal intervenors are likely to succeed on the merits

Rhode Island's attempt to prohibit sports-related event contracts is preempted by federal law. This is for two reasons. First, the event contracts targeted by Rhode Island qualify as "swaps" under the CEA. Second, Congress gave the Commission "exclusive jurisdiction" to regulate

transactions involving swaps, thereby preempting state regulation. Indeed, Congress's creation of the CEA—and conferral of "exclusive jurisdiction" on the Commission—was prompted in large part by repeated conflicts with a patchwork of state laws that interfered with the development of commodity derivatives markets. *See* Dkt. No. 19-1 ¶¶ 35–47. This comprehensive federal regulatory scheme leaves no room for interference by state regulators.

## A.  Event contracts are "swaps" under the CEA

Congress "defined 'swap' broadly." *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). The term encompasses "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A), (A)(ii). Event contracts—including those related to sports—straightforwardly qualify as "swaps" under this definition. [8] *See Flaherty*, 172 F.4th at 227–28 (holding that "Kalshi's sports-related event contracts" are "'swaps' subject to the CFTC's jurisdiction"); *id.* at 233 (Roth, J., dissenting) ("A plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition" of swaps.).

For starters, event contracts make "payment . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." 7 U.S.C. § 1a(47)(A)(ii). Consider an event contract in which a participant takes a "yes" position on the

---

[8] Alternatively, event contracts qualify as binary options under the CEA, which are "option[s] whose payoff is either a fixed amount or zero." CFTC, Futures Glossary: A Guide to the Language of the Futures Industry, Binary Options, https://www.cftc.gov/LearnAndProtect/ AdvisoriesAndArticles/CFTCGlossary/index.htm. Binary options are swaps under 7 U.S.C. § 1a(47)(A)(i), which defines "swap," to include "any agreement, contract, or transaction . . . that is a[n] . . . option of any kind that is for the purchase or sale, or based on the value, of 1 or more . . . commodities, . . . , quantitative measures, or other financial or economic interests or property of any kind." *See also id.* § 1a(19)(iv) (defining "excluded commodity," which is a type of commodity, to include "occurrence[s]").

Patriots beating the Bills. "[P]ayment" under that contract is plainly "dependent on the occurrence . . . of an event"—namely, a Patriots victory over the Bills. Likewise, a "yes" position on the Patriots winning by more than 7.5 points is "dependent on . . . the extent of the occurrence of an event"—the extent to which the Patriots prevail over the Bills. *See Johnson*, 2026 WL 1223373, at *4 (explaining that the phrase "extent of the occurrence of an event or contingency" "reaches how an event unfolds, not just whether it happens").

Additionally, to be a swap, the "event" on which the payoff is dependent must be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Sports-related event contracts easily clear the bar. As the Third Circuit held, "[t]he outcome of a sports event" has consequences for "numerous affected stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities." *Flaherty*, 172 F.4th at 227–28. Those "financial consequences" may not be felt "right away"—indeed, they may never *actually* occur—but "Congress chose to use [the qualifier] 'potential,' which is broad." *Orgel*, 2026 WL 474869, at *8; *see Alabama Power Co. v. Costle*, 636 F.2d 323, 353 (D.C. Cir. 1979) (recognizing that "potential … will always and inherently exceed actual").

If sports event contracts are not "associated with a potential financial, economic, or commercial consequence," the Commission's jurisdiction over numerous other event contracts would be imperiled. For instance, "the CFTC and the Securities Exchange Commission have consistently treated weather derivatives as swaps" because weather events—while of "no intrinsic financial value"—nonetheless "produce commercial consequences for a wide range of market participants." *Johnson*, 2026 WL 1223373, at *5. The same is true of event contracts involving "a wide variety of interests including the results of presidential elections, the accomplishment of certain scientific advances, world population levels, the adoption of particular pieces of

