**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| KALSHIEX LLC,<br><br>          Plaintiff,<br><br>and<br><br>UNITED STATES OF AMERICA and COMMODITY FUTURES TRADING COMMISSION,<br><br>          Proposed Plaintiff-Intervenors,<br><br>v.<br><br>MARK FURCOLO, in his official capacity as Director of the Division of State Lottery; PETER F. NERONHA, in his official capacity as Rhode Island Attorney General; and CHRISTINA TOBIASZ, in her official capacity as Gaming and Athletics Administrator, Department of Business Regulation<br><br>          Defendants. | C.A. No. 1:26-cv-00327-MSM-PAS |
| THE STATE OF RHODE ISLAND by and through ATTORNEY GENERAL PETER F. NERONHA<br><br>          Plaintiff,<br><br>v.<br><br>KALSHIEX LLC.; and QCX LLC d/b/a POLYMARKET US,<br><br>          Defendants. | C.A. No. 1:26-cv-00333-MSM-PAS |

**MEMORANDUM OF LAW IN OPPOSITION TO KALSHI AND POLYMARKET'S MOTIONS FOR A PRELIMINARY INJUNCTION**[1]

For centuries, Rhode Island has regulated gambling within its borders as an exercise of its sovereign authority to protect the health, safety, and welfare of its citizens. Under the current framework, all gambling, including sports betting, must be approved by Rhode Island voters, operated by the Rhode Island Lottery, and comply with all other state laws. Recently, however, Kalshi and Polymarket began offering Rhode Islanders a dressed-up form of gambling—so-called "event contracts"—which allows users to wager on the outcomes of events like sports, and which until very recently Kalshi and Polymarket explicitly referred to in advertising as "betting." In response, the State commenced a state court action seeking to confirm that those sports-related "event contracts" are subject to Rhode Island's constitutional and statutory gambling restrictions. In so doing, Rhode Island joined a growing coalition of states that have taken similar action to reign in these "prediction markets" and hold them accountable to state law.

As they have in litigation elsewhere, Kalshi, Polymarket, and the federal government (the United States and the CFTC) pile in to claim that Rhode Island is simply powerless to act here because state gambling laws are allegedly preempted by the Commodity Exchange Act ("CEA")—a Depression-era statute first passed by Congress to regulate trading in commodities like grain and Irish potatoes, and later expanded to regulate the "volatile and esoteric futures trading complex," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982), but which has absolutely nothing to do with the bets available on Kalshi and Polymarket (like who will win the

---

[1] Because Kalshi and Polymarket raise identical arguments in their respective motions for a preliminary injunction and supporting memoranda, and the parties have jointly moved to consolidate both cases, the State submits this single consolidated response in opposition to both Kalshi and Polymarket's motions. The State is contemporaneously filing a separate opposition in response to the federal government's preliminary injunction motion, which incorporates this brief by reference and is limited to arguments unique to the federal government.

NBA championship).   Even more absurdly, they contend that Congress accomplished this preemption through a 2010 amendment to the CEA that was part of the Dodd-Frank financial reforms in response to the 2008 financial crisis—even though no one noticed for over a decade, not even the Supreme Court when it reaffirmed states' historic power to regulate sports betting in *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 435 (2018).  But Congress does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)—and at bottom, Kalshi and Polymarket's "event contracts" amount to gambling, not "swaps" or any other financial instrument regulated under the CEA.  Because Kalshi and Polymarket's arguments fly in the face of the CEA's plain text, context, every indicator of Congressional intent, and simple common sense, the Court should side with the majority of federal courts in rejecting Kalshi and Polymarket's preemption theory and deny their requests for preliminary relief.

## **BACKGROUND**

### I.    RHODE ISLAND'S HISTORICAL REGULATION OF GAMBLING TO PROTECT THE PUBLIC INTEREST

The regulation of gambling stands at the heart of Rhode Island's historic police powers, dating back to the colonial era.  By the time of the American Revolution, the colonies sought to regulate gambling as a matter of wartime civic virtue.  In October 1774, in response to the punitive "Intolerable Acts" imposed on the colonies by the British, the First Continental Congress (to which Rhode Island belonged) adopted the Articles of Association, which, in addition to embracing a boycott of British goods and an end to the slave trade, pledged to "discountenance and discourage every species of extravagance and dissipation, especially all horse-racing and all kinds of games, cock fighting," and other activities.  Journals of the Continental Congress - The Articles of Association, The Avalon Project (October 20, 1774), (on file with Yale Law School), http://avalon.law.yale.edu/18th_century/contcong_10-20-74.asp.   Rhode Island soon followed

2

with an early form of our centuries-old tradition of state prohibition and regulation of gambling: in 1777, the General Assembly passed an "Act to Prevent Horse Racing," which provided for the forfeiture of horses used in races and authorized proceedings by information. *See* 1777 R.I. Acts & Resolves 7 (Sept. Adjourned Session). To this day, the same basic exercise of the State's police power over gambling is reflected in several provisions of the Rhode Island Constitution and the Rhode Island General Laws.

In 1842, when the Rhode Island Constitution was ratified, it contained a broad prohibition against all "lotteries" in the state. That prohibition remained until 1973, when the citizens of Rhode Island voted to amend the constitution to permit state-operated—but only state-operated—lotteries, with a handful of grandfathered exceptions. R.I. Const. art. VI, § 15. The following year, the General Assembly passed legislation creating the Rhode Island Lottery ("RILOT"). R.I. Gen. Laws § 42-61-1 *et seq.* Likewise, article 6, § 22 of the Rhode Island Constitution, first enacted in 1994 and later amended in 2014, requires statewide and local referenda before expanding "the types or locations of gambling" within the State. The General Assembly, exercising its plenary authority to regulate gambling, has enacted a comprehensive statutory scheme authorizing and outlawing certain gambling activities in the state. *See, e.g.*, R.I. Gen. Laws §§ 11-19-1; 11-19-14; 42-61 *et seq.*; 42-61.2 *et seq.*; 42-61.3 *et seq.*

In May 2018, the Supreme Court of the United States struck down as unconstitutional the Professional and Amateur Sports Protection Act (PASPA), the federal statute that had prohibited states from authorizing sports betting. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018). Just a month later, the Rhode Island General Assembly passed legislation that legalized sports betting in Rhode Island and brought it within the State's existing operational and regulatory

3

framework for casino gaming.[2]   Specifically, the General Assembly authorized RILOT to "implement, operate, conduct, and control sports wagering at" Twin River, once more with "full operational control" vested in RILOT.  R.I. Gen. Laws § 42-61.2-2.4.

The General Assembly broadly defined sports wagering as "the business of accepting wagers on sporting events or a combination of sporting events, or on the individual performance statistics of athletes in a sporting event or combination of sporting events, by any system or method of wagering.  The term includes, but is not limited to, exchange wagering, parlays, over-under, moneyline, pools, and straight bets, and the term includes the placement of such bets and wagers." *Id.* § 42-61.2-1(39).  In 2019, the General Assembly further expanded the availability of sports betting in Rhode Island by authorizing "online sports wagering," permitting sports wagering "over the internet through computers, mobile applications on mobile devices or other interactive devices approved by [RILOT]." *Id.*, § 42-61.2-1(27).  Again, the General Assembly specified that "online sports wagering" would be subject to strict state control, including statutorily imposed revenue sharing and geo-location requirements.  Under § 42-61.2-5(a)(1), the state receives 51% of all in-person and online sports wagering revenues.  The servers that support "online sports wagering" must be physically located within a "restricted area" at Twin River, and any "online sports wagering" vendor must also "employ a mechanism to detect the physical location of a player at the time the player is wagering" to ensure the player is located within Rhode Island.  *Id.*, § 42-61.2-16.  Additionally, the General Assembly authorized RILOT to promulgate rules and

---

[2] *See Harrop v. The Rhode Island Div. of Lotteries*, No. PC-2019-5273, 2020 WL 3033494, at *8 (R.I. Super. Ct. June 01, 2020) (finding "that sports wagering is a type of Class III gaming, Class III gaming is a form of casino gaming, and through the Casino Gaming Acts, the voters approved casino gaming"); *see also* Indian Gaming Regulatory Act (IGRA) 25 U.S.C.A. § 2703(8); 25 CFR § 502.4 - Class III gaming (Class III gaming means all forms of gaming that are not class I gaming or class II gaming, including but not limited to: … (c) [a]ny sports betting...).

regulations applicable to online sports wagering, *id.* § 42-61.2-3.3, and to "enter into contracts for the provision of server-based gaming systems, facilities, and related technology necessary or desirable for the state-operated online sports wagering," *id.* § 42-61.2-4(5).

RILOT has since promulgated rules and regulations and entered into contracts to provide online sports wagering. These regulations impose on any online sports wagering "service provider" a host of additional requirements, including identity and age verification and "know your customer" (KYC) controls, monitoring and reporting of suspicious gambling activity, and responsible gaming protocols such as deposit limits, wager limits, time limits, and player self-exclusion. R.I. State Lottery Div., Rules & Regulations (Feb. 20, 2026), *available at* https://www.rilot.com/content/dam/interactive/ilottery/pdfs/about-us/RILotteryRules_2026.pdf. From 2019 until the present, RILOT has contracted with service provider International Game Technology (IGT) (in coordination with Twin River) for the delivery of "online sports wagering" in Rhode Island, through the technology platform called "Sportsbook Rhode Island®," which is available to Rhode Islanders in web browser and mobile app formats.

