**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

KALSHIEX LLC,

      Plaintiff,

and

UNITED STATES OF AMERICA and COMMODITY FUTURES TRADING COMMISSION,

      Proposed Plaintiff-Intervenors,

v.

MARK FURCOLO, in his official capacity as Director of the Division of State Lottery; PETER F. NERONHA, in his official capacity as Rhode Island Attorney General; and CHRISTINA TOBIASZ, in her official capacity as Gaming and Athletics Administrator, Department of Business Regulation,

      Defendants.

C.A. No. 1:26-cv-00327-MSM-PAS

**MEMORANDUM OF LAW IN OPPOSITION TO THE FEDERAL GOVERNMENT'S MOTION FOR A PRELIMINARY INJUNCTION**[1]

The Court should deny the federal government's motion for a preliminary injunction for the reasons addressed in detail in the State's contemporaneously filed opposition to Kalshi and Polymarket's preliminary injunction motions—namely, (1) Kalshi and Polymarket's "event contracts" are not "swaps" (or any other regulated financial instrument) that are subject to the

---

[1] Because the federal government's motion rests on legal arguments that are virtually identical to the ones raised by Kalshi and Polymarket in their preliminary injunction motions, the State incorporates by reference its contemporaneously filed opposition to those motions. To avoid unnecessary repetition, the State limits its arguments in this opposition to issues unique to the federal government.

Commodity Future Trading Commission's ("CFTC") "exclusive jurisdiction" under the Commodity Exchange Act ("CEA"), ECF No. 30 at 13-24; and (2) the CEA does not preempt state gambling laws, *id*. at 24-34.  Even prior to the merits, however, since the federal government alleges only that the State's lawsuit against Kalshi and Polymarket vaguely harms its "sovereign interest" as the purported "exclusive regulator" of Kalshi and Polymarket's "event contracts"—and it suffers no concrete, particularized injury directly impacting its operations as a result of the State's case—the federal government lacks standing to even request a preliminary injunction, and so its motion should be denied (and its case ultimately dismissed) on that antecedent ground.  For that reason and the others raised below and in the State's response to the parallel motions filed by Kalshi and Polymarket, the Court should deny the federal government's preliminary injunction request.

## ARGUMENT

As a threshold matter, the federal government lacks standing to bring its claims and thus cannot obtain a preliminary injunction.  *Murthy v. Mississippi*, 603 U.S. 43, 56 (2024) ("We begin—and end—with standing.  At this stage, neither the individual nor the state plaintiffs have established standing to seek an injunction against any defendant.  We therefore lack jurisdiction to reach the merits of the dispute.").  But even assuming the federal government has standing, it still falls far short of meeting the standard for a preliminary injunction.  A preliminary injunction is an "extraordinary and drastic remedy" that "is never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008).  Generally, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  Moreover, courts presume irreparable injury to the State from an injunction against the enforcement of duly enacted

2

law. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). Because the federal government is not injured, but rather supported, by the enforcement of state gambling law, this Court should find no standing let alone any reason to grant the federal government a preliminary injunction.

## I.     THE FEDERAL GOVERNMENT LACKS STANDING

Plaintiffs are not entitled to a preliminary injunction if they fail to establish standing to press their claims in federal court in the first place. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 372 (2024) (reversing preliminary injunction where plaintiffs lacked standing). To establish Article III standing, plaintiffs must prove they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Here, the federal government lacks standing because it fails to identify a concrete and particularized injury, let alone one traceable to the State's enforcement of its gambling law or redressable by this Court.[2]

"The United States may not lend its name to a lawsuit merely for the benefit of a private individual but rather must show the requisite injury in fact sufficient to give it standing." 14 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure Jurisprudence* § 3651 (4th ed.) (citing *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 285 (1888)). As the Supreme Court recently reinforced, this injury requirement is necessary because "federal courts do not issue advisory opinions about the law—even when requested by the President." *All. for Hippocratic Med.*, 602 U.S. 367, 378-79 (2024). An injury in fact is "an invasion of a legally protected interest" that is "concrete and particularized." *Spokeo*, 578 U.S. at 339 (citation omitted). A "concrete" injury is "'real,' and not 'abstract.'" *Id*. at 340 (citation omitted). And a "particularized" injury

