**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

---

KALSHIEX LLC,

                     Plaintiff,

and

UNITED STATES OF AMERICA
and COMMODITY FUTURES TRADING
COMMISSION,

                     Proposed
                     Plaintiff-
                     Intervenors

                v.

MARK FURCOLO, in his official capacity as
Director of the Division of State Lottery;
PETER F. NERONHA, in his official capacity
as Rhode Island Attorney General;
CHRISTINA TOBIASZ, in her official
capacity as Gaming and Athletics
Administrator, Department of Business
Regulation,

                     Defendants.

---

Case No. 1:26-cv-00327

**PROPOSED COMPLAINT
FOR INJUNCTIVE AND
DECLARATORY RELIEF**

**PROPOSED COMPLAINT**

Proposed Plaintiff-Intervenors, the United States of America and the Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through their undersigned counsel, bring this civil action for declaratory and injunctive relief, and allege as follows:

## I.    INTRODUCTION

1.    The Commodity Exchange Act ("CEA" or the "Act"), 7 U.S.C. §1, *et seq.*, provides a comprehensive framework for the regulation of commodity derivatives transactions in the United States. This federal law gives the CFTC, a federal agency, "exclusive jurisdiction" over the regulation of commodity futures, options, and swaps traded on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). The United States and the CFTC bring this action to halt Defendants' efforts to prohibit the operation of derivatives markets governed by federal law.

2.    On May 21, 2026—just hours after this lawsuit was filed—the State of Rhode Island filed an enforcement action in Providence County Superior Court against KalshiEX LLC ("Kalshi") and QCX, LLC ("Polymarket"). *See* Petition for Declaratory Judgment, *Rhode Island v. KalshiEx LLC, et al.*, C.A. No. PC-2026-02753 (Super. Ct. May 21, 2026), *removed to federal court Rhode Island v. KalshiEX LLC*, No. 1:26-cv-333, Dkt. No. 1 (D.R.I. May 22, 2026). The petition alleges that "Kalshi and Polymarket facilitate gambling (specifically sports wagering) in Rhode Island by allowing bettors to place wagers on the outcome of sports matches and individual player performances, under the guise of 'trading' 'event contracts' on 'prediction markets.'" *KalshiEX*, No. 1:26-cv-333, Dkt. No. 1.1 (D.R.I. May 22, 2026), ¶ 103. These "event contracts," Rhode Island claims, violate a slew of state gambling laws, including "criminal" gambling prohibitions. *Id.* ¶¶ 106–11. The State thus seeks an injunction prohibiting Kalshi and Polymarket from offering sports-related event contracts in Rhode Island. As Attorney General Neronha put it,

the goal of this lawsuit is to "demand Kalshi and Polymarket stand down."[1]

3.     The event contracts targeted by Rhode Island are "swaps" under the federal CEA, and the exchanges that offer these event contracts are CFTC-regulated Designated Contract Markets (DCMs).

4.     Rhode Island's "demand" that CFTC-regulated DCMs "stand down" from offering CFTC-approved financial products intrudes on the exclusive federal scheme Congress designed to oversee the derivatives industry. Prompted by the evolution of national futures markets and repeated conflicts with state law, Congress enacted the CEA, granting the CFTC "***exclusive jurisdiction***" to regulate those markets and enacting a comprehensive federal regulatory framework that preempts state laws that attempt to regulate the operation of, or transactions on, CFTC-regulated exchanges. 7 U.S.C. § 2(a)(1)(A) (emphasis added). It also gave the Commission discretionary authority to approve or disapprove of certain event contracts based on whether they are, in the Commission's evaluation, contrary to the public interest. *Id.* § 7a-2(c)(5)(C). This comprehensive federal regulatory scheme expressly and impliedly preempts state gambling law as applied to event contracts.

5.     The Commission exercises its comprehensive jurisdiction over event contracts in a variety of ways. It has approved various DCMs that offer event contracts, including Kalshi, Polymarket, Gemini Titan, LLC, and North American Derivatives Exchange, Inc. (Nadex). It monitors the event contracts that DCMs self-certify with the CFTC (more than 3,000 to date). It brings enforcement actions against event-contract participants who violate the CEA or

---

[1] Press Release, State of Rhode Island Att'y Gen. Peter F. Neronha, *Attorney General Neronha sues Kalshi and Polymarket for unlawfully conducting sports gambling in Rhode Island* (May 21, 2026), https://riag.ri.gov/press-releases/attorney-general-neronha-sues-kalshi-and-polymarket-unlawfully-conducting-sports.

Commission regulations, including insider-trading violations. It has signed Memoranda of Understanding with Major League Baseball and the National Hockey League to permit information sharing to ensure market integrity in sports-related event contracts. And it has solicited comments for a potential rulemaking around event contracts. The Commission is thus fully engaged with the event contracts that are subject to its jurisdiction, as well as the markets that offer them.

6.      Rhode Island is not the first State that has attempted to invade the Commission's exclusive jurisdiction over swaps. Already, several federal courts—including the Third Circuit—have swiftly responded by issuing temporary restraining orders and preliminary injunctions barring the States from enforcing their gambling laws against CFTC-regulated exchanges that offer sports-related event contracts. *See, e.g.*, *KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026).

