**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

KALSHIEX LLC,

                                Plaintiff,

and

UNITED STATES OF AMERICA
and COMMODITY FUTURES TRADING
COMMISSION

                                Plaintiff-
                                Intervenors

                         v.

MARK FURCOLO, in his official capacity as
Director of the Division of State Lottery;
PETER F. NERONHA, in his official capacity
as Rhode Island Attorney General;
CHRISTINA TOBIASZ, in her official capacity
as Gaming and Athletics Administrator,
Department of Business Regulation,

                                Defendants.

Case No. 1:26-cv-00327

**REPLY BRIEF IN SUPPORT OF
PLAINTIFF-INTERVENORS' MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................................1

BACKGROUND ...........................................................................................................................1

   I.   Intervenors have standing ..............................................................................................1

       A.   The federal government can vindicate injuries to its sovereignty ...............................2

       B.   Intervenors are injured by disruptions to their operations .............................................6

   II.  Intervenors are likely to succeed on the merits....................................................................7

       A.   Event contracts are swaps .........................................................................................7

       B.   Rhode Island's regulation of swaps is preempted.......................................................14

   III. The equities favor an injunction ......................................................................................20

CONCLUSION............................................................................................................................20

## TABLE OF AUTHORITIES

<u>Cases</u>

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
 458 U.S. 592 (1982) ..............................................................................................2

*American Agriculture Movement, Inc. v. Board of Trade of Chicago*,
 977 F.2d 1147 (7th Cir. 1992) ............................................................................19

*Arizona State Legislature v. Arizona Independent Redistricting Commission*,
 576 U.S. 787 (2015) ...........................................................................................5, 6

*Arizona v. United States*,
 567 U.S. 387 (2012) ..............................................................................................3

*Bostock v. Clayton County*,
 590 U.S. 644 (2020) ............................................................................................19

*Bufkin v. Collins*,
 604 U.S. 369 (2025) ............................................................................................11

*CFTC v. Trade Exchange Network Ltd.*,
 117 F. Supp. 3d 29 (D.D.C. 2015)......................................................................14

*CFTC v. Spagnuolo*,
 No. 1:26-cv-4419 (S.D.N.Y.) ..............................................................................14

*CFTC v. Van Dyke*,
 No. 1:26-cv-3369 (S.D.N.Y.) ..............................................................................14

*Cruise Lines International Association, Inc. v. Suganuma*,
 __F. Supp. 3d __, 2025 WL 3903968 (D. Haw. Dec. 23, 2025)............................3, 4

*Effex Cap., LLC v. National Futures Ass'n*,
 933 F.3d 882 (7th Cir. 2019).................................................................15, 16, 18

*Grand River Enters. Six Nations, Ltd. v. Boughton*,
 988 F.3d 114 (2d Cir. 2021) ..................................................................................6

*KalshiEX LLC v. CFTC*,
 2024 WL 4164694 (D.D.C. Sept. 12, 2024).........................................................18

*KalshiEX LLC v. Flaherty*,
 172 F.4th 220 (3d Cir. 2026) ..................................................8, 10, 13, 18, 19, 20

*KalshiEX LLC v. Johnson*,
 __ F. Supp. 3d __, 2026 WL 1223373 (D. Ariz. May 5, 2026) ........................1, 2, 16

*Kalshiex LLC v. Orgel*,
  2026 WL 474869 (M.D. Tenn. Feb. 19, 2026)..............................................................7

*Kentucky v. Biden*,
  23 F.4th 585 (6th Cir. 2022) ......................................................................................4

*Kucana v. Holder*,
  558 U.S. 233 (2010) .................................................................................................18

*La Union del Pueblo Entero v. Abbott*,
  604 F. Supp. 3d 512 (W.D. Tex. 2022) .....................................................................3

*Leist v. Simplot*,
  638 F.2d 283 (2d Cir. 1980) ....................................................................................10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ..................................................................................................9

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ..................................................................................................2

*Marciano v. de Blasio*,
  589 F. Supp. 3d 423 (S.D.N.Y. 2022) .......................................................................3

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) ................................................................................................14

*QCX LLC v. Nessel*,
  No. 1:26-cv-710 (W.D. Mich.)...................................................................................9

*Rhode Island v. KalshiEX LLC*,
  No. 1:26-cv-00333 (D.R.I.) ........................................................................................4

*Tennessee v. Department of Education*,
  104 F.4th 577 (6th Cir. 2024).....................................................................................4

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012).........................................................................2, 4, 20

*United States v. Alaska*,
  608 F. Supp. 3d 802 (D. Alaska 2022) .......................................................................3

*United States v. California*,
  173 F.4th 1060 (9th Cir. 2026)....................................................................................3

*United States v. Ekblad*,
  732 F.2d 562 (7th Cir. 1984)......................................................................................3

*United States v. Idaho*,
   623 F. Supp. 3d 1096 (D. Idaho 2022) ..................................................................................3

*United States v. Iowa*,
   126 F.4th 1334 (8th Cir. 2025) ..............................................................................................6

*United States v. Mississippi*,
   380 U.S. 128 (1965) ...............................................................................................................5

*United States v. Missouri*,
   114 F.4th 980 (8th Cir. 2024) ........................................................................................3, 4, 6

*United States v. Nebraska*,
   __ F. Supp. 3d __, 2026 WL 1584862 (D. Neb. June 3, 2026) ..............................................3

*United States v. Spagnuolo*,
   No. 1:26-mj-02020 (S.D.N.Y.) ............................................................................................14

*United States v. Van Dyke*,
   No. 1:26-cr-156 (S.D.N.Y.) ..................................................................................................14

*United States v. Wilkinson*,
   986 F.3d 740 (7th Cir. 2021) ................................................................................................14

*United States v. Yarbrough*,
   452 Fed. Appx. 186 (3d Cir. 2011) ........................................................................................5

*Vermont Agency of Nature Reserve v. United States ex rel. Stevens*,
   529 U.S. 765 (2000) ...............................................................................................................2

*Wyandotte Transport Co. v. United States*,
   389 U.S. 191 (1967) ...............................................................................................................2

