# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

KALSHIEX LLC,

       *Plaintiff*,

and

UNITED STATES OF AMERICA and
COMMODITY FUTURES TRADING
COMMISSION,

       *Plaintiff-Intervenors,*

       v.

MARK FURCOLO, in his official capacity
as Director of the Division of State Lottery;
PETER F. NERONHA, in his official
capacity as Rhode Island Attorney General;
and CHRISTINA TOBIASZ, in her official
capacity as Gaming and Athletics
Administrator, Department of Business
Regulation

       *Defendants*.

No. 1:26-cv-00327-MSM-PAS

**ORAL ARGUMENT REQUESTED**

---

THE STATE OF RHODE ISLAND by and
through ATTORNEY GENERAL PETER F.
NERONHA,

       *Plaintiff*,

       v.

KALSHIEX LLC; QCX LLC d/b/a
POLYMARKET US,

       *Defendants*.

No. 1:26-cv-00333-MSM-PAS

(Consolidated)

# QCX LLC'S REPLY IN SUPPORT OF
# <u>MOTION FOR PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

    I.     Polymarket US Is Likely To Succeed On the Merits. ............................................. 3

        A.     The CEA Expressly Preempts The State's Efforts To Apply Its Sports-Wagering Laws Against Polymarket US. ....................................... 3

            1.     The CEA's "exclusive jurisdiction" provision preempts state law. ............................................................................................ 3

            2.     The Federally Regulated Event Contracts Here Are Swaps On A CFTC-Designated Contract Market. ...................................... 9

        B.     Field Preemption Bars the State from Regulating Transactions on a CFTC-Designated Contract Market. ........................................................... 16

        C.     As Applied to Polymarket US, the State's Gambling Laws are Conflict-Preempted. .................................................................................. 20

    II.     Polymarket US Will Be Irreparably Harmed Without Relief. ............................. 23

    III.    The Public Interest and Balance of Equities Strongly Favor Preliminary Relief. .................................................................................................................... 25

CONCLUSION .................................................................................................................. 26

6001151793.17

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Antilles Cement Corp. v. Fortuno*,
670 F.3d 310 (1st Cir. 2012) ............................................................................................25

*Arizona v. United States*,
567 U.S. 387 (2012) .......................................................................................................1, 16

*Brogan v. United States*,
522 U.S. 398 (1998) .............................................................................................................14

*Chevron USA Inc. v. Plaquemines Parish*,
146 S. Ct. 1052 (2026) ...................................................................................................11, 15

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
162 F.4th 631 (6th Cir. 2025) .........................................................................................9, 17

*In re Coughlin*,
33 F.4th 600 (1st Cir. 2022) ...........................................................................................13, 15

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .............................................................................................................21

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024) .................................................................................................................8

*DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*,
2002 WL 31356362 (S.D.N.Y. Oct. 17, 2002) ....................................................................22

*Encino Motorcars, LLC v. Navarro*,
584 U.S. 79 (2018) ...............................................................................................................15

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
545 U.S. 546 (2005) .............................................................................................................14

*FBI v. Fikre*,
601 U.S. 234 (2024) .............................................................................................................24

*FEC v. Cruz*,
596 U.S. 289 (2022) .............................................................................................................25

*Fednav, Ltd. v. Chester*,
547 F.3d 607 (6th Cir. 2008) ...............................................................................................18

*Fischer v. United States*,
603 U.S. 480 (2024) .............................................................................................................13

*Henson v. Santander Consumer USA Inc.*,
582 U.S. 79 (2017) ...............................................................................................................15

i

*Hofmayer v. Dean Witter & Co.*,
  459 F. Supp. 733 (N.D. Cal. 1978) ......................................................................5

*Ingersoll-Rand Co. v. McClendon*,
  498 U.S. 133 (1990) ..........................................................................................21

*Int'l Paper Co. v. Ouellette*,
  479 U.S. 481 (1987) .......................................................................................7, 18

*Jones v. B.C. Christopher & Co.*,
  466 F. Supp. 213 (D. Kan. 1979) .....................................................................5, 6

*KalshiEX LLC v. CFTC*,
  2024 WL 4164694 (D.D.C. Sept. 12, 2024) .............................................18, 19, 22

*KalshiEX, LLC v. Flaherty*,
  172 F.4th 220 (3d Cir. 2026) ...............................................1, 7, 9, 11, 16, 17, 21

*KalshiEX, LLC v. Hendrick*,
  817 F. Supp. 3d 1014 (D. Nev. 2025) ...................................................................3

*KalshiEX LLC v. Johnson*,
  --- F.3d ----, 2026 WL 1223373 (D. Ariz. May 5, 2026) ...............................10, 11, 16

*KalshiEX LLC v. Martin*,
  793 F. Supp. 3d 667 (D. Md. 2025) ......................................................................3

*KalshiEX LLC v. Orgel*,
  2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) ......................................................11

*Kelly v. Carr*,
  691 F.2d 800 (6th Cir. 1980) .................................................................2, 5, 17, 21

*Leist v. Simplot*,
  638 F.2d 283 (2d Cir. 1980) .................................................................................5

*Livadas v. Bradshaw*,
  512 U.S. 107 (1994) ...........................................................................................17

*Marx v. Gen. Revenue Corp.*,
  568 U.S. 371 (2013) ...........................................................................................12

*Me. Forest Prods. Council v. Cormier*,
  51 F.4th 1 (1st Cir. 2022) ...................................................................................21

*Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Emanuelli
  Hernandez*,
  58 F.4th 5 (1st Cir. 2023) .....................................................................................9

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982) ..................................................................................6, 13, 16

*Mississippi v. Louisiana*,
  506 U.S. 73 (1992) ...............................................................................................3

ii

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)......................................................................................11, 23, 24, 25

*Murphy v. National Collegiate Athletic Ass'n*,
    584 U.S. 453 (2018)..................................................................................................8

*Mut. Pharm. Co., Inc. v. Bartlett*,
    570 U.S. 472 (2013).............................................................................................2, 23

*N. Am. Derivatives Exch., Inc. v. Nevada ex rel. Nev. Gaming Control Bd.*,
    815 F. Supp. 3d 1169 (D. Nev. 2025).......................................................................3

*New York v. U.S. Dep't of Justice*,
    804 F. Supp. 3d 294 (D.R.I. 2025).........................................................................24

*Omnipoint Commc'ns, Inc. v. City of Huntington Beach*,
    738 F.3d 192 (9th Cir. 2013) ...................................................................................7

*O'Shea v. Littleton*,
    414 U.S. 488 (1974)...............................................................................................24

*Paine, Webber, Jackson & Curtis Inc. v. Conaway*,
    515 F. Supp. 202 (N.D. Ala. 1981)...........................................................................5

*Perez v. Campbell*,
    402 U.S. 637 (1971)...............................................................................................17

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
    579 U.S. 115 (2016)..................................................................................................9

*Ricci v. Chi. Mercantile Exch.*,
    409 U.S. 289 (1973)...............................................................................................16

*Rice v. Bd. of Trade of City of Chi.*,
    331 U.S. 247 (1947)...............................................................................................20

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947)....................................................................................4, 9, 17, 19, 20

*Rimini Street, Inc. v. Oracle USA, Inc.*,
    586 U.S. 334 (2019)...............................................................................................13

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020).................................................................................................24

*Rosario-Urdaz v. Rivera-Hernandez*,
    350 F.3d 219 (1st Cir. 2003)..................................................................................25

*Sears, Roebuck & Co. v. Stiffel Co.*,
    376 U.S. 225 (1964)...............................................................................................17

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985)...............................................................................................15

iii

*Sherfel v. Newson*,
768 F.3d 561 (6th Cir. 2014) ...................................................................................21

