**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| KALSHIEX LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ) | |
| MARK FURCOLO, in his official capacity as ) | C.A. No. 1:26-cv-00327-MSM-PAS |
| Director of the Division of State Lottery; ) | |
| PETER F. NERONHA, in his official ) | ORAL ARGUMENT REQUESTED |
| capacity as Rhode Island Attorney General; ) | |
| CHRISTINA TOBIASZ, in her official ) | |
| capacity as Gaming and Athletics ) | |
| Administrator, Department of Business ) | |
| Regulation, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

**PLAINTIFF'S REPLY IN FURTHER SUPPORT OF A**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ......................................................................................................................... 1

    A.    Kalshi Is Likely to Succeed Because the CEA Preempts Rhode Island's Efforts to Regulate Event Contracts Traded on DCMs. ....................................... 1

        1.    The CEA's Plain Text Preempts Rhode Island's Regulation of Event Contracts on DCMs. ......................................................................... 2

        2.    The CEA Preempts State Regulation of On-DCM Trading. ..................... 9

    B.    Kalshi Will Suffer Irreparable Harm Without a Preliminary Injunction. ............ 15

    C.    The Balance of the Equities and Public Interest Favor a Preliminary Injunction. ................................................................................................................. 16

CONCLUSION ...................................................................................................................... 18

i

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Acosta v. Restrepo*,
    470 F. Supp. 3d 161 (D.R.I. 2020)................................................................16

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
    977 F.2d 1147 (7th Cir. 1992) ...................................................................14

*In re Am. River Transp. Co.*,
    800 F.3d 428 (8th Cir. 2015) .....................................................................9

*Arizona v. United States*,
    567 U.S. 387 (2012)..................................................................................10

*Blue Lake Rancheria v. Kalshi Inc.*,
    2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) ..........................................9

*Bob Jones Univ. v. United States*,
    461 U.S. 574 (1983)...................................................................................9

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
    162 F.4th 631 (6th Cir. 2025) ...................................................................16

*Coventry Health Care of Mo., Inc. v. Nevils*,
    581 U.S. 87 (2016)....................................................................................10

*D.M. v. Minn. State High Sch. League*,
    917 F.3d 994 (8th Cir. 2019) ....................................................................17

*Duke Energy Trading & Mktg., L.L.C. v. Davis*,
    267 F.3d 1042 (9th Cir. 2001) ..................................................................10

*Entergy, Ark., Inc. v. Nebraska*,
    210 F.3d 887 (8th Cir. 2000) ....................................................................16

*Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Agric.*,
    123 F.3d 1098 (8th Cir. 1997) ..................................................................10

*Ingersoll-Rand Co. v. McClendon*,
    498 U.S. 133 (1990)..................................................................................14

*KalshiEX, LLC v. Flaherty*,
    172 F.4th 220 (3d Cir. 2026) ............................................................ *passim*

*KalshiEX LLC v. Johnson*,
    2026 WL 1223373 (D. Ariz. May 5, 2026) ..............................................17

*KalshiEX LLC v. Orgel*,
   2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) ..................................................................17

*KalshiEX LLC v. Schuler*,
   2026 WL 1295806 (6th Cir. Apr. 24, 2026) .......................................................................3

*Loving v. IRS*,
   742 F.3d 1013 (D.C. Cir. 2014) .........................................................................................5

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
   456 U.S. 353 (1982) ............................................................................................................5

*Monsanto Co. v. Durnell*,
   2026 WL 1825691 (U.S. June 25, 2026) ..........................................................................14

*Mut. Pharm. Co. v. Bartlett*,
   570 U.S. 472 (2013) ..........................................................................................................13

*NIH v. Am. Pub. Health Ass'n*,
   145 S. Ct. 2658 (2025) ......................................................................................................16

*Oncale v. Sundowner Offshore Servs., Inc.*,
   523 U.S. 75 (1998) ..............................................................................................................6

*Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*,
   26 F.3d 1508 (10th Cir. 1994) ............................................................................................3

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
   579 U.S. 115 (2016) ..........................................................................................................12

*Rice v. Bd. of Trade of Chi.*,
   331 U.S. 247 (1947) ..........................................................................................................11

*Rufo v. Inmates of Suffolk Cnty. Jail*,
   502 U.S. 367 (1992) ..........................................................................................................17

*Slaney v. Int'l Amateur Athletic Fed'n*,
   244 F.3d 580 (7th Cir. 2001) .........................................................................................9, 10

*Tafflin v. Levitt*,
   493 U.S. 455 (1990) ..........................................................................................................10

*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*,
   108 F.4th 144 (3d Cir. 2024) ............................................................................................10

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ..............................................................................................................4

iii

*United States v. Locke*,
    529 U.S. 89 (2000)..........................................................................................................12

*United States v. New York*,
    708 F.2d 92 (2d Cir. 1983)............................................................................................16

*West Virginia v. EPA*,
    597 U.S. 697 (2022)..........................................................................................................8

**Statutes**

7 U.S.C. § 1a............................................................................................................... *passim*

7 U.S.C. § 2................................................................................................................. *passim*

7 U.S.C. § 5.........................................................................................................................14