13

legislation, . . . the declaration of war and the length of celebrity marriages" that have been offered "[s]ince 2005." 73 Fed. Reg. at 25,670. "Event contracts based on sports . . . outcomes work the same way." *Johnson*, 2026 WL 1223373, at *5. Indeed, public reporting indicates that the sports industry is using prediction markets to hedge sports-related risk—a clear indication that sports events carry financial consequences for numerous stakeholders.[9]

The CEA also contains a "Special Rule" that further underscores event contracts are swaps within the Commission's jurisdiction. Under a subheading entitled "[e]vent contracts," the Special Rule provides that "[i]n connection with the listing of agreements, contracts, transactions, or *swaps* in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency . . . , the Commission may determine that such [contracts] are contrary to the public interest if [they] involve" various enumerated activities. 7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added). The Special Rule thus confirms that the definition of "swap" encompasses event contracts, and that such contracts are subject to the Commission's jurisdiction.

## B. Rhode Island gambling law is preempted as applied to swap transactions on DCMs

Under the Constitution's Supremacy Clause, "federal law preempts contrary state law." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 162 (2016). Most straightforwardly, Congress can "express[ly]" withdraw specified powers from the States. *Arizona*, 567 U.S. at 399. In addition, "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by . . . exclusive [federal] governance." *Id.* "[S]tate laws are [also] preempted when they conflict with federal law." *Id.* Whether on express, field, or conflict preemption grounds, state gambling law is preempted as to swaps traded on DCMs.

---

[9] *See, e.g.*, Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 22, 2025), https://www.ingame.com/underdog-kalshi-pm-risk-management/.

1.    **The CEA expressly preempts state regulation of commodity derivatives transactions**

The CEA confers on the Commission "exclusive jurisdiction" to regulate "accounts, agreements, . . . and transactions involving swaps." 7 U.S.C. § 2(a)(1)(A). That expression of preemptive intent could hardly be plainer. *See Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) ("[T]he plain wording of the clause . . . contains the best evidence of Congress' preemptive intent."). If the Commission has "exclusive jurisdiction . . . with respect to" event contracts, other governmental authorities—including the States—necessarily lack "jurisdiction" over event contracts. 7 U.S.C. § 2(a)(1)(A); *see Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982) ("[T]he thrust of the [exclusive-jurisdiction] provision was to ensure that regulatory bodies other than the CFTC would not interfere with the orderly development and enforcement of commodities regulation.").

The balance of § 2(a)(1)(A) reinforces that default rule. It states that "[*e*]*xcept as hereinabove provided*," Congress did not "supersede or limit the jurisdiction at any time conferred on . . . regulatory authorities under the laws of . . . any State" or "restrict" State authorities "from carrying out their duties and responsibilities." *Id.* (emphasis added). The CEA thus contemplates States retaining regulatory jurisdiction "[e]xcept" with respect to "accounts, agreements . . . and transactions involving swaps." *Id.*; *see Johnson*, 2026 WL 1223373, at *6 (holding that this "savings clause underscores the [CEA's] preemptive effect"). Accordingly, "to give 'full effect' to both the savings clause and the jurisdictional clause," "preemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Effex Capital, LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019). Rhode Island's enforcement effort is precisely aimed at prohibiting an entire category of derivatives trading on a CFTC-approved exchange and thus is squarely preempted.

15

Other provisions of the CEA underscore the primacy of federal law. Section 13a-2(1), for instance, empowers a State to file suit to enjoin violations of the CEA or a Commission regulation. 7 U.S.C. § 13a-2(1). The natural implication is that States generally lack authority to apply their *own* laws to CFTC-regulated transactions.[10] And even when enforcing the CEA pursuant to this limited carve-out, States cannot sue "a contract market," 7 U.S.C. § 13a-2(1), doubling the inference that States cannot criminalize the operation of a CFTC-registered prediction market.