## II.    THE COMMODITY EXCHANGE ACT'S WHOLLY DISTINCT REGULATORY AMBIT

Compared to Rhode Island's centuries-old history of gambling regulation, federal regulation of commodity futures—financial instruments used by companies to hedge risk—is a more recent and wholly distinct development. In 1936, Congress enacted the CEA, a Great Depression-era statute designed to regulate trading in futures in wheat, corn, and other agricultural commodities. Pub. L. No. 74-574, 40 Stat. 1491 (1936); *see also Merrill Lynch*, 456 U.S. at 360-367 (describing origins and legislative history of the CEA). A commodity "future" is a contract to buy or sell a quantity of a commodity at a specified price on a future date. *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995). The CEA was passed as a successor to the

5

Grain Futures Act, which regulated solely grain futures traded on "contract markets" designated by the Secretary of Agriculture, and sought to prevent the dissemination of misleading market information or price manipulation. *Merrill Lynch*, 456 U.S. at 360-61. Through the CEA, Congress enlarged the scope of covered commodities to include cotton, rice, butter, eggs, and Irish potatoes, *id.* at 362 n.17; it also added detailed provisions regulating trading in futures contracts, *id.* at 362, and once more authorized the Secretary of Agriculture to register "designated contract markets" (DCMs) for futures trading. 7 U.S.C. § 7 (1936).

Congress amended the CEA in 1974 to extend to non-agricultural commodities and other derivatives. Pub. L. No. 93-463, § 201(b), 88 Stat. 1389 (1974). A "derivative" is a contract whose value depends on the performance of an underlying asset, such as a commodity. *Black's Law Dictionary* (12th ed. 2024). Businesses generally rely on derivatives, including futures contracts, as a means of managing and hedging risk. *See, e.g., Noble Metals Int'l, Inc.*, 67 F.3d at 772. As part of the 1974 amendments, Congress also created the CFTC and granted it "exclusive jurisdiction" over futures and derivatives traded on DCMs. Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, § 201, 88 Stat. 1389, 1395 (1974) (current version at 7 U.S.C. § 2(a)(1)(A)). The Supreme Court has explained that this exclusive-jurisdiction provision was "intended only to consolidate federal regulation of commodity futures trading in the Commission" and to "separate the functions of the [CFTC] from those of the Securities Exchange Commission and other regulatory agencies." *Merrill Lynch*, 456 U.S. at 386-87. The "exclusive jurisdiction" provision also contains a savings clause that provides: "Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the [SEC] or any other regulatory authorities under the laws of the United States *or of any State*, or (II) restrict the [SEC] and such other authorities from carrying out their duties and

6

responsibilities in accordance with such laws.  *Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.*"  7 U.S.C. § 2(a)(1)(A) (emphasis added).

In 2010, Congress enacted the Dodd-Frank Act in response to the global financial crisis. *See* Pub. L. No. 111-203, pt. II, 124 Stat. 1376, 1658-754 (2010).  In it, Congress expanded the CEA to cover "swaps."  Pub. L. No. 111-203, 124 Stat. at 1376.  A "swap," a type of derivative, is an agreement between two parties to exchange (or swap) cash flows on financial obligations (such as interest payments), to hedge risk on those obligations.  *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1042-43 (9th Cir. 2003).  Congress added "swaps" because certain ones known as "credit default swaps" had exacerbated the financial crisis.  Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and Consumer Protection Act: Background and Summary* 3 (2017).  Indeed, "[b]y the time of the financial crisis, the notional value of the swaps market was almost $600 trillion, and the collapse of that unregulated market is now almost universally recognized as a principal factor contributing to the crisis."  *QCX LLC v. Nessel*, No. 1:26-cv-00710, slip op. at *8-9 (W.D. Mich. June 17, 2026) (internal quotations omitted).  "It is this market and the institutional entities engaged in it that Congress had in mind when it set about to 'promote the financial stability of the United States by improving accountability and transparency in the financial system' by passing Dodd-Frank."  *Id.*  (citing Dodd-Frank, Pub. L. No. 111-203, 124 Stat. at 1376).

To capture the various forms of swaps in the market, Congress provided a detailed, six-part definition of "swap."  7 U.S.C. § 1a(47)(A).  If a contract qualifies as a swap, option, or a future, it can *only* be traded on a CFTC-registered "designated contract market" ("DCM").  *Id.* § 2(e) (swaps); § 6(a) (futures); 17 C.F.R. § 33.3(a) (options).

To offer a derivative contract for trading, an entity must first receive the CFTC's designation as a DCM. 7 U.S.C. §§ 2(e), 7(a). The DCM may then list contracts on its exchange(s) without any pre-approval by the CFTC, by self-certifying that the contract complies with the CEA. *Id.* § 7a-2(c)(1)-(2); 17 C.F.R. § 40.2(a)(2). The CFTC can review a self-certification and disallow a contract that fails to comply with the CEA's requirements. 7 U.S.C. § 7a-2(c)(3). Significantly, in amending the CEA in 2010, Congress did not intend the changes to authorize sports betting on DCMs. *See, e.g.,* 156 Cong. Rec. S5906-07 (July 15, 2010) (colloquy between Senators Feinstein and Lincoln explaining that sports bets should not be on DCMs because they "would not serve any real commercial purpose" and "would be used solely for gambling"). To that end, Congress enacted a "Special Rule" authorizing the CFTC to disallow a contract that involves "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," or "gaming." 7 U.S.C. § 7a-2(c)(5).

The CFTC has acknowledged that it is not a gaming regulator and that gaming should not occur on DCMs. It previously explained that it "does not believe it has the statutory mandate nor specialized experience appropriate to oversee gaming." Event Contracts, 89 Fed. Reg. 48968, 48976 (proposed June 10, 2024), *withdrawn*, 91 Fed. Reg. 5386 (Feb. 6, 2026). Exercising its authority under the Special Rule, the CFTC categorically prohibited trading on DCMs contracts "that involve[], relate[] to, or reference[]" "gaming." 17 C.F.R. § 40.11(a)(1).

## III.    KALSHI AND POLYMARKET'S ONLINE BETTING OPERATIONS

Kalshi and Polymarket operate CFTC-registered DCMs where users can purchase "event contracts" tied to the outcome of future events on an array topics like politics and sports. Notice of Removal ¶ 9, *Rhode Island v. Kalshiex LLC*, No. 1:26-cv-00333-MSM-PAS (D.R.I. May 22, 2026), ECF No. 1-1. For instance, last year Kalshi and Polymarket began to self-certify and offer (in Rhode Island and elsewhere) "contracts" on sporting events, with payments tied to the

outcomes of those events as well as individual player performances. *Id*. at ¶ 59. In connection with the NBA playoff matchup between the Philadelphia 76ers and the New York Knicks on May 6, 2026, for example, Kalshi offered contracts on both the winning team as well as various individual player statistics, like whether Jalen Brunson would score 25 or more points. *Id*. at ¶¶ 62-63. Such sports "trades" have quickly come to dominate Kalshi and Polymarket's platforms: in 2025, sports represented approximately 85% of Kalshi's business and 39% of Polymarket's (more than any other "trading" category on their platforms). *Id*. at ¶ 59.

Kalshi and Polymarket's "event contracts" resemble traditional gambling in myriad ways. *Id*. at ¶¶ 64-82. For example, Kalshi and Polymarket offer "trades" in familiar sports betting categories like the "moneyline" (which team wins the game), the "over under" (whether the final combined score in a game will be higher or lower than a set line), the "spread" (whether a team will win or lose by a certain number of points), and a host of player "prop" bets (wagers that are independent of the outcome of the match, like individual player statistics)—using those very labels to describe the "trades" available on their platforms. *Id*. Indeed, until very recently, Kalshi and Polymarket marketed themselves using the same gambling vernacular, declaring in online advertisements and public statements that they offer "betting." *Id*. at ¶¶ 83-90. Kalshi, for example, advertised itself as a "sports betting platform" and Polymarket likewise declared that "[l]egal sports betting on the world's largest prediction market is coming to all 50 states." *Id*. at ¶¶ 84, 87.

Despite Kalshi and Polymarket's admissions that their "event contracts" amount to "betting," and despite the CFTC's explicit prohibition on contracts involving "gaming," 17 C.F.R. § 40.11(a)(1)—which Kalshi also previously admitted was intended to include sports wagering, *see* Brief of Appellee KalshiEX LLC at 17, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL

9

4802698 ("An event contract therefore involves 'gaming' if it is contingent on a game or a game-related event—like the Kentucky Derby, Super Bowl, or Masters golf tournament, all of which were mentioned in the [Special Rule's] only legislative history")—the CFTC has taken no recent action to prohibit Kalshi or Polymarket's "event contracts."  Rather, under the authority of its new Chair, who is also its sole commissioner, the CFTC has done a complete about-face—now characterizing state efforts to regulate sports-related "event contracts" as an "attempt to shut down the operations of CFTC-regulated entities" that "gravely interferes with [CFTC's] exclusive jurisdiction," ECF 19-1 at ¶ 62, and aggressively litigating on the side of prediction markets like Kalshi and Polymarket and against states like Rhode Island that are seeking to protect their citizens and enforce their laws.[3]

## IV.    PROCEDURAL HISTORY

On May 21, 2026—*one day* after the Attorney General of Rhode Island granted Kalshi's request and met with company representatives to discuss the regulatory landscape surrounding "event contracts"—Kalshi commenced this case seeking to prevent Rhode Island from enforcing its gambling laws.  ECF No. 1.[4]  Almost simultaneously, the State sued Kalshi and Polymarket in Rhode Island Superior Court, seeking a declaratory judgment that their sports-related "event contracts" are subject to Rhode Island's constitutional and statutory restrictions on gambling. Notice of Removal, *Rhode Island v. KalshiEX LLC*, No. 26-cv-333 (D.R.I. May 22, 2026), ECF

---

[3] Other states that have moved to enforce their gambling laws against "prediction markets" include Connecticut, Massachusetts, New Jersey, New York, Maryland, Ohio, Michigan, Kentucky, Tennessee, Illinois, Wisconsin, Minnesota, Iowa, Utah, Montana, New Mexico, Nevada, Arizona, and Washington.  Notably, despite the "grave" threat all such enforcement allegedly poses to the CFTC, the agency has thus far sued only a subset of enforcing states—namely, Rhode Island, Connecticut, New York, Illinois, Minnesota, Wisconsin, New Mexico, and Arizona.