---

[2] While the State did not oppose the federal government's intervention, it did not (and could not) waive standing. *United States v. AVX Corp.*, 962 F.2d 108, 112, 115 n.7 (1st Cir. 1992) (intervenors must independently satisfy Article III standing and defects in standing cannot be waive but must be raised by the parties or the court "whenever it becomes apparent").

3

"affect[s] the plaintiff in a personal and individual way." *Id*. at 339 (citation omitted).  This latter requirement means that standing is "'substantially more difficult' to establish" when the plaintiff is not "the object of the government action or inaction [it] challenges." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (citation omitted).  The federal government has not given this Court any reason to believe it suddenly suffers a direct and substantial injury from Rhode Island continuing its centuries-long tradition of regulating gambling platforms like Kalshi and Polymarket, and thus it cannot have standing in this case.

Of course, the federal government has standing to assert preemption claims against state action that directly interferes with federal operations, such as when state law attempts to regulate federal officials.  For example, in *United States v. Supreme Court of New Mexico*, 839 F.3d 888 (10th Cir. 2016), the United States had standing to bring a preemption claim against a state rule of professional conduct limiting how federal prosecutors could subpoena defense lawyers.  In that case, unlike here, the state laws that were allegedly preempted tried to regulate federal officials. *Id*. at 899-900.  *See also United States v. City of Arcata*, 629 F.3d 986, 989-90 (9th Cir. 2010) (preemption standing existed where federal government was "the sole target" of municipal ban on the military recruiting minors).  Similarly, the federal government may have preemption standing where state law interferes with private activity on which federal operations rely.  In *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022), for instance, the federal government had preemption standing where California tried to prohibit the private detention centers that held almost all Immigration and Customs Enforcement ("ICE") detainees in the state.  Because the law would have "require[d] ICE to entirely transform its approach to detention in the state," the federal government suffered a concrete and particularized injury giving it standing to sue. *Id*. at 752-54. *See also United States v. King Cnty.*, 122 F.4th 740, 750 (9th Cir. 2024) (preemption standing

existed where local order would have prevented ICE from accessing local airfields); *United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024) (federal injury in fact where state law withdrew resources from federal law enforcement).

Unlike those examples, the federal government does not allege in this case any concrete or particularized impact on CFTC operations from Rhode Island's enforcement of its gambling laws. The agency only waves its hands at a vague and abstract "blow to the Commission's sovereign interest as exclusive regulator" over gambling platforms claiming to be markets. But there is no suggestion that Rhode Island is attempting to regulate the CFTC in a manner that directly interferes with CFTC operations. The CFTC is not the "object of the [State] action or inaction [it] challenges," *Lujan*, 504 U.S. at 562, nor is it using prediction markets like Kalshi to achieve its mission as ICE might use a detention facility or airfield. If anything, state gambling law *supports* the CFTC's work because federal regulations explicitly prohibit "gaming" contracts on federal commodities exchanges (though any reference to this prohibition is conspicuously absent from any CFTC filing in this case). 17 C.F.R. § 40.11(a)(1). Thus, if Rhode Island and its sister states succeed in reigning in Kalshi and other would-be DCMs, the CFTC would have more resources to focus on its actual mission: regulating authentic commodities markets. Indeed, the only measurable "harm" the CFTC allegedly suffers from state action against prediction markets seems to be the agency's ire at having to provide "guidance" and "compliance requirements," ECF No. 23-1 at 11,[3] or in other words, doing its job as a federal agency. In any case, that alleged burden is purely the result of the CFTC's choice to involve itself in these proceedings, and plaintiffs cannot conjure standing by the simple act of bringing the very case for which they allege standing. *See Steel Co. v. Citizens for a*

---

[3] Unless otherwise noted, all ECF references are to *KalshiEX LLC v. Furcolo*, No. 1:26-cv-00327 (D.R.I.).