7.      The United States and the Commission are injured by Rhode Island's enforcement efforts. The federal government has a statutorily protected interest in maintaining exclusive jurisdiction over transactions involving swaps on DCMs, as well as in administering the CEA's comprehensive regulatory structure. Rhode Island, however, is attempting to block the operation of exchanges that the Commission has expressly approved, as well as event contracts that have been self-certified to the Commission and that the Commission has permitted to be listed. These consequences directly harm the federal government's sovereign, legally protected interest in enforcing federal law.

8.      The injury to the United States and the Commission, moreover, is irreparable and requires preliminary and permanent injunctive relief. Constitutional violations, including Supremacy Clause violations, are always irreparable. Furthermore, if Rhode Island is permitted to enforce its gambling laws against CFTC-regulated transactions and markets, the harm to the

3

United States's sovereign interests and regulatory jurisdiction could not be undone after final judgment. Preliminary injunctive relief is required to preserve the status quo during the pendency of the case.

9.      The equities and public interest also strongly favor injunctive relief. The enforcement of a preempted state law is never in the public interest. Further, Rhode Island's enforcement action against Kalshi and Polymarket threatens to wipe out the operation of CFTC-regulated exchanges within the State. And more broadly, the State's actions inject uncertainty into federal derivatives markets over the scope of the Commission's jurisdiction. To restore the Commission's exclusive jurisdiction, the State's pending enforcement action against Kalshi and Polymarket, as well as any future enforcement actions or investigations against federally regulated DCMs, must be enjoined immediately.

10.      The Court should enforce the Commission's exclusive jurisdiction and issue preliminary and permanent injunctive relief holding that Rhode Island gambling law is preempted and unenforceable as applied to CFTC-regulated event contracts.

## II.    JURISDICTION AND VENUE

11.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 (federal-question jurisdiction). This action presents a federal question under the laws and Constitution of the United States because it concerns whether the CEA, 7 U.S.C. § 1, *et seq.*, preempts Rhode Island law insofar as it purports to regulate transactions covered by the CEA and entrusted to the Commission's regulatory jurisdiction.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because at least one Defendant resides in this District and all Defendants are residents of the State. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events

giving rise to the claim occurred and will occur in this District.

13.    The Court has the authority to provide the relief requested under the Supremacy Clause, U.S. Const. art. VI, cl. 2, as well as 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

### III.    PARTIES

14.    Plaintiff KalshiEX is a financial services company with its principal place of business in New York. Kalshi is registered with the Commission as a Designated Contract Market.

15.    Proposed Intervenor-Plaintiff the United States of America regulates U.S. financial markets, and it enforces federal commodity derivatives laws through its executive agency, the CFTC.

16.    Proposed Intervenor-Plaintiff CFTC is an agency of the United States Government that administers and enforces the CEA. The CEA grants the CFTC authority to represent itself through its General Counsel. 7 U.S.C. § 2(a)(4).

17.    Defendant Mark Furcolo is sued in his official capacity as Director of the Division of State Lottery pursuant to R.I. Gen. Law § 42-61.2-3.3, which authorizes the Director to promulgate rules and regulations relating to "sports wagering and associated devices, equipment, and accessories," and R.I. Gen. Law § 42-61.2-13, which enables the Director to enforce the laws and impose administrative penalties at his discretion.

18.    Defendant Peter F. Neronha is sued in his official capacity as Rhode Island Attorney General, in which capacity he is authorized to bring enforcement actions for alleged violations of state gambling law pursuant to R.I. Gen. Law § 11-19-1.

19.    Defendant Christina Tobiasz is sued in her official capacity as Gaming and Athletics Administrator, Department of Business Regulation pursuant to R.I. Gen. Law § 42-61.2-

2.3 which establishes her responsibility for licensing of sports books.

20.    Individually and together, Defendants are responsible for the regulation and enforcement of Rhode Island's gambling laws as applied to CFTC-regulated markets that offer event contracts.

## IV.    FEDERAL LAW GOVERNING COMMODITY DERIVATIVES MARKETS

### A. Congress Vested the CFTC with Exclusive Regulatory Authority Over U.S. Commodity Derivatives Markets

21.    The Constitution empowers Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," U.S. Const. art. I, § 8, cl. 3. The Constitution also vests the President of the United States with the "executive Power," U.S. Const. art. II, § 1, and authorizes the President to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

22.    Based on its enumerated constitutional and sovereign powers to regulate interstate commerce, the United States has broad authority to regulate derivatives markets. That authority includes the power to enforce the supremacy of federal law regulating derivatives markets.

23.    The CEA is the federal statute that provides a comprehensive federal framework for the regulation of commodity derivatives transactions in the United States. *See* 7 U.S.C. § 1 *et seq.* The purpose of the CEA is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the Act] and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants." 7

U.S.C. § 5(b).

24.    The CFTC is the federal executive agency charged with administering and enforcing the CEA. 7 U.S.C. § 2(a). Congress created the CFTC in 1974 to establish a uniform national system for regulating futures trading after concluding that the then-existing patchwork of state-by-state regulation had impaired the development and functioning of national commodity derivatives markets. *See* H.R. Rep. No. 93-975, at 51 (1974); S. Rep. No. 93-1131, at 36 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5843, 5885.