Statutes

7 U.S.C. § 1a(19), CEA § 1a(19) ..............................................................................................14

7 U.S.C. § 1a(36), CEA § 1a(36) ..............................................................................................14

7 U.S.C. § 1a(47), CEA § 1a(47) ...............................................................................7, 9, 11, 14

7 U.S.C. § 2(a), CEA § 2(a) ................................................................................................15, 16

7 U.S.C. § 2(c), CEA § 2(e) .......................................................................................................16

7 U.S.C. § 2(e), CEA § 2(e) .......................................................................................................13

7 U.S.C. § 2(f), CEA § 2(e) .......................................................................................................16

7 U.S.C. § 6(c), CEA § 4(c) .......................................................................................................16

7 U.S.C. § 7(d), CEA § 5(d) .......................................................................................................13

7 U.S.C. § 7a-2(c)(5)(B), CEA § 5c(c)(5)(B) .............................................................................4

iv

7 U.S.C. § 7a-2(c)(5)(C), CEA § 5c(c)(5)(C) ...............................................................11, 13, 18

7 U.S.C. § 13a-2(1), CEA § 6d(1) .........................................................................................18

7 U.S.C. § 13a-2(7), CEA § 6d(7) .........................................................................................18

7 U.S.C. § 16, CEA § 12........................................................................................................16, 17

7 U.S.C. §§ 27–27f .................................................................................................................16

15 U.S.C. § 8321......................................................................................................................9, 11

31 U.S.C. § 5362......................................................................................................................13, 18

Regulations

17 C.F.R. § 38.151(b) .............................................................................................................19

17 C.F.R. § 38.4(a).................................................................................................................4

17 C.F.R. § 40.3(b) .................................................................................................................4

17 C.F.R. § 40.11(a)................................................................................................................12

Concept Release on the Appropriate Regulatory Treatment of Event Contracts,
    73 Fed. Reg. 25,669 (May 7, 2008)................................................................................12

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap
    Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping,
    77 Fed. Reg. 48,208 (August 13, 2012) .........................................................9, 12, 13

Prediction Markets; Public Interest Determinations,
    91 Fed. Reg. 35,806 (proposed June 12, 2026) .............................................9, 12, 18

Other Authorities

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010)...................................................11

Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*,
    13 Va. L. Bus. Rev.  (2019) .........................................................................................17

Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its
    Own Risk Management*, InGame (last updated Oct. 22, 2025),
    https://www.ingame.com/underdog-kalshi-pm-risk-management/...............................10

Catherina Gioino, *This NYC bar just covered everyone's tabs because the
    Knicks won, and used Kalshi to hedge their bets*, Fortune (June 3, 2026),
    https://fortune.com/2026/06/03/nyc-bar-knicks-kalshi-win-prediction-market/ .........10

Celso Brunetti, et al., *Speculators, Prices, and Market Volatility*, 51 Journal of Financial and
    Quantitative Analysis 1545 (2016)................................................................................10

CME Group, Prediction Markets,
    https://www.cmegroup.com/markets/prediction-markets.html (June 17, 2026).........7

CNBC, *Knicks' postseason run brought $380m in economic activity, says NYCEDC's Jeanny Pak*, (June 18, 2026), https://www.cnbc.com/video/2026/06/18/knicks-postseason-run-brought-380m-in-economic-activity-says-nycedcs-jeanny-pak.html........................................................................8

*Event*, Webster's II New College Dictionary (3d ed. 2025)..........................................................7

Henry Bushnell, *USMNT ticket prices for World Cup knockout route skyrocket on resale sites*, The Athletic (updated June 26, 2026), https://www. nytimes.com/athletic/7379054/2026/06/20/usa-ticket-prices -world-cup-knockouts/?eafs_enabled=false ...................................................................8

*In re: Blockratize, Inc.*, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Actions (Jan. 3, 2022), https://www.cftc.gov/media/6891/enfblockratizeorder010322/download....................................14

Jack Pitcher & Andrew Beaton, *The Only Thing Hotter Than the Knicks Is Their Stock Price*, Wall. St. J. (June 8, 2026), https://www.wsj.com/sports/basketball/knicks-nba-finals-msg-stock -b0f2dd31 ............................................................................................................8

Jeff Legwold, *Broncos top Chargers, secure AFC's No. 1 seed for playoffs*, ESPN (Jan. 4, 2026), https://www.espn.com/nfl/story/_/id/47507514/broncos-top-chargers-secure -afc-no-1-seed-playoffs...........................................................................................8

Release No. 9257-26, CFTC, SEC Seek Public Input on Data Reporting Frameworks for Security-Based Swap and Swap Markets (June 18, 2026), https://www.cftc.gov/PressRoom/PressReleases/9257-26...........................................................13

Intervenor-Plaintiffs the United States of America and the Commodity Futures Trading Commission ("Commission" or "CFTC") file this reply in support of their Motion for a Preliminary Injunction (Dkt. No. 23-1) ("Mot.") and in response to Defendants' (collectively, "Rhode Island") opposition (Dkt. No. 31) ("Fed. Opp."), which incorporates by reference the State's opposition to Kalshi and Polymarket's preliminary-injunction motions (Dkt. No. 30) ("Kalshi/Polymarket Opp.").

## INTRODUCTION

Rhode Island insists that sports event contracts are gambling under *state law*, and therefore, they cannot be subject to the Commission's regulation under *federal law*. That is not how preemption works. Under the plain text of the Commodity Exchange Act ("CEA"), event contracts—including those based on sporting events—are "swaps," and thus, the Commission has "exclusive jurisdiction" to regulate them. Rhode Island gambling law must give way.

The State goes even further astray when it asserts that the federal government lacks standing to defend the CFTC's "exclusive jurisdiction" in federal court, a theory that would leave the State and CFTC-regulated *private parties* to hash out the Commission's jurisdiction. Article III is not so enfeebling. Rhode Island is usurping the Commission's exclusive jurisdiction, which inflicts a sovereign injury to the federal government and hinders the Commission's operations. That injury can and should be vindicated by a federal court.