*Snyder v. United States*,
603 U.S. 1 (2024)......................................................................................................12

*Tandon v. Newsom*,
593 U.S. 61 (2021) (per curiam)...............................................................................24

*Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*,
322 F.3d 1039 (9th Cir. 2003) ...................................................................................8

*U.S. Dep't of Treasury v. Fabe*,
508 U.S. 491 (1993)....................................................................................................8

*United States v. Brien*,
617 F.2d 299 (1st Cir. 1980).........................................................................1, 5, 17

*United States v. Locke*,
529 U.S. 89 (2000)......................................................................................................9

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) ...................................................................................12

*Westlake v. Abrams*,
504 F. Supp. 337 (N.D. Ga. 1980) .............................................................................5

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021)....................................................................................................24

**STATUTES**

7 U.S.C. § 1a(9) ...............................................................................................................19

7 U.S.C. § 1a(47)(A).......................................................................................10, 12, 13, 15

7 U.S.C. § 2(a)(1)(A) ...........................................................................................1, 3, 6, 7, 18

7 U.S.C. § 5(b) ...................................................................................................................22

7 U.S.C. § 6a........................................................................................................................13

7 U.S.C. § 6b......................................................................................................................20

7 U.S.C. § 6c......................................................................................................................20

7 U.S.C. § 7(a) ...................................................................................................................20

7 U.S.C. § 7(d) .............................................................................................................20, 21

7 U.S.C. § 7a-2(c) ................................................................................7, 14, 15, 18, 19, 20, 22

7 U.S.C. § 13a-2(1)........................................................................................................18, 22

iv

7 U.S.C. § 16(e) .................................................................................................7, 8, 16

7 U.S.C. § 16(h)(2) ...................................................................................................8

15 U.S.C. § 8302(d)(1) ............................................................................................16

15 U.S.C. § 8321(b) ...........................................................................................12, 16

18 U.S.C. § 1084(a) ................................................................................................14

31 U.S.C. § 5362(1), (1)(E) .....................................................................................14

R.I. Gen. Laws § 42-61.2-13.....................................................................................24

**REGULATIONS**

17 C.F.R. § 38.151(b) .............................................................................................22

17 C.F.R. § 38.552 .................................................................................................20

17 C.F.R. § 38.553 .................................................................................................20

17 C.F.R. § 40.11 ..................................................................................................19

17 C.F.R. § 45.2 ....................................................................................................20

17 C.F.R. § 180.1 ..................................................................................................20

17 C.F.R. § 240.3a68-2(a) .......................................................................................16

31 C.F.R. § 1026.220(a)...........................................................................................20

73 Fed. Reg. 25,669 (May 7, 2008) ............................................................................19

77 Fed. Reg. 36,612 (June 19, 2012) ..........................................................................23

77 Fed. Reg. 48,208 (Aug. 13, 2012)..........................................................................16

89 Fed. Reg. 48,968 (June 10, 2024) ..........................................................................19

91 Fed. Reg. 5386 (Feb. 6, 2026) ..............................................................................19

91 Fed. Reg. 35,806 (June 12, 2026) ..........................................................................19

**OTHER AUTHORITIES**

119 Cong. Rec. 41333 (1973) ....................................................................................5

156 Cong. Rec. S5902 (daily ed. July 15, 2010) ...........................................................15

Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1 (2019)............................................................5

Pub. L. No. 74-675, § 5, 49 Stat. 1491 (1936)..............................................................4

v

Pub. L. No. 93-463, § 201, 88 Stat. 1389 (1974) ........................................................................4, 6

Pub. L. No. 93-463, § 402(d), 88 Stat. 1389 (1974) ......................................................................4

Pub. L. No. 111-203, § 722, 124 Stat. 1376 (2010) ......................................................................7

6001151793.17

## INTRODUCTION

Rhode Island might not like contract markets, but the conflict between state gambling laws and federally regulated derivatives trading was resolved decades ago in favor of federal control. The Supremacy Clause contains no exception for States that object to the text Congress wrote.

Focused on policy disputes, Rhode Island makes basic errors about the statutory regime it asks this Court to displace.

***Express preemption.*** Through its "exclusive jurisdiction" provision, 7 U.S.C. § 2(a)(1)(A), the Commodity Exchange Act ("CEA") granted the Commodity Futures Trading Commission ("CFTC"), not the States, exclusive authority over derivatives traded on a CFTC-regulated contract market. Courts—the First Circuit included—recognized almost immediately that this language "preempts state regulation." *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980). Perhaps that is why the State has nothing to say about the provision's ordinary meaning, asserting instead (and incorrectly) that "§ 2(a)(1)(A) did not exist until the Dodd-Frank Act amended the CEA in 2010." Opp. 28. The State gives the CEA's broad definition of "swap" similarly short shrift. Apparently agreeing that Polymarket US's event contracts fit comfortably within the CEA's plain text, *see KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 231 (3d Cir. 2026), Rhode Island asks the Court to alter that text. And it attributes to Polymarket US and the CFTC a position they have never taken: that the CEA would completely federalize state gambling. This is a scare tactic, not legal argument.

***Field preemption.*** The CEA "provide[s] a full set of standards" for—and preempts the field of—derivatives trading on a CFTC-regulated contract market. *Arizona v. United States*, 567 U.S. 387, 401 (2012). The State does not disagree; it merely argues that the CEA does not preempt a different field—the field of gambling. That is nonresponsive.

1

*Conflict preemption.*  Rhode Island's enforcement action is obstacle-preempted because it would run afoul of one of the CEA's central purposes: "to avoid a diversity of regulations between the C.F.T.C. and the states."  *Kelly v. Carr*, 691 F.2d 800, 804 n.12 (6th Cir. 1980).  After incorrectly claiming that this is a field-preemption argument, the State suggests that uniformity is too "generic" a concern to matter.  Opp. 33.  But Rhode Island's attempt to layer its gambling laws on top of federal derivatives regulation is precisely the kind of patchwork regime Congress sought to avoid.  As for impossibility preemption, the CFTC—Polymarket US's regulator—has explained that it views compliance with Rhode Island's restrictions as violative of contract markets' duties to provide impartial access to customers.  After quibbling with the CFTC's interpretation, the State proposes that Polymarket US simply stop selling in Rhode Island, a suggestion so at odds with the impossibility analysis that the Supreme Court has described it as "incoheren[t]."  *Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 488–90 (2013).

*Irreparable harm.*  Without an injunction, the ongoing enforcement action will continue to irreparably harm Polymarket US's reputation, destroy customer goodwill, and impair the price discovery and market efficiency that make prediction markets valuable.  And any economic harm is unrecoverable because of Rhode Island's sovereign immunity, making it irreparable.  Addressing little of this, the State asserts that there is no prospect of an imminent enforcement action— apparently overlooking that Polymarket US is *already* a defendant in this enforcement action.

*Public interest and balance of equities.*  Nothing stops the State from regulating sportsbooks.  But the State has no legitimate interest in enforcing a preempted law against a CFTC-regulated contract market.

The Court should issue a preliminary injunction.

2

6001151793.17

## ARGUMENT

**I.      Polymarket US Is Likely To Succeed On the Merits.**

Polymarket US is likely to succeed on the merits because enforcement of the State's gambling laws is preempted by federal law.  All three types of preemption—express, field, and conflict—bar the State's enforcement of its gambling laws against Polymarket US, and none of the State's arguments to the contrary justifies its efforts to usurp the CFTC's exclusive jurisdiction.