7 U.S.C. § 7a-2............................................................................................................ *passim*

15 U.S.C. § 8302..............................................................................................................4, 7

31 U.S.C. § 5362..................................................................................................................9

**Other Authorities**

17 C.F.R. pt. 38..................................................................................................................17

17 C.F.R. § 1.31..................................................................................................................17

17 C.F.R. § 38.151..............................................................................................................14

17 C.F.R. § 38.950..............................................................................................................17

17 C.F.R. § 38.1101............................................................................................................17

120 Cong. Rec. S30464 (daily ed. Sep. 9, 1974).............................................................11

156 Cong. Rec. S3063 (daily ed. May 4, 2010).................................................................6

Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*,
    N.Y. Times: DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5...................5

Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a
    World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679 ........5

Anthony M. Diercks et al., *Kalshi and the Rise of Macro Markets*, Fed. Reserve
    Bd. (Feb. 12, 2026), https://perma.cc/9EY4-M3HY .............................................4

iv

Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the Knicks win. Its owner is using Kalshi to hedge the risk.*, Bus. Insider (June 2, 2026), https://perma.cc/SFR4-EBKM ........................................................................................5

Concept Release,
73 Fed. Reg. 25669 (May 7, 2008) ...............................................................................7, 9

*Contingency*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003)...................................3

*Event*, Webster's II New College Dictionary (3d ed. 2005) .........................................................3

*Event*, Webster's Encyclopedic Unabridged Dictionary (1st ed. 2001) ......................................3

Frank N. Fisanich, Prediction Markets Advisory,
CFTC LTR No. 26-08 (Mar. 12, 2026) .....................................................................17

Further Definition of "Swap,"
77 Fed. Reg. 48208 (Aug. 13, 2012)........................................................................7, 8

H.R. Rep. No. 97-565, pt. 1 (1982).............................................................................................11

H.R. Rep. No. 106-711, pt. 2 (2000)......................................................................................10, 11

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent
L. Rev. 657 (1982) .......................................................................................................7

Prediction Markets; Public Interest Determinations,
91 Fed. Reg. 35806 (proposed June 12, 2026)
(to be codified at 17 C.F.R. pt. 40) ................................................................. *passim*

S. Rep. No. 93-1131 (1974)........................................................................................................11

## PRELIMINARY STATEMENT

The Supremacy Clause violation here is plain:  Federal law grants a federal agency, the CFTC,[1] "exclusive jurisdiction" over event contracts traded on federally regulated DCMs. 7 U.S.C. § 2(a)(1)(A).  Federal law also grants the CFTC—and only the CFTC—the discretion to determine whether certain "event contracts" should be barred on DCMs as "contrary to the public interest."  *Id.* § 7a-2(c)(5)(C).  Rhode Island's actions flout these federal commands by asserting concurrent state jurisdiction over event contracts traded on DCMs and usurping the CFTC's discretion to decide which event contracts should be barred.  Defendants' efforts to avoid a preliminary injunction all fail.

## ARGUMENT

**A.    Kalshi Is Likely to Succeed Because the CEA Preempts Rhode Island's Efforts to Regulate Event Contracts Traded on DCMs.**

As a threshold matter, Defendants err in characterizing Kalshi's preemption claims as entrenching on the State's historical authority to regulate gambling.  Kalshi does not assert that the CEA preempts all state gambling regulations.  Rather, Kalshi challenges Rhode Island's effort to apply state gambling laws to federally regulated DCMs like Kalshi, whose event contracts are within the CFTC's "exclusive jurisdiction."  Granting Kalshi relief therefore leaves Rhode Island entirely free to apply its gambling laws to regulate transactions that do not occur on federally regulated DCMs.  Indeed, the CEA expressly preserves states' historic power to regulate gambling in casinos and on sportsbooks by providing that nothing in the CEA "supersede[s]" states' authority "except" as provided in the "exclusive jurisdiction" provision.  7 U.S.C. § 2(a)(1)(A).

---

[1] All capitalized terms used but not defined herein are set out in KalshiEX LLC's ("Kalshi") Memorandum of Law in Support of a Preliminary Injunction (Dkt. No. 5-1).

1

The CEA simply prevents Rhode Island from extending its state gambling regulations to reach instruments traded on federally regulated, nationwide exchanges like Kalshi.

1.    <u>The CEA's Plain Text Preempts Rhode Island's Regulation of Event Contracts on DCMs.</u>

Defendants' efforts to regulate Kalshi's event contracts are incompatible with the plain text of the CEA's "exclusive jurisdiction" provision.  The CEA preempts state regulation of contracts traded on DCMs by granting the CFTC "exclusive jurisdiction" over "accounts," "agreements," and "transactions involving swaps [and futures]" traded on DCMs.  *Id.*  The CEA then defines "swaps" to include "contract[s]" "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  *Id.* § 1a(47)(A)(ii).