Likewise, Section 16(e)(1) insulates various laws and actions from preemption, including state laws applicable to certain *off-DCM* transactions or persons who fail to obtain registration or designation from the Commission. 7 U.S.C. § 16(e)(1)(B)–(C). Yet Congress omitted any potential for state law to apply to *on-DCM* transactions or *registered* persons, *id.*, further reinforcing that state law has no application to the swap transactions and DCMs targeted by Rhode Island.

Some courts, to be sure, have pointed to *other* preemption provisions—namely, § 16(e)(2) and § 16(h)—and concluded that because these do not expressly preempt state gambling laws applicable to swaps traded on DCMs, such laws remain applicable. *E.g.*, *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 681 (D. Md. 2025). Neither § 16(e)(2) nor § 16(h), however, detracts from the preemptive force of § 2(a)(1).

Take § 16(e)(2) first. That language was added to clarify that even where a contract is "excluded" or "exempted" by the Commission, the CEA nonetheless "supersede[s] and preempt[s] the application of any State or local law that prohibits or regulates gaming" as to those contracts.[11]

---

[10] States may sue in state court for "an alleged violation of any general civil or criminal antifraud statute of such State." 7 U.S.C. § 13a-2(7). Again, the implication is that States cannot sue for alleged violations of *other* state laws.

[11] For instance, the CEA excludes certain transactions in foreign currency, government securities, certain other commodities, and a hybrid instrument that is predominantly a security. 7 U.S.C. §§ 2(c), 2(f); *id.* §§ 27–27f. The CEA also allows the CFTC to "exempt" certain transactions from statutory requirements. *Id.* § 6(c). As one example, the CFTC has exempted

16

7 U.S.C. § 16(e)(2); *see Thrifty Oil Co. v. Bank of Am. National Tr. & Sav. Ass'n*, 322 F.3d 1039, 1057 (9th Cir. 2003) ("In other words, where the CFTC exempts transactions from the CEA pursuant to Section 4(c), those same transactions benefit from preemption of state bucket shop laws under Section 12(e)(2)(A)."). If state law is preempted as to *excluded* or *exempted* transactions, it follows *a fortiori* that state law is preempted as to *non-excluded* and *non-exempted* transactions on an exchange—which, after all, come within the Commission's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A).

Section 16(h) provides that a swap "shall not be considered to be insurance" and accordingly "may not be regulated as an insurance contract under the law of any State." 7 U.S.C. § 16(h). The preemption of state insurance law in no way implies the non-preemption of other state laws. Section 16(h) was enacted in the aftermath of the 2008 financial crisis, which many in Congress attributed to credit default swaps—"an arrangement similar to an insurance contract." *Merrill Lynch Int'l v. XL Cap. Assur. Inc.*, 564 F. Supp. 2d 298, 300 (S.D.N.Y. 2008). Under the circumstances, Congress's use of a "belt-and-suspenders approach to make sure that *all*" swaps were governed by federal law is a perfectly "likely" inference, *see Atlantic Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020), far more "likely" than the notion that Congress only preempted state insurance law as to swaps but implicitly left other state law intact (all whilst giving the Commission "exclusive jurisdiction" over swaps).

### 2.    The CEA occupies the field of regulating trading on a DCM

"Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation,'" *Murphy v. National*

---

swaps entered into by central banks or sovereign entities from certain CEA requirements. 17 C.F.R. § 50.75. For these excluded and exempted transactions, § 16(e)(2) clarifies that state gambling laws remain preempted.

*Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018), or where "there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," *Arizona*, 567 U.S. at 399. "[L]ike all [forms of] preemption," field preemption "must be grounded 'in the text and structure of the statute at issue.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020).

As the Third Circuit held, the CEA preempts the field of "regulation of trading on a DCM (a form of futures trading)." *Flaherty*, 172 F.4th at 229. Congress gave the Commission "exclusive jurisdiction" over "swaps . . . traded or executed on a [DCM]," and it allowed state "regulatory authorities" to retain jurisdiction only "[e]xcept as hereinabove provided." 7 U.S.C. § 2(a)(1)(A). DCMs, moreover, are subject to extensive regulation by the Commission. They must, among other things, register with the Commission, *id.* § 7(a); comply with "core principle[s]" governing trading, *id.* § 7(d); and self-certify compliance with the CEA and the Commission's regulations, *id.* § 7a-2(c)(1). "These provisions regulate every aspect of DCMs, . . . leaving no room for state regulation." *Johnson*, 2026 WL 1223373, at *6; *see also Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001) ("Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions.").