[4] Unless otherwise noted, all ECF references are to *KalshiEX LLC v. Furcolo*, No. 1:26-cv-00327-MSM-PAS (D.R.I. May 22, 2026).

No. 1.  The following day, Kalshi and Polymarket removed the State's case to federal court, *id.*, and Kalshi filed the instant motion for a preliminary injunction, ECF No. 5.  The CFTC and the United States have moved to intervene in Kalshi's case, ECF No. 19, and both the federal parties and Polymarket have filed motions for a preliminary injunction of their own, raising the same arguments that Kalshi raises with respect to the CEA and preemption, ECF No. 23 (federal government); Mot. for Prelim. Inj., *Rhode Island*, No. 1:26-cv-00333, ECF No. 26 (Polymarket).  To ensure an efficient resolution of the core dispute in these cases, the State has decided against contesting removal or the federal parties' intervention and has instead moved with the other parties to consolidate the matters before this Court.

## ARGUMENT

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'"  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  To secure a preliminary injunction, "a plaintiff must show: (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest."  *New York v. U.S. Dep't of Just.*, 804 F. Supp. 3d 294, 310 (D.R.I. 2025); *see also Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) ("The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor.").  Kalshi and Polymarket fail to establish any of these factors, let alone all four, and so the Court should deny their motions.

## I.    KALSHI AND POLYMARKET ARE UNLIKELY TO SUCCEED ON THE MERITS

A movant's likelihood of success on the merits is "the weightiest of the four factors" in the preliminary injunction analysis.  *New York v. Trump*, 764 F. Supp. 3d 46, 49 (D.R.I. 2025).  "If

11

the movant 'cannot demonstrate that he is likely to succeed . . . the remaining factors become matters of idle curiosity.'" *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020) (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)). Kalshi and Polymarket's arguments fail on the merits both because (1) their "event contracts" do not qualify as "swaps" within the meaning of the CEA; and (2) even if their event contracts are "swaps," the CEA does not preempt Rhode Island gambling laws either expressly or impliedly.

Most federal district courts to examine these issues have rejected Kalshi and Polymarket's arguments and have allowed States to continue enforcing their gambling laws. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025) (CEA does not preempt state regulation of sports-related event contracts); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025) (contracts based on outcome of sporting events are not "swaps" under CEA subject to CFTC's exclusive jurisdiction); *N. Am. Derivatives Exch., Inc. v. Nevada*, 815 F. Supp. 3d 1169, 1175-76 (D. Nev. 2025) (same); *Robinhood Derivatives, LLC v. Dreitzer*, No. 2:25-cv-01541, 2025 WL 3283308, at *1 (D. Nev. Nov. 25, 2025) (same); *KalshiEX, LLC v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004, at *6-7 (S.D. Ohio Mar. 9, 2026) (Kalshi's sports event contracts are not "swaps" and, alternatively, CEA does not preempt State regulation); *Ohio Gambling Recovery, LLC v. Kalshi Inc.*, No. 4:25-CV-1573, 2026 WL 865788, at *6 (N.D. Ohio Mar. 30, 2026) (same); *QCX, LLC v. Nessel*, No. 1:26-cv-710, slip op. at 4, 23 (W.D. Mich. June 17, 2026) (same); *but see KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313 (D.N.J. Apr. 28, 2025) (granting preliminary injunction as to Kalshi's sports-related "event contracts"); *Kalshiex LLC v. Orgel*, No. 3:26-cv-34, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) (same as to Tennessee); *KalshiEX LLC v. Johnson*, 26-cv-01715, 2026 WL 1223373 (D. Ariz. May 5, 2026) (same as to Arizona). State courts have also rejected those arguments. *See, e.g., Commonwealth v. KalshiEX*

12

*LLC*, No. 2584cv02525, 2026 WL 188019 (Mass. Super. Ct. Jan. 20, 2026) (state sports wagering laws are not preempted by the CEA); *State ex rel. Nev. Gaming Control Bd. v. KalshiEx, LLC*, No. 26 OC 00050 1B (Nev. Dist. Ct. Mar. 20, 2026) (same, and event contracts are not swaps).

And while Kalshi and Polymarket (and the federal government) rely heavily on the Third Circuit's recent decision in *KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3rd Cir. 2026) (affirming District of New Jersey's preliminary injunction grant), *Flaherty* is a divided-panel opinion with a lengthy dissent, and decisions from several other circuits are pending: in Kalshi's appeal from the Southern District of Ohio's denial of its preliminary injunction motion, the Sixth Circuit also denied Kalshi's request for an injunction pending appeal, concluding that the merits of "the preemption arguments [are] largely in equipoise (if not favoring Ohio)" and that the equities and public interest favor Ohio. *Kalshiex LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *3 (merits), *7 (other factors). Similar appeals from other district court denials of Kalshi's preliminary injunction requests are currently pending in the Fourth and Ninth Circuits. *See KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir.); *KalshiEX, LLC v. Assad, et al.*, No. 25-7516 (9th Cir.). This Court should join the majority of courts to have addressed these issues and deny Kalshi and Polymarket's motions.

### A. Kalshi and Polymarket's Event Contracts Are Not Within CFTC's "Exclusive Jurisdiction"

The Court does not even need to reach Kalshi and Polymarket's preemption argument because their so-called "event contracts" are neither swaps nor commodity futures contracts and so fall outside of the CFTC's "exclusive jurisdiction." 7 U.S.C. § 2a(1)(A). *See, e.g., Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 828 (4th Cir. 2010) (affirming that under "constitutional avoidance principles," "courts should not decide the constitutional question of preemption before considering the [non-constitutional] law grounds").

13

First, the mere fact that Kalshi and Polymarket's self-certified "event contracts" are "traded" on CFTC-registered DCMs does not automatically mean they are "swaps" under the CEA, notwithstanding Kalshi and Polymarket's (and the federal government's) many assertions to that effect. *See, e.g.,* ECF No. 5 at 13 ("Kalshi's event contracts are traded on a contract market designated by the CFTC, and the CFTC therefore has 'exclusive jurisdiction' to regulate these contracts."). To the contrary, "the CEA defines a swap and states that if something is a swap, it must be traded on an exchange." *Hendrick*, 817 F.Supp.3d at 1030 (citing 7 U.S.C. §§ 1a(47), 2(e)). "Kalshi's proposed distinction [is] self-fulfilling, circular, and inconsistent with the statutory text. Kalshi essentially argues that if contracts are not traded on an exchange, then they are not swaps that must be traded on an exchange. But the CEA states that all swaps must be traded on the exchange. Additionally, the CFTC has prohibited DCMs from listing contracts that involve gaming. 17 C.F.R. § 40.11(a)(1). By Kalshi's logic, Kalshi's gaming contracts should not count as swaps because the CFTC prohibited them from being traded on an exchange." *Id*. Likewise, the CFTC's opinion about the scope of its "exclusive jurisdiction" and its view that Kalshi and Polymarket's "event contracts" are "swaps" does not automatically make it so.

At bottom, Kalshi and Polymarket's offerings are *bets* on outcomes of events like sports that have no direct, inherent financial consequence and serve no hedging or price discovery function—and this Court should not rubber stamp their efforts to shoehorn what is fundamentally gambling into a framework that Congress created to give sophisticated traders in real commodities a mechanism to protect against economic risk. *See, e.g., id.* at 1029 ("These are sports wagers and everyone who sees them knows it."); *Flaherty*, 172 F.4th at 232 (Roth, J., dissenting) ("I see Kalshi's actions as a performative sleight meant to obscure the reality that Kalshi's products are sports gambling. Because Kalshi is facilitating gambling, it can be subjected to state regulation.").

14

They are not "swaps," "options," "futures contracts," or any other derivative that the CEA expressly assigns to the CFTC. Thus, the Court need not reach the preemption issue, and should deny the preliminary injunction on this ground alone. *See, e.g., QCX LLC v. Nessel*, 2026 WL 1166362, at *3 No. 1:26-cv-710 (W.D. Mich. March 10, 2026) ("If the event contracts allegedly threatened by the state's enforcement actions are not 'swaps,' federal law does not stand in the state's way").