*Better Env't*, 523 U.S. 83, 107 (1998) ("The litigation must give the plaintiff some other benefit besides reimbursement of costs that are a byproduct of the litigation itself."). Such circular reasoning would render the standing doctrine meaningless, as this Court has previously recognized. *Fitch v. Fed. Hous. Fin. Auth.*, No. 18-cv-214, 2021 WL 4901909, at *7 (D.R.I. Oct. 21, 2021) (citing *Pemental v. Bank of N.Y. Mellon*, No. 16-483S, 2017 WL 3279015, at *8 (D.R.I. May 10, 2017)).

The federal government's contention that its preemption standing rests on its right to enforce federal law is similarly misplaced. Assuming the federal government generally does have standing to enforce its laws, it still has not alleged that the State has violated any federal law. The only possible claim the federal government might have is based on the "exclusive jurisdiction" provision, which does not "operate directly on the [s]tates," *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 478 (2018), and so the states cannot "violate" that provision. None of the authorities that the federal government relies on says otherwise. Its exemplar case, *FEC v. National Conservative Political Action Committee*, 470 U.S. 480, 485 (1985), found standing where the defendants "threatened, and now have made, substantial expenditures in apparent contravention" of the statute the FEC was enforcing. Moreover, that statute expressly gave the FEC standing to seek declaratory relief testing the statute's constitutionality, and in citing that provision, the Court noted the unique quality of elections law, where there is little time to prosecute enforcement actions before they become moot. *Id.* The CEA does not give the CFTC the same special standing, and no more should it since the CEA does not operate under the same time pressures as the FEC. Likewise, in *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 771-73 (2000), the state agency allegedly violated the False Claims Act, giving the federal government an injury-in-fact for standing.

6

In fact, the CFTC cites only one case suggesting that the federal government has the free-range preemption standing the agency now seeks. In *KalshiEX LLC v. Johnson*, No. CV-26-01715, 2026 WL 1223373, at *3 (D. Ariz. May 5, 2026), a parallel case where the CFTC is also trying to protect Kalshi and other prediction markets from state regulation, the court summarily confirmed the federal government's standing to enjoin Arizona's enforcement of its gambling laws against event contracts on DCMs. That conclusion, however, misapplied the cited cases, all of which allowed the federal government to sue when facing an obvious, tangible injury caused by state enforcement measures. In *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 193 (1967), the United States incurred monetary costs to remove a sunken vessel in an inland waterway, while in *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 896-900 (10th Cir. 2016), a state professional conduct rule "worked to the detriment of federal prosecutors" by limiting their evidence-gathering abilities. *Arizona v. United States*, 567 U.S. 387, 409-10 (2012), is even further afield. *Arizona* concerned immigration, a matter uniquely entrusted to the federal government by its constitutional authority to "establish a uniform Rule of Naturalization" and its "inherent power as sovereign to control and conduct relations with foreign nationals." 567 U.S. at 394-95. The Court discussed at length how state-by-state regulation of immigration status would concretely harm federal interests, citing such authorities as the Federalist Papers and briefs offered by former cabinet secretaries and foreign nations. *Id*. at 395. Ultimately, the Court recognized how "[i]mmigration policy shapes the destiny of the Nation" and how all Americans may be harmed by "[p]erceived mistreatment of aliens in the United States." *Id*. at 395, 415. By contrast, as the Supreme Court recognized in *Murphy*, 584 U.S. at 458-59, states have always been free to experiment with gambling policy—without imperiling their national identity or safety abroad. *Arizona* does not say that the federal government is inherently injured by any preempted state law

in any area, and in fact, does not even contain the word "standing." Thus, at most, the *Arizona* Court assumed jurisdiction *sub silentio* and is for that reason "not binding authority for the proposition that jurisdiction exist[ed]." *In re Navy Chaplaincy*, 534 F.3d 756, 764 (D.C. Cir. 2008) (citation omitted); *see also Steel Co.*, 523 U.S. at 91 ("[D]rive-by jurisdictional rulings . . . have no precedential effect.").