25.    Derivatives are financial instruments such as futures, options, or swaps that derive their value from something else, like a benchmark, a physical commodity, or—as relevant here—certain events or contingencies. In general, market participants use derivatives to hedge risks or speculate on commodity price movements.

26.    Section 2(a)(1) of the CEA provides:

> ***The Commission shall have exclusive jurisdiction***, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), ***with respect to accounts, agreements*** (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), ***and transactions involving swaps*** or contracts of sale of a commodity for future delivery (including significant price discovery contracts), ***traded or executed on a contract market designated pursuant to section 7 of this title*** or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title.

7 U.S.C. § 2(a)(1)(A) (emphasis added). Thus, "transactions involving swaps" traded on "designated" "contract market[s]" are subject to the Commission's "exclusive jurisdiction." *Id.*

27.    Event contracts are a type of "swap" as defined by the CEA. Section 1a(47)(A) of the CEA, broadly defines "swap" to include "any agreement, contract, or transaction"—

(i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase

7

or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence; . . .

(iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap . . . [or,]

(vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of [these clauses].

7 U.S.C. § 1a(47)(A).

28.     The definition in subparagraph (ii) is particularly apt: event contracts "provide[] for . . . payment . . . that is dependent on the occurrence, nonoccurence, or the extent of the occurrence of an event or contingency," and that event or contingency is "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). That definition encompasses sports event contracts: they provide for payment based on the "occurrence" or "nonoccurrence" of an event (*e.g.*, whether the Patriots will beat the Bills), or the "extent of the occurrence of an event" (*e.g.*, whether the Patriots will beat the Bills by more than 7 points), and the consequences of those events are "associated with a potential financial, economic, or commercial consequence" (*e.g.*, ticket revenue for future Patriots games, television viewership, payouts from sportsbooks, etc.). *See KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 227–28 (3d Cir. 2026).

29.     Event contracts also qualify as swaps under subparagraph (i), in that they are binary options, or "option[s] whose payoff is either a fixed amount or zero," that are based on a commodity (*i.e.*, the underlying event or contingency). CFTC, Futures Glossary, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm#B; *see also* 73 Fed. Reg. 25669, 25670 (May 7, 2008) ("A significant number of event contracts are

8

structured as all-or-nothing binary transactions commonly described as binary options."); 77 Fed. Reg. 25320, 25321 n.6 (Apr. 27, 2012) ("[T]he swap definition . . . includes options . . . .").

30.    Event contracts also qualify as swaps under paragraph (iv), in that they are agreements or transactions that have become commonly known to the trade as "swaps." 7 U.S.C. § 1a(47)(A)(iv).

31.    The CEA requires that, subject to certain exemptions or exceptions, commodity derivatives transactions must be conducted on exchanges designated by, or registered with, the Commission. As relevant here, no person may operate a facility for the trading or processing of swaps unless the facility is registered as a swap execution facility or designated as a contract market. *See* 7 U.S.C. § 7b-3(a); 17 C.F.R. § 37.3.

32.    Designated contract markets (DCMs) are boards of trade or exchanges that operate under the regulatory oversight of the Commission pursuant to Section 5 of the CEA, 7 U.S.C. § 7. The Commission designates a board of trade as a contract market through a formal application process through which an applicant board of trade must demonstrate its ability to comply with detailed statutory requirements called "core principles." 7 U.S.C. § 7(d). These core principles require, among other things, that DCMs:

   a. "[E]stablish, monitor, and enforce compliance with the rules of the contract market, including—(i) access requirements; (ii) the terms and conditions of any contracts to be traded on the contract market; and (iii) rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2)(A).

   b. "[H]ave the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the contract market." 7 U.S.C. § 7(d)(2)(B).

   c. "[L]ist on the contract market only contracts that are not readily susceptible to manipulation." 7 U.S.C. § 7(d)(3).

   d. "[H]ave the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement practices and procedures, including—(A) methods for conducting real-time monitoring of trading; and (B) comprehensive and accurate trade reconstructions." 7 U.S.C. § 7(d)(4).

e.  "[P]rovide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process. . . ." 7 U.S.C. § 7(d)(9).

f.  "[M]aintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information—(A) to assist in the prevention of customer and market abuses; and (B) to provide evidence of any violations of the rules of the contract market." 7 U.S.C. § 7(d)(10).

g.  "[E]stablish and enforce—(A) rules and procedures for ensuring the financial integrity of transactions . . . and (B) . . . (ii) the protection of customer funds." 7 U.S.C. § 7(d)(11)

h.  "[E]stablish and enforce rules—(A) to protect markets and market participants from abusive practices committed by any party . . . and (B) to promote fair and equitable trading on the contract market." 7 U.S.C. § 7(d)(12).

33.    The Commission has promulgated detailed rules governing the process through which a board of trade can achieve designation as a contract market, as well as detailed rules governing the operations of the contract market once that designation is in place. DCMs may list for trading commodity futures, options, or swaps as permitted by Part 38 of the Commission's regulations. 17 C.F.R. § 38, *et seq.*

34.    Today there are 25 exchanges in the United States have active designations from the CFTC to operate as a contract market. These DCMs include providers of event contracts, whether they be recently designated markets (*e.g.*, Kalshi, Polymarket, and Gemini Titan), or markets with longstanding designations (*e.g.*, North American Derivatives Exchange (Nadex) and CME Group).