## BACKGROUND

### I.    Intervenors have standing

The District of Arizona—the only court to address the federal government's standing to sue a State for invading the Commission's jurisdiction—had little trouble holding that "[t]he federal government 'may sue to protect its interests,' … and that authority extends to suits seeking to enjoin the enforcement of preempted state law." *KalshiEX LLC v. Johnson*, __ F. Supp. 3d __,

1

2026 WL 1223373, at *3 (D. Ariz. May 5, 2026) (quoting *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967)). "The CFTC therefore has standing to seek to enjoin [state] enforcement of [state] gambling laws against event contracts traded on DCMs." *Id.* This Court should follow suit.

### A. The federal government can vindicate injuries to its sovereignty

**1.** Rhode Island claims that a "blow to the Commission's sovereign interest as exclusive regulator" is too "vague and abstract" to qualify as an Article III injury. Fed. Opp. 5. But "[i]t is beyond doubt that [a] complaint asserts an injury to" the "sovereignty" of the United States where there is a "violation of its laws." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). After all, "[v]indicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 576 (1992), and this core constitutional authority would be impaired if the federal government could not bring suit to enforce federal law.

A State's enforcement of a preempted law directly injures the federal government's sovereignty. The federal government, like the States, has a "sovereign interest[]" in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction," which "involves the power to create and enforce a legal code." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). Enforcement of preempted state law undermines the federal government's exclusive "sovereign power over" the relevant subject matter, and its exclusive power to "enforce a legal code." *Id.* Thus, as courts routinely recognize, "[t]he United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations."[1] *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see also*

---

[1] Rhode Island argues that *Alabama* did not address standing. Fed. Opp. 8. True, but *Alabama* did hold that the United States suffered irreparable harm because of a preempted state

2

*United States v. California*, 173 F.4th 1060, 1069 (9th Cir. 2026) ("irreparable harm [to the federal government] necessarily results from allowing California to enforce a law invalid" under the Supremacy Clause); *United States v. Nebraska*, __ F. Supp. 3d __, 2026 WL 1584862, at *20 (D. Neb. June 3, 2026); *Cruise Lines Int'l Ass'n, Inc. v. Suganuma*, __F. Supp. 3d __, 2025 WL 3903968, at *10 (D. Haw. Dec. 23, 2025); *United States v. Idaho*, 623 F. Supp. 3d 1096, 1107 (D. Idaho 2022); *United States v. Alaska*, 608 F. Supp. 3d 802, 809 (D. Alaska 2022); *La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 527 (W.D. Tex. 2022).

For instance, in *United States v. Missouri*, the federal government sought to enjoin a preempted state law that prohibited state officers from enforcing any federal law that infringed on the right to keep and bear arms. 114 F.4th 980, 983 (8th Cir. 2024). The Eighth Circuit upheld the federal government's Article III standing, holding that "[t]he United States has a legally protected interest in enforcing federal law" and that the Missouri statute's "[i]nterference with the federal government's interest in enforcing federal law is sufficient to establish that the Act's implementation injured the United States." *Id.* at 984–85; *see also United States v. Ekblad*, 732 F.2d 562, 563 (7th Cir. 1984) ("The United States has standing to seek relief from actual or threatened interference with the performance of its proper governmental functions").

**2.** Applying these principles, the federal intervenors have standing. By bringing state-law enforcement actions against CFTC-regulated entities, Rhode Island seeks to "give itself independent authority" in a federally regulated area, which would "diminish[] the Federal Government's control over enforcement and detract[] from the integrated scheme of regulation created by Congress." *Arizona v. United States*, 567 U.S. 387, 402 (2012). That necessarily

---

law. If anything, that strengthens the federal government's injury: proving irreparable harm is "a much taller task than showing injury-in-fact to survive a motion to dismiss." *Marciano v. de Blasio*, 589 F. Supp. 3d 423, 431 n.9 (S.D.N.Y. 2022).

3

"[i]nterferes with the federal government's interest in enforcing federal law," *Missouri*, 114 F.4th at 985, and "undermine[s]" the Commission's exclusive "domain of federal authority" over swap transactions, *Alabama*, 691 F.3d at 1301; *Suganuma*, 2025 WL 3903968, at *10 (holding that the United States had standing to enjoin a state tax that allegedly infringed upon "federal supremacy over interstate maritime commerce").

Consider what would happen if the State were permitted to prohibit the trading of sports-related event contracts under its gambling laws. Such contracts would be banned from Rhode Island—meaning that the Commission would have no practical ability to permit the listing of these contracts. *See Rhode Island v. KalshiEX, LLC, et al.*, No. 1:26-cv-00333, Dkt. No. 1-1 ¶ 117 (D.R.I. May 22, 2026) (seeking a permanent injunction "enjoin[ing] [DCMs] from offering sports-related 'event contracts' on 'prediction markets' within the State of Rhode Island"). The Commission would thus not simply lose its "exclusive jurisdiction" over sports-related event contracts in Rhode Island—practically speaking, it would have *no* jurisdiction over such contracts in Rhode Island. Likewise, the Commission would effectively be powerless to exercise its authority under federal law to approve sports-related event contracts for listing in Rhode Island. *See* 7 U.S.C. § 7a-2(c)(5)(B) (allowing the Commission to "approve a new contract or other instrument" for trading); 17 C.F.R. §§ 38.4(a); 40.3(b) (similar). This direct "[i]nterference with the federal government's interest in enforcing federal law" "is sufficient to establish that [state law] injure[s] the United States." *Missouri*, 114 F.4th at 985.[2]

---

[2] State-standing doctrine reinforces the federal government's standing. As courts routinely recognize, the "sovereign interests" of States "can establish Article III standing." *Tennessee v. Department of Educ.*, 104 F.4th 577, 591 (6th Cir. 2024). For instance, "States have a sovereign interest to sue the United States when a federal regulation purports to preempt state law" or "when they believe that the federal government has intruded upon areas traditionally within states' control." *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022) (collecting cases). This case is simply the flip side of the coin: the United States is suing a State because "a federal [statute] … preempt[s] state law" and because "the [state] government has intruded upon areas traditionally