**A.      The CEA Expressly Preempts The State's Efforts To Apply Its Sports-Wagering Laws Against Polymarket US.**

1.      <u>The CEA's "exclusive jurisdiction" provision preempts state law.</u>

Express preemption turns on statutory text.  And the plain text of the CEA confirms that the CFTC has "exclusive jurisdiction" over "transactions involving swaps . . . traded or executed on a contract market" like Polymarket US.  7 U.S.C. § 2(a)(1)(A).  By granting the CFTC "exclusive jurisdiction," the CEA expressly preempts state law.  Jurisdiction, as used in the statute, is "the power to exercise authority."  *Jurisdiction*, Merriam-Webster Dictionary (2025).  And where jurisdiction is deemed "exclusive," it "necessarily denies jurisdiction" to others.  *Mississippi v. Louisiana*, 506 U.S. 73, 77–78 (1992).  The CFTC has authority over exchange-traded swaps; Rhode Island does not.  Mot. 4; Kalshi Mot. 14–16; CFTC Mot. 15–17.[1]

**(a).**      The State does not dispute the "plain meaning" of "exclusive jurisdiction," *Mississippi*, 506 U.S. at 78, even as it refuses to "equate" those words "with 'express preemption,'"

---

[1] Many of the cases the State claims (Opp. 12) to have "rejected Kalshi and Polymarket's arguments" have in fact *agreed* that section 2 preempts state law.  *See*, *e.g.*, *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 679 (D. Md. 2025) (acknowledging, in a field-preemption case, section 2 "reflects a congressional intent to preempt at least some state laws"); *N. Am. Derivatives Exch., Inc. v. Nevada ex rel. Nev. Gaming Control Bd.*, 815 F. Supp. 3d 1169, 1180 (D. Nev. 2025) ("Section 2's first sentence supersedes the SEC and state regulatory authorities' jurisdiction"); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1023 (D. Nev. 2025) ("adopt[ing] in full [the] analysis" in *N. Am. Derivatives Exch., Inc.*).

Opp. 27.  But Congress in 1974 knew exactly what it was doing when it added them to the CEA: following the roadmap for preemption described in the seminal preemption case, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947).  There, the Court held that the federal Warehouse Act preempted state law because Congress (1) eliminated a provision of the Act providing that "nothing . . . shall be construed to . . . impair . . . the operation of the laws of any State," and (2) added a provision making federal "power, jurisdiction, and authority" "exclusive."  *Id*. at 222–24, 232–33.  These "amendments," the Court held, made it "unequivocally . . . clear that [Congress] intend[ed] no regulation except its own."  *Id.* at 236; *see id.* at 238 (Frankfurter, J., dissenting) (stating that the majority "uproots a vast body of State enactments . . . on the ground that Congress . . . provided that 'the power, jurisdiction, and authority conferred upon the'" federal government "'shall be exclusive'").

The 1974 Act followed the same playbook:  Congress eliminated a provision stating that "[n]othing in this section . . . shall be construed to impair any State law applicable to any [exchange-traded] transaction."  Pub. L. No. 74-675, § 5, 49 Stat. 1491, 1494; *see* Pub. L. No. 93-463, § 402(d), 88 Stat. 1389, 1413 (1974 deletion of this language).  And it added the exclusive-jurisdiction language borrowed from *Rice*.  *See* Pub. L. No. 93-463, § 201, 88 Stat. 1389, 1395 (1974).  By granting the CFTC exclusive jurisdiction over certain transactions (now including swaps), Congress "terminat[ed] the dual system of regulation" and subjected CFTC-regulated transactions "to regulation by one agency and by one agency alone."  *Rice*, 331 U.S. at 234.  And when Dodd-Frank expanded the list of derivatives mentioned in section 2, it placed the exchange-traded swaps "on the same exclusive jurisdictional footing as exchange-traded commodity futures."

4

6001151793.17

Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 3 (2019).[2]

Courts quickly recognized that the amended CEA *does* "preempt[] state regulation," *Brien*, 617 F.2d at 310, including "state gambling laws," *Paine, Webber, Jackson & Curtis Inc. v. Conaway*, 515 F. Supp. 202, 207 (N.D. Ala. 1981). That is, courts concluded "that state regulatory agencies [were] preempted by the 'exclusive jurisdiction' of the CFTC." *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *accord*, *e.g.*, *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) ("the courts have held that § 2(a)(1) of the CEA preempts the application of state law"); *Westlake v. Abrams*, 504 F. Supp. 337, 343–44 (N.D. Ga. 1980); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).[3]

Even state officials who opposed exclusive federal control still acknowledged that the 1974 Act left no place for state regulation. By "giv[ing] exclusive jurisdiction over commodities regulation to the Commodity Futures Trading Commission," one Texas commissioner complained, Congress had "dismantled an effective regulatory system within the states." *Extend Commodity*

---

[2] Legislative history, to the extent it is relevant, *see infra* p. 16, confirms that "Congress intended to avoid a diversity of regulations between the C.F.T.C. and the states," *Kelly*, 691 F.2d at 804 n.12. The "Joint Explanatory Statement of the Committee of Conferees of the C.F.T.C.A" stated that, "'[u]nder the exclusive grant of jurisdiction to the Commission the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned. . . . In view of the broad grant of authority to the Commission to regulate the futures trading industry, the Conferees do not contemplate that there will be a need for any supplementary regulation by the states.'" *Id.* "[D]ifferent state laws," one Senator warned, "would just lead to total chaos." Hearings Before the S. Comm. on Agric. & Forestry, 93d Cong. 685 (1974) (statement of Senator Clark). Congress therefore gave the CFTC exclusive jurisdiction to put an end to "[v]aried and often conflicting" state regulation. 119 Cong. Rec. 41333 (1973).

[3] As the First Circuit noted in *Brien*, it was initially an open question whether "general antifraud statutes" were "preempted." 617 F.2d at 310. To resolve this problem—and to confirm the otherwise-broad "preemption of state regulatory activity enacted in 1974"—Congress later added a narrow carve-out permitting States to enforce "general civil or criminal anti-fraud statutes." *Kelly*, 691 F.2d at 804 n.12.

*Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agric.*, 95th Cong. 363–64 (1978).  The Massachusetts Secretary of State demanded that Congress "abolish the exclusive jurisdiction of the CFTC and the consequent preemption of state action against commodity-related fraud." *Id.* at 379.  And a state securities commissioner from Minnesota bemoaned that, because the CFTC had "the authority to regulate" commodity markets "exclusively," courts had "precluded the application of state securities laws to any transactions involving commodities." *Id.* at 383.

    **(b).**    Rhode Island deems all of this statutory history irrelevant on the theory that "§ 2(a)(1)(A) did not exist until the Dodd-Frank Act amended the CEA in 2010." Opp. 28.  That is incorrect.  *See* Pub. L. No. 93-463, § 201, 88 Stat. 1389, 1395 (1974) (adding the "exclusive jurisdiction" provision to the CEA).  Indeed, elsewhere in its Opposition, the State draws the Court's attention to a discussion of the enactment of section 2 *from 1982*.  *See* Opp. 25 (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386 (1982)).  In *Curran*, the Supreme Court recounted that "[t]he purpose of the exclusive-jurisdiction provision in [a] bill passed by the House was to separate the functions of the Commission from those of the Securities and Exchange Commission *and other regulatory agencies*."  456 U.S. at 386 (emphasis added). Rhode Island, however, omits the last four words from the quotation and represents that the purpose of the provision was to displace "other federal agencies." Opp. 25.  At any rate, the "House version" of the "exclusive jurisdiction provision" "was revised in the Senate to make it clear that state as well as federal regulation was preempted." *Jones*, 466 F. Supp. at 218.  And the "Senate amendment" prevailed. *Curran*, 456 U.S. at 387.