Defendants try to escape this text by asserting that Kalshi's event contracts do not fit within the statutory definition of "swap" (at 13–23), but that is both irrelevant and wrong.  It is irrelevant because the CFTC's exclusive jurisdiction extends to all "agreements" traded on DCMs, and Kalshi's event contracts are certainly DCM-traded "agreements," even if they are not swaps. 7 U.S.C. § 2(a)(1)(A).  Indeed, there can be no dispute that event contracts can be traded on DCMs because the CEA's "Special Rule" grants the CFTC the authority to exclude certain "[e]vent contracts" from DCMs—including contracts involving "gaming"—if the agency determines those contracts are "contrary to the public interest."  *Id.* § 7a-2(c)(5)(C).  That provision would make no sense if all event contracts were excluded from DCMs.

Regardless, Defendants are wrong to assert that Kalshi's event contracts are not swaps. Kalshi's event contracts are structured to make payment "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event" "associated with a potential financial, economic, or commercial consequence."  *Id.* § 1a(47)(A)(ii).  Kalshi's sports-event contracts, for

2

example, turn on events with potential financial consequences for numerous parties, including team sponsors, advertisers, and local businesses.  Thus, as the Third Circuit recently held, "Kalshi's sports-event contracts fit comfortably" within the CEA's definition (ii) of "swap." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 227 (3d Cir. 2026).[2]

Defendants fight this straightforward conclusion by asserting (at 15–16) that Kalshi's event contracts are not swaps because they allegedly depend on outcomes rather than events.  But "outcome" is simply one meaning of "event."  Dictionaries define "event" as "[t]he actual outcome or final result," *Event*, Webster's II New College Dictionary (3d ed. 2005), or "the outcome, issue, or result of anything," *Event*, Webster's Encyclopedic Unabridged Dictionary (1st ed. 2001). Courts agree.  *See Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*, 26 F.3d 1508, 1514–15 (10th Cir. 1994).  And common usage is in accord:  People often refer, for example, to a Super Bowl win as a "major *event* for a team."   Moreover, the relevant definition of "swap" also covers a "contingency"—"something liable to happen as . . . [a] result of something else."  *Contingency*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003).  That term, too, easily encompasses a team winning a game.

Defendants next assert (at 16–17) that Kalshi's contracts are not swaps because sports events are not "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).  To support this argument, Defendants cite (at 16) a dictionary agreeing with Kalshi that "associate[d]" means "join[ed]" or "connect[ed]."  But Defendants then leap to the conclusion (at 17) that an event must have "direct, inherent financial consequence[s]"—even

---

[2] Even the dissent in *Flaherty* agreed that a "plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition."  172 F.4th at 233 (Roth, J., dissenting).  And while Defendants argue (at 13) that *KalshiEX LLC v. Schuler*, 2026 WL 1295806 (6th Cir. Apr. 24, 2026) diminishes *Flaherty*'s persuasive weight, *Schuler* was an unpublished stay order that reached no firm conclusions about the merits.  *Id.* at *1.

3

though their own dictionary requires a mere "connect[ion]" and the statute requires an association with "potential" economic consequences—the opposite of "direct" or "inherent."

Defendants fare no better with their contextual arguments (at 18–20). Everything about Congress's six-part definition of "swap" evidences its intent to define the term broadly. Subsection (iv) sweeps in any agreement "that is, or in the future becomes, commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(iv). Subsection (vi) captures "any combination or permutation of" any agreement described in the other subparts. *Id.* § 1a(47)(A)(vi). Meanwhile, Congress specified exclusions from the definition, *id.* § 1a(47)(B), and authorized the CFTC and SEC to "further define" swap by regulation, *see* 15 U.S.C. § 8302(d)(1), underscoring that it did not want courts to add limitations of their own. *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (where Congress enumerates express exceptions, courts generally should not imply additional ones).

Defendants assert (at 19) that swaps must be "used to hedge existing risk in markets." But the CEA requires only that an event be "associated with a potential financial . . . consequence"— not that each transaction in fact be used for hedging. 7 U.S.C. § 1a(47)(A)(ii). And even if Defendants were right, as the CFTC has explained, "prediction markets allow market participants to hedge exposure to a wide array of events for which no traditional financial instrument otherwise exists," including "sporting events." Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35806, 35807–08, 35830 (proposed June 12, 2026) (to be codified at 17 C.F.R. pt. 40) ("June NPRM") (citation omitted); *see also* Anthony M. Diercks et al., *Kalshi and the Rise of Macro Markets*, Fed. Reserve Bd. (Feb. 12, 2026), https://perma.cc/9EY4-M3HY.

Moreover, the record of hedging on Kalshi grows all the time. An insurance company "expects to hedge about $30 million annually through" Kalshi to help teams and sponsors "manage

4

the financial risks of performance incentives in athletes' and coaches' contracts."[3]    Businesses have used Kalshi "to hedge" on promotions tied to whether particular teams win and by how much.[4]    Defendants are therefore wrong (at 19) that there is no "concrete" evidence of hedging through sports contracts.    And while Defendants complain that these markets attract speculators, that is true of all derivatives:  The "liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982).