Congress understood this when it created the Commission and the "comprehensive regulatory structure" it is charged with administering. *Curran*, 456 U.S. at 356. As the Conference Report details, the "exclusive grant of jurisdiction" to the Commission was designed to "preempt the field insofar as futures regulation is concerned," such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383, at 35–36 (1974). Congress also deleted from the CEA language

18

that allowed the States to retain a measure of regulatory authority, which "assure[d] that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974); *see Effex Capital*, 933 F.3d at 894 ("[A] catalyst for the significant [1974] amendments to the Commodity Exchange Act was a fear that, without increased federal regulation, the states would regulate the futures markets to a chaotic effect.").

The enactment of the Special Rule for "event contracts" in 2010 further consolidated the Commission's control over the field. *See* 7 U.S.C. § 7a-2(c)(5)(C). That Rule, again, grants the Commission discretionary authority to approve or disapprove of event contracts on DCMs that involve certain enumerated categories of activity, including "gaming." *Id.* § 7a-2(c)(5)(C)(i)–(ii); 17 C.F.R. § 40.11(c)(2). By creating a specific public-interest review process for a subset of swaps, Congress clearly signaled that these contracts—including those whose underlying activity involves "gam[es]" like sports—are within the Commission's exclusive regulatory purview, not the States'.

"[A]t the very least," then, Congress has field preempted "the regulation of trading on a DCM," which encompasses "event contracts" traded on prediction markets. *Flaherty*, 172 F.4th at 228–29.

### 3. Rhode Island's enforcement effort conflicts with the CEA and Commission Rules

Finally, "conflict preemption . . . prohibits [a State] from regulating sports-related event contracts on CFTC-licensed DCMs." *Flaherty*, 172 F.4th at 229. Conflict preemption comes in two varieties: "where compliance with both federal and state regulations is a physical impossibility," and "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (citation modified). Both apply here.

19

First, compliance with both Rhode Island gambling law and federal law is impossible. A DCM is required by federal law to provide "impartial access to its markets and services" to all its "members," and to provide "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b). If Rhode Island gambling law prohibits sports event contracts, however, then DCMs will be forced to discriminate against Rhode Islanders by delisting event contracts there. That would violate the requirement of "impartial" and "non-discriminatory" access. *See Johnson*, 2026 WL 1223373, at *8 (holding that if event contracts are prohibited under Arizona law, "a DCM operator must exclude Arizona residents from trading event contracts on its platform, in violation of 17 C.F.R. § 38.151(b) and (b)(1)").

Second, subjecting CFTC-regulated markets to state-by-state requirements would stand as an obstacle to federal regulation. "As Congress recognized in enacting the [CFTC] Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *American Agric. Movement, Inc. v. Board of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992); *see Johnson*, 2026 WL 1223373, at *8 ("If states could prosecute DCM operators for offering event contracts, the operators would face the prospect of fifty different regulators, each capable of restricting which contracts may be listed on each exchange."). Thus, allowing States to regulate derivatives like event contracts could re-introduce the "total chaos" Congress sought to prevent by providing the Commission with exclusive jurisdiction over futures trading in 1974 and extending that jurisdiction to swaps.[12]

---

[12] *See* Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

### III.   The remaining factors favor granting preliminary relief

Absent an injunction, the United States and the CFTC will suffer irreparable harm. Courts in this Circuit "measure irreparable harm on a sliding scale . . . such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 43 (1st Cir. 2010) (citation modified). The federal intervenors' strong likelihood of success on the merits therefore must color the Court's consideration of the irreparable-harm prong.