     1.  <u>Kalshi and Polymarket's "event contracts" are not "swaps" under the CEA</u>

A swap is a financial instrument by which two parties agree to exchange cash flows on financial obligations as a means of hedging volatility and managing risk. *Thrifty Oil*, 322 F.3d at 1042. Given the diversity of swaps in the marketplace, Congress, when enacting Dodd-Frank, implemented a detailed, six-part definition of "swap." 7 U.S.C. § 1a(47)(A). Kalshi relies exclusively on the second part, which covers contracts where "payment" is "dependent on" the "occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). Kalshi's self-serving interpretation flies in the face of the statutory text and context, Congressional intent, CFTC guidance, federalism principles, and common sense.

     *a)  Kalshi and Polymarket's interpretation is contrary to the statutory text*

Kalshi and Polymarket's "event contracts" fail the plain text definition of "swaps" for two key reasons: (1) they depend on event *outcomes*, not the "event[s]" themselves; and (2) the outcomes of the vast majority of their "event contracts" (including sports-related contracts) are not "associated with" potential economic consequences, meaning consequences that flow directly from the events themselves and which businesses would want to hedge against.

To qualify as a "swap," payment must "depend[] on" whether "an event or contingency" occurs. 7 U.S.C. § 1a(47)(A)(ii). An "event" is different from an "outcome." An "event" is "a

15

happening of some significance that took place or will take place, in a certain location, during a particular interval of time." *N. Am. Derivatives Exch.*, 815 F. Supp. 3d at 1183; *see, e.g.*, *Webster's New World College Dictionary* 492 (4th ed. 2004) (a "happening or occurrence, esp. when important"). Likewise, a "contingency" means a "contingent event"—a happening that may or may not occur—not the result of an event already scheduled to occur. *N. Am. Derivatives Exch.*, 815 F. Supp. 3d at 1183 n.9; *see, e.g.*, *Webster's New World College Dictionary* 314 (an "event" that "depends on" "another"). An "outcome," on the other hand, is a "result" of the event or contingency. *Webster's New World College Dictionary* 1023.

Kalshi and Polymarket's contracts depend on outcomes, not events. For example, one places a bid on the winner—not the mere occurrence—of the Super Bowl. Likewise, one may bet on the score of the game, the distance of the longest punt, the number of injuries, and other results flowing from the event, but one would never confuse those results for the "event" itself. *See N. Am. Derivatives Exch.*, 815 F. Supp. 3d at 1183*; Hendrick*, 817 F.Supp.3d at 1026 (concluding based on this distinction between outcomes and events that Kalshi's sports-related event contracts "are not swaps within the CEA's meaning").

To count as a "swap," a contract must also be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). "Associate" means to "connect" or "join together." *Webster's New World Collegiate Dictionary* 86. An event that is "associated" with a "financial, economic, or commercial consequence" is one that is "*inherently* joined or connected" with such a consequence—that is, "the event or contingency *itself* has some potential financial, economic, or commercial consequence without looking at externalities like potential downstream financial consequences such as parties extrinsic to the event betting on it." *Hendrick*, 817 F.Supp.3d at 1027 (emphasis added). For example, a loan issuer can hedge against

the risk that a loan defaults by purchasing a "credit default swap" from a financial institution, paying the seller regular premiums in return for a payout if and when the loan defaults. Likewise, a bond issuer might purchase an "interest rate swap" to insure against rising interest rates, exchanging a portion of the cash flow from the bond in return for security against changes in the rate market. The outcomes of sporting events like the NBA championship have no such direct, inherent financial consequences, except perhaps for the participants themselves (who may not bet on the games). Even Kalshi acknowledged this in federal court just two years ago when defending its elections-focused "event contracts" against the CFTC, stating that games like horse racing or boxing matches lack "intrinsic economic significance" or "economic consequences outside of the game itself." *Hendrick*, 817 F.Supp.3d at 1028 n.3 (referencing Kalshi's arguments in 2024 before the district court and the D.C. Circuit).

Citing the Third Circuit's recent divided-panel decision in *Flaherty*, Kalshi and Polymarket contend that their sports-related "event contracts" satisfy this component of the "swap" definition because sports events "have consequences—often significant ones—for a broad ecosystem of stakeholders, including team sponsors, advertisers, television networks, franchises, local communities, and more." ECF No. 5-1 at 11, n.3 (citing *Flaherty*, 172 F.4th at 227-28). But as the District of Nevada recently held in *Hendrick*, such a position "knows no limiting principle," and must be rejected, since virtually *anything* might have "*some* conceivable financial consequence if one is creative enough." *Hendrick*, 817 F. Supp. at 1027 (emphasis added). A bet on which team wins a youth softball game could equally qualify as a "swap" under Kalshi and Polymarket's view because the winning team might eat a celebratory dinner at its favorite restaurant. If such attenuated consequences were sufficient, then nearly every event would be "associated with" potential economic consequences, and this requirement would "lose all

meaning." *Id.* at 1031; *see also Flaherty*, 172 F.4th at 233 (Roth, J., dissenting) ("Congress could not have intended for such a rationality-defying outcome."); *QCX, LLC v. Nessel*, No. 1:26-cv-710, slip op. at 14 (W.D. Mich. June 17, 2026) (stating that "[i]t is difficult to imagine anything would not have any potential financial consequence, especially if the downstream consequences could include others betting on the event," and noting that Polymarket's "swap" definition "would intrude not only on the province of state gambling law but also contract law (service contracts), property law (mortgages), and family law (prenuptial agreements), among others").

      *b)  Kalshi and Polymarket's reading of "swaps" makes no sense in context*

The statutory context supplies further confirmation that Kalshi and Polymarket's "event contracts" are not "swaps."  Where a definition contains several parts, a court should look to those parts to inform its reading of the one at issue.  *See, e.g., Yates v. U.S.*, 574 U.S. 528, 543 (2015) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (applying "the principle of *noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress'").  Here, all five other parts of the CEA's six-part definition of "swap" refer to financial instruments used to *hedge*, or offset, existing financial risk—and none of them references gaming or sports wagers.  *See* 7 U.S.C. § 1a(47)(A).

Parts (i), (iii), and (v) list specific financial instruments that involve "financial or economic interests" such as "interest or other rates, currencies, commodities, [or] securities . . . or property of any kind."  *Id.*, § 1a(47)(A)(i), (iii), (v).  Part (iii) further lists 22 specific "commonly known" swaps (like a "credit default swap," a "currency swap," or a "weather swap"), *id.*, § 1a(47)(A)(iii),[5]

---

[5] While a few of the "commonly known" swaps in subpart (ii) do not directly reference a financial instrument or measure, like a "weather swap" or "emissions swap," "Congress could have concluded that such swaps are so closely related to financial consequences or were already so

and part (v) covers certain "security-based swap agreement[s]" in which "a material term is based on the price, yield, value, or volatility of any security," *id.*, § 1a(47)(A)(v).  Part (iv) covers any contract "that is or in the future becomes, commonly known to the trade as a swap."  *Id.*, § 1a(47)(A)(vi).  Every other part of the definition refers to financial instruments used to hedge existing risk in markets, and part (ii) should be read as referring to the same.  *Beecham v. U.S.*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well.").

Kalshi and Polymarket's sports-related "event contracts" do not offset risk.  A bet on the outcome of the NBA Championship, for instance, serves no hedging or price discovery function, and no one can credibly claim otherwise.  Indeed, beyond unsupported allegations in Kalshi's complaint and brief, *see, e.g.,* ECF No. 5 at 11 n.3 ("Some sportsbooks have turned to Kalshi's contracts to hedge their financial risks"), neither Kalshi nor Polymarket provides any concrete evidence that any person in the real world actually uses sports-related "event contracts" (on Kalshi, Polymarket, or anywhere else) to hedge risk, as opposed to gamble for entertainment.[6]  The fact

---

commonly traded as swaps to include them within the definition," *Hendrick*, 817 F.Supp.3d at 1027 n.2.  Certainly, Congress could have, but did not, include gaming or sports wagers.

[6] None of the examples that Kalshi cites in its complaint on this point contains any real support, either.  *See* ECF No. 1 at ¶ 40 (unsupported allegation that the use of "sports event contracts" as a means of "hedging [entities'] exposure" is "happening in the market right now"); ¶ 41 (stating only that "Game Point Capital," a "sports-focused insurance firm," uses Kalshi to hedge generally, not that it uses Kalshi's *sports*-related "event contracts" as the hedging device); ¶ 42 (additional examples of entities using DCMs generally to hedge sports-related risk, but no mention of their use of sports-related "event contracts" in particular).  On this point, even the CFTC references only "public reporting indicat[ing] that the sports industry is using prediction markets to hedge sports-related risk."  ECF No. 23-1 at 14, n.9.  The only "public reporting" that CFTC cites is an October 2025 article by "InGame," a "website dedicated to covering the regulated U.S. sports betting and prediction market industries."  The article concerned an announcement by "Underdog Sports"— no ordinary member of the "sports industry" (as CFTC suggests), but an online sports betting platform—that it had declared a "plan" to use prediction markets for risk management.  And the article itself clarifies that Underdog had "not yet made any of the bets or trades described here."

that there are businesses with genuine sports-related exposure (like sportsbooks) also says nothing about whether those businesses use sports-related "event contracts" in particular as the hedging mechanism to offset that risk. On the other hand, sports betting *creates* risk—potentially tremendous risk, both to the bettor's personal and financial health, and to the institutions and societies that bear the costs of problem gambling.