The same is true of two circuit decisions cited by the federal government, *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) and *United States v. South Carolina*, 720 F.3d 518, 528 (4th Cir. 2013), which both mention the alleged federal injury only in passing, without citation, and without considering standing. Moreover, the only circuit case the federal government cites that found federal injury-in-fact in a preemption context, *United States v. Iowa*, 126 F.4th 1334, 1343 (8th Cir. 2025), proves the State's point that there is no preemption standing until the "United States has clearly shown it will likely establish a particularized and concrete injury." In *Iowa*, another immigration case, the United States "describe[d] specific harms" from state enforcement. *Id*. The only declaration the CFTC submits in support of its motion describes no actual interference with CFTC operations but rather complains that the prediction market litigation, initiated by the prediction markets both in Rhode Island and elsewhere, "complicated" its oversight responsibilities. ECF No. 23-2 ¶ 7. The declaration provides no detail on those alleged "complications," other than stating that resources have been committed to providing guidance on compliance with the CEA and CFTC regulations and State gambling law. *Id*. Such "broad generalities" are insufficient to establish injury in fact, *Iowa*, 126 F.4th at 1343, and in any case, the CFTC can fulfill its duties by simply pointing prediction markets to its own regulations prohibiting gaming on DCMs in the first place. *See* 17 C.F.R. § 40.11(a)(1).

In short, the federal government has not identified any injury-in-fact caused by the State's enforcement of its gambling laws against Kalshi and Polymarket. Nor has it identified any concrete harm to its own operations, and its purported "sovereign injury" is far too abstract to establish an injury in fact, either. Having failed to establish standing, the federal government cannot obtain a preliminary injunction, and so the Court can and should deny its motion on this ground alone.

## II. THE FEDERAL GOVERNMENT IS UNLIKELY TO SUCCEED ON THE MERITS

To secure a preliminary injunction, the federal government must make a "strong showing" that it is likely to succeed on the merits. *Acevedo-García v. Vera-Monroig*, 296 F.3d 13, 16 n.3 (1st Cir. 2002). Because the federal government seeks to enjoin a "duly enacted state statute," the Court should apply a more "rigorous" standard at this preliminary stage to "reflect[] the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (referencing *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)).

### A. Event Contracts Are Not "Swaps" Under the CEA

As explained in the State's opposition to Kalshi and Polymarket's preliminary injunction motions, Kalshi and Polymarket's "event contracts" do not qualify as swaps under the CEA. ECF No. 30 at 15-24. The State reiterates and incorporates those arguments here, emphasizing once again that Kalshi and Polymarket are not mitigating but rather creating risk by facilitating bets on

outcomes like the winners of sports events that have no direct financial consequence and are otherwise economically inconsequential to the contract's parties.[4]

The Court should also reject the arguments the federal government brings on its own. First, the federal government's interpretation of the CFTC's own jurisdictional reach under the CEA is entitled to no deference: after *Loper Bright*, courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous," and it is this Court, not the federal government, that must determine the statute's meaning. *Hodzic v. Bondi*, 171 F.4th 44, 54 (1st Cir. 2026) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024)). That remains the case no matter how many lawsuits the current CFTC chooses to bring in support of its "unequivocal" belief (as Kalshi puts it) that "event contracts fall within its exclusive jurisdiction." ECF No. 5-1 at 7.[5]