**B. State Attempts to Shut Down National Markets Drives Early Derivatives Regulation**

35.    Rhode Island's attempt to shut down derivatives trading is not new. By the mid-nineteenth century, commodity exchanges in major trading hubs like New York and Chicago had organized trading on futures contracts to facilitate price discovery (information exchange), risk management (hedging), and speculation. But States and courts impeded these new markets, often

failing to distinguish between futures trading and "gambling" or "wagering," with many States even prohibiting futures trading as a form of gambling. *See, e.g.*, *Irwin v. Williar*, 110 U.S. 499, 508–09 (1884) (describing futures contracts as "nothing more than a wager"); *see also Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888) (describing futures as "gambling in grain").

36.     Nevertheless, the Supreme Court and Congress acknowledged that futures markets served a valuable economic function and should be given room to develop. As Justice Holmes, writing for the Supreme Court, noted in *Board of Trade of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236, 247–48 (1905):

> People will endeavor to forecast the future, and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value [is] well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want. It is true that the success of the strong induces imitation by the weak, and that incompetent persons bring themselves to ruin by undertaking to speculate in their turn. But legislatures and courts generally have recognized that the natural evolutions of a complex society are to be touched only with a very cautious hand, and that such coarse attempts at a remedy for the waste incident to every social function as a simple prohibition and laws to stop its being are harmful and vain.

37.     Congress, recognizing the value of these new markets and the negative effects of a patchwork of state regulation, centralized the oversight and regulation of futures trading on federally regulated contract markets. The first federal legislation designed to create a comprehensive federal regulatory framework for futures markets was the Future Trading Act of 1921, Pub. L. No. 67-66, 42 Stat. 187 (1921) ("21 Act"), followed by the Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998 (1922) ("22 Act"). In passing these laws, Congress recognized the importance of uniform federal regulation of futures markets, even over objections that the new legislation would displace some States' regulations. *Cf.* H.R. Rep. No. 67-1095, at 5 (1922) (Conf. Rep.) (objecting that the bill was "designed to . . . more or less eliminate some of the most important police powers of several sovereign States"). Yet these early statutes did not

11

make preemption complete, as the Supreme Court held that federal law "did not supersede any applicable provisions of [] Missouri law making gambling in grain futures illegal." *Dickson v. Uhlmann Grain Co.* 288 U.S. 188, 198 (1933).

38.    Congress expanded federal oversight of futures markets in 1936 with the Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936). But even as futures markets expanded beyond their agricultural origins, market participants continued to face the persistent threat of state regulation through a patchwork of state laws. The CEA, as it then existed, permitted state involvement in futures markets to at least some extent, as Section 4c of that Act provided that "nothing in this section or section 4b of the title shall be construed to impair any State law applicable to any transaction enumerated or described in such sections." 7 U.S.C. § 6c (1940). The Supreme Court held that this language "serves the function of preventing supersedure and preserving state control in two areas where state and federal law overlap." *Rice v. Board of Trade of Chicago*, 331 U.S. 247, 255 (1947).

### C.    Congress Gave the CFTC "Exclusive" Jurisdiction over Futures Trading in 1974

39.    In 1973, futures exchanges recommended that "federal policy . . . be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions." Review of Commodity Exch. Act and Discussion of Possible Change: Hearings Before the H. Comm. on Agric.*,* 93d Cong., 1st Sess. 121 (1973). Congress quickly responded, explicitly addressing the issue the following year when it passed the Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389 (1974) ("CFTC Act of 1974").

40.    With the passage of the CFTC Act of 1974, Congress amended the CEA to establish "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quoting H.R. Rep. No. 93–975, at 1 (1974)).

41.    The CFTC Act of 1974 amendments to the CEA worked a sea change in the regulation of U.S. derivatives markets in three critical ways. First, Congress established the CFTC, vesting in this federal executive agency the authority to administer the CEA. Second, Congress expanded the scope of the CEA to cover all commodities. Third, Congress expressly gave the CFTC "exclusive jurisdiction" over U.S. commodity futures and options markets. *See* CFTC Act of 1974, § 201(b), 88 Stat. at 1395 (providing that "the Commission shall have exclusive jurisdiction with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' . . . ), and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 5 of this Act or any other board of trade, exchange, or market" (codified at 7 U.S.C. § 2(a)(1)(A))).

42.    Preemption was an express goal of the CFTC Act of 1974. Congress recognized the need for uniform, nationwide regulation of futures and options in commodity markets because concurrent regulation by the states or other federal regulators such as the Securities and Exchange Commission could lead to "total chaos." *See* Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark). The saving clause in Section 4c, which preserved certain applications of state law from preemption, was stricken from the statute "to assure that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974) (Statement of Sen. Curtis). Thus, the CFTC Act of 1974 "preempt[ed] the field insofar as futures regulation is concerned" such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897.

13

**D. Congress Reinforced and Clarified the CFTC's Exclusive Jurisdiction After 1974**

43.  Amendments to the CEA between 1978 and 2010 repeatedly reinforced and clarified the Commission's exclusive jurisdiction over futures and options.