**3.** Rhode Island's constrained theory—that "the federal government has standing to assert preemption claims against state action that directly interferes with federal operations" or "interferes with private activity on which federal operations rely"—has no basis in law or logic. Fed. Opp. 4. If taken seriously, it is not apparent why the federal government could bring criminal prosecutions where the victim is a private individual. Crimes such as carjacking do not regulate or directly injure the federal government, yet no one doubts the United States can enforce its laws in Article III courts. *See United States v. Yarbrough*, 452 Fed. Appx. 186, 189 (3d Cir. 2011) ("The Government doubtlessly suffers an 'injury in fact' when a defendant violates its criminal laws."). The same is true civilly. The CFTC and many other agencies enforce fraud, antitrust, consumer-protection, insider-trading, and other laws in federal court even though the injury is directly felt by private individuals, not the government itself. The United States routinely brought civil-rights actions against States during the Civil Rights Movement, even though individuals were the ones being directly injured and could bring their own suits. *See, e.g.*, *United States v. Mississippi*, 380 U.S. 128, 136–38 (1965) (rejecting argument that Attorney General lacked authority to sue a State and its officials over attempts to racially restrict voting rights). Under Rhode Island's reasoning, the United States would lack a concrete injury to bring any of these important cases. That cannot be right.

Indeed, Rhode Island seems to acknowledge that the United States can bring preemption suits over "immigration" since it is "a matter uniquely entrusted to the federal government." Fed. Opp. 7. But the federal government alleges that event contracts are also "uniquely entrusted" to the Commission's oversight—a theory accepted as true at the standing stage. *See Arizona State*

---

within [the CFTC's] control." *Id.* The federal government's standing to sue in federal court under such circumstances is at least as great as that of the States.

*Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015).  Likewise, Rhode Island says that "[a]ssuming the federal government generally does have standing to enforce its laws" (it obviously does, *see Missouri*, 114 F.4th at 985), "it still has not alleged that the State has violated any federal law."  Fed. Opp. 6.  Yes, it has: the complaint alleges, among other things, that "Defendants' attempt to shut down the operations of CFTC-regulated entities … gravely interferes with the Commission's exclusive jurisdiction over swaps."  Dkt. No. 37 ¶ 62.  Rhode Island's attempt to smuggle its merits defenses into the standing analysis should be rejected.

### B.    Intervenors are injured by disruptions to their operations

Apart from injuring federal sovereignty, Rhode Island's enforcement efforts cause direct harm to the CFTC's day-to-day operations.  As a result of state enforcement efforts against event contracts, the Commission's Division of Market Oversight has received requests for guidance from DCMs as to appropriate steps to comply with the CEA and CFTC regulations.  *See* Dkt. No. 23-2 ¶ 7.  Commission staff has devoted resources to assessing these concerns, which has diverted them from core supervision and oversight functions.  *Id.*  If Rhode Island is permitted to enforce its preempted state laws, these diversions will only be exacerbated.

The State claims that these diversions are nothing more than the Commission "doing its job as a federal agency."  Fed. Opp. 5.  But when "enforcement of" state law "forc[es] federal officials to expend limited resources," that is injurious.  *United States v. Iowa*, 126 F.4th 1334, 1342 (8th Cir. 2025), *vacated as moot*, 2025 WL 1140834 (8th Cir. Apr. 15, 2025); *cf. Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 121 (2d Cir. 2021) (finding injury in fact based on allegations of "compliance costs associated with an increased regulatory burden").

## II.    Intervenors are likely to succeed on the merits

Rhode Island claims authority to ban CEA-regulated event contracts listed on CFTC-registered exchanges—first, because event contracts are supposedly not "swaps," and second, because the CEA purportedly does not preempt state law as to on-exchange derivatives trading. Neither objection stands.

### A.    Event contracts are swaps

A contract is a swap if "payment" is (1) "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency" that (2) is "associated with a potential financial, economic, or commercial consequence."    7 U.S.C. § 1a(47)(A)(ii).    Sports event contracts satisfy both prongs.

**1.**  Rhode Island first objects that sports event contracts are based on "outcomes" rather than "events" or "contingencies."  Kalshi/Polymarket Opp. 15–16.  That is a false dichotomy: an "outcome" *is* an "event."  *See Event*, Webster's II New College Dictionary (3d ed. 2025) (defining "event" to mean "[t]he actual outcome or final result").  Indeed, virtually all event contracts, not just sports event contracts, are based on outcomes.  CME Group—the largest derivatives exchange in the world—offers event contracts keyed to the next Federal Funds rate decision, which is the outcome of an event (an FOMC meeting).[3]  Political event contracts settle based on the outcome of an election, even though the election is also an event.  *Kalshiex LLC v. Orgel*, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026) ("President Trump winning the 2024 presidential election was an outcome, but also an event.").  Likewise, the final result of a game is an event, no less than the

---

[3]  CME Group, Prediction Markets, https://www.cmegroup.com/markets/prediction-markets.html (last visited June 24, 2026).

game itself. *Id.* ("[A] three-hour-long game, and the Titans' winning that game, are both occurrences of events.").

Second, Rhode Island denies that sporting events are associated with potential economic consequences. Kalshi/Polymarket Opp. 16–18. That is demonstrably wrong. As the Third Circuit explained, sports events affect "numerous [] stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 227–28 (3d Cir. 2026). Because the Denver Broncos beat the Los Angeles Chargers to close last year's regular season, they secured home-field advantage in the NFL Playoffs—which had direct commercial consequences for the franchise and the city of Denver.[4] When the U.S. soccer team qualified for a knockout-round game at Levi's Stadium, ticket prices skyrocketed by over $1,000.[5] Madison Square Garden Sports, the parent of the New York Knicks, doubled in market value over the past year because of the team's performance,[6] and the team's postseason run generated around $380 million for New York City's economy.[7]

Rhode Island responds that this position "knows no limiting principle," since "virtually *anything* might have some conceivable financial consequence if one is creative enough." Kalshi/Polymarket Opp. 17 (citation modified). Not so: like any causation requirement, the

---

[4] Jeff Legwold, *Broncos top Chargers, secure AFC's No. 1 seed for playoffs*, ESPN (Jan. 4, 2026), https://www.espn.com/nfl/story/_/id/47507514/broncos-top-chargers-secure-afc-no-1-seed-playoffs.