    The State similarly undermines its case by drawing attention to section 2's savings clause, which comes immediately after the exclusive-jurisdiction clause. *See* Opp. 28.  The savings clause

6

provides that "except as hereinabove provided"—*i.e.*, except for the exclusive-jurisdiction provision—section 2 does not "supersede" the "jurisdiction" of or "restrict" the "regulatory authorities under the laws of . . . any State." 7 U.S.C. § 2(a)(1)(A). As the Third Circuit explained, the implication is obvious: the CFTC's exclusive jurisdiction *does* supersede state law. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 231 (3d Cir. 2026); *see also Omnipoint Commc'ns, Inc. v. City of Huntington Beach*, 738 F.3d 192, 195 (9th Cir. 2013) (explaining that this "except as provided" formulation is "typical" of a "preemption clause").[4] Rhode Island cites field-preemption decisions, Opp. 28, suggesting that a "saving clause" can "negate[]" "field" preemption in certain circumstances. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987). But it does not explain how those decisions have any bearing on the express-preemption analysis—or on the exclusive-jurisdiction provision—here.

Nor does Rhode Island explain how the CEA's Special Rule could possibly be considered an "express carveout to the CFTC's exclusive jurisdiction." Opp. 28. That Rule grants "the Commission"—not the States—authority to determine whether event contracts "involve . . . activity that is unlawful under . . . State law" or "gaming," and, if so, whether to ban such contracts as "contrary to the public interest." 7 U.S.C. § 7a-2(c). Even when banned, the contracts remain subject to the CFTC's exclusive jurisdiction. *See* CFTC Mot. 19.

**(c).** Rhode Island notes that another provision in the CEA "supersede[s]" state laws "prohibit[ing] or regulat[ing] gaming"—asserting that provision would be "superfluous" if section 2(a)(1)(A) "already preempted state gaming law." Opp. 26 (quoting 7 U.S.C. § 16(e)(2)). But that provision applies only to certain "transaction[s] that [are] excluded . . . or exempted" from the

---

[4] Dodd-Frank made only minor changes to the savings clause, *see* Pub. L. No. 111-203, § 722, 124 Stat. 1376, 1672 (2010); it did not "add[] . . . the savings clause" to section 2. *Contra* Opp. 28.

7

CEA, 7 U.S.C. § 16(e)(2)—*i.e.*, to transactions outside federal authority and outside the CFTC's exclusive jurisdiction, *see Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1056–57 (9th Cir. 2003).  Transactions *within* the CFTC's exclusive jurisdiction are separately preempted by section 2.  There is no superfluity; the two provisions fit hand-in-glove.

Rhode Island also mentions another provision of Dodd-Frank, Opp. 26, prohibiting state regulation of swaps "as an insurance contract under the law of any State."  7 U.S.C. § 16(h)(2); *see* § 722(b), 124 Stat. at 1673.  That provision, however, satisfies the McCarran-Ferguson Act, which requires Congress to call out insurance by name when it is the subject of preemption.  *See U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 507 (1993) ("The McCarran-Ferguson Act . . . overturn[s] the normal rules of pre-emption . . . by imposing what is, in effect, a clear-statement rule"); *cf.* CFTC Mot. 17 (explaining why Congress chose to take that step in Dodd-Frank).  Federal law therefore confirms what common sense suggests: the prohibition against state regulation of swaps as insurance was not an invitation for state regulation of swaps as *gaming*.

In any event, neither of those preemption provisions—added many years after the exclusive-jurisdiction provision—makes section 2 "any less clear."  *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 52 (2024).  Because the Supreme Court "do[es] not require Congress to employ a particular linguistic formulation when preempting state law," *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 478 (2018), "it is a mistake," *id.*, for Rhode Island to write off section 2 on the ground that it does not state "that state law is preempted," Opp. 25.  And because "no magic words are required" to preempt state law, "the clarity of each statute must be evaluated on its own terms."  *Kirtz*, 601 U.S. at 52 (internal quotation marks omitted).  "[T]he fact that Congress chose to use certain language to" preempt state law "in one amendment

8

to the [CEA] hardly means it was foreclosed from using different language to accomplish the same goal in a different set of amendments to the same law." *Id.* (cleaned up).

**(d).**    Finally, Rhode Island's invocation of the presumption against preemption is unavailing. *See* Opp. 24–26, 28.

*First*, the "presumption against pre-emption" does not apply in "express pre-emption" cases. *Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Emanuelli Hernandez*, 58 F.4th 5, 11 (1st Cir. 2023) (quoting *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016)); *compare id.* (refusing to apply "pre-*Franklin* case law" about "the presumption"), *with* Opp. 24–25 (insisting that the presumption applies based on pre-*Franklin* case law and a single out-of-circuit decision). The State has no response. *Cf.* Kalshi Mot. 14 (raising this point).

*Second*, the presumption does not apply where "there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). That is the case here, however one might characterize event contracts. "[T]he federal government has regulated the derivatives market for over a century." *Flaherty*, 172 F.4th at 230. And even accepting the State's framing, "the regulation of interstate gambling isn't a traditional area of state regulation." *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 641 n.5 (6th Cir. 2025) (emphasis omitted).

*Third*, even if the presumption applied, the Supreme Court in *Rice* held that it was overcome where Congress did exactly what it did here: added an exclusive-jurisdiction provision and deleted a provision permitting state regulation of the same subject matter. *See Rice*, 331 U.S. at 232–33, 236; *supra* pp. 4–7.

2.    <u>The Federally Regulated Event Contracts Here Are Swaps On A CFTC-Designated Contract Market.</u>

Event contracts are swaps—and the CFTC has been regulating them since 1993. *See* CFTC

9

6001151793.17

Mot. 12–14. An event contract is an agreement where "payment . . . is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

(a).    *Event or contingency.* The "event or contingency" language is broad enough to cover the outcome of an athletic event. *See* Mot. 2 (noting Polymarket US has self-certified this kind of contract). Even if the State were correct that "Polymarket's contracts depend on outcomes, not events," they would still be captured by the CEA's definition. Opp. 16. First, "[t]he ordinary meaning of 'event' includes 'something that happens,' 'a noteworthy happening,' or 'a postulated outcome, condition, or eventuality.'" *KalshiEX LLC v. Johnson*, --- F.3d ----, 2026 WL 1223373, at *4 (D. Ariz. May 5, 2026). Indeed, Rhode Island *agrees* that the ordinary meaning of "event" is "a 'happening or occurrence.'" Opp. 16. Second, to indicate that the word covers "result[s]" or "outcome[s]," Mot. 4, "Congress included the phrase, '*the extent of* the occurrence,'" *Johnson*, 2026 WL 1223373, at *4 (quoting 7 U.S.C. § 1a(47)(A)(ii)). "The term 'extent' implies a result that is measurable along a spectrum." *Id*. So, "[i]f 'occurrence' and 'nonoccurrence' capture whether an event happens, 'the extent of the occurrence' extends to how an event resolves." *Id*. Similarly, a "contingency" is "something whose occurrence depends on chance or uncertain conditions." *Contingency*, Webster's New World College Dictionary (5th digital ed. 2025).

*Associated with.* Polymarket US's sports-event contracts also are "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Two things are "associated with" one another when they are "related" or "connected." *Associated*, Merriam-Webster's Dictionary (online ed.); *accord Johnson*, 2026 WL 1223373, at *4. The ordinary meaning of the statutory language is therefore broad; synonymous language "sweeps broadly," covering direct and "indirect" "connection[s]" so long as they are not "tenuous, remote, or

10

peripheral." *Chevron USA Inc. v. Plaquemines Parish*, 146 S. Ct. 1052, 1060–61 (2026) (interpreting "[t]he phrase 'relating to'"); *see Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (treating "relating to" as synonymous with "bring into association with").