Defendants are also wrong (at 20) that adhering to subpart (ii)'s plain meaning would result in superfluity.    Subpart (ii) captures "event"-based swaps not necessarily captured by other subparts.    To be sure, subpart (ii) overlaps with other subparts, but overlap is inevitable even under Defendants' reading, because the swaps identified in subpart (iii)—such as "an interest rate swap" or "credit default swap," 7 U.S.C. § 1a(47)(A)(iii)—overlap substantially with subsection (iv), which includes any agreement "known to the trade as a swap," 7 U.S.C. § 1a(47)(A)(iv).  That the subsections necessarily overlap confirms that Congress intended to define "swap" broadly.  *See Loving v. IRS*, 742 F.3d 1013, 1019 (D.C. Cir. 2014) (Kavanaugh, J.) (Congress sometimes "employ[s] overlap or redundancy so as to remove any doubt and make doubly sure").

Nor does "Congressional intent" support Defendants' cramped reading of "swap." Defendants contend (at 20–21) that because the definition of "swap" was added partially in response to the 2008 financial crisis, Congress must have only been targeting the type of swaps involved in that crisis.    But statutes often reach beyond the "principal evil" that animated them,

---

[3] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times: DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5.

[4] Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the Knicks win.  Its owner is using Kalshi to hedge the risk.*, Bus. Insider (June 2, 2026), https://perma.cc/SFR4-EBKM; Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679.

and "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). In any event, congressional debates in the runup to Dodd-Frank frequently referenced "gambling with credit default swaps" as a reason why "Wall Street reform" was needed. 156 Cong. Rec. S3063 (daily ed. May 4, 2010) (statement of Sen. Boxer). Congress has always been aware of potential overlap between derivatives trading and gambling, and in Dodd-Frank it responded by giving *the CFTC* jurisdiction over swaps involving "gaming"—not banning them outright or handing the states the power to do so. 7 U.S.C. § 7a-2(c)(5)(C).

Defendants argue (at 17) that their extratextual gloss is needed because otherwise the swap definition "knows no limiting principle." But that is wrong. The swap definition excludes events without any prospect of financial consequences, subject to normal principles of causation. Kalshi accordingly does not offer trades on many events that are commonly the subject of sportsbook bets—from the winner of a coin flip to the color of a Gatorade shower. And the CFTC is in the process of imposing still more limits through its recent Notice of Proposed Rulemaking, which sets out a detailed framework regarding which sports event contracts may be traded on a DCM. June NPRM, 91 Fed. Reg. at 35806.[5]

Defendants distort (at 21) the CFTC's position. The CFTC has confirmed that Kalshi's sports-event contracts are swaps because "a sports event has the potential to affect numerous

---

[5] Nor, as Defendants falsely insinuate (at 17), did Kalshi tell the D.C. Circuit that sports-event contracts do not have financial consequences. That litigation concerned whether Kalshi's *election* contracts involved gaming and thus could be subject to public-interest review under the Special Rule. Kalshi distinguished election contracts—which did not even trigger the Special Rule—from sports-event contracts and explained that the Special Rule "empower[ed] the CFTC to at least *review* the category of game-based contracts." Brief of Appellee KalshiEX LLC at 45, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024). Kalshi never suggested that sports-event contracts fall outside of CFTC jurisdiction, and instead confirmed that "the CFTC's 'exclusive jurisdiction' over the derivatives markets preempts any state law that purports to prohibit the trading of a contract on a regulated exchange." *Id.* at 31 (citation omitted). That is the same position Kalshi takes here. It had nothing to do with whether sports-event contracts are swaps.

6

stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities." Amicus Br. of CFTC at 12, *KalshiEX, LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), Dkt. No. 31 (citation modified). The June NPRM likewise explains that sports events "generate billions of dollars in economic activity"—more than sufficient to qualify as "potential" economic consequences. June NPRM, 91 Fed. Reg. at 35807 (citation omitted). It further provides that many sports-event contracts "can be operated consistent with the public interest," *id.* at 35836, while proposing to prohibit others that "present a particular risk of manipulation or market disruption" as contrary to the public interest, *id.* at 35829.

Defendants respond (at 21) by accusing the CFTC of changing positions. But the CFTC has *always* maintained that its exclusive jurisdiction preempts state regulation of instruments traded on DCMs. In the 1970s, the CFTC recognized that the CEA "preempt[s]" state laws as to DCM-traded instruments—including laws that would bar futures as "illegal gambling contracts." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 700 (1982) (citation omitted). In 2008, the CFTC recognized that the "CEA supersedes and preempts other laws, including state and local gaming and bucket shop laws, with respect to transactions executed on . . . a Commission-regulated market." Concept Release, 73 Fed. Reg. 25669, 25673 (May 7, 2008).

Defendants erroneously assert (at 21) that a 2012 regulation defining "swap" is to the contrary. But that definition helps Kalshi, not Defendants. Pursuant to an express delegation of authority to further define terms like "swap," 15 U.S.C. § 8302(d)(1), the CFTC explained that instruments that are "traded on an organized market or over-the-counter" (like event contracts) are swaps and those that are not traded on exchanges (like insurance contracts or sports bets) are not. Further Definition of "Swap," 77 Fed. Reg. 48208, 48247–48 (Aug. 13, 2012). That distinction

7

closely tracks the scope of the CFTC's "exclusive jurisdiction" under the CEA, which covers instruments "traded or executed" on a DCM, not untradeable insurance contracts or sports bets.