Courts widely recognize that the enforcement of an unconstitutional state law causes irreparable injury. *See United States v. California*, 173 F.4th 1060, 1069 (9th Cir. 2026) ("[I]rreparable harm necessarily results from allowing California to enforce a law invalid under the [Supremacy Clause]."); *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010) ("If a statute is expressly preempted, a finding with regard to likelihood of success fulfills the remaining [preliminary injunction] requirements."). That harm is especially acute to the federal government. After all, the United States is injured "when its valid laws in a domain of federal authority are undermined by impermissible state regulations," *Alabama*, 691 F.3d at 1301, and because that injury cannot be undone by an eventual award of damages, it is necessarily irreparable. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) ("If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel.").

That Rhode Island is currently advancing an enforcement action against CFTC-regulated DCMs only exacerbates the irreparability of harm. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("When enforcement actions are imminent . . . there is no adequate remedy at law."). Indeed, Rhode Island has not only brought a civil action to enforce its gambling laws against CFTC-regulated DCMs; it has issued a thinly veiled threat that CFTC-regulated DCMs

21

can be *criminally prosecuted* for operating markets in compliance with federal law. *KalshiEX*, No. 1:26-cv-00333 (D.R.I.), Dkt. No. 1-1¶ 111. Such threats require immediate redress.

Finally, "when the defendants are government entities or officials sued in their official capacity, the balance of equities and public interest factors merge." *Tirrell v. Edelblut*, 747 F. Supp. 3d 310, 318 (D.N.H. 2024) (citing *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021)). Here, both factors support an injunction because "[f]rustration of federal statutes and prerogatives are not in the public interest." *Alabama*, 691 F.3d at 1301. And where a state law is preempted, the State is not "harm[ed] from . . . nonenforcement of invalid legislation." *Id.* Accordingly, as the Third Circuit held, it is neither equitable nor in the public interest to allow States to target event contracts in violation of the Supremacy Clause. *See Flaherty*, 172 F.4th at 232; *see also Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631, 643 (6th Cir. 2025) ("enjoining the enforcement of a [state gambling] law that violates constitutional rights 'is always in the public interest'"); *Orgel*, 2026 WL 474869, at *10 ("A credible threat of imminent prosecution for a state violation that conflicts with federal law can establish a likelihood of irreparable harm.").

In short, the federal intervenors are likely to establish that Rhode Island's incursion into the Commission's domain is preempted. At minimum, the Court should preserve the status quo by entering a preliminary injunction, which would protect the federal government from irreparable harm and preserve market stability while the Court considers the merits.

## CONCLUSION

Rhode Island's gambling laws are preempted as applied to event contracts traded on CFTC-regulated DCMs. The United States and the CFTC respectfully ask this court to enter a preliminary injunction prohibiting Rhode Island from applying its laws against CFTC-regulated DCMs.

Dated: May 29, 2026

*/s/ Tiberius Davis*
Tiberius Davis (DC Bar No. 90020605)

*Attorneys for the United States of America*

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

TIBERIUS DAVIS
Counsel to the Assistant Attorney General
450 5th St. NW,
Washington, DC 20001
Tel:  202-860-8970
tiberius.davis@usdoj.gov

ALEXANDRA McTAGUE
Senior Litigation Counsel
Tel:  202-718-0483
alexandra.mctague2@usdoj.gov

Respectfully Submitted,

*/s/ M. Jordan Minot*
M. Jordan Minot (DC Bar No. 1722554)

*Attorneys for the Commodity Futures Trading Commission*

TYLER S. BADGLEY
General Counsel
M. JORDAN MINOT
Deputy General Counsel
HENRY J. DICKMAN
Senior Assistant General Counsel
ANDREW WEISBERG
Senior Assistant General Counsel
MARGARET P. AISENBREY
Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
Tel:  (202) 209-1087
Fax:  (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
hdickman@cftc.gov
aweisberg@cftc.gov
maisenbrey@cftc.gov

23