The statutory context provides at least one other reason why Kalshi and Polymarket's "event contracts" are not "swaps": if part (ii) is read to extend to contracts on virtually anything that happens or could happen with some conceivable financial consequence, then all five other parts of the "swap" definition are left with nothing to do. *See Hendrick*, 817 F.Supp.3d at 103. Kalshi's position "is thus at odds with one of the most basic interpretative canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

c) *Kalshi and Polymarket's interpretation is inconsistent with Congressional intent and CFTC guidance*

Kalshi and Polymarket's self-serving interpretation of "swap" also rests on the premise that when Congress amended the CEA in 2010 as part of the Dodd-Frank reforms—intended to address systemic risk in the U.S. economy and rein in risky financial products like "credit default swaps" in the aftermath of the 2008 financial crisis—Congress quietly authorized gambling on CFTC-designated exchanges. The suggestion is absurd. At the time of the crisis, sports wagering was illegal everywhere but Nevada. *See Murphy*, 584 U.S. at 462. Moreover, the only mention of sports betting in the legislative history of Dodd-Frank makes clear that Congress wanted to *prevent* gambling on CFTC-regulated DCMs. *See* 156 Cong. Rec. S5906-07 (July 15, 2010) (colloquy between Senators Feinstein and Lincoln explaining that "[i]t would be quite easy to construct an

20

'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and the Masters Golf Tournament"—but that "[t]hese type of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling."). By every possible measure of Congressional intent, then, Kalshi and Polymarket's arguments fail. *See e.g., Schuler*, 2026 WL 657004, at *6 (holding that CEA's chief purposes of managing risk and price discovery are "better achieved when a 'swap' is understood as a transaction involving financial instruments and measures that traditionally and directly *affect commodity prices*. Currency exchange rates, the weather, and energy costs all do that; the number of points scored in the Huskies-Bobcats game does not.").

The CFTC also previously rejected a maximalist reading of "swap." In 2012, it promulgated a regulation defining "swap" to exclude "consumer and commercial arrangements that historically have not been considered swaps," such as "traditional insurance products," "automobile loans," and "employment contracts"—even though such things could fall within an expansive interpretation of § 1a(47)(A)(ii). *See* Further Definition of "Swap," 77 Fed. Reg. 48208-01, 48212, 48246-50 (Aug. 13, 2012); *see* 17 C.F.R. § 1.3. The CFTC explained that contracts in areas historically regulated by states, such as insurance, fell outside its jurisdiction since there was no indication that Congress "intended" for those contracts "to be regulated as swaps." *Id*. at 48212 & n.29; *see id*. at 48246. The reasoning applies equally, or perhaps with even greater force, to Kalshi's "event contracts": bets on things like sports "historically have not been considered to involve swaps" and "do not involve risk-shifting arrangements with financial entities," but rather are "entered into by consumers . . . primarily for personal purposes." 77 Fed. Reg. at 48246-48.

### d) Absurd consequences flow from Kalshi and Polymarket's position

"Interpretations of a statute which would produce absurd results are to be avoid if alternative interpretations consistent with the legislative purposes are available." *Griffin v.*

21

*Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).   The consequences of Kalshi and Polymarket's interpretation of "swap" are absurd to a staggering degree.

Under Kalshi and Polymarket's interpretation, wagers on virtually *anything* would qualify as "swaps," at least so long as the bet is made on a DCM, and the CEA is clear that "swaps" must be traded on CFTC-registered DCMs.  7 U.S.C. § 2(e).  In other words, by Kalshi and Polymarket's circular (and limitless) reasoning, a contract is a swap because it is on a DCM and therefore must be on a DCM.  Moreover, according to Kalshi and Polymarket, the CEA's "exclusive jurisdiction" over swaps traded on DCMs means that no state can regulate them.  So, if Kalshi and Polymarket were correct, the CFTC would be the nation's *sole* regulator for things like sports betting.  It would mean that when Congress added "swaps" to the CEA in 2010 as part of Dodd-Frank—which was a "direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008," S. Rep. 111-176, 2, 29-30 (Apr. 30, 2010)—it silently shifted all authority to regulate gambling from fifty-plus state and territorial regulators to a federal agency lacking the expertise and resources to do so.  At the same time, it would divert the CFTC's limited resources away from its actual mission: "maintain[ing] the integrity and efficiency of the derivatives markets to enable commercial enterprises to safely and reliably hedge price risk in the raw materials they use and the products they sell."  *Id*.  Remarkably, the supposed paradigm shift occurred so secretly that even the Supreme Court missed it when it reaffirmed states' historic police power to regulate sports betting in *Murphy*.  584 U.S. at 1484-85 ("Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own.").  It would also mean that virtually all betting occurring outside of a DCM violates federal law, since the CEA prohibits "any person, other than an eligible contract participant" from "enter[ing] into a swap unless the swap is entered

22

into on, or subject to the rules of, a [DCM]." 7 U.S.C. § 2(e); *see also* 7 U.S.C. § 13(a)(5) (making it a felony punishable by up to 10 years in prison to willfully violate the CEA or CFTC regulations).

"Had Congress intended such a sea change in the regulatory landscape, it surely would have said so," because Congress does not "hide elephants in mouseholes." *N. Am. Derivatives Exch.*, 815 F. Supp. 3d at 1185 (quoting *Whitman*, 531 U.S. at 468); *see also*, *Martin*, 793 F. Supp. 3d at 684; Mass PI Order 12; *Schuler*, 2026 WL 657004, at *6 (S.D. Ohio Mar. 9, 2026) ("In the absence of congressional intent to effect such a sea change, that result is absurd"). Nor does Congress grant agencies such "'highly consequential power' through ambiguous language." *Learning Res., Inc. v. Trump*, 607 U.S. ---, 146 S. Ct. 628, 628 (2026) (quoting *West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022)). Nationalizing gambling, particularly sports betting, under the CFTC would have "vast economic and political" consequences, invoking the major questions doctrine. *West Virginia*, 597 U.S. at 716 (internal quotation marks omitted).

Finally, Kalshi and Polymarket's interpretation of "swap" would impliedly repeal other important federal laws. There is a strong presumption against such repeals by implication. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018). The Indian Gaming Regulatory Act (IGRA) provides a comprehensive framework for tribal governments to offer and regulate gaming activity on their own lands. 25 U.S.C. § 2701 *et seq.* A requirement that all betting occur on CFTC-registered DCMs would eviscerate the IGRA. The Wire Act likewise criminalizes the transmission of "bets or wagers on any sporting event or contest" where such wagering is illegal under state law. 18 U.S.C. § 1084(a)-(b). Kalshi and Polymarket's interpretation of "swap" would necessarily entail a repeal of this law as well. *Martin*, 793 F.Supp.3d at 683. If Congress had intended to

23

repeal the IGRA or the Wire Act when passing Dodd-Frank, it could have and would have said so.[7]

    2.   Kalshi's offerings are not options or futures in excluded commodities

Kalshi also argues in passing that its event contracts are "options[s]" or "contracts . . . for future delivery" of a commodity (specifically an "excluded commodity") that are purportedly subject to the CEA's "exclusive jurisdiction." ECF No. 5-1 at 11-12. Like "swap," the CEA's definition of "excluded commodity" requires an "occurrence" to be "associated with a financial, commercial, or economic consequence," § 1a(19)(iv), which Kalshi's offerings are not (for the reasons already explained). And even if Kalshi's contracts did deal in "excluded commodities," they would not fall under the CFTC's "exclusive jurisdiction" in § 2(a); Congress defined "commodity" differently from "excluded commodity," and chose to include the former but not the latter in the "exclusive jurisdiction" provision. *Hendrick*, 817 F.Supp.3d at 1033-34.

### B. The CEA Does Not Preempt Rhode Island's Gambling Laws

Even assuming some subset of Kalshi's event contracts *do* qualify as "swaps," the CEA does not preempt Rhode Island gambling law. The general presumption against preemption "applies with particular force" in areas like gambling that are "traditionally occupied by the States." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008). The Court must begin from the presumption that "Congress did *not* mean to preempt [Rhode Island]'s 'historic police powers' unless the [CEA] discloses that result as 'the clear and manifest purpose of Congress.'" *Schuler*,

---

[7] Kalshi attempts to circumvent this conflict via the Unlawful Internet Gaming Enforcement act of 2006 ("UIGEA"), 31 U.S.C. § 5361 *et seq.*, which supplements the Wire Act by making it a crime to fund illegal online betting. *Id.* § 5363. As Kalshi notes, the UIGEA defines "bet" and "wager" to exclude transactions on DCMs. ECF No. 5-1 at 20 (citing 31 U.S.C. § 5362(1)(E)(ii)). But those definitions do not apply outside of the UIGEA; the UIGEA expressly states that it does not "alter[]" or "limit[]" other laws. *Id.* § 5361(b). Thus, the Wire Act continues to prohibit internet betting that is illegal under state law.

2026 WL 1295806, at *5 (6th Cir. Apr. 24, 2026) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)).  The CEA's text and history does not even hint that Congress intended to overturn centuries of state gambling regulation in the guise of financial market oversight, and this Court should not read such a non-intuitive purpose, and non-sensical consequence, into the statute.

    1.  <u>The CEA does not expressly preempt state gambling law</u>

Kalshi's express preemption argument simply reframes its "exclusive jurisdiction" argument under § 2(a)(1)(A) and should be rejected for the reasons already discussed.  Even if § 2(a)(1)(A) covered some fraction of Kalshi's contracts, however, it still does not expressly preempt state laws.  Courts "start with the assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)) (citing 15 U.S.C. § 1261 note (b)(1)(B) and 15 U.S.C. § 2075(a)), which provide that "no State or political subdivision of a State" may "establish" a product-safety standard different from a federal standard).  There is no express exemption without a "clear statement to that effect," namely, that state law is preempted or state authorities may act within a specified area. *Am. Apparel & Footwear Assoc. v. Baden*, 107 F.4th 934, 939 (9th Cir. 2024) (internal quotation marks omitted).  Here, § 2(a)(1)(A) says nothing about state law, preempted or otherwise.