---

[4] The federal government also argues in a footnote that "event contracts qualify as binary options under the CEA," and therefore are "swaps under 7 U.S.C. §1a(47)(A)(i)." ECF No. 23-1 at 12 n.8. This is incorrect. First, event contracts are not "options." An option is defined in Section 1a(36) as "an agreement, contract, or transaction that is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty[.]'" The federal government provides no evidence (nor can it) indicating that an event contract, like whether the Knicks or Spurs will win the NBA finals, is "of the character of, or is commonly known to the trade" as any of the listed financial products. Moreover, even if sports bets or other event contracts could qualify as an "option," it would not be "for the purchase or sale, or based on the value, of" any of the listed items in 7 U.S.C. § 1a(47)(A)(i). For example, the outcomes of sporting events (or players' performances therein) are not "interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind," and the federal government offers no reason to conclude otherwise. *See id*. Furthermore, the federal government appears to ignore the CFTC's own definition of a "binary option" as a "type of option" not a swap. Futures Glossary, Commodity Futures Trading Commission, https://www.cftc.gov/LearnAndProtect/Advisories AndArticles/CFTCGlossary/index.htm#S.

[5] *Compare United States v. Illinois*, No. 1:26-cv-03659 (N.D. Ill. Apr. 2, 2026) (lawsuit brought by CFTC against state); *United States v. Connecticut*, No. 3:26-cv-00498 (D. Conn. Apr. 2, 2026) (same); *United States v. New York*, No. 1:26-cv-03404 (S.D.N.Y. Apr. 24, 2026) (same); *United States v. New Mexico*, No. 1:26-cv-01912 (D.N.M. June 12, 2026) (same); *United States v. Minnesota*, No. 0:26-cv-02661 (D. Minn. June 4, 2026) (same); *United States v. Wisconsin*, No. 2:26-cv-00749 (E.D. Wis. Apr. 28, 2026) (same); *United States v. Arizona*, No. 2:26-cv-

Moreover, any argument the federal government asserts claiming that the CFTC is a gaming regulator deserves no deference as it is contrary to the CFTC's longstanding policy asserting the opposite. The CFTC previously explained that it "does not believe it has the statutory mandate nor specialized experience appropriate to oversee [gaming]." Event Contracts, 89 Fed. Reg. 48968, 48983 (proposed June 10, 2024), withdrawn, 91 Fed. Reg. 5386 (Feb. 6, 2026). Because of this, the CFTC categorically prohibited trading contracts on DCMs "that involve[], relate[] to, or reference[]" "gaming." 17 C.F.R. § 40.11(a). The CFTC's sudden reversal of that position—abandoning a categorical prohibition it had defended as recently as June 2024 before now intervening as a plaintiff to champion Kalshi's prediction markets as the incoming Trump administration took office—is precisely the kind of about-face that warrants skepticism, not deference. See *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016) (holding that an agency that provides no reasoned explanation for its action in reversing a longstanding position is entitled to no deference).

1. <u>The State's Interpretation of "Swaps" Does Not Endanger the CFTC's Jurisdiction Over Actual Swaps</u>

Finally, the Court should ignore the federal government's slippery-slope argument that excluding gaming contracts from the definition of "swaps" would "imperil[]" the CFTC's jurisdiction over derivatives traditionally recognized as swaps. ECF No. 23-1 at 13. The CEA expressly includes such derivatives in its definition of "swaps," including "weather swap[s]," "energy swap[s]," and "agricultural swap[s]." 7 U.S.C. § 1a(47)(A)(iii). Thus, the Court's interpretation of paragraph (ii) would have no impact on these types of derivatives. In this way,

---

02246 (D. Ariz. Apr. 2, 2026) (same); *with Kalshiex LLC v. Schuler*, No. 2:25-cv-01165 (S.D. Ohio Oct. 7, 2025) (where the CFTC did not intervene or bring separate suit); *KalshiEX LLC v. Orgel*, No. 3:26-cv-00034 (M.D. Tenn. Jan. 9, 2026) (same); *KalshiEx LLC v. Cox*, No. 2:26-cv-00151 (D. Utah Feb. 23, 2026) (same); *KalshiEX LLC v. Bird*, No. 4:26-cv-00109 (S.D. Iowa Mar. 11, 2026) (same); *KalshiEX LLC v. Knudsen*, No. 6:26-cv-00028 (D. Mont. Apr. 12, 2026).

the CEA's definition of swaps recognizes the special status of such derivatives and, for example, how "weather (and its impacts on agriculture, among other things) . . . are linked to the national interest in a way that the outcome of a sporting event or how many points a particular team scores are not." *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1027 n.2 (D. Nev. 2025). Acknowledging as much, the State has not challenged the CFTC's clear jurisdiction over such swaps.