44.  In the Futures Trading Act of 1978 ("78 Act"), Congress preserved the Commission's exclusive authority over futures transactions on CFTC-regulated DCMs while clarifying the States' ability to pursue certain CEA violations against actors other than federally regulated exchanges. The 78 Act added a section to the CEA authorizing states to bring actions for injunctive or monetary relief for specified violations of the CEA and to enforce their "general civil or criminal antifraud" statutes. *See* 78 Act, Pub. L. 95-405, § 15(7), 92 Stat. 865, 873 (1978) (codified at 7 U.S.C. § 13a-2(7)). Other than this explicit authorization of state authority, the CEA retained the broad preemption of state laws put in place in 1974. Proposals to carve off pieces of the Commission's "exclusive" jurisdiction were rejected, because "[t]he nature of the underlying commodity is not an adequate basis to divide regulatory authority." S. Rep. No. 95-850, at 111–12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110–11. That "a futures contract market does not fit into the traditional mold where there are both hedging and price-discovery functions should not be the determining factor in whether the contract is to be regulated by the CFTC." *Id.* Congress also further added to the list of justifications supporting the Commission's exclusive jurisdiction over commodity derivatives, citing concerns over "costly duplication and possible conflict of regulation or over-regulation." *Id.*

45.  The Futures Trading Act of 1982 ("82 Act") further clarified the scope of the CEA's preemption of other federal and state laws and the role of the States in pursuing illegal or fraudulent off-exchange transactions, while still recognizing "the CFTC['s] exclusive jurisdiction to regulate futures trading and enforce the provisions of the Act, thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, at 44–45 & 102–03 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871,

14

3893–94 & 3951–52. First, the 82 Act clarified the procedures for States to pursue violations of the CEA's anti-fraud provisions in state court. Second, the 82 Act added language to permit the application of federal or state laws to *off-exchange* transactions or unregistered market participants. 82 Act, Pub. L. No. 97-444, § 229, 96 Stat. 2294, 2318 (1982). Other state laws that could arguably apply to DCMs and market participants registered with the CFTC remained preempted. *See* H.R. Rep. No. 97-565, at 44–45 & 102–103, 1982 U.S.C.C.A.N. at 3893–94, 3951–52. Congress explained that it "continue[d] to support the idea of a single unified program of regulation and exclusive CFTC jurisdiction over exchange-traded futures," "recogniz[ing] the somewhat esoteric nature of the commodity futures markets and the desire to have knowledgeable and uniform enforcement of the Act." *Id.*

46.     In the Futures Trading Practices Act of 1992 ("92 Act"), Pub. L. No. 102-546, 106 Stat. 3590 (1992), Congress gave the Commission authority to "exempt" certain off-exchange ("over-the-counter" or "OTC") derivatives transactions from the CEA's mandatory exchange-trading regime. *Id.* § 502(a), 106 Stat. 3629–31. Yet in the same section of the 92 Act, Congress expressly preempted the application of state or local gambling or bucket shop laws as applied to certain off-exchange derivative transactions exempted by the Commission. *Id.* § 502(c), 106 Stat. 3631; *see also* Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, Appendix E, § 117, 114 Stat. 2763A-365, 2763A-402–03 (2000). *A fortiori*, state gaming law is necessarily preempted as to derivatives that are traded *on a CFTC-registered exchange* and fall within the Commission's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A).

47.     Congress has long understood that CFTC-regulated derivatives can be mistaken by some as gambling. State gambling laws, after all, prompted Congress to enter the field of derivatives regulation in the first place. More recently, Congress enacted the Unlawful Internet

15

Gambling Enforcement Act of 2006, which prohibits an online "bet or wager" that is "unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." 31 U.S.C. § 5362(10). Significantly, Congress expressly excluded from the definition of "bet or wager" "any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under the Commodity Exchange Act." *Id.* § 5362(1)(E)(ii). For Congress, then, CEA-regulated transactions are not gambling.

### E.  Congress Embraced Preemption for Swap Transactions in the Dodd-Frank Act

48.      In the wake of the 2008 financial crisis, Congress reworked the regulatory structure for the "swaps" market, creating a framework within the CEA for the on-exchange execution, clearing, and reporting of vast portions of those swaps. The 2010 Dodd-Frank Act expressly extended the Commission's "exclusive jurisdiction" to encompass "accounts, agreements . . . , and transactions involving swaps" traded on DCMs and swap execution facilities. *See* Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A).

49.      In the Dodd-Frank Act, Congress made clear that the Commission has exclusive jurisdiction over event contracts. In CEA § 5c(c)(5)(C) (codified at 7 U.S.C. § 7a-2(c)(5)(C)), Congress created a "Special Rule" that provides the Commission with specific oversight and prohibitory authority over event contracts. Specifically, the Special Rule states that the Commission "may determine" that event contracts involving certain activities "are contrary to the public interest" and may not be listed on CFTC-regulated markets, including contracts whose underlying activity involves "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii).

50.      By creating a specific public-interest review process, Congress signaled that these contracts fall within the Commission's exclusive regulatory purview, not the States'.

### F.  The Commission Uses Its Authority to Carry Out Congress's Directives

51.      The CEA confers on the Commission the authority to make rules governing swaps

16

and other derivatives contracts. See, *e.g.*, 7 U.S.C. §§ 2, 6, 6s, 7. Pursuant to that authority, the Commission has for decades promulgated rules that regulate a large, nationwide industry and which seek to provide clarity to the industry, market participants, and the public. *See* 17 C.F.R. § 1.1, *et seq.*

52.    Part of the Commission's responsibilities include issuing guidance and promulgating new rules to provide certainty when markets change and innovate. The CFTC already has extensive rules on what a DCM must do to become certified with the Commission, *see* 17 C.F.R. Part 38, and what a DCM must do to either self-certify a contract before listing, *see* 17 C.F.R. § 40.2, or to submit a contract for the Commission to approve, *see* 17 C.F.R. § 40.3.