[5] Henry Bushnell, *USMNT ticket prices for World Cup knockout route skyrocket on resale sites*, The Athletic (June 26, 2026), https://www. nytimes.com/athletic/7379054/2026/06/20/usa-ticket-prices-world-cup-knockouts/.

[6] Jack Pitcher & Andrew Beaton, *The Only Thing Hotter Than the Knicks Is Their Stock Price*, Wall St. J. (June 8, 2026), https://www.wsj.com/sports/basketball/knicks-nba-finals-msg-stock-b0f2dd31.

[7] CNBC, *Knicks' postseason run brought $380m in economic activity, says NYCEDC's Jeanny Pak*, (June 18, 2026), https://www.cnbc.com/video/2026/06/18/knicks-postseason-run-brought-380m-in-economic-activity-says-nycedcs-jeanny-pak.html.

"swap" definition's "associated with" language presumptively incorporates proximate-cause principles, so potential economic consequences that are "too remote" from the underlying event don't count. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). And there are other backstops that Rhode Island ignores. For instance, the State expresses concern about event contracts involving "youth softball game[s]," Kalshi/Polymarket Opp. 17, but the Commission has proposed rulemaking that would presumptively prohibit such contracts as contrary to the public interest, *see* 91 Fed. Reg. 35,806, 35,870–71 (proposed June 12, 2026). The State also frets that a plain-text reading would result in "contract law (service contracts), property law (mortgages), and family law (prenuptial agreements)" being subsumed into the "swap" definition. Kalshi/Polymarket Opp. 18 (quoting *QCX LLC v. Nessel*, No. 1:26-cv-710, Dkt. No. 41 (W.D. Mich. June 17, 2026)). But the Commission—exercising its joint authority with the SEC to further define the term "swap," 15 U.S.C. § 8321(b)—has clarified that "these types of customary consumer and commercial agreements" are not swaps. *See* 77 Fed. Reg. 48,208, 48,246–48 (Aug. 13, 2012). The CEA's exclusions from the "swap" definition guard against other far-flung scenarios. *See, e.g.*, 7 U.S.C. § 1a(47)(B)(ii) (excluding, *inter alia*, sale of "nonfinancial commodity … for deferred shipment or delivery").

**2.** With no foothold in the "swap" definition contained in § 1a(47)(A)(ii), Rhode Island turns to the other "swap" definitions, *see* § 1a(47)(A)(i), (iii)–(vi). These definitions, the State argues, "refer to financial instruments used to *hedge*, or offset, existing financial risk," and it claims that subparagraph (ii) must do the same—or else subparagraph (ii) would render the other subparagraphs surplusage. Kalshi/Polymarket Opp. 18–20. This goes wrong on several fronts.

9

First, none of the "swap" definitions contains a hedging requirement. For good reason: while hedging is one purpose for trading derivatives, there is also a well-established public interest in speculating via derivatives trading, which is essential for well-functioning, liquid markets. *See Leist v. Simplot*, 638 F.2d 283, 288 (2d Cir. 1980) (explaining that "[t]he activity of speculators is essential to the operation of a futures market" and that "the liquidity, so badly needed in futures markets, simply would not exist" without speculators). Derivatives trading also furthers the "national public interest" in "disseminating pricing information," which is distinct from hedging. 7 U.S.C. § 5(a); *see* Celso Brunetti, et al., *Speculators, Prices, and Market Volatility*, 51 Journal of Financial and Quantitative Analysis 1545 (2016), https://www.jstor.org/stable/44157831?seq=1. To be sure, trading an event contract for hedging purposes confirms the underlying event's potential economic consequences, but a hedging objective is by no means necessary.

Second, it is wrong to assume that sports event contracts have no hedging utility. Sports carry significant upside and downside risks for numerous stakeholders, including franchises, networks, sponsors, and local businesses. *Flaherty*, 172 F.4th at 228. Event contracts can mitigate that exposure, as illustrated by the recent instance of a New York City bar offering patrons free drinks if the Knicks won Game 1 of the Finals and hedging that contingency on Kalshi.[8] Likewise, the fantasy-sports company Underdog Sports hedges using prediction markets.[9] So the State's claim that there is no "concrete evidence that any person in the real world actually uses sports-related 'event contracts' … to hedge risk" is plainly wrong. Kalshi/Polymarket Opp. 19.

---

[8] Catherina Gioino, *This NYC bar just covered everyone's tabs because the Knicks won, and used Kalshi to hedge their bets*, Fortune (June 3, 2026), https://fortune.com/2026/06/03/nyc-bar-knicks-kalshi-win-prediction-market/.

[9] Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 22, 2025), https://www.ingame.com/underdog-kalshi-pm-risk-management/.

Third, Congress clearly did not intend to limit the definition of "swap" to the categories of financial instruments it expressly enumerated.  Rather, Congress extended the swap definition to contracts that "in the future become[] commonly known to the trade as a swap," 7 U.S.C. § 1a(47)(A)(iv), and even then, Congress *still* worried its "swap" definition was not expansive enough, as it instructed the Commission to "adopt a rule to further define the term[] 'swap'" in order to "include transactions and entities that have been structured to evade this subtitle," 15 U.S.C. § 8321(b); *see also id.* § 8302(d)(1) (CFTC and SEC have authority to "further define the term[] 'swap'").  And because these broad "swap" definitions create inherent redundancy, Rhode Island's surplusage concerns are misplaced.  *See Bufkin v. Collins*, 604 U.S. 369, 387 (2025) ("[W]hen both interpretations involve the same redundancy, the canon against surplusage simply does not apply.").