As a result, the CEA's language "sweeps in a wide range of qualifying downstream consequences, not necessarily limited to those that carry a market price." *Johnson*, 2026 WL 1223373, at *5. *Contra* Opp. 17 (asserting, based on a pre-*Plaquemines* decision, that an interpretation that permits indirect connections "knows no limiting principle"). And because "[t]he outcome of a sports event certainly can be associated with a potential financial, economic, or commercial consequence," Polymarket US's event contracts "fit comfortably within the Act's definition." *Flaherty*, 172 F.4th at 227–28; *see* Mot. 3–4; CFTC Mot. 13–14 (supplying examples).

Rhode Island apparently does not dispute that Polymarket US's event contracts qualify as swaps under the statute's ordinary meaning. *See* Opp. 16 (relying on a similar definition of "associate"). But the State does what elsewhere it admits it may not: "supply a provision that Congress omitted." Opp. 26. According to Rhode Island, it is not enough for an event to be related or connected to "a potential financial, economic, or commercial consequence"; it must be "*inherently* joined or connected with such a consequence." *Id.* at 16. The word "inherent," however, "is not in the definition." *KalshiEX LLC v. Orgel*, 2026 WL 474869, at *8 (M.D. Tenn. Feb. 19, 2026). And its insistence that the Court may not "look[] at" "potential downstream financial consequences," Opp. 16, artificially narrows the text's ordinary meaning, which is more than broad enough to cover "indirect" "connection[s]," *Plaquemines*, 146 S. Ct. at 1060.

**(b).** Rhode Island's appeal to "statutory context," Opp. 18, only ends up confirming the statute's breadth. Consider the State's narrow conception of a swap as an agreement to "hedge risk" by exchanging payment based "on financial obligations []such as interest payments[,]"

11

"interest rate[s]," or "loan defaults."  *Id.* at 7, 17.  All those arrangements would fall within the definition of swap in section 1a(47)(A)(iii), which covers agreements "that transfer[] . . . financial risk" and that pay out "based on the value or level of 1 or more interest or other rates, . . . instruments of indebtedness, . . . , or other financial or economic interests."  They are also covered by section 1a(47)(A)(i) as agreements "for the purchase or sale, or based on the value, of 1 or more interest or other rates, . . . instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind."  And like the 20 other swaps specifically mentioned in section 1a(47)(A)(ii), the State's hypothetical "interest rate swap" and "credit default swap," Opp. 17, would also be covered by section 1a(47)(A)(iv) because each is "an agreement, contract, or transaction that is . . . commonly known to the trade as a swap."

That considerable overlap—regardless of how one reads section 1a(47)(A)(ii)—shows that redundancy is a feature of the CEA.  To ensure effective federal oversight of the derivatives market, Congress "defined 'swap' broadly."  *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025).  And it directed the CFTC "to *further* define the term[] 'swap'" "[t]o include transactions and entities that have been structured to evade" the statute.  15 U.S.C. § 8321(b) (emphasis added).  In other words, Congress took a deliberate "belt and suspenders" approach designed "to avoid potential ambiguities, gaps, or loopholes."  *Snyder v. United States*, 603 U.S. 1, 19 (2024).

And that approach forecloses the State's attempt to invoke the presumption against surplusage.  Opp. 20.  When a statute contains unavoidable redundancy—that is, when no "competing interpretation" can prevent at least some overlap between each "clause and word"— the presumption against surplusage supplies no "assist[ance]."  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).  Put slightly differently:  "That Congress took a belt-and-suspenders approach in drafting an unmistakably broad provision does not somehow narrow the text or

12

obscure Congress' intent." *In re Coughlin*, 33 F.4th 600, 608–09 (1st Cir. 2022), *aff'd sub nom. Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382 (2023); *see also Rimini Street, Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019) ("Sometimes the better overall reading of the statute contains some redundancy.").

The State's invocation of "*noscitur a sociis*" fails for a similar reason. Opp. 18. Rhode Island proposes to limit section 1a(47)(A)(ii) "to financial instruments used to hedge existing risk in markets" on the theory that the other definitions of "swap" are similarly limited. *Id.* They are not: of the six definitions, only one requires the "transfer[]" of "financial risk." 7 U.S.C. § 1a(47)(A)(iii). "[S]peculating" is permissible, too—as the State admits. *Curran,* 456 U.S. at 389–90; *see* Opp. 31. That is why the CEA allows the CFTC to limit "*[e]xcessive* speculation." 7 U.S.C. § 6a (emphasis added). Regardless, *noscitur a sociis* is inapplicable because there is no "general phrase," *Fischer v. United States*, 603 U.S. 480, 488 (2024), or "ambiguous" term in need of clarification, *Coughlin*, 33 F.4th at 608–09 & n.11 (canons used to resolve ambiguity inapplicable where "Congress took a belt-and-suspenders approach"). And even if it *were* applicable, Rhode Island admits that the definitions surrounding section 1a(47)(A)(ii) are *not* limited to agreements based on events with inherent "financial consequences." Opp. 18 n.5.

The State's attempt to use the presumption against "hid[ing] elephants in mouseholes" likewise fails. Opp. 23. For all its talk of the storied tradition of state gambling regulation, Rhode Island is candid that Dodd-Frank was passed at a time when federal law made "sports wagering . . . illegal everywhere but Nevada." Opp. 20. So even if, contrary to law and fact, swaps traded on designated contract markets *were* gaming, it is not clear how Dodd-Frank could have effected "a sea change" in the federal-state balance. *Id.* at 23. Regardless, all agree that the 2010 amendments give the CFTC discretion to ban event contracts involving "gaming." 7 U.S.C. § 7a-2(c); *see supra*

13

pp. 7–9; Opp. 8, 28, 29.  Rhode Island demands a clear statement for matters of "economic and political significance," but it does not explain how Congress could have been any clearer.  Opp. 23.

Finally, Rhode Island maintains that Polymarket US's view "would impliedly repeal" the Wire Act and Indian Gaming Regulatory Act (IGRA).  Opp. 23.  But IGRA has nothing to say about derivatives trading on designated contract markets.  And the Wire Act prohibits "betting or wagering" where illegal under state law, 18 U.S.C. § 1084(a), but the State concedes that the CEA effectively "repeal[s] . . . this law" only if the CEA "require[s] all betting [to] occur on CFTC-registered [contract markets]"—an interpretation that Polymarket US has never advanced and that Rhode Island resists.  Opp. 23.  Besides, as the State also concedes, federal law elsewhere "supplements the Wire Act," Opp. 24 n.7, by making clear that "[t]he term 'bet or wager' . . . does not include . . . any transaction conducted on . . . a registered entity . . . under the Commodity Exchange Act," 31 U.S.C. § 5362(1), (1)(E).

**(c).**    Abandoning the statutory text entirely, the State ventures into purposivism, legislative history, and policy.  Each is a dead end.

Start with supposed statutory purpose.  Because the "authoritative statement" of congressional intent "is the statutory text," *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005), courts should not "restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy," *Brogan v. United States*, 522 U.S. 398, 403 (1998).  The CEA proves this point: Rhode Island speculates that the purpose of Dodd-Frank was to bring under federal control "credit default swaps," Opp. 20, but "credit default swap[s]" make up just a subpart of a subpart of the statutory definition, 7 U.S.C. § 1a(47)(A)(iii)(XV).

Or consider "legislative history," which "cannot introduce ambiguity into a clear statute."