Defendants nonetheless assert (at 22–23) that treating sports event contracts as swaps would transform the CFTC into the nation's "*sole* regulator for things like sports betting." In making this argument, Defendants rely on 7 U.S.C. § 2(e), which provides that swaps must be "entered into on, or subject to the rules of, a board of trade designated as a contract market" under the CEA. But again, sports bets are not swaps because they "are not traded on an organized market or over the counter." 77 Fed. Reg. at 48214. Nor is that reasoning "circular," as Defendants suggest (at 22). Casinos and sportsbooks do not structure their bets to be tradeable, nor are those actually traded anywhere. Accordingly, Section 2(e)—which governs where and how swaps must be traded—has no application to traditional sports bets.

Defendants' reliance on the major-questions doctrine (at 23) is also misplaced. That doctrine applies where a federal agency relies on "vague" statutory language to assert authority to make "decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716, 723 (2022) (citation omitted). But here, there is no statutory ambiguity: Congress expressly addressed the CFTC's authority over instruments traded on DCMs through the "exclusive jurisdiction" provision, 7 U.S.C. § 2(a)(1)(A), and it expressly granted the CFTC discretion regarding whether certain categories of "[e]vent contracts" should be traded on DCMs through the Special Rule, *id.* § 7a-2(c)(5)(C)(i). Moreover, granting a federal agency the authority to determine what can be traded on federally regulated exchanges is hardly an "[e]xtraordinary grant[] of regulatory authority." *West Virginia*, 597 U.S. at 723.

Finally, Defendants' resort to other statutes (at 23–24) fails. Recognizing the CEA grants the CFTC exclusive jurisdiction over DCM-traded event contracts does not impliedly repeal IGRA

8

or the Wire Act because neither regulates DCM-traded instruments.  Rather, UIGEA provides that the term "bet or wager" "does not include" "any transaction" conducted on "a registered entity" under the CEA.  31 U.S.C. § 5362(1)(E)(ii).  Defendants misunderstand (at 24 n.7) UIGEA's import.  UIGEA postdates both IGRA and the Wire Act, and UIGEA's definition is entitled "to great weight" in resolving the meaning of prior statutes addressing the same subject matter.  *Bob Jones Univ. v. United States*, 461 U.S. 574, 587 n.10 (1983) (citation omitted).  Interpreting IGRA and the Wire Act to exclude on-DCM trading harmonizes them with the CEA and UIGEA, fulfilling the obligation to "regard each as effective" to the extent they "are capable of co-existence."  *In re Am. River Transp. Co.*, 800 F.3d 428, 433 (8th Cir. 2015) (citation omitted); *see also Blue Lake Rancheria v. Kalshi Inc.*, 2025 WL 3141202, at *1 (N.D. Cal. Nov. 10, 2025) (holding that the CEA governs event contracts over purportedly contrary laws).[6]

2.    The CEA Preempts State Regulation of On-DCM Trading.

Rhode Island's laws are subject to express, field, and conflict preemption.  Defendants' arguments to the contrary fail.

Express Preemption:  The CEA grants the CFTC "exclusive jurisdiction" over event contracts traded on DCMs.  Defendants fail to distinguish the authorities holding that a grant of exclusive jurisdiction preempts state law.  The "explicit statutory conferral of exclusive jurisdiction . . . is a form of express preemption" because it "withdraws any concurrent jurisdiction" state authorities might otherwise possess.  *Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151–152 (3d Cir. 2024); *see Slaney v. Int'l Amateur Athletic Fed'n*,

---

[6] While this Court need not resolve the issue, Defendants err in contending (at 24) that Kalshi's contracts are not futures or options in "excluded commodities."  Since 2000, excluded commodities have included intangibles, including "occurrence[s]" that are "associated with a financial, commercial, or economic consequence."  7 U.S.C. § 1a(19)(iv).  The CFTC therefore recognized in 2008 that "[e]vent contracts" can "exhibit the attributes of either options or futures contracts."  73 Fed. Reg. at 25670.

9

244 F.3d 580, 595 (7th Cir. 2001); *Heart of Am. Grain Inspection Serv., Inc. v. Mo. Dep't of Agric.*, 123 F.3d 1098, 1103 (8th Cir. 1997); *Duke Energy Trading & Mktg., L.L.C. v. Davis*, 267 F.3d 1042, 1057 (9th Cir. 2001). And the presumption favoring concurrent jurisdiction is "rebutted" precisely where—as here—Congress confers "exclusive jurisdiction" on a federal authority. *Tafflin v. Levitt*, 493 U.S. 455, 459 (1990).

Defendants suggest (at 25–26) that the "exclusive jurisdiction" provision does not expressly preempt state laws because Congress used different phrases to describe its preemptive intent in other parts of the CEA. But because preemption requires no "particular linguistic formulation," *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 99 (2016), the absence of the words "preempt" or "supersede" from the exclusive-jurisdiction grant is immaterial—especially because the savings clause confirms that state law is "supersede[d]" as "provided" by that grant. 7 U.S.C. § 2(a)(1)(A).