Rather, the Supreme Court has read § 2(a)(1)(A) as simply "consolidat[ing] *federal* regulation of commodity futures trading in the [CFTC]," "separat[ing] the functions of the [CFTC] from those of the [SEC]" and other federal agencies. *Merrill Lynch*, 456 U.S. at 386-87.  That interpretation is further supported by other provisions in the CEA that *do* expressly preempt state law, confirming that Congress knew how to enact express preemption provisions in the CEA and

chose not to do so with respect to state gaming law. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 289 (1995) (affirming the "inference that an express pre-emption clause forecloses implied pre-emption" within the same statute); *see also Jama v. Immigr. & Customs Enf.*, 543 U.S. 335, 342 (2005) (the presumption against reading unsaid provisions into a statute is "even greater when Congress has shown elsewhere in the same statute that it knows how to make such [provisions] manifest").

The first express preemption provision provides that the CEA "shall supersede and preempt the application of any State or local law that prohibits or regulates gaming" with respect to specific products, not including swaps. 7 U.S.C. § 16(e)(2). Reading the CEA to preempt gaming laws as applied to "swaps" would run contrary to Congress's choice to exclude swaps from this express preemption provision. Moreover, § 16(e)(2) would be superfluous if § 2(a)(1)(A) already preempted state gaming law, and this Court should not adopt a reading of the CEA that renders an entire section meaningless. *See Schuler*, 2026 WL 657004, at *8 (observing that the types of preempted "gaming" enumerated in 7 U.S.C. § 16(e)(2) do not include sports-event contracts, which is "'strong evidence' that Congress did not intend the CEA to preempt state sports gambling laws") (quoting *Martin*, 793 F. Supp. 3d at 681); *see also Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (quoting *Nat'l Assn. of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128 (2018) (applying the canon against superfluity with "special force" where a reading would make an entire subparagraph meaningless).

The other express preemption provision preempts state insurance law such that a swap "may not be regulated as an insurance contract under the law of any State." 7 U.S.C. § 16(h)(2). Congress could have passed a similar provision preempting State gambling law, but again, it chose not to do so. The Court's role is not to supply a provision that Congress omitted, but rather "to

26

apply faithfully the law Congress has written." *Lackey*, 604 U.S. at 205.  And again, any ambiguity must be construed against preemption, particularly in fields traditionally left to state regulation. *Altria*, 555 U.S. at 77 ("[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'") (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).

Kalshi and Polymarket equate "exclusive jurisdiction" with "express preemption," but it cites no binding caselaw supporting that position.  The Supreme Court cases it cites did not confer "exclusive jurisdiction" to any federal agency.  One of the cited cases confirmed the Supreme Court's "original and exclusive jurisdiction" over controversies between states. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992) (citing 28 U.S.C. § 1251(a)).  Another found that Congress's delegation of rulemaking authority to the National Highway Traffic Safety Administration did *not* preempt state tort law under an express preemption clause that lacked the "exclusive jurisdiction" language at issue here.  *Freightliner*, 514 U.S. at 284.  Another found field preemption *implied* by the Federal Power Act, an implication the Court would not reach if the statute's "exclusive jurisdiction" language *expressly* preempted state law.  *Hughes v. Talen Energy Mktg.*, 578 U.S. 150, 164 (2016).  And the Tenth Circuit's non-binding interpretation of the Interstate Commerce Commission Termination Act found express preemption "unambiguous" in a much more detailed provision that explicitly "preempt[ed] . . . State law."  *See BNSF Ry. Co. v. Hiett*, 22 F.4th 1190, 1193; 49 U.S.C. § 10501(b).  Thus, none of these cases control the Court's interpretation of the CEA's "exclusive jurisdiction."

Nor does § 2(a)(1)(A)'s savings clause transform the entire provision into an express preemption of state gaming law.  The clause states that "[e]xcept as hereinabove provided," "nothing contained in this section shall [] supersede or limit" the "jurisdiction conferred" on

27

"regulatory authorities under the laws" of "any State." 7 U.S.C. § 2(a)(1)(A). The plain language of the provision *preserves*, not preempts, state authority. Indeed, "[a] savings clause generally 'negates the inference that Congress left no room for state causes of action.'" *Martin*, 793 F. Supp. 3d at 682 (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987)). Moreover, the exclusive jurisdiction language is immediately qualified "to the extent otherwise provided in [Dodd-Frank]." 7 U.S.C. § 2(a)(1)(A). Both the statute's Special Rule and the CFTC's implementing regulation exclude from DCMs contracts relating to "gaming" or activities that are "unlawful under any . . . State law." *See* 7 U.S.C. § 7a-2(c)(5)(C)(i); 17 C.F.R. § 40.11(a). This express carveout to the CFTC's exclusive jurisdiction confirms Congress's intent to "avoid[] unintended encroachment on the authority of the States" pertaining to event contracts. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663-64 (1993); *see also, e.g.*, *Schuler*, 2026 WL 657004, at *8 (noting that the express reference to the "laws . . . of any State" in 7 U.S.C. § 2(a)(1)(A) "leaves ample room for states to legislate and regulate").

Finally, Kalshi and Polymarket's discussion of the CEA's history tracing back to 1974 is irrelevant since § 2(a)(1)(A) did not exist until the Dodd-Frank Act amended the CEA in 2010, when Congress also added the savings clause discussed above.

In sum, Kalshi cannot point to any provision expressly preempting state gambling laws, and it cannot disguise that fact by citing a handful of distinguishable cases, a savings clause that only proves Congress's deference to state gambling law, and legislative history that long predates the provision at issue.

2. The CEA does not impliedly preempt state gambling law

Since the plain language of the CEA defers to, rather than supersedes, the State's historic authority to regulate gambling, Kalshi and Polymarket must argue that Congress implied

28

preemption despite its express provisions to the contrary. Implied preemption may be found where Congress demonstrates an intent "to foreclose any state regulation in the *area*" (field preemption) or else where it is apparent that "compliance with both state and federal law is impossible" (conflict preemption). *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015). Neither exists here.

### a) Field preemption does not apply

Field preemption applies only in the "rare cases" where "Congress 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140 (1986)). Even if a statute suggests some preemptive intent, courts must construe the field as narrowly as possible. *Medtronic*, 518 U.S. at 485. Moreover, "[t]he presumption against preemption operates with special force in cases in which Congress has legislated in a field which the States have traditionally occupied," *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 594 (6th Cir. 2024) (cleaned up), and "the case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them.") *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989) (cleaned up).

This Court need look no further than the text of the statute to see that Congress never intended the CEA to field-preempt state gambling law. The Special Rule carves out space for continued State regulation of contracts relating to "gaming" or other "activity that is unlawful under any . . . State law," 7 U.S.C. § 7a-2(c)(5)(C)(i), and the CFTC has long embraced that domain of State authority by banning such contracts on DCMs, 17 C.F.R. § 40.11(a). The Special Rule is an "affirmative indication[] from Congress" that the nation's tradition of State gambling regulation

29

would be "consistent with the balance struck by" the federal commodities exchange statute. *Bonito Boats*, 489 U.S. at 166. This Court should not now overturn that balance set by Congress.

Even assuming the CEA implies some preemption, there is no reason to believe it precludes state gambling law. *Martin*, 793 F. Supp. 3d at 679. Interpreting the field narrowly, as this Court must, the CEA's preemption of state regulatory regimes for traditional commodities like grain futures cannot encompass the entirely unrelated field of gambling. *Id.* The Supreme Court ruled as much when interpreting the CEA's predecessor, the Grain Futures Act, and found no preemption of State gambling laws. *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933). While the CEA provides for the regulation of grain and similar commodities exchanged on traditional markets, it provides no guidance on how the CFTC could or should replace the myriad state laws and regulations governing bets and wagers. *See* 7 U.S.C. §§ 1 *et seq.*; *see also Dickson*, 288 U.S. at 198. The CEA does not require licensing or background checks, indicate which bets are allowed, protect against insider betting or unfair bets, require the house to set aside reserves or open its books to regular audits, or guarantee basic consumer protections like age restrictions or measures to address problem gaming. The CEA's silence on these issues is not surprising since, as explained thoroughly *supra*, it was never intended as a gambling statute, and that intent is decisive when determining the scope of any field preemption. *See Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th at 631, 639 (6th Cir. 2025). Indeed, the CFTC has asserted that it does not "ha[ve] the statutory mandate nor specialized experience appropriate to oversee" gaming. 89 Fed. Reg. at 48983. The CEA may preempt state law regarding genuine commodities exchanges, but it does not create a "self-certifying" exemption to state gaming laws for gambling rings disguised as markets.