    2.   <u>Rhode Island Gambling Law Is Not Preempted By the CEA.</u>

The federal government is also unlikely to succeed on the merits because the CEA does not preempt state gambling law for the many reasons laid out in the State's response to the Kalshi and Polymarket motions. ECF No. 30 at 24-34. The additional authorities cited by the federal government only demonstrate that the CEA was never intended to preempt state gambling laws.

First and foremost, *Effex Capital, LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019), affirmed the Seventh Circuit's earlier finding, in *American Agriculture Movement, Inc. v. The Board of Trade of the City of Chicago*, 977 F.2d 1147, 1155 (7th Cir. 1992), that "Congress intended to preempt some, but not all, state laws that bear upon the various aspects of commodity trading" and other regulated products. *See also Effex*, 933 F.3d at 893 n.26 (explaining how *American Agriculture* was overruled by *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287-89 (1995), only to the extent it suggested that implied preemption analysis is only appropriate where a statute is devoid of express preemptive language). To draw that line, the Seventh Circuit examined "the goals and policies underlying the statute." *Am. Agri.*, 977 F.2d at 1155-56; *see Murphy v. Smith*, 583 U.S. 220, 226 (2018) (endorsing courts' "stepping back to take in the larger statutory scheme surrounding the specific language" at issue). The court concluded that state laws are preempted under § 2(a)(1)(A) *only* if they "*directly* affect trading on or the operation of a [regulated] market"

and therefore "stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Am. Agric.*, 977 F.2d at 1156-57 (emphasis added) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  Applying *American Agriculture*, *Effex* found that state defamation claims brought directly against the National Futures Association ("NFA") for a disciplinary proceeding were preempted by the CEA's provision requiring regulated entities to appeal such proceedings to the CFTC.  933 F.3d at 894-95.  Specifically, the Court found that allowing such tort claims would permit State courts to "effectively [] supervise the NFA's regulation of its members and thus impede its federally mandated role in the Commodity Exchange Act's overall scheme." *Id*.  By contrast, the Court acknowledged that other state torts, specifically those brought against brokers, were not preempted because they have "little or no bearing" on the market's regulation.  *Id*. at 894 (quoting *Am. Agri.*, 977 F.2d at 1156).  Enforcing state gambling law against prediction markets like Kalshi falls in the latter, non-preempted category because (as already explained) state gambling law does not interfere with the CFTC's operations as did the defamation lawsuit at issue in *Effex*.  In any case, *Effex* affirmed that the CEA "did not manifest an intent to occupy completely the entire field of commodity futures regulation," ending any argument for field preemption.  *Id*.

Nor does the federal government's creative interpretation of § 13a-2(1) (authorizing states to generally enforce the CEA) or § 16(e)(1) (disclaiming preemption for certain transactions) create a safe harbor for any self-certifying DCM against all state gambling law.  The CEA expressly affirmed continuing state jurisdiction over those matters, like gambling, long entrusted to state enforcement: "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State."  7 U.S.C. § 2(a)(1)(A).  Reading this provision in harmony, as this Court must, with the two cited by the federal government, it is readily apparent