53.    The CEA's layered oversight approach also requires DCMs to serve as the first line of defense in policing their markets. Before listing an event contract for trade, a DCM must provide the Commission with information including the contract's rules, "a concise explanation and analysis" of the contract's "terms and conditions," and "a certification . . . that the product to be listed complies with the [CEA] and [CFTC] regulations." 17 C.F.R. § 40.2(a)(3). The Commission can require DCMs to turn over "evidence, information or data" proving compliance with the CEA. *Id.* § 40.2(b). If a DCM fails to provide this information or offers a "false certification," the Commission "may stay the listing of a contract." *Id.* § 40.2(c).

54.    With respect to event contracts, the Commission recently published an advisory letter to DCMs on prediction markets and event contracts. CFTC, Prediction Markets Advisory, CFTC Letter No. 26-08 (Mar. 12, 2026), https://www.cftc.gov/PressRoom/PressReleases/9193-26.

55.    To provide additional clarity in the marketplace, the Commission is in the process of writing and revising its rules applicable to event contracts and prediction markets. On March

17

16, 2026, the CFTC published in the Federal Register an advance notice of proposed rulemaking soliciting public comments on prediction markets. 91 Fed. Reg. 12,516 (Mar. 16, 2026).

56.    The Commission also pursues enforcement actions against market participants who violate the CEA or CFTC regulations in trading event contracts. For example, the Commission recently filed a civil enforcement action against a U.S. servicemember who used sensitive nonpublic information to trade event contracts related to the ouster of Venezuelan President Nicolás Maduro. *See Commodity Futures Trading Commission v. Van Dyke*, No. 1:26-cv-3369 (S.D.N.Y.). It has also filed an enforcement action against a Google employee who used nonpublic information to trade event contracts related to Google's Year in Search list. *See Commodity Futures Trading Commission v. Spagnuolo*, No. 1:26-cv-4419 (S.D.N.Y.).

57.    The Commission has also executed Memoranda of Understanding with Major League Baseball and the National Hockey League that provide a mechanism for each league to exchange information with the Commission, which will allow the Commission to swiftly respond to incidents on prediction markets and anticipate emerging trends.[2]

58.    Where other States have sued to enforce gambling or other criminal laws, the Commission has not stood idly by. To date, it has brought preemption actions against Arizona, Connecticut, Illinois, Minnesota, New York, and Wisconsin. *See United States v. Arizona*, No. 2:26-cv-02246 (D. Ariz.); *United States v. Connecticut*, No. 3:26-cv-00498 (D. Conn.); *United States v. Illinois*, No. 1:26-cv-03659 (N.D. Ill.); *United States v. Minnesota*, No. 0:26-cv-2661 (D. Minn.); *United States v. New York*, No. 1:26-cv-3404 (S.D.N.Y.); *United States v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis.). The District of Arizona granted the Commission's motions for both a

---

[2]    CFTC, Release Number 9199-26 (Mar. 19, 2026), https://www.cftc.gov/PressRoom/PressReleases/9199-26; CFTC, Release Number 9235-26 (May 21, 2026), https://www.cftc.gov/PressRoom/PressReleases/9235-26.

temporary restraining order and preliminary injunction prohibiting Arizona from enforcing its state laws against CFTC-regulated DCMs. *See KalshiEX LLC v. Johnson*, __ F. Supp. 3d __, 2026 WL 976055, at \*2 (D. Ariz. Apr. 10, 2026) (TRO); *KalshiEX LLC v. Johnson*, __ F. Supp. 3d __, 2026 WL 1223373, at \*9 (D. Ariz. May 5, 2026) (preliminary injunction). Similar preliminary-injunction motions remain outstanding in Minnesota, New York, and Wisconsin.

## V.    RHODE ISLAND IS TARGETING SWAPS THAT TRADE ON CFTC-REGISTERED DESIGNATED CONTRACT MARKETS

59.    Since at least March 2026, the Rhode Island State Lottery Commission has conducted an "active investigation" into "prediction markets." As Defendant Mark Furcolo, director of the Lottery Commission, explained: "Anytime someone wagers on a prediction market platform and doesn't bet on our platform, obviously, there is an economic impact to the state."[3]

60.    Kalshi's complaint alleges that its representatives met with the Rhode Island Attorney General's staff on May 20, where staff members "made clear that Defendants believe that Kalshi's federally regulated offerings do not comply with Rhode Island gambling laws." Dkt. No. 1 ¶ 3. Kalshi also alleges that "the Attorney General made clear that Kalshi would not receive any advanced notice before the state filed an enforcement action against the company." *Id.* Kalshi filed this lawsuit the next day.