**3.**    Rhode Island next invokes legislative history and prior administrative practice. Kalshi/Polymarket Opp. 21.  These sources, however, *support* classifying event contracts as swaps. The colloquy between Senators Feinstein and Lincoln cited by Rhode Island (at 20–21) revolved around the statutory "Special Rule" for event contracts, which gives the Commission authority to prohibit the listing of "swaps … based upon [an] occurrence, extent of an occurrence, or contingency" that "involves" "gaming," when those swaps are determined by the Commission to be contrary to the public interest.  7 U.S.C. § 7a-2(c)(5)(C)(i).  Senator Lincoln acknowledged to Senator Feinstein that event contracts could be structured "around sporting events such as the Super Bowl, the Kentucky Derby, and the Masters Golf Tournament," and that the Commission's Special Rule power would extend to these scenarios.  156 Cong. Rec. S5906-07 (daily ed. July 15, 2010).  So the legislative history *confirms* that sports event contracts are subject to the Commission's jurisdiction.

As for administrative practice, the Commission has never disclaimed jurisdiction over event contracts.  On the contrary, the Commission has overseen the trading of event contracts since 1992.  73 Fed. Reg. 25,669, 25,671 (May 7, 2008).  Instead, Rhode Island points (at 21) to a joint SEC/CFTC rulemaking that excluded from the "swap" definition certain "consumer and commercial arrangements that historically have not been considered swaps."  77 Fed. Reg. at 48,246.  But the Commissions' reasoning was that such contracts "are not traded on an organized market or over-the-counter," *id.* at 48,247, which is not true of event contracts (sports-related or otherwise) traded on DCMs.

The State also accuses the Commission of an "about-face," claiming that the Commission formerly exercised its Special Rule power to "categorically prohibit[] trading [event] contracts on DCMs" that involve "gaming."  Fed. Opp. 11 (citing 17 C.F.R. § 40.11(a)); *see* 91 Fed. Reg. 35,806 (proposed June 12, 2026) (NPRM to amend § 40.11).  Even if that interpretation of the Commission's regulation was true, it would not mean that event contracts are not swaps—and it certainly would not mean *States* can regulate event contracts.

**4.**  Rhode Island also claims that it would be absurd to treat sports event contracts as swaps because that would supposedly make the CFTC "the nation's *sole* regulator for things like sports betting."  Kalshi/Polymarket Opp. 22.  To be clear, the Commission does not assert—and has never asserted—jurisdiction over gambling, including sports gambling.  The Commission regulates event contracts traded on DCMs, and the question before this Court is simply whether that longstanding exercise of jurisdiction has a statutory basis.

In any event, Rhode Island ignores the structural differences between sportsbooks that enable sports betting and CFTC-approved DCMs that list event contracts, sports-related or otherwise.  Sportsbooks act as a casino or "house" that directly bets against users—if the bettor

12

wins, she takes the "house's" money; if not, the sportsbook pockets the bettor's wager. Sportsbook bets are thus bilateral transactions priced by an in-house bookie, rather than by the market, and so are not readily susceptible to the CEA's exchange-trading requirement for swaps offered to retail participants. *See* 7 U.S.C. § 2(e). DCMs that list event contracts, by contrast, are neutral exchanges that match counterparties and collect transaction fees, like other futures or swaps exchanges. That the latter are within the Commission's jurisdiction does not demand the same of the former. *See* 31 U.S.C. § 5362(1)(E) (distinguishing CEA-regulated products from gambling). And even if the "far-fetched" concern about the Commission regulating sportsbooks had traction, the CFTC and SEC's joint authority to "further define" swaps provides a meaningful backstop. *Flaherty*, 172 F.4th at 228 (citing 15 U.S.C. § 8302(d)(1), 77 Fed. Reg. 48,208 (Aug. 13, 2012)). Indeed, the CFTC and the SEC are currently seeking public comment on the swap definition in regard to event-based contracts.[10]

**5.** A ruling that event contracts are not swaps would leave the fast-growing prediction-market space bereft of federal regulation—a hugely destabilizing consequence that Rhode Island ignores. Event contracts, for all their advantages, pose manipulation risks, and the CEA provides a comprehensive framework for mitigating abuses. DCMs that list event contracts must comply with core statutory safeguards. 7 U.S.C. § 7(d). The Commission can exercise its Special Rule authority to prohibit the listing of "swaps" involving "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.* § 7a-2(c)(5)(C). The United States and the Commission are bringing commodity-fraud charges and enforcement

---

[10] *See* Release No. 9257-26, CFTC, SEC Seek Public Input on Data Reporting Frameworks for Security-Based Swap and Swap Markets (June 18, 2026), https://www.cftc.gov/PressRoom/PressReleases/9257-26.

actions for illegally trading event contracts based on insider information, which presuppose CEA coverage.[11]  And the Commission can sanction platforms for offering event contracts without registering as a DCM or a Swap Execution Facility—as it did to Polymarket in 2022 for offering "swaps as defined by Section 1a(47) of the [CEA]" without registering.[12]  None of this oversight would be possible if event contracts lie outside the CEA.

For these reasons, event contracts, including those related to sports, are swaps subject to Commission regulation.[13]

## B.    Rhode Island's regulation of swaps is preempted

Rhode Island also denies the CEA's preemptive force.  That argument has no basis.

**1.**  At the outset, the Court should not apply a presumption against preemption, which is applicable only to federal statutes that infringe on "the historic police powers of the States." Kalshi/Polymarket Opp. 25 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).  Given

---

[11] *See CFTC v. Van Dyke*, No. 1:26-cv-3369 (S.D.N.Y.); *CFTC v. Spagnuolo*, No. 1:26-cv-4419 (S.D.N.Y.); *United States v. Van Dyke*, No. 1:26-cr-156 (S.D.N.Y.); *United States v. Spagnuolo*, No. 1:26-mj-02020 (S.D.N.Y.).

[12] *In re: Blockratize, Inc.*, Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Actions (Jan. 3, 2022), https://www.cftc.gov/media/6891/enfblockratizeorder010322/download.

[13] Event contracts are also swaps because they are "binary options."  Mot. 12 n.8.  The "swap" definition encompasses "option[s] … based on the value[] of … commodities."  7 U.S.C. § 1a(47)(A)(i).  Binary options are a type of option, because they are "commonly known to the trade as[] an 'option[.]'"  *Id.* § 1a(36); *see CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 36 (D.D.C. 2015) (binary options "are known as options in industry practice").  And sports-related binary options are based on "excluded commodities," because a sporting event is "an occurrence … that is—(I) beyond the control of the parties to the relevant contract …; and (II) associated with a financial, commercial, or economic consequence."  7 U.S.C. § 1a(19)(iv); *contra* Kalshi/Polymarket Opp. 24.  Rhode Island offhandedly claims that the Commission's exclusive jurisdiction covers "commodities" but not "excluded commodities," Kalshi/Polymarket Opp. 24, but that is misguided: excluded commodities *are* commodities.  *United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021) (holding that "excluded commodities" "remain 'commodities' under the Act as a whole").