14

*Coughlin*, 33 F.4th at 609.  Even if legislative history were relevant, it would cut against the State's position.  The "colloquy" the State quotes, *see* Opp. 20, concerns the introduction of the Special Rule—and, with it, the "CFTC's authority to prevent trading that is contrary to the public interest," 156 Cong. Rec. S5902, S5906–07 (daily ed. July 15, 2010).  So, if Congress *did* foresee what Rhode Island calls "gambling on CFTC-designated exchanges," Opp. 20, it addressed the issue by affording the CFTC, not the States, the discretion to approve or disapprove event contracts involving "gaming."  7 U.S.C. § 7a-2(c)(5)(C).  And if Congress did *not* foresee the trading of sports-related event contracts, it is not courts' "job to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have done."  *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017).  "Even if Congress did not foresee all of the applications of the statute, that is no reason not to give the statutory text a fair reading."  *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 90 (2018).

Rhode Island's appeal to policy fails, too.  To conjure up an outcome it believes "absurd," Rhode Island addresses an argument no party has made: that "wagers on virtually *anything* would qualify as 'swaps.'"  Opp. 22.  But that is not Polymarket US's position: the definition in § 1a(47)(A)(ii) is broad, not limitless; *see supra* pp. 10–11; *Plaquemines*, 146 S. Ct. at 1061; *cf. Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985) ("[T]he fact that [a statute] has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.").

Nor has the CFTC claimed the mantle of "the nation's *sole* regulator for things like sports betting."  Opp. 22; *see* CFTC Mot. 15.  To the contrary, it has long distinguished exchange-traded derivatives from "customary consumer . . . arrangements" that are "not traded on an organized market."  77 Fed. Reg. 48,208, 48,247 (Aug. 13, 2012).  In other words, event contracts traded on

15

an organized exchange (like Polymarket US) fall comfortably within the definition of swap and must obtain CFTC designation as a contract market.  Wagers placed with sportsbooks do not fall into that definition and need not obtain CFTC designation.  *See* 7 U.S.C. § 16(e)(1) (CEA does not "preempt" "transaction[s]" that are "not conducted on" an exchange); *Flaherty*, 172 F.4th at 229 (recognizing this "limiting principle").  Rhode Island asserts that this distinction is "circular" and "limitless," Opp. 22, but it does not deny that this distinction has proven effective for over a decade.  And it has not resulted in the consequences Rhode Island scares up.

No doubt, some cases might raise particularly difficult questions about "the outer bounds of the definition of swap."  *Johnson*, 2026 WL 1223373, at *5.  But that is why Congress directed *the CFTC* to "further define the term[] 'swap.'"  15 U.S.C. §§ 8302(d)(1), 8321(b).  That is why the CFTC has for over a decade encouraged the submission of "request[s] . . . to provide a[n] interpretation of whether a particular agreement . . . is" a "swap."  17 C.F.R. § 240.3a68-2(a).  And that is why, in cases where the scope of the CEA is in dispute, the Supreme Court has required parties to seek CFTC guidance *before* attempting to enjoin a contract market.  *See Ricci v. Chi. Mercantile Exch.*, 409 U.S. 289, 304 (1973).

### B.    Field Preemption Bars the State from Regulating Transactions on a CFTC-Designated Contract Market.

The CEA's text, structure, and purpose reflect an intent to occupy the field of trading on a CFTC-regulated contract market.  Mot. 4–5; Kalshi Mot. 13–20; CFTC Mot. 17–19.  As for text and structure, the CEA "'provides a full set of standards'" for trading, *Arizona*, 567 U.S. at 401; *see* Kalshi Mot. 18 (providing examples).  That is why, long before swaps joined other derivatives in the statute, the Supreme Court recognized that the CEA was "aptly characterized as a comprehensive regulatory structure" for futures trading.  *Curran*, 456 U.S. at 355–56.  As for purpose, the First Circuit and other courts have held that "Congress intended the CFTC to occupy

16

the entire field of commodities futures regulation," *Brien*, 617 F.2d at 310, and "intended to avoid a diversity of regulations between the C.F.T.C. and the states," *Kelly*, 691 F.2d at 804 n.12.

Instead of addressing any of this, Rhode Island discusses the inapplicable presumption against preemption, *see supra* pp. 9–10, and focuses on whether the CEA "precludes state *gambling* law." Opp. 30 (emphasis added). But the relevant "field" is the one in which Congress has "legislated," not whichever field happens to suit a State's litigating position. *Rice*, 331 U.S. at 230. "A federally occupied field can cover a narrow subject, so long as Congress intended to exclusively regulate that field." *Churchill Downs*, 162 F.4th at 638. Here, that is "the regulation of trading on a" contract market, not the regulation of gambling. *Flaherty*, 172 F.4th at 229.

The other field-preemption arguments scattered throughout the Opposition also fail. *First*, the State asserts that "there is no reason to believe [the CEA] precludes state gambling law." Opp. 30. To the contrary, the preemption of state gambling law was a central purpose of the CEA. *See* Kalshi Mot. 3; CFTC Mot. 16–17. At any rate, the Supreme Court for over 50 years has rejected "the aberrational doctrine" that States may avoid preemption by asserting that the challenged law addresses a different subject or serves a different "purpose." *Perez v. Campbell*, 402 U.S. 637, 651–52 (1971); *cf. Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231 (1964) ("a State cannot encroach upon the federal patent laws," either "directly" or "under some other law"). What matters is not the label but the "real effect" of state law. *Livadas v. Bradshaw*, 512 U.S. 107, 119 (1994); *accord Perez*, 402 U.S. at 652. And it is indisputable that the real effect of Rhode Island's enforcement action is to encroach upon trading on CFTC-regulated contract markets. As applied to Polymarket US, that means Rhode Island's gambling laws are preempted. *See Flaherty*, 172 F.4th at 229.

17

6001151793.17

*Second,* the savings clause does not alter the field-preemption analysis.  The State asserts that a "savings clause 'negates the inference that Congress left no room for state causes of action.'" Opp. 28 (quoting *Ouellette*, 479 U.S. at 492).  But the *Ouellette* Court ultimately *rejected* that inference, reasoning that the provision at issue "merely sa[id] that 'nothing *in this section*' . . . shall affect . . . state law; it d[id] not purport to preclude pre-emption of state law by other provisions of the Act."  479 U.S. at 493.  Here, too, the savings clause merely says that "nothing contained in this section" (except the exclusive-jurisdiction clause) "shall . . . supersede" state law.  7 U.S.C. § 2(a)(1)(A); *see supra* pp. 7–8.  It does not purport to preclude pre-emption of state law by the comprehensive provisions elsewhere in the CEA.  *Cf. Fednav, Ltd. v. Chester*, 547 F.3d 607, 619–20 (6th Cir. 2008) (where a "savings clause concerns a different field than the one at issue, . . . it is inapposite to the question whether Congress intended to preempt the [relevant] field").

*Third*, Rhode Island asserts that the Special Rule "carves out space for continued State regulation of contracts relating to 'gaming' or other 'activity that is unlawful under any . . . State law.'"  Opp. 29 (quoting 7 U.S.C. § 7a-2(c)(5)(C)(i)).  That argument has no basis in the statute Congress wrote.  The Special Rule leaves the decision to ban a contract to the CFTC, 7 U.S.C. § 7a-2(c)(5)(C)(i), and the CEA bars States from using such a decision as a basis for suing "a contract market," *id.* § 13a-2(1).