Defendants argue that (at 25–26) Congress's choice to "enact express preemption provisions [elsewhere] in the CEA" shows that Congress did not otherwise intend preemption. Not so. For one thing, the "exclusive jurisdiction" provision *is* an "express preemption" provision. For another, "the existence of an express preemption provision does not . . . make it more difficult to establish the preemption of laws falling outside the clause." *Arizona v. United States*, 567 U.S. 387, 406 (2012) (citation modified). And for still another, the CEA's other preemption provisions reinforce the CFTC's exclusive jurisdiction over DCM-traded instruments. Section 16(e)(2) preempts state gaming and bucket shop laws with respect to certain off-DCM transactions that are nonetheless regulated by the CEA. When Congress enacted this provision in 2000, it recognized that "the current" CEA already "supersedes and preempts" state law "in the case of transactions conducted on a registered entity," like a DCM. H.R. Rep. No. 106-711, pt. 2, at 71 (2000). Thus,

10

Defendants are wrong (at 26) to suggest that § 16(e)(2) would be "superfluous" if § 2(a)(1)(A) already preempted state gaming law because § 2(a)(1)(A) only applies to *on*-DCM transactions; § 16(e)(2) extends the preemptive scope of the statute by "add[ing]" that "gaming and bucket shop laws" are preempted for certain *off*-DCM transactions as well. H.R. Rep. No. 106-711, pt. 2, at 71. Likewise, Section 16(h) prevents states from applying insurance law to all swaps, including over-the-counter swaps outside the CFTC's exclusive jurisdiction under Section 2(a).

Defendants are even further afield in arguing (at 28) that Section 2(a)'s savings clause preserves states' parallel authority with respect to contracts traded *on* DCMs. The clause preserves state authority only "except as hereinabove provided"—that is, except with respect to the CFTC's "exclusive jurisdiction" over DCMs. 7 U.S.C. § 2(a)(1)(A). Indeed, Congress contemplated exactly this division of labor in 1974: It specifically deleted a clause in the prior act that had "preserv[ed] state control" in the area of commodities trading. *Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947). Congress removed that provision "to assure that Federal preemption is complete." 120 Cong. Rec. S30464 (daily ed. Sep. 9, 1974); *see Flaherty*, 172 F.4th at 230.

Defendants err in suggesting (at 28) that the CEA's pre-Dodd-Frank history is irrelevant because Congress added swaps to the CFTC's jurisdiction in Dodd-Frank. Congress amended the CEA to give the CFTC exclusive jurisdiction in 1974, and Congress's 1982 and 2000 enactments each confirmed that the CEA already "supersedes and preempts" state law as to on-DCM transactions. When Congress added "swaps" to the CFTC's exclusive jurisdiction in Dodd-Frank, it would have been unmistakably clear that doing so preempted state regulation of swaps traded on DCMs. S. Rep. No. 93-1131, at 31 (1974); H.R. Rep. No. 97-565, pt. 1, at 44 (1982); H.R. Rep. No. 106-711, pt. 2, at 71; *see Flaherty*, 172 F.4th at 226.

11

Defendants assert (at 24) that there is a "general presumption" against preemption.  But no such presumption applies where, as here, a statute expressly preempts state law, *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016), or "when the State regulates in an area where there has been a history of significant federal presence," *United States v. Locke,* 529 U.S. 89, 108 (2000).

Field Preemption:  As the Third Circuit explained, states' efforts to regulate DCM-traded instruments are field preempted because the CEA "grants the CFTC exclusive jurisdiction over" "swaps" "traded or executed on a [DCM]." *Flaherty*, 172 F.4th at 228–229 (citation omitted).

Defendants claim (at 29) that Rhode Island is not field preempted from regulating event contracts on DCMs because the CEA's "Special Rule carves out space for continued State regulation of contracts relating to 'gaming.'"  That is flat out wrong.  The Special Rule gives *the CFTC* discretion to exclude certain "gaming" contracts from DCMs if *the CFTC* believes they are contrary to the public interest.  7 U.S.C. § 7a-2(c)(5)(C)(i).  The Special Rule does not give states any right to regulate contracts that the CFTC has permitted on DCMs.  And Defendants are equally wrong in asserting (at 29) that the CFTC has "bann[ed]" sports event contracts on DCMs under 17 C.F.R. § 40.11(a).  The CFTC "has consistently applied § 40.11 to operate a discretionary review framework rather than a self-executing *per se* prohibition, because the opposite interpretation would violate the statute."  June NPRM, 91 Fed. Reg. at 35815.  Rule 40.11(c) also clearly allows the CFTC (not 50 states) to "approv[e] or disapprov[e]" any contract under the Special Rule.  Regardless, the June NPRM explains that the CFTC is in the process of replacing Rule 40.11 with a new rule clarifying that sports-event contracts are *not* (and never have been) categorically prohibited, that they are instead subject to public-interest review, and that many sports-event

12

contracts "can be operated consistent with the public interest."  June NPRM, 91 Fed. Reg. at 35813, 35836.