30

Ultimately, field preemption does not apply because commodity futures regulation and gambling regulation are distinct fields with distinct regulatory needs and policy goals. *See* 89 Fed. Reg. 48982-83. Commodity futures markets allow commercial sellers and buyers of commodities to manage financial risk by trading with investors. *See* 7 U.S.C. § 5(a). Speculation is permitted, but only to help markets function more efficiently. *See Merrill Lynch*, 456 U.S. at 358-59. The CFTC oversees such speculation to ensure that prices reflect economic reality. *See* 7 U.S.C. § 6(a). Gambling, by contrast, does not mitigate risk inherent in markets but creates and gamifies risk for entertainment and profit. Unlike the CFTC, gambling regulators are not tasked with stabilizing financial markets but rather protecting consumers from unfair and deceptive practices and mitigating the negative externalities from this activity. Congress never intended the CEA to supplant the states' regulatory expertise and policy preferences in the gambling domain, and thus there can be no field preemption.

b)  *Conflict preemption does not apply*

"Conflict preemption takes place either when compliance with both state and federal regulations is impossible or when state law interposes an obstacle to the achievement of Congress's discernible objectives." *Grant's Dairy—Me., LLC v. Comm'r of Me. Dep't of Agri., Food & Rural Res.*, 232 F.3d 8, 15 (1st Cir. 2000). Neither is true here.

i.  Kalshi can comply with State law and the CFTC's impartial access rule

"Impossibility pre-emption is a demanding defense." *Wyeth*, 555 U.S. at 573 (2009). Nothing in the CEA or the CFTC's regulations requires platforms like Kalshi and Polymarket to defy Rhode Island law, and Kalshi and Polymarket provide no authority otherwise. Aside from general handwaving about "core DCM principles," discussed *infra*, Kalshi and Polymarket identify only a single potential conflict with the CFTC's "impartial access" rule, 17 C.F.R. § 38.151(b), and only by turning the rule on its head. The impartial access rule requires DCMs to "provide its

31

members, persons with trading privileges, and independent software vendors with impartial access to its markets and services, including: (1) Access criteria that are impartial, transparent, and applied in a non-discriminatory manner; and (2) Comparable fee structures for members, persons with trading privileges and independent software vendors receiving equal access to, or services from, the designated contract market." 17 C.F.R. § 38.151(b). The CFTC adopted the rule "in order to prevent the use of discriminatory access requirements as a competitive tool against certain participants." 77 Fed. Reg. 36612, 36625. For example, the rule guarantees buy-side firms access to dealer-to-dealer platforms. *See In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 446-47 (S.D.N.Y. 2017) (interpreting the CEA's impartial access rule as applied to Swap Exchange Facilities, 7 U.S.C. § 7b-3(f)(2)(B)(i)). The rule was thus meant as a check against platforms like Kalshi and Polymarket, who might otherwise discriminate against rivals to dominate a market, not a blank check to expand their market reach by disregarding state law.

Nor does the rule guarantee anyone anywhere access to any DCM. To the contrary, the rule expressly requires DCMs to "establish and impartially enforce rules governing denials, suspensions, and revocations" of "access privileges." 17 C.F.R. § 38.151(c). The Special Rule against gaming and other contracts in violation of state law further confirms that the impartial access rule does not require DCMs to offer every wager to everyone in every jurisdiction. *Schuler*, 2026 WL 1295806, at *6. Instead, as the CFTC noted when adopting the rule, the goal is "[e]fficiency [] promoted by defining clear rules governing the denial" of access. 77 Fed. Reg. at 36673. One such clear rule would be denying access where participation would violate state gambling laws. The rule would be applied neutrally to prevent anyone from accessing the platform within the given jurisdiction, regardless of their competitive relationship with Kalshi or any other platform. As a result, "Kalshi would not discriminate against nonresidents of [Rhode Island] by

32

complying with the State's gambling laws any more than a company would discriminate against nonresidents by charging [Rhode Island] sales tax for the nonresident's in-state purchases." *Schuler*, 2026 WL 1295806, at *6. Thus, there is no conflict.

Because "it is possible for [Kalshi and other platforms] to comply with each of the state law measures at issue while also comply with each of the federal ones," there is no conflict impossibility preemption in this case. *Capron v. Office of Attorney General of Mass.*, 944 F.3d 9, n.10 (1st Cir. 2019).

        ii.     Rhode Island gambling law poses no obstacle to Dodd-Frank's objectives

Likewise, Rhode Island's gambling laws pose no "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015). Once again, Kalshi mischaracterizes Congress's intentions, suggesting that the CEA created a "uniform federal scheme" that should displace "state-by-state regulation" of gambling. ECF No. 5-1 at 21. As an initial matter, uniformity is a field-preemption not a conflict-preemption argument, as conflict preemption assumes that States may regulate and may regulate nonuniformly. *Martin*, 793 F. Supp. 3d at 685; *Wyeth*, 555 U.S. at 575. Moreover, as explained previously, the CEA did not make the CFTC the nation's sole gaming authority, and in fact, expressly carved out gaming and other matters subject to State regulation from the CFTC's intended jurisdiction. Those carveouts "show[] that uniformity 'is not to be accomplished at all costs,'" and Kalshi and Polymarket must "identify more than generic uniformity concerns to meet the 'high threshold' required to establish obstacle preemption.'" *Schuler*, 2026 WL 1295806, at *6 (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 222 (1983)). Thus, as other federal courts have recognized, Kalshi and Polymarket's uniformity argument for conflict preemption fails for the same reasons their field preemption

33

argument fails. *Id.*; *Martin*, 793 F. Supp. 3d at 685; *Schuler*, 2026 WL 1295806, at \*6; *see also N. Am. Derivatives Exch.*, 815 F. Supp. 3d at 1187.

Nor does the CEA preempt state enforcement of state law simply because it gave the CFTC the authority to review particular contracts involving "terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law." ECF No. 5-1 at 23. The Special Rule preserves, not preempts, state law enforcement. 7 U.S.C. § 7a-2(c)(C)(i)(I); *see Martin*, 793 F. Supp. 3d at 686 (finding that the "CFTC's Core Principles and Maryland's gaming laws work in tandem"). The CEA did not intend to foreclose enforcement of state gaming laws any more than it intended to foreclose state prosecution of assassins or terrorists. It merely empowered the CFTC to join, not supplant, the states in promoting the public interest against unregulated gaming.

## II.    KALSHI AND POLYMARKET HAVE NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM ABSENT AN INJUNCTION

In seeking a preliminary injunction, a party must make a "clear showing" that, absent injunctive relief, it suffers irreparable harm that is both likely and imminent. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008) ("[P]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is likely in the absence of an injunction); *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) ("If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit."); *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999) (en banc) ("The Supreme Court has repeatedly cautioned that, absent a threat of immediate and irreparable harm, the federal courts should not enjoin a state to conduct its business in a particular way."). A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store. *New York v. U.S. Dep't of Just.*, 804 F. Supp. 3d 294, 329 (D.R.I. 2025) (quoting *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir.

2004)).  Because Kalshi "seeks to enjoin a government agency . . . [its] case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs." *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976) (internal quotations omitted).  This well-established rule requires the moving party to demonstrate a "very strong showing of irreparable injury" for federal courts to interfere with non-federal government operations.  *DeNovellis v. Shalala*, 135 F.3d 58, 62 (1st Cir. 1998).

### A.  There Is No Immediate Threat of State Action

Kalshi's motion (which Polymarket joins) seeks a court order that "preliminarily enjoins Defendants from pursuing any state action, including the one filed [on May 21, 2026], against Kalshi and its affiliates concerning trading on Kalshi's DCM."  ECF No. 5 at 2.  Since Kalshi's filed its motion, there have been several noteworthy developments: Kalshi and Polymarket removed Rhode Island's case (and the State does not oppose removal); the parties have jointly move to consolidate the two cases; and the State confirmed, as this Court's order reflects, that it would take "no further action, or begin enforcement action, beyond" the two cases "unless and until those matters are decided, or [the State] provides sufficient notice to [Kalshi] and to the [Court] and the Court has addressed the issue with counsel."  Text Order, *KalshiEx LLC v. Rhode Island*, No. 26-cv-327 (D.R.I. May 26, 2026).

Kalshi and Polymarket's preliminary injunction motions are premised on the threat of imminent irreparable harm from state enforcement action.  That predicate has been eliminated.  In the absence of an injunction, nothing changes for Kalshi or Polymarket—the federal court action and the State's petition for declaratory judgment continue, and no state action will be brought by Rhode Island until these matters are decided.  Under *Winter* and its progeny, the Court should deny the motions as no irreparable injury to Kalshi or Polymarket is immediate, likely, or even possible,

35

in the absence of a preliminary injunction, and the preliminary injunction inquiry ends there. *See Winter*, 555 U.S. at 381 (declining to address the merits where there was no irreparable harm).

### B. Even If a Threat of State Action Existed, Kalshi and Polymarket Still Cannot Demonstrate a Likelihood of Irreparable Harm

There are several reasons why Kalshi and Polymarket would not face a threat of irreparable harm, even if the possibility of immediate state action somehow existed.