13

that the CEA envisions state enforcement alongside—not in conflict with—CFTC enforcement. The language of § 13a-2(1) gives states a federal cause of action to enforce the CEA in certain cases, and instead of preempting state action, the specific savings clause for state antifraud enforcement merely reinforces the statute's general intent to leave state law enforcement intact. *See KalshiEX, LLC v. Martin*, 793 F. Supp. 3d 667, 681-82 (D. Md. 2025) ("A savings clause generally 'negates the inference that Congress left no room for state causes of action.'") (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987)). *See Neang Chea Taing v. Napolitano*, 567 F.3d 19, 27 (1st Cir. 2009) ("We are mindful of the 'cardinal rule that courts must strive to harmonize all the provisions of a statute to give them all force and effect.'") (quoting *United States v. Roberson*, 459 F.3d 39, 55 (1st Cir. 2006)). The same holds true for the savings language in § 16(e)(1). *KalshiEX, LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *5 (6th Cir. Apr. 24, 2026) (finding §§ 2(a)(1)(A), 13a-2(1), and 16(e)(1) all show that the CEA "often permits state regulation" and signals no field preemption).

## III.    THE REMAINING FACTORS ALSO FAVOR DENIAL

Even if the federal government had made the necessary "strong showing" on the merits, it still must also make a "clear showing" that the remaining factors favor a preliminary injunction. *Winter*, 555 U.S. at 22. That separate showing is especially important since the CFTC is seeking an "injunction against enforcement of a presumptively constitutional state legislative act." *Respect Maine PAC v. McKee*, 562 U.S. 996 (2010). A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store. *New York v. U.S. Dep't of Just.*, 804 F. Supp. 3d 294, 329 (D.R.I. 2025) (quoting *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)). Where the party opposing injunctive relief is a government entity, the potential hardship and the public interest considerations merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). This element

14

focuses on "the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does." *Santiago v. Municipality of Utuado*, 114 F.4th 25, 34-35 (1st Cir. 2024) (quoting *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221 (1st Cir. 2003)).

Crucially, the federal government identifies no concrete, irreparable harm if a preliminary injunction is denied. As already noted above, the federal government faces no injury-in-fact whatsoever. Furthermore, as detailed in the State's opposition to Kalshi and Polymarket's preliminary injunction motions, even if the CFTC's supposed abstract injury does count as irreparable harm, it is counterbalanced by the harm the State would suffer from an injunction against its duly enacted laws. ECF No. 30 at 39-41; *Schuler*, 2026 WL 1295806, at *7 ("[A] State 'suffers a form of irreparable injury' any time a court enjoins it 'from effectuating statutes enacted by representatives of its people.'") (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)). As the Southern District of Ohio noted, "[t]his principle weighs heavily here because [the State] wants to enforce one of its longstanding police powers: the regulation of gambling." *Id*. (citing *National Collegiate Athletics Ass'n*, 584 U.S. at 458-60, 474 (2018) and *Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905)). "An injunction would thus not only preclude [Rhode Island] from enforc[ing] the will of its legislature. It would also impede the State from furthering its gaming laws' public-welfare considerations like protecting young people from addictive habits. The equities and public interest thus favor [Rhode Island]." *Id*. (internal citations and quotations omitted).

## **CONCLUSION**

Because the federal government lacks standing, and loses on both the merits and the equities, this Court should deny the federal government's preliminary injunction motion.

Respectfully submitted,

MARK FURCOLO, in his official capacity as Director of the Division of State Lottery; PETER F. NERONHA, in his official capacity as Rhode Island Attorney General; and CHRISTINA TOBIASZ, in her official capacity as Gaming and Athletics Administrator, Department of Business Regulation

By their attorneys:

*/s/ Patrick J. Dolan*
Patrick J. Dolan (R.I. Bar #10462)

*/s/ Paul T.J. Meosky*
Paul T.J. Meosky (R.I. Bar # 10742)

*/s/ Michael B. Collins*
Michael B. Collins (R.I. Bar # 11176)

Special Assistant Attorneys General
150 South Main Street
Providence, RI 02903
(401) 274-4400
(401) 222-2995 (Fax)
pdolan@riag.ri.gov
pmeosky@riag.ri.gov
mcollins@riag.ri.gov

16

## **CERTIFICATION**

I hereby certify that the foregoing document was filed through the ECF system on June 18, 2026 and will be sent electronically to the registered participants identified on the Notice of Electronic Filing.

/s/ Paul T.J. Meosky