61.    Hours after this lawsuit was filed, the State of Rhode Island filed a petition for declaratory judgment in Providence County Superior Court against Kalshi and Polymarket. *See* Petition, *Rhode Island v. KalshiEx LLC, et al.*, C.A. No. PC-2026-02753 (Super. Ct. May 21, 2026). Polymarket subsequently removed that action to federal court. *See Rhode Island v.*

---

[3] Patrick Anderson, *Why RI Is Investigating Popular Kalshi, Polymarket Prediction Markets*, The Providence Journal (Mar. 27, 2026), https://www.providencejournal.com/story/news/politics/state/2026/03/27/ri-joins-list-of-states-investigating-kalshi-polymarket-prediction-markets/89338021007/.

*KalshiEX LLC*, No. 1:26-cv-333, Dkt. No. 1 (D.R.I. May 22, 2026). Rhode Island's petition alleges that "Kalshi and Polymarket facilitate gambling (specifically sports wagering) in Rhode Island by allowing bettors to place wagers on the outcome of sports matches and individual player performances, under the guise of 'trading' 'event contracts' on 'prediction markets.'" *KalshiEX*, No. 1:26-cv-333, Dkt. No. 1.1 (D.R.I. May 22, 2026), ¶ 103. It claims that "[t]hese 'event contracts' are, in all relevant respects, identical to [] sports wagers" in violation of "Rhode Island's gambling laws and regulations." *Id.* ¶¶ 104–05. Specifically, Rhode Island alleges that Kalshi and Polymarket:

    a.  "operate in Rhode Island outside of the State's control and in the absence of the requisite voter approvals, in violation of Sections 15 and 22 of Article 6 of the Rhode Island Constitution," *id.* ¶ 106,

    b.  offer sports-related event contracts that "qualify as 'casino gaming'" under state law, which "is limited to the state-run operations at Twin River, subject to [Rhode Island Lottery's] 'full operational control,'" *id.* ¶¶ 107–08,

    c.  "are engaged in 'online sports wagering' under R.I. Gen. Laws § 42-61.2-1(27)" without a valid license or contract from the State, *id.* ¶¶ 109–10, and

    d.  "are also in violation of R.I. Gen. Laws § 42-61.3-2(b)(18), among other state criminal laws that target unlawful gambling operations," *id.* ¶ 111.

62.    Defendants' attempt to shut down the operations of CFTC-regulated entities—including by threat of *criminal punishment*—gravely interferes with the Commission's exclusive jurisdiction over swaps. The entire point of the CEA is to create a uniform and predictable nationwide market for futures trading, and the Commission oversees that market by certifying DCMs and requiring compliance with self-certification or submission-certification requirements

20

before listing event contracts. Defendants' enforcement efforts undermine that uniformity, thwart Congress's scheme, and intrude on the Commission's exclusive jurisdiction. Defendants' enforcement action also makes it much more difficult for the Commission to regulate, advise, and enforce its authority over DCMs, wasting resources and subverting the Commission's congressionally mandated authority.

63.     Every step Defendants take toward enforcing preempted state law against the Commission's regulated entities causes additional disruption to the markets exclusively regulated by the Commission and thus causes irreparable harm to the Commission's exclusive jurisdiction, authority, and operations. Incremental enforcement steps send mixed signals to this interconnected market, disrupting their operations. DCMs are forced to guess whether they are held to the standards of the CFTC and CEA, state regulators, or both. This frustrates the purpose of the CEA to serve the public interest via a system of effective self-regulation of trading facilities, clearing systems, market participants, and market professionals under the Commission's oversight.

## VI.    RHODE ISLAND LAW IS PREEMPTED AS APPLIED TO SWAPS OFFERED BY DESIGNATED CONTRACT MARKETS

64.     The Constitution's Supremacy Clause mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

65.     The CEA, as continuously refined over more than a century, gives the CFTC "exclusive jurisdiction" over futures and swaps traded on a DCM. 7 U.S.C. § 2(a)(1)(A). The CEA "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). "[P]reemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Effex Cap., LLC v. National Futures Ass'n*, 933 F.3d 882, 894

21

(7th Cir. 2019) (quoting *American Ag. Movement v. Board of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992)).

66.     "[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (internal citation omitted). "This Clause gives Congress 'the power to preempt state law,' which Congress may exercise either expressly or impliedly." *Capron v. Office of Att'y Gen. of Massachusetts*, 944 F.3d 9, 21 (1st Cir. 2019). "There are two types" of implied preemption—"field preemption and conflict preemption, which itself comes in two varieties: obstacle preemption and impossibility preemption." *Id.*

67.     Express preemption occurs "[w]here a federal statute contains a clause expressly purporting to preempt state law," an inquiry that looks to "the plain wording of the clause." *Medicaid & Medicare Advantage Prods. Ass'n of Puerto Rico, Inc. v. Emanuelli Hernandez*, 58 F.4th 5, 11 (1st Cir. 2023) (citation omitted). Congress explicitly preempted state regulation of commodity derivatives transactions by vesting the Commission with "exclusive jurisdiction" over all "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a [DCM]." 7 U.S.C. § 2(a)(1)(A). Congress therefore preempted state regulation of transactions subject to the Commission's "exclusive jurisdiction," including swaps. The event contracts targeted by Rhode Island are "swaps," and thus, the Commission's exclusive jurisdiction precludes Rhode Island from regulating or prohibiting them.