14

that event contracts are swaps, *supra* § II, they do not fall within the State's police powers—they fall within the core of the CFTC's jurisdiction.

**2.**    Congress vested the Commission with "exclusive jurisdiction" over "transactions involving swaps … traded or executed on a [designated] contract market."  7 U.S.C. § 2(a)(1)(A). As the Seventh Circuit has explained, to give "full effect" to the exclusive-jurisdiction provision, Congress necessarily "intended to preempt some, but not all, state laws that bear upon the various aspects of commodity futures trading."  *Effex Cap., LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019).  "[P]reemption is appropriate," the court explained, "'[w]hen application of state law would directly affect trading on or the operation of a futures market.'"  *Id.* (citation omitted).  That is precisely the case here: by bringing enforcement actions to prohibit the listing of "swaps" on CFTC-approved DCMs, Rhode Island is directly interfering with on-DCM trading. The State claims *Effex* is inapplicable because "state gambling law does not interfere with the CFTC's operations."  Fed. Opp. 13.  It does so interfere, *supra* § I.B, but more fundamentally, there is no basis in the statutory text or *Effex* to assert that preemption turns on "interfere[nce] with the CFTC's operations."

Rhode Island also claims that § 2(a)(1) is limited to dividing federal regulatory authority among federal agencies.  Kalshi/Polymarket Opp. 25.  That is part of § 2(a)(1)'s function, but not its sole function.  In the very next sentence, Congress specified: "*Except as hereinabove provided*, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the [SEC] or other regulatory authorities under the laws of the United States *or of any State*, or (II) restrict the [SEC] *and such other authorities* from carrying out their duties and responsibilities in accordance with such laws."  7 U.S.C. § 2(a)(1)(A) (emphases added).  Swap transactions are "hereinabove provided," meaning Congress did "supersede" and "limit the jurisdiction" of States,

15

and did "restrict" them "from carrying out their duties and responsibilities" as to those transactions. *Id.* Indeed, if the exclusive-jurisdiction provision was not preemptive, there would be no need for this savings clause. *Effex*, 933 F.3d at 894 (preemption follows from the "savings clause and the jurisdictional clause"); *Johnson*, 2026 WL 1223373, at *6 ("A savings clause underscores the CFTC's preemptive effect, as state regulatory authority is preserved only '[e]xcept as hereinabove provided'—that is, except where the CEA has vested exclusive jurisdiction in the CFTC."). And while Rhode Island asserts that the savings clause "*preserves*, not preempts, state authority," Kalshi/Polymarket Opp. 27–28, that is true only insofar as a contract is covered by the savings clause. Swap transactions fall within the exclusive-jurisdiction clause, so they necessarily fall outside the savings clause.

Next, Rhode Island points to § 16(e)(2), which "supersede[s] and preempt[s] the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability)" for contracts that are "excluded" by the CEA or "exempted" by the Commission. 7 U.S.C. § 16(e)(2). This provision, Rhode Island asserts, "would be superfluous if § 2(a)(1)(A) already preempted state gaming law." Kalshi/Polymarket Opp. 26.

Not at all: § 16(e) actually *confirms* the preemptive effect of § 2(a)(1). An "excluded" contract is, by definition, outside the Commission's exclusive jurisdiction. 7 U.S.C. §§ 2(c), (f), 27–27f. And the Commission's exemptive authority allows it to release certain contracts from CEA requirements. *Id.* § 6(c). Section 16(e)(2) therefore functions as a preemptive backstop: even for transactions largely beyond the CEA's purview, state gambling laws still cannot apply. Rhode Island's theory—that state gambling law is preempted only for contracts *beyond* the Commission's jurisdiction, but not contracts *within* its jurisdiction—makes no sense. To the

16

contrary, if Congress preempted state gambling law even with respect to excluded or exempted contracts, it necessarily preempted state gambling law as to on-DCM transactions within the Commission's exclusive jurisdiction. *See* Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. Bus. Rev. 1, 6 (2019) ("Exclusive jurisdiction under section 2(a)(1)(A) is also preemptive jurisdiction; it has a much broader preemptive reach than gaming and bucket shop law-style preemption under section 12(e)(2)(B), which covers only excluded or exempt contracts over which the CFTC would [generally] have no jurisdiction.").

The remainder of § 16(e) confirms this reading. Section 16(e)(1) provides that "[n]othing in this chapter shall supersede or preempt … the application of any … State statute (*except as provided in paragraph (2)*) … to any transaction … that is *not* conducted on or subject to the rules of a registered entity," like a DCM. 7 U.S.C. § 16(e)(1)(B) (emphases added). In other words, for *off-DCM* transactions, state law—though not state gambling law—remains available. For that savings clause to do any work, it necessarily follows that transactions conducted *on a DCM* are subject to federal law only. And there is more: when Congress added "swaps" to the Commission's exclusive jurisdiction, it deliberately chose *not* to make § 16(e)(1) applicable to swaps at all. *See id.* § 2(d) ("Nothing in this chapter … governs or applies to a swap" except various provisions, including § 16(e)(2) but not § 16(e)(1).); Taylor-Brill, *supra* at 6 ("The exclusion of swaps from section 12(e)(1) was a clear expression of congressional intent as to how the new preemption model is supposed to work under section 2(a)(1)(A)."). Thus, the net effect of § 16 is to preserve (1) some state law, but not gambling law, (2) with respect to non-swap transactions, (3) conducted off DCMs. It therefore must be true that (1) state gambling law, (2) with respect to swap transactions, (3) conducted on DCMs, lies in the CEA's preemptive heartland.