At any rate, Rhode Island appears to proceed under the misimpression that "an event contract 'involves' an enumerated activity if the act of trading the contract 'amounts to' the activity." *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *11 (D.D.C. Sept. 12, 2024).  That cannot be correct: the CFTC may also prohibit event contracts that "involve . . . assassination[ or] war," 7 U.S.C. § 7a-2(c)(5)(C)(i), but "no one would" contend that "an event contract could ever 'amount to' assassination" or war.  *CFTC*, 2024 WL 4164694, at *11.  Instead, a swap "'involves' an

18

enumerated activity if the event being . . . traded [in the] contract . . . relates to that activity." *Id.* at *13.  So, for example, an event contract "involves" war if the "subject of the transaction" is a war.  *Id.* at *11.  And an event contract "involves" gaming if the underlying event is gaming— "playing games or playing games for stakes."  *Id.* at *10.  The underlying event for Polymarket US's sports-event contracts is sports, not gaming.[5]

*Fourth*, Rhode Island turns the clock back a century and describes the CEA as a "regulatory regimes for traditional commodities like grain futures."  Opp. 30.  Whatever "the CEA's predecessor" statute might have considered a commodity, *id.,* today's CEA is so broad that the term "commodity" covers "all . . . goods and articles, except onions," and "all services . . . except motion picture box office receipts," 7 U.S.C. § 1a(9).  That is why the CFTC had exclusive jurisdiction over a "diverse" range of non-agricultural event contracts—including elections—even before swaps were added to the CEA.  73 Fed. Reg. 25,669, 25,671 (May 7, 2008).

Rhode Island is right about one thing, though:  The Supreme Court *has* previously held that the CEA does not preempt state law.  Opp. 30.  The very same day the Supreme Court decided that Congress preempted state law by amending the Warehouse Act to give the federal government "exclusive" "jurisdiction," *Rice*, 331 U.S. at 223, the Court held in a "companion case[]" that the absence of an equivalent provision in the CEA meant that the CEA did *not* preempt state law:

---

[5] As Rhode Island notes, the CFTC recently withdrew a notice of proposed rulemaking that would have revised 17 C.F.R. § 40.11 to prohibit event contracts based on "sporting events."  *See Event Contracts*, 89 Fed. Reg. 48,968, 48,976 (proposed June 10, 2024), *withdrawn*, 91 Fed. Reg. 5386 (Feb. 6, 2026); *see* Opp. 8, 30 (citing the withdrawn proposal).  This proposed revision undermines the State's assertion that such contracts are *already* prohibited.  And the CFTC withdrew the rule because it was based on an interpretation of the Special Rule—the interpretation the State appears to advance—that the D.C. federal district court rejected.  *See* 89 Fed. Reg. at 48,976 (relying on the CFTC's now-vacated "Kalshi Order"); *Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35,806, 35,821 & n.177 (explaining that "the Commission preliminarily believes that the . . . Kalshi Order [was] incorrect" and adopting the "interpretation is also consistent with the reasoning of the District Court for the District of Columbia").

19

"[T]here is not contained in the Commodity Exchange Act, as there is in the United States Warehouse Act, a declaration by Congress that the system which it has adopted for the regulation of trading on contract markets is exclusive of state regulation." *Rice v. Bd. of Trade of City of Chi.*, 331 U.S. 247, 253 (1947). That is why Congress inserted the exclusive-jurisdiction provision in 1974. *See supra* pp. 4–5; Kalshi Mot. 14–16; CFTC Mot. 5, 16–17.

*Finally*, the State once more falls back on policy arguments, listing various restrictions it believes absent in the CEA that are present under state gambling regimes. Opp. 30. When a field is preempted, however, "the federal scheme prevails" even when "it is a more modest, less pervasive regulatory plan than that of the State." *Rice*, 331 U.S. at 236. The State is also wrong about the content of the CEA. It *does* "require licensing." *Contra* Opp. 30. *See* 7 U.S.C. § 7(a), (d); *id.* § 8; CFTC Mot. 19; Kalshi Mot. 22. It does provide for "background checks." *Contra* Opp. 30. *See* 31 C.F.R. § 1026.220(a). It places limits on the kinds of contracts that "are allowed." *Contra* Opp. 30. *See* 7 U.S.C. §§ 7(d)(3), 7a-2(c)(5)(C)(i). It prohibits "insider" and other "unfair" trading. *Contra* Opp. 30. *See* 7 U.S.C. §§ 6b, 6c; 17 C.F.R. § 180.1. A contract market is not the "house" and does not itself hold customer funds—meaning there are no "reserves" to "set aside"— but the CEA does require rules for the protection of customer funds, does contain extensive recordkeeping requirements, and does provide for "regular audits." *Contra* Opp. 30. *See* 7 U.S.C. § 7(d)(7), (10), (11), (20); 17 C.F.R. §§ 38.552, 38.553, 45.2. And the CEA mandates extensive "consumer protections." *Contra* Opp. 30. *See* 7 U.S.C. § 7(d)(2)(A)(iii), (d)(12); *id.* § 9. It is alarming that the State feels so confident about overriding a statute it seems to know so little about.

## C.  As Applied to Polymarket US, the State's Gambling Laws are Conflict-Preempted.

Both kinds of conflict preemption—obstacle and impossibility—bar Rhode Island's attempts to enforce its gambling laws against Polymarket US.

20

6001151793.17

Start with obstacle preemption.  The State's attempt to regulate contracts listed on a contract market frustrates the central "purposes and objectives of Congress," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), when amending the CEA: "to avoid a diversity of regulations between the C.F.T.C. and the states," *Kelly*, 691 F.2d at 804 n.12, by "do[ing] away with the patchwork of state regulations," *Flaherty*, 172 F.4th at 230; *see* Mot. 5.  The State's principal response, that "uniformity is a field-preemption not a conflict-preemption argument," Opp. 33, is one the Supreme Court has already rejected, *see Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142, 145 (1990) (relying on "the goal of uniformity that Congress sought to implement" to find "express" *and* "conflict preemption"); *Sherfel v. Newson*, 768 F.3d 561, 564 (6th Cir. 2014) (similar).  And the State's mistaken belief that "[t]he Special Rule preserves . . . state law enforcement" is no more meritorious the second time around.  Opp. 34; *see supra* p. 7.

The State describes the obstacle-preemption arguments as turning on "generic uniformity concerns," but that is incorrect.  Opp. 33.  Obstacle preemption applies whenever federal law "confers a right on private actors (either explicitly or implicitly) that conflicts with [a state-law] restriction."  *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022).  Here, to ensure "a system of effective self-regulation of trading facilities," 7 U.S.C. § 5(b), Congress eliminated the requirement that contract markets demonstrate to the CFTC that new contracts satisfied a "public interest" and "'economic purpose test'" "before they could trade th[ose] contracts," *CFTC*, 2024 WL 4164694, at *2.  In place of that requirement, Dodd-Frank gave contract markets the right "to self-certify that their proposed contracts complied with the statute and the CFTC's regulations, with no prior review required," *id.*, subject to after-the-fact public-interest review *only* by the CFTC, *see* 7 U.S.C. § 7a-2(c)(5)(C)(i) (permitting CFTC "public interest" review of self-certified gaming-related event contracts).

21

Rhode Island's asserted veto power over CFTC public-interest determinations would turn the federal statutory scheme on its head. It would strip contract markets of their right to trade after self-certification, instead requiring them to satisfy each State's individual public-interest test before offering a new contract. That reading is untenable. Mot. 5; *cf.* 7 U.S.C. § 13a-2(1) (prohibiting States from suing "contract market[s]" for CEA violations); *id.* § 13a-2(7) (limiting States to state-court suits based on general fraud laws). Decisions about what contracts may be listed on a designated contract market "are matters for uniform federal regulation subject to review by the CFTC, not matters for review or adjudication by individual state[s]." *DGM Invs., Inc. v. N.Y. Futures Exch., Inc.*, 2002 WL 31356362, at *5 (S.D.N.Y. Oct. 17, 2002).