Defendants also err in arguing (at 29–30) that the appropriate "field" is state gaming law. As the Third Circuit explained, the proper field is "the regulation of trading on a DCM" rather than the broader field of "gambling."  *Flaherty*, 172 F.4th at 228–229 (citation omitted).  Defendants' contrary argument misunderstands the nature of the preemption inquiry.  The question is not whether the CEA displaces all state gambling regulation—it plainly does not.  The question is whether Congress fully occupied the narrower field the CEA governs—regulating trading on DCMs.  The answer, as other courts have held, is yes.  *See, e.g.*, *id.* at 228.

Were it otherwise, states could evade preemption by relabeling federally regulated instruments as "gambling."  If a state reclassified index futures as "wagers" and banned them, that state law would be perfectly permissible under Defendants' framework.  But, as the CFTC has explained, "States cannot invade the CFTC's exclusive jurisdiction" "by re-characterizing swaps trad[ed] on DCMs as illegal gambling."  *See* Amicus Br. of CFTC at 2, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ("CFTC Amicus Br.").

Conflict Preemption:  Defendants maintain (at 31–35) there is no conflict preemption because Kalshi can comply with both Rhode Island law and the CFTC's "impartial access" requirement by ceasing to offer its event contracts everywhere.  But the Supreme Court squarely rejected a similar contention, explaining that if ceasing to act altogether were enough to defeat impossibility preemption, it would be "all but meaningless."  *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 488 (2013) (citation omitted).

Defendants also err (at 32) in recasting the impartial-access rule as a mere anti-discrimination check that a neutral, state-by-state exclusion would satisfy.  Defendants identify no

13

DCM in the CFTC's history that has operated state-by-state, and forcing Kalshi to match only intrastate traders would fragment a single nationwide market into fifty siloed liquidity pools in which identical contracts trade at different prices—a form of geographic price discrimination antithetical to the impartial-access Core Principle.  17 C.F.R. § 38.151(b); 7 U.S.C. § 5(a).  And the CFTC has expressly rejected Defendants' reading, explaining that it is "impossible" for Kalshi and all other DCMs to provide impartial access to its markets and services *and* comply with state gaming laws.  Mem. of Law in Supp. of Proposed Mot. for Prelim. Inj. at 20, Dkt. No. 23-1; CFTC Amicus Br. 23–24, 26–27.

Defendants likewise err in dismissing (at 33–34) Kalshi's argument that forcing it to comply with Rhode Island gaming laws would be an obstacle (and therefore conflict) with Congress's objective to bring futures markets "under a *uniform* set of regulations."  *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992) (emphasis added); *see also Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990) (finding conflict preemption where state regulation was "at odds with the goal of uniformity that Congress sought to implement"); *Monsanto Co. v. Durnell*, 2026 WL 1825691, at *6 (U.S. June 25, 2026) (state law preempted where federal "[u]niformity" "would otherwise be impossible to achieve").  Thus, the Third Circuit held that enforcement of state gambling laws "would create an obstacle to executing the [CEA] because such state enforcement would prohibit Kalshi, which operates a licensed DCM under the exclusive jurisdiction of the CFTC, from offering its sports-related event contracts," resulting in "exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230.

Finally, Defendants fail to acknowledge that Rhode Island law plainly conflicts with the Special Rule, which grants the CFTC the discretionary power to bar certain "event contracts" from

14

DCMs if it determines that those contracts are contrary to the "public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). Defendants (at 32) attempt to characterize the Special Rule as a law "against gaming and other contracts in violation of state law." But that ignores two key features of the Special Rule: 1) it provides that the CFTC "may"—not must—prohibit certain event contracts; and 2) it grants that discretion to the CFTC alone. *Id.* Rhode Island's efforts to usurp the CFTC's discretion by policing event contracts itself are therefore directly contrary to the CEA.

**B.    Kalshi Will Suffer Irreparable Harm Without a Preliminary Injunction.**

Kalshi's opening brief catalogued multiple ways Kalshi would be irreparably harmed if forced to comply with preempted state laws. Defendants' efforts to dispute these injuries fail.

Defendants attempt (at 35) to dismiss Kalshi's risk of harm based on their representation that, while Kalshi's preliminary-injunction motion is pending, they will not enforce state gambling laws against Kalshi without "provid[ing] sufficient notice to [Kalshi] and to the [Court]" and giving the Court time to "address[] the issue with counsel." But that is a far cry from a promise not to enforce the state's gambling laws against Kalshi until the litigation is finally concluded— the relief necessary to ensure Kalshi does not incur the irreparable harms it catalogued in its opening brief. Indeed, Defendants' assertion that Kalshi does not need a preliminary injunction because there is no danger of enforcement against Kalshi is belied by Defendants' own arguments (at 39–41) that a preliminary injunction should not issue because it would inhibit the state's ability to enforce its gambling laws against Kalshi.

Defendants further assert (at 36) that because their priority is seeking a declaratory judgment, Kalshi does not face a "Hobson's choice." This strains credulity. Rhode Island's complaint's primary form of relief sought is a permanent injunction preventing Kalshi from "offering sports-related" event contracts within Rhode Island. Complaint ¶ 117, *Rhode Island v.*

15

*KalshiEX LLC*, No. 26-cv-00333 (D.R.I. May 22, 2026), Dkt. No. 1-1.  The Third Circuit has already held that Kalshi faces irreparable harm from the Hobson's choice presented by state regulation:  on one hand, criminal and civil liability for non-compliance; on the other, federal regulatory jeopardy, loss of business, and reputational harm from compliance.  *Flaherty*, 172 F.4th at 231–32.  That analysis applies with greater force here, where Defendants seek to criminalize Kalshi's operations.