*First*, Kalshi and Polymarket rely on *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992), to contend that state enforcement actions brought under a preempted state law constitutes irreparable injury. ECF No. 5-1 at 23; QCX LLC's Mot. for Prelim. Inj. at 6, *Rhode Island v. KalshiEX LLC*, No. 1:26-cv-00333, ECF No. 26. As already noted, the CEA does not preempt Rhode Island law. And neither Kalshi nor Polymarket has demonstrated that it faces "repetitive penalties" for "continuing or repeated violations" with no "realistic option of violating the law once and raising its federal defenses," as in *Morales*. *Id.* (citing *Ex parte Young*, 209 U.S. 123, 156 (1908)). Since the State has made abundantly clear its enforcement priority—a declaratory judgment action, not an enforcement proceeding involving civil penalties or treble damages as in *Morales*—Kalshi and Polymarket do not face the kind of "Hobson's choice" required for courts to intervene and enjoin state enforcement action. *See id.*

Furthermore, "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *See FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980); *Kugler v. Helfant*, 421 U.S. 117, 124 (1975) (generally "the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution alone do not constitute 'irreparable injury'"). And the "harms associated" with enforcement actions are generally not considered to be an irreparable injury because Kalshi and Polymarket can raise their claims as affirmative defenses in the state-initiated action. *See O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)

36

(noting plaintiffs lacked irreparable injury because if they were prosecuted or illegally sentenced, state and federal remedies were available); *Sherwin-Williams Co. v. Cnty. of Delaware*, 968 F.3d 264, 270 (3d Cir. 2020).

*Second*, Kalshi and Polymarket cannot claim irreparable injury from the possibility of having to cancel contracts that are illegal and violate public policy. They allege various harms if forced to cease accepting wagers and cancel contracts in Rhode Island, including "forgo[ing] [] business" in the State, "liquidat[ing] users' positions," and "paus[ing] trading pending the outcome of litigation." ECF No. 5-1 at 24-25. In reality, what Kalshi and Polymarket must cease accepting are *unauthorized* wagers; they may accept wagers from Rhode Island users if their operations comply with Rhode Island's gaming laws. Kalshi and Polymarket's alleged injury therefore is caused not by the threat of contract cancellations, but by their own decisions to ignore Rhode Island's legal requirements. *See Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) ("Injury caused by failure to secure a readily available license is self-inflicted, and self-inflicted wounds are not irreparable injury."); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) ("If the harm complained of is self-inflicted, it does not qualify as irreparable."); *State v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (similar). Moreover, Kalshi and Polymarket's allegations that its users would be harmed in the absence of a preliminary injunction hold little weight, as potential harm to third parties is not relevant to the irreparable harm analysis. *See CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 622 (1st Cir. 1995) ("[T]he issuance of a preliminary injunction requires a showing of irreparable harm to the movant rather than to one or more third parties.").

*Third*, Kalshi and Polymarket cannot claim irreparable injury from a loss of goodwill or the potential "market disruption" if no injunction is granted. They are already engaged in litigation

37

across the country and have been denied preliminary injunctions in several lawsuits. It is certainly no secret that states are moving to enforce their laws against Kalshi, Polymarket, and other "prediction markets" that are violating state gambling laws. In other words, any supposed reputational harm has already occurred—harm caused solely by Kalshi and Polymarket's own decisions to circumvent state law—and preliminary relief will not change that.

*Fourth*, Kalshi and Polymarket's alleged economic injury from compliance with government regulation, including subjecting them to "extraordinary technological challenges and costs" like possible "geolocation" orders, is not irreparable. Alleged economic injury stemming from compliance with government regulation is not irreparable harm. *See A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976) ("[a]ny time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits," but "proof of such an injury, alone," cannot "satisfy the requisite for a preliminary injunction"); *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) ("However, ordinary compliance costs are typically insufficient to constitute irreparable harm."); *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) (similar). Additionally, Kalshi and Polymarket are already required to overcome these "technological challenges" in order to operate in other states where courts have denied their injunction requests, including Massachusetts (Kalshi) and Nevada (both). It is farcical for them to claim that implementing the same technology in Rhode Island will impose any actual harm.

The absence of any immediate threat of state action is alone sufficient to defeat Kalshi's irreparable harm showing. But even assuming such a threat existed, Kalshi could not satisfy its burden for the reasons discussed above.

38

III.    **THE EQUITIES AND PUBLIC INTEREST ALSO WEIGH IN THE STATE'S FAVOR AND AGAINST AN INJUNCTION**

The final considerations in the preliminary injunction analysis are the balance of the equities and the effect of an injunction on the public interest. *Universal Truck & Equip. Co. v. Caterpillar, Inc.*, 883 F. Supp. 2d 337, 338 (D.R.I. 2012) (quoting *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 5 (1st Cir. 2012)). Where the party opposing injunctive relief is the government, the potential hardship and the public interest considerations merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). This element focuses on "the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does." *Santiago v. Municipality of Utuado*, 114 F.4th 25, 34 (1st Cir. 2024) (quoting *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221 (1st Cir. 2003)).

Enjoining enforcement of state gambling laws would inflict two significant harms on the State. First, the extraordinary remedy that Kalshi and Polymarket demand—wholesale immunity from state gambling laws—would inflict exactly the kind of irreparable injury that courts have recognized when a State is barred from enforcing its own duly enacted statutes. As the Sixth Circuit recently noted in denying Kalshi's request for an injunction pending appeal, "[a] State 'suffers a form of irreparable injury' any time a court enjoins it 'from effectuating statutes enacted by representatives of its people.'" *Schuler*, 2026 WL 1295806, at *7 (citation omitted); *see also Hendrick*, 817 F. Supp. 3d at 1036 (injunction would injure "[t]he traditional police powers of the states" over gambling, "which are considerable and longstanding"). The First Circuit has also adopted this principle: "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). Here,

39

Rhode Island voters approved two constitutional amendments limiting the scope of gambling in their State; their General Assembly enacted comprehensive statutory schemes within those limits; and RILOT has operated and regulated such gambling ever since. Any injunction preventing the State from implementing this framework is quintessential irreparable harm.

Further, the harm the State would suffer from an injunction would intrude on its duty to protect Rhode Islanders. An injunction would "impede the State from furthering its gaming laws' public-welfare considerations like protecting 'young people' from 'addictive' habits." *Schuler*, 2026 WL 1295806, at *7; *see also Hendrick*, 817 F. Supp. 3d at 1036 ("[S]ome segment of the population will suffer from problem gambling, but neither DCMs nor the CFTC is equipped to address those issues the same way state gaming regulators . . . are."); *Martin*, 793 F.Supp.3d at 677 ("Gambling has been recognized as a potentially harmful 'vice activity,' such that states have a recognized interest in reducing 'the social costs associated with' it." (quoting *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 185 (1999))). Other courts, including the District of Rhode Island, have similarly recognized the State's historical responsibility to regulate gambling. *Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905) ("The suppression of gambling is concededly within the police powers of a state"); *see also In re Advisory Opinion to Governor*, 856 A.2d 320, 323 (R.I. 2004) ("the General Assembly has plenary power to legislate on all matters pertaining to gambling in this state."); *Allendale Leasing, Inc. v. Stone*, 614 F. Supp. 1440, 1454 (D.R.I. 1985) ("It cannot be gainsaid that a state government may lawfully prohibit gambling in the exercise of its police power.").

As noted, Rhode Island has enacted a comprehensive regulatory framework over gambling reflective of these interests. Rhode Island law explicitly recognizes that it is the State's duty "to act responsibly toward those who cannot participate conscientiously in gaming," and so mandates

40

the creation of "compulsive and problem gambling programs," including player self-exclusion programs and problem gambling awareness training. R.I. Gen. Laws § 42-61.2-14. State law also requires that participants in online gaming accounts be at least twenty-one years of age, protecting younger Rhode Islanders from certain forms of gaming. R.I. Gen. Laws § 42-61.2-1(24). In addition to preventing the State from furthering these interests, an injunction would also prevent the State from collecting its share of sports-wagering revenue—fifty-one percent of all such revenue—through its declaratory judgment action against Kalshi and Polymarket. Gambling revenues flow into the State Lottery Fund and then the General Fund to support vital public services. R.I. Gen. Laws § 42-61.2-5(a)(1), (b). Rhode Island has structured its entire sports wagering regulatory regime around the principle that the State, through RILOT, maintains full operational control over wagering conducted within its borders. An injunction permitting Kalshi and Polymarket to operate outside that framework would undermine the State's sovereign authority to protect Rhode Islanders from the social costs of unregulated gambling. Finally, an injunction would amount to an invitation for other companies to evade Rhode Island's—or any state's—gambling laws, by structuring their wagers as event contracts and self-certifying them with the CFTC. Such a result would severely erode states' historic police powers to regulate gambling within their borders.

In short, the equities and public interest also tilt strongly in the State's favor and against Kalshi and Polymarket's requests for an injunction.

## CONCLUSION

Kalshi and Polymarket's motions for a preliminary injunction should be denied.

Respectfully submitted,

MARK FURCOLO, in his official capacity as Director of the Division of State Lottery; PETER F. NERONHA, in his official capacity as Rhode Island Attorney General; and CHRISTINA TOBIASZ, in her official capacity as Gaming and Athletics Administrator, Department of Business Regulation


By their attorneys:

*/s/ Patrick J. Dolan*
Patrick J. Dolan (R.I. Bar #10462)

*/s/ Paul T.J. Meosky*
Paul T.J. Meosky (R.I. Bar # 10742)

*/s/ Michael B. Collins*
Michael B. Collins (R.I. Bar # 11176)

Special Assistant Attorneys General
150 South Main Street
Providence, RI 02903
(401) 274-4400
(401) 222-2995 (Fax)
pdolan@riag.ri.gov
pmeosky@riag.ri.gov
mcollins@riag.ri.gov

42

## **CERTIFICATION**

  I hereby certify that the foregoing document was filed through the ECF system on June 18, 2026 and will be sent electronically to the registered participants identified on the Notice of Electronic Filing.

<em>/s/ Paul T.J. Meosky</em>

43