68.     Even without the express language of the CEA preempting state regulation, any state interference with transactions traded on a DCM is preempted because Congress occupied the

22

field of commodity regulation "so comprehensively that it has left no room for supplementary state legislation." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 228–29 (3d Cir. 2026) (citation omitted). As the scope of the CEA and the long history of amendments to it make clear, Congress created "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). And it vested "exclusive jurisdiction" to administer that structure—particularly in regard to swaps traded on DCMs—with the Commission. 7 U.S.C. § 2(a)(1)(A). "Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions." *Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001). States therefore cannot prohibit, regulate, or otherwise undermine the offering of event contracts on DCMs.

69.      There are also numerous direct conflicts between federal law and Rhode Island law. CFTC regulations require DCMs to provide "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b). Rhode Island's enforcement efforts would require DCMs to violate that rule by forcing them to deny event contracts to Rhode Islanders.

70.      Rhode Island law also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (internal citation omitted). If States can regulate the offering of event contracts by DCMs, then DCMs would face the prospect of 50 regulators across the country, which defeats Congress's design of centralizing derivatives regulation under the Commission.

71.      Therefore, the CEA preempts Rhode Island law to the extent it purports to prohibit, limit, or condition the listing or trading of event contracts on CFTC-regulated DCMs.

23

## VII.    CLAIM FOR RELIEF

### COUNT I – United States Constitution, Art. VI, cl. 2 (Supremacy Clause)

72.    The allegations in the preceding paragraphs are re-alleged and incorporated herein by reference.

73.    The United States has a cause of action in equity to sue to enjoin a state law's implementation and enforcement of a law that violates the Supremacy Clause. *See Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967) ("Our decisions have established, too, the general rule that the United States may sue to protect its interests."); *United States v. Missouri*, 114 F.4th 980, 986 (8th Cir. 2024) (recognizing the "equitable tradition" of suits by the United States "to enjoin a state law's implementation and enforcement or for other appropriate relief").

74.    The event contracts targeted by Rhode Island's enforcement action are swaps as defined by the CEA. *See* 7 U.S.C. §1a(47)(A).

75.    The "prediction markets" targeted by Rhode Island's enforcement action are designated contract markets that are registered, monitored, and regulated by the Commission.

76.    The CEA confers upon the Commission "exclusive jurisdiction" over "accounts, agreements . . . and transactions involving swaps . . . traded or executed on a [DCM]." 7 U.S.C. § 2(a)(1)(A). The CEA otherwise creates a comprehensive regulatory structure for overseeing swaps traded on DCMs, which the Commission—and only the Commission—is charged by Congress with administering.

77.    Rhode Island state law—including but not limited to Sections 15 and 22 of Article 6 of the Rhode Island Constitution and Rhode Island General Laws § 42-61.2-1(2), § 42-61.2-1(27), and § 42-61.3-2(b)(18)—is expressly preempted by the CEA as applied to event contracts listed on CFTC-regulated DCMs.

78.    Rhode Island state law—including but not limited to Sections 15 and 22 of Article

24

6 of the Rhode Island Constitution and Rhode Island General Laws § 42-61.2-1(2), § 42-61.2-1(27), and § 42-61.3-2(b)(18)—is field preempted by the CEA as applied to event contracts listed on CFTC-regulated DCMs.

79.    Rhode Island state law—including but not limited to Sections 15 and 22 of Article 6 of the Rhode Island Constitution and Rhode Island General Laws § 42-61.2-1(2), § 42-61.2-1(27), and § 42-61.3-2(b)(18)—is conflict preempted by the CEA as applied to event contracts listed on CFTC-regulated DCMs. Compliance with both state and federal law is impossible, and state law stands as an obstacle to the full accomplishment of Congress's stated objectives and purposes.

## VIII.    RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

A. That this Court enter a judgment declaring that Rhode Island state laws as applied to transactions listed, offered, or executed on CFTC-regulated DCMs violate the Supremacy Clause and are therefore preempted, unconstitutional, and invalid;

B. That this Court issue a preliminary and permanent injunction that prohibits Defendants as well as their successors, agents, and employees, from investigating for or enforcing Rhode Island state laws as applied to transactions listed, offered, or executed on CFTC-regulated DCMs;

C. That this Court award Plaintiffs their costs and fees in this action; and

D. That this Court award any other relief it deems just and proper.

Dated: May 28, 2026

Respectfully submitted,

By: */s/ Tiberius Davis*

*/s/ M. Jordan Minot*

*Attorneys for the United States of America*

*Attorneys for the Commodity Futures Trading Commission*

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General

TIBERIUS DAVIS
Counsel to the Assistant Attorney General
450 5th Street, N.W.
Washington, DC 20001
Tel. 202-860-8970
tiberius.davis@usdoj.gov

ALEXANDRA McTAGUE SCHULTE
Senior Litigation Counsel
Tel. 202-718-0483
alexandra.schulte@usdoj.gov

TYLER S. BADGLEY
General Counsel
M. JORDAN MINOT
Deputy General Counsel
HENRY J. DICKMAN
Senior Assistant General Counsel
ANDREW WEISBERG
Senior Assistant General Counsel
MARGARET P. AISENBREY
Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, DC 20581
Tel. (202) 209-1087
tbadgley@cftc.gov
jminot@cftc.gov
hdickman@cftc.gov
aweisberg@cftc.gov
maisenbrey@cftc.gov

26