17

The State's attempt to turn § 13a-2 to its advantage also fails.  Fed. Opp. 13–14.  By expressly giving the States authority to enforce the CEA under certain circumstances (though not against a contract market), 7 U.S.C. § 13a-2(1), as well as "general" antifraud statutes, *id.* § 13a-2(7), the natural implication is that other state laws, like gambling law, are not enforceable.[14] *Kucana v. Holder*, 558 U.S. 233, 249 (2010) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)).

**3.**  Rhode Island asserts that there can be no field preemption because "commodity futures regulation and gambling regulation are distinct fields."  Kalshi/Polymarket Opp. 31.  But that is premised on the fallacy that event contracts are gambling rather than CEA-regulated swaps. *Contra supra* § II; *see* 31 U.S.C. § 5362(1)(E) (distinguishing CEA-regulated products from gambling).  Given that "sports-related event contracts are swaps under the Act," the "scope of field preemption" is "properly defined" "as the regulation of trading on a DCM (a form of futures trading) rather than as gambling (a broader and traditionally state-regulated field)." *Flaherty*, 172 F.4th at 229.  And on-exchange derivatives trading is unquestionably the subject of federal preemption. *See, e.g.*, *Effex*, 933 F.3d at 894 ("[P]reemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" (citation omitted)).

---

[14] Rhode Island also claims that the statutory Special Rule "preserves, not preempts, state law enforcement" because it allows the Commission to prohibit the listing of event contracts if the contracts "involve" "activity that is unlawful under any … State law." 7 U.S.C. § 7a-2(c)(5)(C)(i); Kalshi/Polymarket Opp. 34.  Not so.  The Special Rule applies "if the contract or transaction's *underlying event* relates in some way to activity that is illegal—not if the act of staking money on the contract's underlying would be unlawful under any state law." *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *12 (D.D.C. Sept. 12, 2024) (emphasis added); *see* 91 Fed. Reg. at 35,821–22 (incorporating this interpretation).  Here, the underlying events are sporting contests, so the event contracts do not "involve" "activity that is unlawful."  7 U.S.C. § 7a-2(c)(5)(C)(i).

Rhode Island also claims that the Commission lacks the experience to regulate gaming, Kalshi/Polymarket Opp. 22, 31, but again, because event contracts are derivatives under the CEA, it is the *State* that lacks the requisite regulatory experience.

**4.** The State's gambling laws are also conflict-preempted as to event contracts because a DCM could not comply with those laws while also providing "impartial access to its markets and services" on "non-discriminatory" terms. 17 C.F.R. § 38.151(b), (b)(1). Rhode Island surmises that this rule is only "meant as a check against platforms … discriminat[ing] against rivals to dominate a market," but there is no textual support for this theory. Kalshi/Polymarket Opp. 32. The reality is that enforcement of state gambling law will require DCMs to deprive Rhode Islanders of access to sports event contracts offered to other Americans. That is discrimination. *Cf. Bostock v. Clayton Cnty.*, 590 U.S. 644, 657 (2020) ("To 'discriminate against' a person, then, would seem to mean treating that individual worse than others who are similarly situated.").

As for obstacle preemption, Rhode Island does not dispute that the enforcement of gambling laws on a state-by-state basis would undermine the "uniform federal scheme" administered by the Commission; instead, it simply says that disuniformity does not suffice for conflict preemption. Kalshi/Polymarket Opp. 33. But Congress created the CFTC precisely to displace "wholecloth" the "patchwork" of state law that previously existed. *Flaherty*, 172 F.4th at 230; *see American Agric. Movement, Inc. v. Board of Trade of Chicago*, 977 F.2d 1147, 1156 (7th Cir. 1992) ("The Act's proponents were concerned that the states … might step in to regulate the futures markets themselves."). Indeed, if the CEA's "exclusive jurisdiction" provision (and its otherwise-comprehensive regulatory structure) does not bar States from prohibiting event contracts, that means States could invoke their gambling laws to ban any type of swap—including interest-rate, currency, and energy swaps. States could even ban futures contracts altogether, as

19

many did before derivatives regulation was federalized.  That is a direct obstacle to the regulatory design that Congress created.

## III.    The equities favor an injunction

As to federal intervenors, Rhode Island's only irreparable-harm argument is to reprise its standing defense, which is meritless.  Fed. Opp. 15; *supra* § I.  It also asserts that the public interest supports enforcing state law, Fed. Opp. 15, but this reasoning presumes that state law is valid in the first place.  Where, as here, "valid laws in a domain of federal authority are undermined by impermissible state regulations," it is "[t]he United States [that] suffers injury."  *Alabama*, 691 F.3d at 1301 (emphasis added); *see Flaherty*, 172 F.4th at 232 ("the [CEA] preempts [state] law," so "the public interest is best served by enforcing the Act").

## CONCLUSION

The Court should enter a preliminary injunction.

Dated: June 30, 2026                                    Respectfully Submitted,

/s/ Tiberius Davis                                         /s/ M. Jordan Minot
Tiberius Davis (DC Bar No. 90020605)        M. Jordan Minot (DC Bar No. 1722554)

*Attorneys for the United States of America*       *Attorneys for the Commodity Futures Trading Commission*

BRETT A. SHUMATE                               TYLER S. BADGLEY
Assistant Attorney General                         General Counsel
Civil Division                                             M. JORDAN MINOT
                                                               Deputy General Counsel
TIBERIUS DAVIS                                      HENRY J. DICKMAN
Counsel to the Assistant Attorney General     Senior Assistant General Counsel
450 5th St. NW,                                         ANDREW WEISBERG
Washington, DC 20001                             Senior Assistant General Counsel
Tel:  (202) 860-8970                                 MARGARET P. AISENBREY
tiberius.davis@usdoj.gov                           Senior Assistant General Counsel

ALEXANDRA McTAGUE SCHULTE         U.S. Commodity Futures Trading Commission
Senior Litigation Counsel                          Three Lafayette Centre
Tel:  (202) 718-0483                                 1155 21st Street, NW
alexandra.schulte@usdoj.gov                     Washington, DC 20581

20

Tel:  (202) 209-1087
Fax:  (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
hdickman@cftc.gov
aweisberg@cftc.gov
maisenbrey@cftc.gov