As for impossibility preemption, the CFTC has explained that contract markets cannot comply with Rhode Island law without violating the federal requirement for designated contract markets to "provide [their] members . . . with impartial access to its markets and services" "in a non-discriminatory manner." 17 C.F.R. § 38.151(b). Rhode Island notes that this requirement prohibits "discriminatory access requirements" from being used "as a competitive tool against certain participants." Opp. 32 (quoting 77 Fed. Reg. 36,612, 36,625 (2012)). But the very next sentence shows why the CFTC has said there is an impossibility problem: "[A]ccess to a [designated contract market] should be based on the financial . . . soundness of a participant, not on factors that could bar access and result in discriminatory access or act as a barrier to entry." 77 Fed. Reg. at 36,625. And the State does not deny that compliance with Rhode Island law would "bar access" despite the "financial . . . soundness of a participant." The State's assertion that the rule does not "guarantee anyone anywhere access to any [contract market]" is therefore nonresponsive. Opp. 32. Finally, the State's suggestion that Polymarket US could simply stop

22

providing access to its platform, *id.*, is one the Supreme Court has described as "incoheren[t]" and "irrelevant" to "the impossibility analysis," *Bartlett*, 570 U.S. at 488–90.

## II.    Polymarket US Will Be Irreparably Harmed Without Relief.

A preliminary injunction is necessary to prevent imminent, irreparable harm.

*First*, without a preliminary injunction, Polymarket US is put to "a Hobson's choice: continually violate the [Rhode Island] law[s] and expose [itself] to potentially huge liability; or violate the law[s] once as a test case and suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales*, 504 U.S. at 381.  In these circumstances, the Supreme Court has held that "the prospect of [state] suit which supplies the necessary irreparable injury," *id.* at 382—a holding that applies with even greater force here given that the State has *already* sued.  Mot. 5–6; Kalshi Mot. 24.

In light of this posture—with Polymarket US already on the receiving end of an enforcement action—Rhode Island's argument that the prospect of such an action "has been eliminated" is not just surprising but untrue.  Citing no supporting authority, the State contends that there is no imminent harm because "no state action will be brought by Rhode Island until these matters are decided."  Opp. 35.  The State, however, has made no such commitment:  As Rhode Island concedes, it believes itself free to "begin enforcement action" so long as it "provides sufficient notice."  *Id.*  But a defendant may not moot a request for injunctive relief "by the simple expedient of suspending its challenged conduct after it is sued," particularly where it reserves the right to "later pick up where it left off."  *FBI v. Fikre*, 601 U.S. 234, 241 (2024).  Otherwise, the defendant could "repeat this cycle as necessary until it achieves all of its allegedly unlawful ends." *Id.* (internal quotation marks omitted).

Because Polymarket US "remain[s] under a constant threat that government officials will use their power to reinstate the challenged restrictions," Polymarket US "remain[s] entitled to

23

emergency injunctive relief." *Tandon v. Newsom*, 593 U.S. 61, 63 (2021) (per curiam) (internal quotation marks omitted); *see*, *e.g.*, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 20 (2020) (similar)*; New York v. U.S. Dep't of Justice*, 804 F. Supp. 3d 294, 331 (D.R.I. 2025) (because government "maintains the authority to enforce," its "argument about non-enforcement was largely unconvincing").

Rhode Island's efforts to distinguish *Morales* are also unconvincing.  The State maintains that its "enforcement priority" is "a declaratory judgment action, not . . . civil penalties," Opp. 36, but the State's complaint demands "restitution[,] disgorgement," and an injunction *in addition to* declaratory relief.  Dkt. 1-1 ("Compl.") ¶¶ 116–18.  Rhode Island does not deny that "repetitive penalties attach" to the "violations" it alleges, *Morales*, 504 U.S. at 381, or that it will seek to recover such penalties.  To the contrary, the complaint cites various state laws classifying certain conduct as a felony as well as various statutory prohibitions that attract penalties of up to $1,000 per violation.  *See*, *e.g.*, Compl. ¶¶ 27–35, 115–16 (citing criminal laws under Chapter 19 of Title 11 and the Casino Gaming Acts); R.I. Gen. Laws § 42-61.2-13.

The State's backup theory—that there is no irreparable harm where a party "can raise [its] claims as affirmative defenses" in state court, Opp. 36—would categorically preclude pre-enforcement challenges because "constitutional defenses *always* stand fully available" in state court, *Whole Woman's Health v. Jackson*, 595 U.S. 30, 36 n.1 (2021) (emphasis added).  Citing *O'Shea v. Littleton*'s doctrine against equitable intervention, *see* 414 U.S. 488, 502 (1974), Opp. 36–37, gets the State no further: *Also* citing *O'Shea*, the *Morales* Court held "that this doctrine does not prevent federal courts from enjoining state officers who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected [by]

24

an unconstitutional act, violating the Federal Constitution." *Morales*, 504 U.S. at 381 (internal quotation marks omitted). Just so here.

*Second*, ceasing operations in Rhode Island would harm Polymarket US within and outside of Rhode Island by eliminating business prospects, tarnishing Polymarket US's reputation, and reducing liquidity for others on the platform. Mot. 6–7. The State responds, incorrectly, that event contracts are "illegal and violate public policy," and claims that Polymarket US's reputation is already sullied and "caused . . . by [its] own decisions." Opp. 37–38. But "an injury resulting from" the refusal to comply with "an unlawful enactment" is in no meaningful sense "'self-inflicted.'" *FEC v. Cruz*, 596 U.S. 289, 297 (2022). The State's own attempt to garner media attention through a press release about this litigation belies the assertion that additional state action has little reputational impact.[6] Regardless, unlawful behavior by other States does not give Rhode Island license to pile on. *See Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 318 (1st Cir. 2012) (injunctive relief available to "potentially lessen [an] injury" even if the relief would not "completely remedy the harm"). And at no point does the State deny that, under First Circuit precedent, any costs Polymarket US incurred would be irrecoverable given sovereign immunity— making them irreparable. Mot. 7 (citing *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003)); *see* Opp. 38 (citing out-of-circuit decisions).

## III.     The Public Interest and Balance of Equities Strongly Favor Preliminary Relief.

The last two factors similarly support an injunction. The State never disputes—and so concedes—that neither equity nor the public interest is furthered by allowing the continued violation of federal law, or that the State lacks a cognizable interest in enforcing preempted laws.

---

[6] Press Release, Attorney General Neronha sues Kalshi and Polymarket for unlawfully conducting sports gambling in Rhode Island (May 21, 2026), *available at* https://riag.ri.gov/press-releases/attorney-general-neronha-sues-kalshi-and-polymarket-unlawfully-conducting-sports.

25

Mot. 7. Those principles make quick work of the State's asserted pecuniary and other interests, all of which stem from the incorrect belief that the State may regulate Polymarket US like a sportsbook. *See* Opp. 39–41.

Polymarket US complies with the CEA; it seeks an injunction to ensure that the State does the same.

## CONCLUSION

The Court should enjoin the State from enforcing its preempted laws against Polymarket US.

26

6001151793.17

Dated: June 30, 2026

Respectfully submitted,

/s/ *Matthew H. Parker*
Matthew H. Parker (#8111)
Jessica Sylver (#8607)
WHELAN CORRENTE & FLANDERS LLP
100 Westminster Street, Suite 710
Providence, RI 02903
Telephone:  401.270.4500
Fax: 401.270.3760
mparker@whelancorrente.com
jsylver@whelancorrente.com

Orin Snyder*
Matt Benjamin*
Amanda LeSavage*
GIBSON DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com
alesavage@gibsondunn.com

Thomas H. Dupree, Jr.*
Jacob T. Spencer*
Adam I. Steene*
GIBSON DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

*Admitted pro hac vice*

*Attorneys for Defendant QCX LLC d/b/a Polymarket US*

27

6001151793.17