Defendants' remaining harm arguments also fail.  Their contention (at 38) that Kalshi's compliance costs are not irreparable ignores that those costs cannot be recouped from state officials shielded by sovereign immunity.  *NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025); *see Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000); *see also United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983).  Defendants' assertion (at 38) that Kalshi would not be harmed by geofencing because two other states have already required Kalshi to geofence disregards that any and all geofencing is contrary to CFTC's impartial access requirement.  The more geofencing Kalshi is required to do, the greater the harm to Kalshi.  And Defendants are wrong that harm to Kalshi's users is irrelevant.  Abruptly liquidating positions and fragmenting Kalshi's nationwide market would inflict loss of competitive position and goodwill on Kalshi itself—harms that courts cannot "easily compensate."  *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 643 (6th Cir. 2025).

**C.     The Balance of the Equities and Public Interest Favor a Preliminary Injunction.**

Defendants claim (at 41) that a preliminary injunction would run contrary to the public's interest in allowing the state to maintain "full operational control over wagering conducted within its borders."  But that principle plainly does not apply where the law in question violates the Constitution.  Rather, "it is always in the public interest to prevent violation of a party's constitutional rights."  *Acosta v. Restrepo*, 470 F. Supp. 3d 161, 168 (D.R.I. 2020) (citation

16

omitted); *see D.M. v. Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) (same). And multiple courts have now held that states have no legitimate interest in enforcing their preempted laws against Kalshi. *See Flaherty*, 172 F.4th at 231–32; *KalshiEX LLC v. Johnson*, 2026 WL 1223373, at *9 (D. Ariz. May 5, 2026); *KalshiEX LLC v. Orgel*, 2026 WL 474869, at *11 (M.D. Tenn. Feb. 19, 2026).

Defendants' contention (at 40–41) that the equities favor the state because its statute is motivated by public-safety concerns does not shift the balance. The CFTC's comprehensive regulatory framework addresses these concerns through market-surveillance requirements, anti-manipulation provisions, and enforcement authority. *See, e.g.*, 17 C.F.R. §§ 38.950, 1.31; *id.* § 38.1101(a)(2); *id.* pt. 38. Moreover, the CFTC's June NPRM sets forth a detailed proposal for regulating prediction markets. *See* June NPRM, 91 Fed. Reg. at 35855 (explaining the CFTC's role is to "protect market participants and the public" by "discouraging harmful incentives or illicit conduct, ensuring clear settlement and market safeguards, deterring misuse of material non-public information and manipulation, and mitigating risks for all participant types"); *see also* Frank N. Fisanich, Prediction Markets Advisory, CFTC LTR No. 26-08, at 1 (Mar. 12, 2026) (providing DCMs with guidance regarding their responsibilities as to the listing of event contracts that may carry risk of manipulation). The federal government is not ignoring the concerns Defendants have raised; it is addressing them through the regulatory framework that Congress established. Allowing Rhode Island to impose its gaming laws on Kalshi would undermine the careful balance that Congress struck in the CEA.

Beyond that, the failure to issue an injunction here would "reach beyond the parties involved directly in the suit and impact . . . the public's right[s]." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 381 (1992). Users nationwide face substantial distortion of markets and

17

contract prices.  Decl. of Xavier Sottile ¶¶ 42–48, Dkt. No. 5-5.  Given that the Rhode Island laws are preempted as applied to Kalshi, the balance of the equities and public interest firmly favor preliminary relief.

## CONCLUSION

For the foregoing reasons, the Court should issue a preliminary injunction.

18

DATED:  June 30, 2026

Respectfully submitted,
**MILBANK LLP**

By:   /s/ Colleen E. Roh Sinzdak

Neal Katyal (*pro hac vice*)
Joshua B. Sterling (*pro hac vice*)
Colleen E. Roh Sinzdak (*pro hac vice*)
William E. Havemann (*pro hac vice*)
**MILBANK LLP**
1101 New York Avenue NW
Washington, D.C. 20005
Telephone:  202-835-7500
Facsimile:  202-263-7586

Grant R. Mainland (*pro hac vice*)
Andrew L. Porter (*pro hac vice*)
Matthew J. Laroche (*pro hac vice*)
Nicole D. Valente (*pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone:  212-530-5000
Facsimile:  212-530-5219

Ryan M. Gainor (#9353)
Mackenzie C. McBurney (#10098)
**HINCKLEY, ALLEN & SNYDER LLP**
100 Westminster Street, Suite 1400
Providence, RI 02903-2319
Telephone:  401-274-2000
Facsimile:  401-277-9600
rgainor@hinckleyallen.com
mmcburney@hinckleyallen.com

*Attorneys for Plaintiff KalshiEX LLC*

19

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed through the ECF system on June 30, 2026 and will be sent electronically to the registered participants identified on the Notice of Electronic Filing.

*Colleen E. Roh Sinzdak*
Colleen E. Roh Sinzdak